# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____

IMMANUEL CAMPBELL, RUBIN CARTER,          )
MARKEES SHARKEY, DEONTE BECKWITH,         )
CHANTE LINWOOD, RACHEL JACKSON,           )
BLACK LIVES MATTER CHICAGO,               )
BLOCKS TOGETHER, BRIGHTON PARK            )
NEIGHBORHOOD COUNCIL, JUSTICE FOR         )      Case No. 17cv4467
FAMILIES – BLACK LIVES MATTER CHICAGO,    )      (Class Action)
NETWORK 49, WOMEN'S ALL POINTS BULLETIN,  )
 and 411 MOVEMENT FOR PIERRE LOURY,       )
                                          )
on behalf of themselves and a class of    )
similarly situated persons,               )
                                          )
     Plaintiffs,                          )
                                          )
          v.                              )
                                          )
CITY OF CHICAGO, and CHICAGO POLICE       )
OFFICERS MIGUEL VILLANUEVA (#17423),      )
JOSUE A. ORTIZ (#15448), DOROTHY CADE (#7814), )
RICHARD BOLIN (#14590), PETER JONAS (#5069), )
BRETT POLSON (#5612), ANGEL PENA (#7135), )
WAUKEESHA MORRIS (#8255),                 )
JAEHO JUNG (#13387),JOHN CORIELL (#14274), )
CHAD BOYLAN (#8200), THOMAS MCGUIRE (#1337), )
ANTHONY OSTROWSKI (#15324),               )
LAWRENCE GADE JR. (#1841),                )
and JOHN LAVORATA (#8464),                )
                                          )
in their individual capacities,           )
                                          )
     Defendants.                          )
_____  )

## CLASS ACTION COMPLAINT

Plaintiffs IMMANUEL CAMPBELL, RUBIN CARTER, MARKEES SHARKEY, DEONTE BECKWITH, CHANTE LINWOOD, and RACHEL JACKSON, individually and on behalf of a class of similarly situated individuals in the City of Chicago who have been or in the future will be subject to use of force by Chicago Police Department (the "CPD" or "Chicago Police" or "Department") officers, as well as Organizational Plaintiffs Black Lives Matter Chicago, Blocks Together, Brighton Park Neighborhood Council, Justice for Families – Black Lives Matter Chicago, Network 49, Women's All Points Bulletin, and 411 Movement for Pierre Loury, file this class action Complaint for declaratory and injunctive relief against the City of Chicago, as well as CPD Officers Miguel Villanueva, Josue A. Ortiz, Richard Bolin, Dorothy Cade, Waukeesha Morris, Angel Pena, Peter Jonas, Brett Polson, Jaeho Jung, Thomas McGuire, Chad Boylan, John Coriell, Anthony Ostrowski, Lawrence Gade Jr., and John Lavorata, in their individual capacities, and allege as follows:

### INTRODUCTION

1.      Our nation's founding doctrines provide a bulwark against violations of official power, including abuses by law enforcement. The Constitution and federal and state laws prevent police officers from exploiting their positions of authority to subject individuals to unwarranted physical violence, threats, and abuse. The City of Chicago

2

has violated and continues to violate these longstanding canons of fairness and equality. Acting through the CPD, the City of Chicago promotes a culture of rampant brutality, especially against people of color.

2.      For years and continuing to this day, the City of Chicago has employed a pattern and practice of excessive force that adversely affects all people in Chicago, but that disproportionately and intentionally targets Black and Latinx individuals.

3.      The CPD's pattern of civil rights violations against people of color is well-documented. Between 2005 and 2015, the CPD reported using force on adults approximately 42,500 times. In 30,736 cases the subject was Black, and in 6,364 cases the subject was Latinx.

4.      That means Black people—who make up approximately one-third of the City's population—comprised *72 percent* of the cases where adults were subjected to CPD use of force over a ten year period. Whites, who make up a similar portion of the city's population, were just over 9 *percent* of CPD use of force cases.

5.      Black men between the ages of 20 and 34 experience force at a rate about 14 times that of their white counterparts. Black women in the same age range are about ten times as likely to experience force as their white counterparts.[1]

---

[1] The CPD does not collect data on individuals who identify as gender non-binary. All CPD data is tracked by reference to men and women.

6.      Latinxs are subject to much higher rates of CPD force as well—more than double the rate for whites between 2005 and 2015. From 2013 to 2015, people in predominantly Latinx districts were subject to police force at a rate 20 percent higher than in white-majority districts.

7.      Despite these disparities, Black and Latinx complainants rarely receive relief for the abuse they suffer at the hands of the CPD. No reasonable system of police accountability exists, and the system that does exist is discriminatorily applied. Between January 2011 and March 2016, white complainants were three times more likely than Black complainants and six times more likely than Latinx complainants to have their allegations of excessive force upheld.

8.      The violations and injuries alleged herein have been recognized by the U.S. Department of Justice (the "DOJ"), the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the communities affected by police violence. Over the years, these official abuses have caused grievous harm to individuals in this City, including the named Plaintiffs, their families, the Plaintiff organizations, and the communities the named Plaintiffs seek to represent.

9.      The City of Chicago's *de facto* policies, practices, and customs, which give rise to the violations alleged in this Complaint, have gone unchecked through multiple

4

iterations of municipal leadership, including under Mayor Rahm Emanuel and

Superintendent Eddie Johnson.

10.     The City continues to pay out tens of millions of taxpayer dollars each

year as a result of its pattern and practice of police brutality. The City has proven that it

would rather pay for its officers' continued use of excessive force than remedy the

underlying problems giving rise to the abuses in the first place.

11.     Absent federal court supervision, nothing will improve. Internal revisions

to the CPD's accountability and operational structures have failed to ameliorate

conditions on the ground for those subjected on a daily basis to police abuse. CPD

policy changes, implemented over the years and supposedly as recently as May 2017,

are superficial changes in name only. Personnel shifts have also failed to correct the

systematic deficiencies giving rise to the constitutional violations alleged herein.

12.     CPD officers abide by an ingrained code of silence and "warrior

mentality" wholly disconnected from the policies that exist on the books. The "thin blue

line" reigns supreme. The City of Chicago has proven time and time again that it is

incapable of ending its own regime of terror, brutality and discriminatory policing.

13.     It is clear that federal court intervention is essential to end the historical

and on-going pattern and practice of excessive force by police officers in Chicago.

14.     The named individual and organizational Plaintiffs seek a city-wide, class action injunction prohibiting the abusive policies and practices undergirding the alleged constitutional and state law violations alleged herein. These unconstitutional policies include: the adoption, approval and promotion of a system of discriminatory policing that targets Black and Latinx people who reside in or visit the City of Chicago; the CPD's use of excessive force, particularly against people of color, by a variety of methods, including Taser use, shootings, vehicular violence, baton use, use of chemical agents, physical harassment during baseless street stops, and hand-to-hand violence such as body slams, emergency take-downs, arm locks, chokeholds, punching, kicking, and slapping; the CPD's use of excessive force and physical harassment targeting youth of color; the CPD's reliance upon overly aggressive tactics that lead to unnecessary escalation and excessive force; the perpetuation of a code of silence and a failure of accountability within the CPD that allows officers to abuse individuals—egregiously, repeatedly—with impunity; the City's failure to train the 12,000 members of the CPD, many of whom regularly use force against residents and visitors of Chicago without proper safeguards; and inadequate municipal data collection systems that impede accountability and transparency in the CPD. Each together results in an overarching pattern of excessive force.

15.     This is an injunctive civil rights action Complaint filed on behalf of a class

of all persons who, since June 14, 2015, have been, or in the future will be, subjected to

uses of force by the CPD. Plaintiffs also seek relief on behalf of a subclass consisting of

the Black and Latinx members of the larger class. This lawsuit is brought against the

City of Chicago for violations of the Fourth and Fourteenth Amendments of the United

States Constitution, pursuant to 42 U.S.C. § 1983, and Illinois state law, including the

Illinois Civil Rights Act of 2003, 740 ILCS 23/5. The individual named Plaintiffs

individually seek monetary damages against the City of Chicago and individual CPD

officers for the harm they incurred as a result of the City's policies and practices. But all

Plaintiffs primarily seek declaratory and injunctive relief on behalf of the entire city-

wide class, so as to put an end, once and for all, to the CPD's practice of subjecting the

people of Chicago—especially people of color—to excessive and brutal force.

## JURISDICTION AND VENUE

16.     This case arises under the U.S. Constitution and the laws of the United

States. The case presents a federal question within this Court's jurisdiction under Article

III of the Constitution and 28 U.S.C. § 1331; this Court also has jurisdiction under 28

U.S.C. § 1343(3) to redress the deprivation, under color of state law, of any right,

privilege, or immunity secured by the U.S. Constitution. The Court has supplemental

jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law,
including the Illinois Civil Rights Act.

17.     Plaintiffs seek remedies under 28 U.S.C. §§ 2201 and 2002, 42 U.S.C.
§§ 1983 and 1988, and Rule 65 of the Federal Rules of Civil Procedure. This Court may
issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).

18.     Venue is proper in the United States District Court for the Northern
District of Illinois under 28 U.S.C. § 1391(b) as a substantial part of the events or
omissions giving rise to the Plaintiffs' claims occurred in this district.

## INDIVIDUAL PARTIES

### *Plaintiffs*

19.     Plaintiff IMMANUEL CAMPBELL is a 22-year-old Black man who resides
in Chicago, but attends school at the University of Illinois at Urbana-Champaign. On
July 9, 2016, during a peaceful demonstration, Mr. Campbell was subjected to excessive
force, false arrest and malicious prosecution by CPD Officers John Coriell (#14274),
Anthony Ostrowski (#15324), Thomas McGuire (#1337), and Chad Boylan (#8200) in the
South Loop neighborhood of downtown Chicago. Mr. Campbell is likely to be subjected
to future unconstitutional and illegal uses of force by the CPD, under the policies and
practices described herein. Mr. Campbell brings this action on behalf of himself, and a
class of similarly situated individuals who are subject to the CPD's use of force, and

seeks injunctive and declaratory relief. Mr. Campbell also seeks monetary damages on behalf of himself.

20.     Plaintiff RUBIN CARTER is a 30-year-old Black man who resides in Forest Park, Illinois. He is a regular visitor to the City of Chicago, where his family resides. On April 8, 2017, he was subjected to excessive force and false arrest by CPD Officers Josue A. Ortiz (#15448) and Miguel Villanueva (#17423) in the West Town neighborhood of the City of Chicago. Mr. Carter is likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Mr. Carter brings this action on behalf of himself, and a class of similarly situated individuals who are subject to the CPD's use of force, and seeks injunctive and declaratory relief. Mr. Carter also seeks monetary damages on behalf of himself.

21.     Plaintiff MARKEES SHARKEY is a 19-year-old Black man who resides in Chicago, Illinois. On October 6, 2015, he was subjected to excessive force and false arrest by CPD Officer Richard Bolin (#14590) in the West Pullman neighborhood of the City of Chicago. Officers Dorothy Cade (#7814) and Waukeesha Morris (#8255) failed to intervene to prevent Officer Bolin's abuse of Mr. Sharkey, or otherwise report Officer Bolin's use of unnecessary and excessive force. Mr. Sharkey is likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Mr. Sharkey brings this action on behalf of himself, and a

9

class of similarly situated individuals who are subject to the CPD's use of force, and

seeks injunctive and declaratory relief. Mr. Sharkey also seeks monetary damages on

behalf of himself.

22.     Plaintiff DEONTE BECKWITH is a 23-year-old Black man who resides in

Chicago, Illinois. On July 16, 2016, he was subjected to excessive force and false arrest

by CPD Officers Peter Jonas (#5069), Brett Polson (#5612), Angel Pena (#7135), and Jaeho

Jung (#13387) in the South Shore neighborhood of Chicago. Mr. Beckwith is likely to be

subjected to future unconstitutional and illegal uses of force by the CPD, under the

policies and practices described herein. Mr. Beckwith brings this action on behalf of

himself, and a class of similarly situated individuals who are subject to the CPD's use of

force, and seeks injunctive and declaratory relief. Mr. Beckwith also seeks monetary

damages on behalf of himself.

23.     Plaintiff CHANTE LINWOOD is a 28-year-old Black woman who resides

with her children in Chicago, Illinois. On April 3, 2016, she was subjected to excessive

force by CPD Officers Lawrence Gade Jr. (#1841) and John Lavorata (#8464) in the Gold

Coast neighborhood of Chicago. Ms. Linwood is likely to be subjected to future

unconstitutional and illegal uses of force by the CPD, under the policies and practices

described herein. Ms. Linwood brings this action on behalf of herself, and a class of

similarly situated individuals who are subject to the CPD's use of force, and seeks

injunctive and declaratory relief. Ms. Linwood also seeks monetary damages on behalf of herself.

24.     Plaintiff RACHEL JACKSON is a 26-year-old Black woman who resides in Chicago, Illinois. On April 3, 2016, she was subjected to excessive force by CPD Officers Lawrence Gade (#1841) and John Lavorata (#8464) in the Gold Coast neighborhood of Chicago. Ms. Jackson is likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Ms. Jackson brings this action on behalf of herself, and a class of similarly situated individuals who are subject to the CPD's use of force, and seeks injunctive and declaratory relief. Ms. Jackson also seeks monetary damages on behalf of herself.

25.     Plaintiff BLACK LIVES MATTER CHICAGO is an organization that fights for justice with families most impacted by race-based violence and marginalization of Black communities, while working to create just and equitable systems. Black Lives Matter Chicago works to end state violence and criminalization of Black communities by deconstructing the white supremacist, capitalist patriarchy. Individual members of Black Lives Matter Chicago live in or regularly travel through Chicago and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Police violence forces Black Lives Matter Chicago to spend additional time and money addressing police abuses

encountered by its members, diverting resources away from Black Lives Matter's

mission of creating just and equitable systems for all. Black Lives Matter Chicago brings

this action on its own behalf and as an organizational representative for its members.

Black Lives Matter Chicago participates as a plaintiff only for purposes of securing

declaratory and injunctive relief.

26.     Plaintiff BLOCKS TOGETHER ("BT") is a membership-based community

organizing group in the West Humboldt Park neighborhood on Chicago's West Side.

BT empowers residents to work together for systematic changes that bring concrete

improvement to their lives. BT tackles social justice issues relating to education,

housing, economic justice, and the criminalization of youth. Discriminatory policing is

an area of concern for BT. Individual members of BT live in or regularly travel through

Chicago, especially the West Humboldt Park neighborhood, and have been or are likely

to be subjected to future unconstitutional and illegal uses of force by the CPD, under the

policies and practices described herein. Individual members are particularly likely to be

affected given the level of police abuse in that neighborhood. Police violence forces BT

to spend additional time and money addressing police abuses encountered by its

members, diverting resources away from the organization's focus on other social justice

issues critical to its mission, including education, housing, and economic justice. BT

brings this action on its own behalf and as an organizational representative for its

members. BT participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

27.     Plaintiff BRIGHTON PARK NEIGHBORHOOD COUNCIL (BPNC) is a community-based, nonprofit organization serving a working-class neighborhood on Chicago's Southwest Side. BPNC's mission is to create a safer community, improve the learning environment at public schools, preserve affordable housing, provide a voice for youth, protect immigrant rights, promote gender equality, and end all forms of violence, including police violence. Individual members of the BPNC live in or regularly travel through Chicago, particularly the Brighton Park neighborhood, and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Of the 197 allegations of police abuse made in the Brighton Park neighborhood between 2011 and 2015, 50 percent of the complaints were made by Latinx residents and 18 percent were made by Black residents. Police violence forces the BPNC to spend additional time and money addressing police abuses encountered by its members, diverting resources away from the organization's focus on other social justice issues critical to its mission, including education, housing, immigration, and gender issues. The BPNC brings this action on its own behalf and as an organizational representative. The BPNC participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

28.     Plaintiff JUSTICE FOR FAMILIES – BLACK LIVES MATTER CHICAGO is an organization committed to working with families impacted by violence, including state and police violence. Justice for Families designs campaigns, strategies, and direct actions with families so they can fight for justice for their loved ones. It provides financial support to families after a loss, as well as safe healing spaces for families to talk about their experiences and console each other. Individual members of the Justice for Families live in or regularly travel through Chicago and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Police violence forces Justice for Families to spend additional time and money addressing police abuses encountered by its members, diverting resources away from the organization's focus on issues of non-state violence that impacts families. Justice for Families brings this action on its own behalf and as an organizational representative for its members. Justice for Families participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

29.     Plaintiff NETWORK 49 is a progressive, community-led political organization committed to organizing and advocating for policies and elected leadership that advance a high quality of community life, benefiting all residents in the 49th Ward of the City of Chicago. Network 49 works through community-led and open processes to identify the key issues of concern for its community and its neighbors.

Those concerns include opposing the privatization of public education and defending neighborhood schools, improving community safety, and promoting balanced community development. Discriminatory policing is an area of concern for Network 49. Individual members of Network 49 live in or regularly travel through Chicago, particularly the Rogers Park, Edgewater, and West Ridge neighborhoods, and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Police violence forces Network 49 to spend additional time and money addressing police abuses encountered by its members, diverting resources away from the organization's focus on other social justice issues critical to its mission, including education, community development, and community safety. Network 49 brings this action on its own behalf and as an organizational representative for its members. Network 49 participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

30.     Plaintiff WOMEN'S ALL POINTS BULLETIN ("WAPB") is a human rights and community policing non-profit organization that provides services, education, and training to eradicate all forms of violence against women during policing encounters. Individual members of the WAPB live in or regularly travel through Chicago, and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein.

WAPB brings this action as an organizational representative for its members. WAPB participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

31.     Plaintiff 411 MOVEMENT FOR PIERRE LOURY is an organization formed in response to the fatal shooting of 16-year-old Pierre Loury by Chicago Police. It was created as a response to the problematic culture of violence being committed in the city of Chicago by the civil servants that are contracted to serve, protect, and uphold the law. The organization is a vehicle for information to keep everyone informed, educated, and active in the fight for justice for Loury and all families who are affected by institutional racism. Individual members of the 411 Movement live in or regularly travel through Chicago and have been or are likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein. Police violence forces the 411 Movement to spend additional time and money addressing police abuses encountered by its members, diverting resources away from the organization's focus on other issues of institutional racism. The 411 Movement brings this action on its own behalf and as an organizational representative for its members. The 411 Movement participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

*Defendants*

32.     Defendant CITY OF CHICAGO is a municipal corporation under the laws of the City of Chicago, located in the Northern District of Illinois. It is authorized under the laws of the State of Illinois to maintain the CPD, which acts as the City's agent in the area of municipal law enforcement, and for which the City is ultimately responsible. Defendant CITY was, at all times material to this Complaint, the employer and principal of the Defendant Officers described below.

33.     Police Officers MIGUEL VILLANUEVA (#17423), JOSUE A. ORTIZ (#15448), RICHARD BOLIN (#14590), DOROTHY CADE (#7814), WAUKEESHA MORRIS (#8255), PETER JONAS (#5069), BRETT POLSON (#5612), ANGEL PENA (#7135), JAEHO JUNG (#13387), JOHN CORIELL (#14274), ANTHONY OSTROWSKI (#15324), THOMAS MCGUIRE (#1337), CHAD BOYLAN (#8200), LAWRENCE GADE JR. (#1841), and JOHN LAVORATA (#8464) are City of Chicago employees with the CPD. Each is sued in his or her individual capacity for violating the individual constitutional rights of the named Plaintiffs. They are referred to collectively herein as the "Defendant Officers."

34.     At all times material to this Complaint, the Defendant Officers acted under color of state law as police officers of the City of Chicago, and acted in the course and within the scope of their employment.

## ALLEGATIONS OF FACT

**I.    THE CITY OF CHICAGO'S POLICIES AND PRACTICES WERE THE MOVING FORCE BEHIND THE VIOLATIONS OF PLAINTIFFS' RIGHTS AND THE RIGHTS OF THE PUTATIVE CLASS MEMBERS.**

35.    The City's policies, practices, and customs concerning the use of force are the direct and proximate cause of the constitutional violations outlined in this Complaint. The effects of these policies are widespread throughout the City. While the named Plaintiffs were each brutalized by CPD officers in different neighborhoods within the City of Chicago—the South Loop, West Town, West Pullman, the Gold Coast, and South Shore—each was harmed as a result of the City's municipal-wide policies of discriminatory policing and excessive force. As a result, all members of the Plaintiff class are subject to a heightened risk of physical and emotional harm.

36.    The City's policies and practices are the true cause of the harm suffered by the named Plaintiffs. They have been perpetuated by the City of Chicago and the CPD for decades, continuing through the present day and, absent the relief requested herein, into the future.

### A.  The City of Chicago, Through the Chicago Police Department, Has a Policy, Practice, and Longstanding Custom of Racially Discriminatory Policing.

37.    The CPD has a history of racially discriminatory policing. The use of excessive force against people of color is a key mode of social control used by the CPD

Case 3:16-cv-00742-BAJ-RLB   Document 51-3   06/15/07   Page 19 of 132

and has been for decades. The use of abusive tactics against these communities instills fear and erodes trust in the CPD.

38.     In April 2016, the Task Force released a report about the system of training, accountability and oversight of CPD officers (the "Task Force Report"). It found: "The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself."

39.     The Task Force reported that racial bias in the CPD was "not a thing of the past." Instead, "data establishes that CPD's use of force disproportionately affects people of color. The same is true for foot and traffic stops. These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself."

40.     The shooting of Black teenager Laquan McDonald by CPD Officer Jason Van Dyke on October 20, 2014 created a public firestorm over police violence targeting

minority communities in Chicago. But while McDonald's death may have been a

flashpoint, it was preceded by a long history of police abuses and discriminatory

conduct.

**1. The Chicago Police Department Has Historically Employed Racially Discriminatory Policing Methods.**

*History of Racialized Police Violence in Chicago*

41.     Historical context for the current state of the CPD is telling.

42.     In 1968, Chicago Police confronted protestors outside the Democratic

National Convention. Officers had been given orders to shoot to kill if protests escalated

and many officers took this as a blank check for violence. A CBS reporter observed:

"Now they're moving in, the cops are moving and they are really belting these

characters. They're grabbing them, sticks are flailing. People are laying on the ground. I

can see them, colored people. Cops are just belting them; cops are just laying it in.

There's piles of bodies on the street. There's no question about it. You can hear the

screams, and there's a guy they're just dragging along the street and they don't care. I

don't think…I don't know if he's alive or dead. Holy Jesus, look at him. Five of them are

belting him, really, oh, this man will never get up."

43.     In 1969, the CPD executed Black Panther leader and activist Fred

Hampton as he slept beside his pregnant girlfriend. Mark Clark, another activist in the

apartment raided by the police, was also killed. The six survivors, several of whom

20

were seriously wounded, were beaten by police and arrested. A later investigation revealed that the police fired 82 to 99 shots at Hampton and the others in the apartment. In 1982, the City agreed to settle a civil suit filed on behalf of the survivors and relatives of Hampton for $1.85 million.

44. In 1972, United States Representative Ralph Metcalfe held hearings after receiving reports that police were abusing Black residents of Chicago and that the CPD was ignoring these complaints. Metcalfe's panel uncovered many incidents of abusive police conduct, including excessive force, and Black Chicagoans described being beaten for minor infractions. Metcalfe's panel determined that "the use of fatal force by police is far more frequent in Chicago than in other major urban centers" and "[i]n serious instances of abusive police conduct, the police consistently place criminal charges to justify their conduct and put the citizen-victim on the defensive." Metcalfe wrote a nearly 90-page report documenting police abuses and demanding reforms. The report called the CPD "rotten to the core."

45. Between 1972 and 1991, former CPD Commander Jon Burge and his midnight crew tortured more than 200 criminal suspects, most of them Black, to obtain confessions. Tactics used by Burge and his crew included beatings, suffocating, burning with cigarettes and radiators, and electric shocks. Ten of the suspects tortured into confessing were sent to Death Row. For years, the City of Chicago turned a blind eye

21

and refused to investigate Burge, despite clear evidence (including medical evidence) that torture was being used in CPD Areas on the South Side of Chicago.

46.     It was not until activists and Burge survivors sought reform and filed countless post-conviction and civil rights lawsuits that the torture cases were brought to light. In 2015, the City announced the establishment of a $5.5 million reparations fund for victims of torture by Burge. By 2015, the City had already paid $57 million to Burge victims and an additional $50 million for the legal defense of police officers involved in those cases.

47.     Burge and his midnight crew are just some of many examples of Chicago police officers who have engaged in patterns of abuse. Detective Richard Zuley was the subject of investigations into his use of torture in the 1990s and early 2000s. Detective Reynaldo Guevara is accused of abusing and framing at least 51 people for murder, most of them Black or Latinx. Former Chicago Police Sergeant Ronald Watts and his tactical team engaged in robbery, extortion, evidence fabrication, and excessive force in the Ida B. Wells Homes in Chicago throughout the 2000s. Commander Glenn Evans was implicated in at least 45 excessive force complaints between 1988 and 2008—more than any other CPD officer during those decades. The City of Chicago was on notice about the criminal activities of these and many other abusive officers, but failed to take action to stop them.

48.     In recent years, the CPD eliminated whole units as a result of officers' abuses. In 2007, the CPD disbanded its Special Operations Section ("SOS"), tasked with taking guns and drugs off the street in the early 2000s, after a criminal investigation showed its officers abused citizens for financial gain. Seven members of the unit were criminally charged with armed violence, home invasion, and kidnapping. SOS was the most complained against unit (in a list of 662 officers who amassed 11 or more complaints between 2001 and 2006), but the least likely to be disciplined.

### *History of Racialized Stops and Seizures*

49.     In addition to employing excessive force in furtherance of a policy of discriminatory policing, the CPD has a history of illegally stopping and seizing Black and Latinx individuals.

50.     In the 1980s, the CPD gang crimes unit made thousands of arrests annually for disorderly conduct. These street sweeps were used as pretext to arrest many youth of color. In 1980, 89,382 Black individuals were arrested for disorderly conduct, compared to 33,270 white and 17,931 Latinx individuals. A federal lawsuit brought by the American Civil Liberties Union (ACLU) supposedly put an end to this practice and a reportedly "irate" federal judge voided an estimated 800,000 disorderly conduct arrests over five years. Upon his election as mayor of Chicago, Harold Washington called the practice abhorrent and unlawful.

23

Case 3:16-cv-02742-BAJ-RLB   Document 51-3   06/15/17   Page 24 of 132

51.     While the number of disorderly conduct arrests dropped in the 1990s and 2000s, the racial disparity remained. In the 2000s, the Black/white ratio for disorderly conduct arrests was 10 to 1.

52.     In 1999, a Chicago gang loitering ordinance was found to be unconstitutional by the Supreme Court in *City of Chicago v. Morales*, 527 U.S. 41 (1999). The ordinance had been used by police to engage in street sweeps, arresting about 45,000 people over three years. Most of the people targeted were Black and Latinx, many of whom were not gang members. The ordinance had no discernible impact on the crime rate. In striking it down, the Supreme Court held that the ordinance created a "potential for arbitrary enforcement," *id*. at 56, because it "afford[ed] too much discretion to the police," *id*. at 64, and "reach[ed] a substantial amount of innocent conduct," *id*. at 60.

53.     In the 2000s, statistical proof emerged that the CPD targeted people of color for widespread investigatory stops and frisks. Data collected by the ACLU showed a pattern of unjustified stops and searches resulting in the unnecessary detention of young people of color.

54.     During the summer of 2014, the ACLU reported that 250,000 individuals in Chicago were stopped without a finding of criminal activity. Blacks and Latinxs

accounted for about 89 percent of the stops, far out of proportion to their respective populations.

### *History of Lawsuits and Settlements Stemming from Discriminatory Policing*

55.     The City's policy and practice of racist policing is evident in its history of lawsuits filed by victims and survivors of officer violence, and subsequent financial settlements. Throughout the years, the City has taken no steps to terminate officers who harm people of color while on the job. Instead, the City has spent millions of dollars paying the costs of police brutality.

56.     Between 2004 and 2015, Chicago spent approximately $642 million on lawsuit settlements, judgments, and legal fees for defenses related to police misconduct; $391.5 million was paid in settlements and judgments alone. In 2014 and 2015, settlements, judgments, legal fees, and other costs in police misconduct cases cost the City at least $106 million. In 2016, Chicago paid nearly $32 million for 187 police misconduct lawsuits, and $20 million more on outside lawyers to litigate the cases.

57.     Of the police misconduct cases filed against the CPD, 88 percent end in settlement; on average, a lawsuit against the CPD is settled almost every other day. Overall, the city spent more than $280 million settling 943 misconduct lawsuits from 2011 to 2016, plus another $91 million for outside lawyers to help defend police officers in those suits. In doing so, the City exceeded its budget for misconduct lawsuits by

almost $270 million, and was forced to borrow money using long-term bonds, at cost to

taxpayers.

58.     These significant financial outlays have failed to result in changes to the

City's policies and practices concerning use of force and the treatment of people of

color. They prove that the City of Chicago is willing to pay to enable officers to continue

violating people's constitutional rights.

59.     The facts of the suits and settlements provide further evidence of a pattern

and practice of racialized excessive force within the CPD.

60.     In the years covered by this Complaint, June 2015 to June 2017, at least 99

cases were filed by people alleging excessive use of force by CPD officers. These cases

include the following, which are currently pending:

a. *Anderson et al v. City of Chicago et al,* 1:16-cv-00726: On September 4, 2015,

the plaintiffs, all family members, were relaxing in their home at 6540

South Drexel Avenue when several CPD officers pulled up to the house.

The officers were seeking a 29-year-old man on drug charges, and had a

search warrant for the home. One of the plaintiffs, a Black man, told the

officers that only children and a dog were inside the house, but the

officers still entered the home. The plaintiff's granddaughter and her

friend where watching television in the living room when the officers

screamed at them to "get the fuck on the ground." The officers put guns to

their heads while another officer shot the dog and made mocking remarks

about doing so. The dog did not attack, approach, or threaten the officers.

An officer yanked one of the girls to her feet and threw her face-first into

the ground, leaving her with a lacerated lip, and then handcuffed her. The

officer allegedly said, "Since you wanna act like a nigger I'm going to treat

you like one." The other girl was then pulled up from the ground by her

hair and handcuffed. The officers continued to make derogatory remarks,

calling the girls "young dumb bitches" who "grow up to be nothing ass

females." One officer allegedly said, "I can do whatever I want. I'm CPD."

The granddaughter's friend gave the officers her name and address and

one officer said that he knew her family and would kill them.

b. *Brooks v. Wisz*, 1:17-cv-02851: On August 18, 2015, the plaintiff, a Black

man, was driving through Chicago from where he lived in Iowa. He had a

valid permit to carry a gun. CPD officers pulled him over at Augusta

Boulevard and Central Park Avenue while he was traveling with three

passengers in his car. The officers approached the car with guns drawn

and began yelling at the passengers to exit the vehicle. The plaintiff

showed the police his weapon permit but the officers responded that they

Case 3:16-cv-00742-BAJ-RLB   Document 51-3   06/15/17   Page 28 of 132

would arrest him anyway. The officers then forcefully removed him from the car. When the plaintiff asked why he was being stopped, the officers told him that the car was carrying too many Black passengers and that, since one out of every three Black people are "dirty," someone in the car must have been doing something illegal. The plaintiff was then arrested and charged with aggravated unlawful use of a weapon.

c.  *Hightower v. City of Chicago*, 1:17-cv-03543: On July 31, 2016, police stopped the plaintiff at 1400 North Lake Shore Drive where he was attempting to hail a taxi outside his girlfriend's apartment. The officers discussed whether the plaintiff should be taken to the hospital; the plaintiff declined and went back inside. Officers followed him, put him in a chokehold, tackled him to the ground and kicked him. One officer tased the plaintiff several times. They told him they were removing him from the building for his own "well-being."

d.  *Rodriguez v. Griffin*, 1:17-cv-04038: On May 29, 2015, the plaintiff, a Latinx man, went to pick up his brother's tow truck, which had a boat attached to it, when he was pulled over by police and placed in custody. Officers put handcuffs on him and tightened them to the point that they caused bruising and lacerations. The plaintiff also suffered an asthma attack in

the back of the squad car. Officers then pulled into a Chicago fire station and other officers joined them. They dragged the plaintiff out of the car by his handcuffs, causing additional lacerations. The officers then proceeded to beat the plaintiff, causing lacerations, scrapes, and contusions.

e. *Thomas v Chicago Police Department*, 1:17-cv-04090: On June 25, 2015, the plaintiff, a Black man, was riding a bicycle near the intersection of Congress Parkway and Lotus Avenue when he was approached by police in an unmarked car. The officer exited the car with his gun drawn. The plaintiff then ran away. The officer caught him and ordered him to lay on the ground. The officer handcuffed the plaintiff and then kicked him in the face, splitting open his right eye.

f. *Jackson v. Chicago et al*, 1:17-cv-01930: On March 12, 2015, the plaintiff, a Black man, was sitting in his vehicle near East 80th Street and South Langley Avenue when CPD officers approached the vehicle in plainclothes with their guns drawn. The officers pulled and kicked the plaintiff's car door, yelling at him to open it. The plaintiff did not know the individuals were police officers, and did not comply until an officer pointed a gun directly at the plaintiff's head and stated that he would shoot the plaintiff through the window if he did not open the door. The

plaintiff exited the vehicle and was thrown to the ground. An officer used a Taser on the plaintiff 14 times. Several other officers arrived on the scene and began to kick and step on the plaintiff's head.

g. *Zeigler v. City of Chicago et al*, 1:17-cv-02070: On October 14, 2015, the plaintiff, a Black man, was standing near 5091 West Washington Boulevard with a group of other people. The officers approached the group with weapons in hand. They did not observe any of the individuals engaging in threatening conduct. The plaintiff fled because he saw the officers approaching with their guns drawn. The officers caught the plaintiff and one used his Taser on him. The plaintiff fell to the street and the other officer ran over the plaintiff with his police vehicle.

h. *Rodriguez v. The City of Chicago et al*, 1:16-cv-05803: On August 28, 2014, plaintiff, a 57-year-old Latinx and mother of four, was stopped by two Chicago Police officers for a minor traffic violation. While she was receiving the ticket, police slammed her against the police car and twisted her arms behind her back. She fell and injured both her knees and her foot, on which she had recently had surgery. The officers then "violently grabbed her, tore her shirt, and broke her glasses." She was subsequently handcuffed so tightly that her wrists were cut.

i. *Friends-Smiley et al v. City of Chicago et al,* 1:16-cv-05646: On June 9, 2014,

the plaintiff, a Black woman, was at her home at 62 East 102nd Street with

her daughter, son, and nephew. Officers were in the neighborhood

pursuing a suspected drug dealer. An officer asked for permission to

search the property for the suspect. The plaintiff's daughter declined to

give permission. The officers then forced their way into the home and

began manhandling the plaintiff, who had a brace on one of her arms. One

of the officers twisted the braced arm behind her back and shoved her to

the ground. The plaintiff's daughter demanded the officers stop and leave

the house; she tried to shield her mother from the attack. At that point,

one of the officers punched her in the face, threw her to the ground, and

said, "tase that bitch." The plaintiff's daughter was then tased several

times. Officers thereafter handcuffed the plaintiff to a chair. They made

the plaintiff's daughter, who weighed 280 pounds, sit on the lap of the

plaintiff, who weighed 170 pounds. One of the officers grabbed the

daughter by the roots of her hair and hit her multiple times with a

flashlight. The officers used racial slurs and other derogatory language

throughout the encounter. After being informed that their original suspect

Case: 3:16-cv-00742-BAJ-RLB   Document 51/3   06/15/17   Page 32 of 132

had been caught, the officers left the plaintiff's home without uncuffing her.

61.    At least 19 excessive force suits filed since June 2015 have resulted in settlements, including the following:

a.    *Price v. City of Chicago et al,* 1:16-cv-01946: On May 31, 2015, the plaintiff, a Black man and Navy veteran, was involved in a minor car accident behind his home on Congress Parkway. A CPD officer arrived on the scene following the accident. The plaintiff exited the car and began recording the encounter on his cell phone. The officer ordered the plaintiff to put his hands on the hood of his vehicle and the plaintiff complied. The officer then punched the plaintiff in the face and threw him to the ground. The officer placed his knee on the plaintiff's back and slammed his head against the pavement multiple times. A few minutes later, other officers arrived on the scene and kicked the plaintiff. One officer was still on top of the plaintiff when another deployed pepper spray. Yet another officer then deployed his Taser on the plaintiff while he was still on the ground. The officers then handcuffed the plaintiff.

b.    *Clark v. City of Chicago, et al,* 1:15-cv-11467: On December 22, 2013, the plaintiff, a Black woman, was traveling in a car near 95th Street and South

LaSalle Street, where CPD officers were conducting a traffic stop on another vehicle. The plaintiff stopped her vehicle behind the car on which the officers were conducting the stop. An officer arrived on the scene, jumped out of his car, and began shooting in the direction of the plaintiff's vehicle. The officer shot approximately 16 rounds. The plaintiff put her vehicle into reverse to avoid the gunfire but struck another vehicle, injuring herself and damaging both cars. The plaintiff also witnessed the officers using unnecessary force on the juveniles who had been stopped in the other vehicle. Those teenagers also entered a settlement with the City due to the officers' use of excessive force.

c. *Miller v. White et al*, 1:16-cv-02446: On June 13, 2015, the plaintiff was placed in custody at 7712 South East End and then brought to a police station by CPD officers. Unprovoked, the officers put the plaintiff into a head-lock while other officers kicked and struck him. The plaintiff suffered broken bones in his face, a laceration around his eye, and broken blood vessels behind his left eye.

d. *Foster v. The City of Chicago et al*, 1:16-cv-02875: The plaintiff, a 38-year-old Black woman, was walking on the sidewalk on May 13, 2014, near 235 North Lockwood Street, heading towards the El train station. CPD officers

33

pulled their car over where the plaintiff was walking and ordered her to come to their car. As the plaintiff approached, one officer grabbed one of the plaintiff's arms and the other officer grabbed her other arm. One of the officers bent and twisted the plaintiff's arm and performed a takedown procedure. Another officer placed his knee on the plaintiff's back, causing her additional pain.

e. *Hardman v. City of Chicago et al.*, 1:15-cv-04948: The plaintiff, a Black woman, was visiting an apartment in the South Shore neighborhood on July 8, 2014. CPD officers came to the apartment allegedly in response to a noise complaint stemming from loud music, and entered it without a warrant or permission. The plaintiff, who was not the leaseholder of the apartment, told the officers that she did not reside in the apartment and did not control the music. At that point, the plaintiff was hanging out in the apartment in underwear and a t-shirt. The officers told her to shut up, and acted aggressively towards her. The plaintiff called her father for guidance on how to deal with the aggressive police. One of the officers, angry at her for calling her father, grabbed the plaintiff, twisted her arm behind her back, and handcuffed her, without cause. He then paraded her down the street in her underwear, not allowing her to dress. The plaintiff

34

was falsely charged with obstruction and resisting a police officer. She was found not guilty of all charges.

f. *Simmons et al v. City of Chicago et al*, 1:15-cv-08434: On July 11, 2014, CPD officers came to a party on the 1500 block of South Christiana Avenue and began harassing various people at the party, including the 21-year-old son of one of the plaintiffs. When the plaintiff, a Black woman, attempted to intervene, an officer slammed her onto the hood of a police car. Another plaintiff, also Black, then began protesting the assault and the officer hit him in the head with a baton, causing him to collapse to the ground. Both of the plaintiffs were arrested.

g. *Smith v. Manning et al*, 1:15-cv-05898: On July 4, 2014, the plaintiff, a disabled veteran suffering from post-traumatic stress disorder, was drinking a beer outside the laundromat at Howard Street and North Greenview Avenue, where he was doing his laundry. CPD officers approached him with their hands on their guns. The plaintiff, believing he could be harmed by the officers, fled the scene. The officers pursued him and eventually surrounded him. The plaintiff attempted to comply with the officers' commands and raised his hands to show he was unarmed. A newly-arrived officer then began shooting. Two other officers also began

shooting, striking the plaintiff five times in the chest, stomach, arms, and legs and grazing him with two additional bullets in his face and neck.

h. *Nezirov v. Askins et al*, 1:15-cv-05923: On July 11, 2014, the plaintiff, a taxi driver, was attempting to pick up passengers at Midway Airport. While the plaintiff was waiting for a passenger, a CPD officer approached and asked him to move his taxi. The officer then issued the plaintiff a ticket, at which point the plaintiff told the officer that he would see him in court. The officer re-approached the car, grabbed the plaintiff by the throat, and placed him in a chokehold.

i. *Turner et al v. City of Chicago et al*, 1:15-cv-06741: On August 2, 2013, the plaintiffs, both Black, were outside their home at 718 West 54th Place. CPD officers arrived and began towing one of the plaintiff's cars. The plaintiffs requested permission to remove personal items from the car before it was towed. One of the officers then hit the female plaintiff, who was pregnant at the time. She later suffered a miscarriage.

62. A small percentage of CPD officers are responsible for a disproportionate share of police brutality, but the CPD has failed to take any effective steps to address patterns of police abuse. Of the CPD's roughly 12,000 officers, 124 were identified in nearly one-third of the lawsuits alleging misconduct that the City settled between 2009

and early 2016, costing the City $34 million. For example, in that time period the City

settled seven lawsuits against Officer Sean Campbell, and four against his former

partner, Steven Sautkus. Yet the City has consistently failed to take disciplinary action

against the repeat offenders who terrorize private individuals in this City.

> **2.  The Chicago Police Department Continues to Engage in Racially
> Discriminatory Conduct That Contributes to a Pattern and Practice
> of Excessive Force.**

63.      Incidents of racially discriminatory policing are not relegated to the past.

The City's policies and practices of racist policing remain in effect, and are the moving

force behind the violations described herein.

64.      The 2016 Task Force Report confirmed that institutional racism is deep-

seated within the CPD. It is especially visible in the CPD's use of weapons on Black and

Latinx people. The Report found that "CPD's own data gives validity to the widely held

belief the police have no regard for the sanctity of life when it comes to people of color."

People of color are disproportionately the targets of police bullets. Since 1996, over 1,600

people have been shot by Chicago Police; more than 90 percent of those were Black men

or children.

65.      An examination of CPD shootings by the *Chicago Tribune* covering the

years 2010 to 2015 reveals that Black people accounted for 80 percent of the 262 people

shot by the CPD (despite Black people comprising only 33 percent of Chicago's

population) and Latinxs accounted for 14 percent of the total, while whites were less than 6 percent of the total. Black people were the target of 76 percent of the 1,886 CPD Taser discharges between 2012 and 2015.

66.     In keeping with these numbers, over the past five years, there have been scores of shootings of Black individuals by police, including the fatal shootings of Richard Grimes, Cleotha Mitchell, Kajuan Raye, Darius Jones, Joshua Beal, Paul O'Neal, Derek Love, Pierre Loury, Thurman Reynolds, Lamar Harris, Charles Smith, Quintonio LeGrier, Bettie Jones, Jeffery McCallum, James Anderson, Rafael A. Cruz Jr., Heriberto Godinez, Jr., Eugene McSwain, Martice Milliner, Alfontish Cockerham, Michael Westley, Jeffrey Kemp, Justus Howell, Laquan McDonald, Ronald Johnson, Roshad McIntosh, Desean Pittman, Warren Robinson, Pedro Rios, Dominique Franklin Jr., Joe Huff Jr., Mark Garcia, Deonta Mackey, Raason Shaw, Hector Hernandez, Veronica Rizzo-Acevedo, Gary Smith, Michael Myers, Francisco Rocha, Steven Isby, Darius Cole-Garrit, Terrence Gilbert, Cedrick Chatman, Dakota Bright, Rekia Boyd, Stephon Watts, Flint Farmer, and Darius Pinex.

67.     The highest rates of police shootings between 2010 and 2015 occurred in the mostly Black and Latinx neighborhoods on the South and West Sides of the City, including in Gresham, Englewood, Grand Crossing, Calumet, and Harrison. In contrast,

the lowest rates of police shootings occurred in the predominantly white neighborhoods on the Near North and Northwest Side of the City.

68.    People of color are also more likely to be subjected to non-lethal force by police. As reported by the Task Force, the 2015 Chicago Community Survey conducted by researchers from the University of Illinois at Chicago found "large racial disparities in the use of force reported by respondents….15% of Black people and 17% of Latinos reported being shoved or pushed around, in contrast to 6% of Whites. [Black people] were twice as likely as whites to be threatened by a weapon. Compared to whites, all other groups were at least twice as likely to have been subjected to some form of force before being released."

69.    The CPD continues to use race as a factor in decisions to detain individuals. Members of the Task Force reported hearing "over and over again from a range of voices, particularly from African-Americans, that some CPD officers are racist, have no respect for the lives and experiences of people of color and approach every encounter with people of color as if the person, regardless of age, gender or circumstance, is a criminal." The Task Force cited the ACLU's stop data in support of this assertion: 72 percent of people stopped by police in Chicago in 2014 were Black and 17 percent were Latinx. As reported by the Chicago Community Survey, almost 70

percent of young Black men described being stopped by police in 2015; 56 percent of them reported being stopped while on foot.

70.     CPD traffic stop data as reported by the ACLU reinforce these disparities. In 2013, Black and Latinx drivers were searched four times as often as white drivers even though contraband was found on white drivers twice as often as on Black and Latinx drivers. The CPD also set up 84 percent of DUI checkpoints in predominantly Black and Latinx police districts, despite the fact that majority-white districts have more alcohol-related car crashes than many minority districts.

71.     The unlawful use of investigatory stops is directly related to the CPD's policy and practice of excessive force. As the Task Force concluded: "The overuse of investigatory stops has left a lingering, negative perception of the police in communities of color, in part because for people of color, a significant number of those stops also involved actual or threatened physical abuse."

72.     This on-going policy and practice of discriminatory policing was confirmed by the DOJ's recent investigation into the CPD.

73.     In December 2015, the DOJ, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an investigation of the CPD and the accountability body charged with overseeing the police—the Independent Police Review Authority ("IPRA"). This

investigation was undertaken to determine whether the CPD was engaging in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices within the CPD, IPRA, and the City constituted this pattern or practice. The DOJ investigation assessed the CPD's use of force, and addressed CPD policies, training, reporting, investigation, and review related to officer use of force.

74.     In January 2017, the DOJ finished its investigation and released its finding (the "DOJ Findings Report"). In accordance with the allegations herein, the DOJ Findings Report identified a prevalence of racially discriminatory conduct by CPD officers. It confirmed that such conduct is approved by the highest ranks of leadership in the Department and the City.

75.     The DOJ determined that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable." The agency also found that the impact of the CPD's pattern or practice of unreasonable force fell heaviest on predominantly Black and Latinx neighborhoods.

76.     In interviews with the DOJ, CPD officers acknowledged engaging in racial profiling and harassment. One sergeant told the DOJ that "if you're Muslim, and 18 to 24, and wearing white, yeah, I'm going to stop you. It's not called profiling, it's called being pro-active." Another lieutenant reported, "I'm a black man in Chicago, of course I've had problems with the police."

77.     CPD officers regularly use racially charged and abusive language. Black youth are routinely called "nigger," "animal," or "pieces of shit" by CPD officers. These statements were confirmed by CPD officers. One officer interviewed by the DOJ stated that "he personally has heard coworkers and supervisors refer to black individuals as monkeys, animals, savages, and 'pieces of shit.'"

78.     CPD officers frequently express discriminatory views on social media. One officer recently posted two graphic photos of slain black men with the caption: "Hopefully one of these pictures will make the black lives matter activist organization feel a whole lot better!" Other CPD officers posted discriminatory remarks about Muslims, referring to them as "ragtop" and stating, "the only good Muslim is a fucking dead one." Supervisors were responsible for many of these statements. A sergeant posted 25 anti-Muslim statements and at least 43 other discriminatory posts. A lieutenant posted at least five anti-immigrant and anti-Latinx statements. The DOJ pointed to derogatory, racist comments made anonymously on popular CPD Internet forums as further evidence of the scope of the problem.

79.     Citizens regularly complain about the use of racially charged language by police, but the City has taken no steps to put an end to such racist behavior. From 2011 to March 2016, the CPD complaint database contained 980 police misconduct complaints coded as discriminatory verbal abuse on the basis of race or ethnicity,

Case 1:17-cv-04467 Document #: 1 Filed 06/14/17 Page 43 of 132 PageID #:43

including 354 complaints for use of the word "nigger." Just 13 of these 980 complaints

were sustained, and only then in the face of irrefutable evidence, such as an audio or

video recording, or when the victim took extraordinary steps to document the incident.

For instance, the DOJ described one sustained complaint where an officer told a woman

at a dog park: "Fuck you, you fucking nigger, you should keep your big mouth shut."

When the woman's husband told the officer not speak that way to his wife, the officer

responded: "Why? Because she's pregnant? I don't care if she's pregnant. I'll beat her

fuckin' ass too." The husband, a police officer himself who knew how to navigate the

complaint process, reported the incident to the police, obtained witness information,

and filed a robust complaint. But this is far from the typical outcome.

80.     Chicago leaders admit that racism within the CPD remains a problem:

a.     In August 2011, former Police Superintendent Garry McCarthy

acknowledged the "historical divide between police and communities of

color." He continued, "the most visible arm of government is a police

force. And the institutionalized governmental programs that promoted

racist policies that were enforced by police departments in this country are

part of the African-American history in this country."

b.     Mayor Rahm Emanuel has also admitted to the existence of racism in the

CPD. In April 2016, Mayor Emanuel said, "I don't really think you need a

task force to know… that there is racism that exists in the city of Chicago and obviously can be in our departments." Earlier, in December 2015, following the shooting death of Laquan McDonald, Emmanuel also acknowledged that Chicago Police employ a double standard in the treatment of youth of color and white youth, "and that's wrong."

c. In April 2016, when Superintendent Eddie Johnson was sworn in, he told reporters, "We have racism in America. We have racism in Chicago. So it stands to reason we would have some racism within our agency."

81.     The policies and practices of racially discriminatory policing cannot be separated from the CPD's policies of excessive force. Both are mainstays of the CPD's law enforcement program. Both significantly harm police-community relations and the class the Plaintiffs seek to represent. As the DOJ concluded, "the pattern or practice of unreasonable force [within the CPD], coupled with the recurrence of unaddressed racially discriminatory conduct by officers further erodes community trust and police effectiveness."

### B. The Chicago Police Department Has a Pattern and Practice of Using Excessive Force and Physical Brutality.

82.     Operating in tandem with the CPD's system of racially discriminatory policing, the City of Chicago exercises a policy and practice of excessive force and physical violence that disparately impacts Black and Latinx individuals within the City.

83.     There are approximately 61,300 use of force reports in the CPD database from 2005 and 2015. In this period, approximately 42,500 individuals were subject to force by the CPD. Approximately 3,850 individuals are subject to force in a given year in Chicago; in 2015, 3,500 individuals were the victims of CPD force.

84.     Between 2010 and 2014, CPD officers shot and killed 70 people—the most fatal shootings of any other police department in the top 10 most populous cities in this country.

85.     After its year-long investigation, the DOJ determined that "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive….CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD."

86.     Based on its review of complaints, the DOJ determined that uses of force by the CPD "were not aberrational." Instead, "our holistic review of this information, combined with our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct."

87.     The DOJ found that the pattern and practice of unreasonable force most impacted the South and West Sides of the City, and predominantly Black and Latinx

neighborhoods: "Raw statistics show that CPD uses force almost ten times more often against [Black people] than against whites. As a result, residents in black neighborhoods suffer more of the harms caused by breakdowns in uses of force, training, supervision, accountability, and community policing."

88.     Just as City of Chicago leadership admits to systemic racism in Chicago policing, so too do CPD authorities acknowledge the Department's policy and practice of using excessive force. In 2016, Eugene Williams, a 36-year veteran of the CPD and one of the candidates the Chicago Police Board recommended to replace former Superintendent Garry McCarthy, said, "I believe that the Chicago Police Department and law enforcement in general have been steeped in a 'warrior mentality' (kicking butts and taking names) for much too long. Collectively, we have been slow if not recalcitrant to change as if we are stuck in a time warp back in the 1980s….This phenomenon has created a dangerous culture in law enforcement."

*Unlawful Shootings and Vehicular Violence Stemming from Foot Pursuits*

89.     This pattern or practice of unreasonable force includes CPD officers regularly shooting at fleeing suspects who pose no immediate threat to officers or the public. The DOJ investigation found that "the act of fleeing alone was sufficient to trigger a pursuit ending in gunfire, sometimes fatal." The investigation presented several incidents where police shot and killed fleeing, unarmed suspects in the back.

46

90.     These occurrences were caused in part by the CPD's failure to institute a foot pursuit policy or take corrective action concerning such violence. As the DOJ investigation stated, "this puts officers and the public in danger and results in unreasonable uses of force."

91.     The CPD's pattern or practice of unreasonable force also includes firing at vehicles without justification, despite the fact that this practice is "inherently dangerous and almost always counterproductive." Although the CPD has a policy that prohibits "firing at or into a moving vehicle when the vehicle is the only force used against the sworn member or another person," the policy has not been enforced.

92.     CPD officers lack discipline when discharging their weapons. Officers often disregard innocent bystanders when shooting guns and Tasers. The DOJ noted that, in one incident, officers fired 45 rounds at a man during a foot pursuit. The suspect was shot, and dozens of bullets were also fired into the residential neighborhood where the pursuit occurred. Officers also regularly fire their weapon simply because other officers do so, without being able to articulate any independent reason that may justify a use of deadly force.

93.     CPD officers systematically rely upon a stop technique called a "jump out," in which officers—frequently in plainclothes and riding in unmarked vehicles— approach a street corner or group of individuals, jump out, and rapidly approach, often

with guns drawn. The practice generally causes one or more of the targets to flee from the scene. Officers then pursue the fleeing person, often with one officer tasked with chasing him or her on foot, thus increasing the risk of a serious or deadly force incident. The "jump out" technique is especially problematic when used by CPD tactical or other specialized units using plainclothes officers and unmarked vehicles, which can make it difficult for community members to identify the individuals as police officers. Such procedures directly contribute to the CPD's policy and practice of excessive force.

94.     The DOJ determined that CPD officers regularly make tactical decisions that result in avoidable uses of force. For example, CPD officers frequently fail to await backup or otherwise inject themselves into high-risk situations, even where immediate intervention is unnecessary. Officers also employ dangerous vehicle maneuvers, including box-in techniques, which enhance the risk of physical harm to both officers and private individuals.

### *Unreasonable Discharge of Tasers and Other Weapons*

95.     The CPD's pattern or practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat.

96.     Officers use Tasers as "a tool of convenience," without considering the fact that they can inflict significant harm and pain on the individual. They are regularly

48

employed against people who are only passively resisting or against individuals

suspected of minor, non-violent crimes. The DOJ reported that CPD officers used Tasers

against a man suspected of urinating in public, a man suspected of petty theft, and a

110-pound youth who had been painting graffiti on a garage.

97.     The DOJ investigation delineated clear omissions in the CPD policy

governing Taser use. Under that policy, officers believed they were entitled to use

Tasers in response to *any* form of supposedly active resistance, including non-violent

encounters:

> "The use of unreasonable force to quickly resolve non-violent encounters is a
> recurrent issue at CPD. This is at least in part because CPD's policy permits the
> use of Tasers in situations where it is unreasonable, and allows the use of Tasers
> in drive-stun mode in any circumstance in which 'probe mode' is allowed. CPD's
> policy permits use of a Taser (in any mode) to defeat active resistance, defined by
> CPD policy as 'movement to avoid physical control,' without regard to the
> severity of the crime or whether the person poses any danger to an officer,
> factors that must be considered in judging the reasonableness of a use of force."

98.     The CPD's written Taser policy teaches its officers that they may use

Tasers against individuals who are simply walking away and do not pose any

immediate threat of physical harm to anyone. Though CPD revised its Taser policy in

May 2017, these deficiencies remain unaddressed. The May 2017 policy states that

officers are authorized to use Tasers against "active resisters" and the policy defines an

active resister as "a subject who is attempting to avoid apprehension and who fails to

comply with an [officer's] orders…."

49

99.     The DOJ also reported the systematic use of other forms of excessive force by the CPD, including unlawful baton use, hand strikes and punches, "takedown/emergency handcuffing," "wrist locks," "arm bars," and "knee strikes," all utilized for the purpose of exerting physical control and often without lawful cause.

*Excessive Force against Children and Teenagers*

100.     CPD officers, as a matter of policy and practice, use excessive, less-than-lethal force on Black and Latinx children and teenagers, including of the kind outlined above (such as emergency handcuffing, take-downs, and punches). Officers recklessly and disproportionately use force on children for non-criminal conduct and minor violations, including using Tasers against children in school.

101.     Force is also used against children in retaliation. In one incident, the DOJ found that an officer confronted teenage boys who had been playing basketball on his property by pointing his gun at them, using profanity, and threatening to put their heads through a wall and to blow up their homes. The boys were forced to life face-down and were handcuffed together, scraping their knees and wrists.

102.     The findings in the DOJ Report about the CPD's policy and practice of using excessive force are reinforced by complaint data and citizen beliefs, as published in the Task Force Report. As the Reported noted: "Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by

those who have sworn to protect and serve them. Throughout our community engagement efforts, including during our youth panels, we heard story after story of officers treating youth with disrespect, humiliating them or worse."

### *Policy and Practice of Escalation Leading to Excessive Force*

103.    The CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD also fails to de-escalate encounters when it would be reasonable to do so.

104.    In encounters with individuals that begin consensually, or in cases in which officers stop individuals for low-level violations, officers repeatedly use the most intrusive forms of police response possible—including Tasers and guns. They do so even where individuals do not present a threat to the officers or to other bystanders.

105.    Even where some use of force may be justified, officers, as a matter of practice, use a higher level of force than is objectively reasonable.

106.    The DOJ observed this trend of escalation in shootings, finding that CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable uses of force and resulting harm, including deaths." The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause.

107.    In one incident recorded by the DOJ, officers forcibly brought a man to the
ground because he stiffened and locked his arms while they were arresting him for
walking his dog without a leash and refusing to present identification. Officers
provided no justification for the level of force they used. They failed to explain why
they did not attempt to resolve the situation with common (and common sense) de-
escalation techniques.

108.    The Task Force similarly found "many examples of CPD encounters with
citizens in routine situations that have gone tragically wrong." The Task Force
acknowledged widespread reports from Chicagoans that officers approach "routine
situations with an overaggressive and hostile demeanor, using racially charged and
abusive language."

109.    Investigations conducted by IPRA over the past two years (2015 to 2017)
exemplify the CPD's pattern and practice of unnecessary escalation and intrusive police
responses. In each of these incidents, CPD officers used brutal and excessive force in
situations that explicitly did not require *any* force.

    a.  LOG 1084058: On April 16, 2016, officers responded to a retail theft at
        Walmart. A Black man was suspected of taking deodorant and soap
        without paying for the purchase. The man started to flee from the officers
        who responded to the call. For this minor offense, officers performed an

emergency takedown of the man, and performed an "armbar" and "wrist lock." The man was subsequently arrested and taken to the hospital for injuries.

b.  LOG 1083633: On January 10, 2017, officers observed a vehicle with an inoperable tail light stopped at a red light. The officers pulled over the vehicle and asked the driver to get out of the car. The driver allegedly tried to swing his arm at the officer, at which point the officer issued several knee strikes to the driver's chest, while performing an emergency takedown. Backup officers arrived and tased the driver. The driver was taken to the emergency room, where he was *again* tased. The driver incurred serious bruising and swelling to his face and head as a result of the incident.

c.  LOG 1082884: On November 5, 2016, a Latinx man was brought into police custody at the 9th District police station on a charge of criminal damage to property. Video shows that, while he was in custody, the man began banging on the door to the holding cell with his handcuffs. The officer entered the holding cell and shoved the man down so hard that his head hit the floor, causing him to suffer a head fracture and brain bleed.

The man was hospitalized in critical condition as a result of the unnecessary use of force.

d.   LOG 1080972: Videos from June 13, 2016 show a white officer on top of a Black man, pushing him into the ground and grabbing his dreadlocks. A crowd of Black people surrounded the white officer and the Black man, yelling for the officer to let the Black man go. Another white officer arrived on the scene and he screamed at the crowd to retreat. At one point the Black man's hand reached up in the air and the second white officer responded by stomping on the man's face. The crowd yelled at the officers, telling them that they stomped the man for no reason. By that point, the Black man was lying on the street, unmoving. He remained on the street, as officers yelled at the individual recording on his cell phone to "put down the phone" and "get off the street or else you're going to jail."

e.   LOG 1080437: On May 7, 2016, a man was in police custody, calmly walking, when an officer grabbed his hoodie from behind and threw him to the floor. When the man attempted to get up, the officer slammed him to the floor again and pinned him down. Another officer pointed his Taser at the man. The officers then dragged the man on the floor and handcuffed his arm to a bench. The man remained on the floor unmoving,

54

surrounded by officers, until the paramedics arrived about eight minutes later. The officer's report states that during processing, the man became aggressive and began swinging his fist at the officer, attempting to strike the officer, and necessitating the deployment of a Taser and a takedown. This report is a fabrication; the video does not show the man swinging his fists or in any way threatening the officer.

f.  LOG 1080601: Videos from March 11, 2016 depict a man, who was filming during the Donald Trump rally and protest, being grabbed from behind and thrown to the ground by officers. As he was handcuffed, an officer placed his boot on the man's neck. The man was charged with resisting arrest, though the videos evidence no show of resistance.

g.  LOG 1081740: On June 23, 2016, officers responded to a disturbance at a Walgreens. A 59-year-old man refused to leave the Walgreens after being denied a refill of his prescription. When the officers attempted to arrest the man, he swore at the officers and pulled away from the officers' grip. The officers then physically detained the man by using "wrist locks" and an "arm bar." The man was arrested and taken to the hospital for injuries incurred in the incident.

h.  LOG 1077477: On October 7, 2015, a Black man and an officer were having a conversation in a lockup. Video depicts them speaking calmly. Suddenly, the officer grabbed the man around the neck, pushed him against the door and choked him. The video clearly shows that the Black man was no threat to the officer and made no motions that could be construed as threatening. Another white officer, who was sitting behind a desk, walked over to the officer and the man, but failed to intervene, standing and watching as the first officer continued to choke the man, who was by that point on the ground.

i.  LOG 1079273: On September 11, 2015, officers conducted a field interview on someone suspected of drinking an alcoholic beverage from a cup. The suspect was a Black man who started to run away from the police as they approached him. The officers chased him, and tased him in the back. Officers transported the man to the hospital for treatment for lacerations on his face that he sustained after falling to the ground when he was tased. The man also suffered bruises and a swollen eye more indicative of a punch than a laceration sustained from a fall. The man was charged with resisting, drinking on the public way and marijuana possession.

j.   LOG 1075692: On June 16, 2015, a Canadian man was eating at a Portillo's Restaurant, when he was confronted by an off-duty officer working security who told him that he had to leave the premises because it was closing. Other customers were also in the restaurant. The man refused to leave and threw some cheese at the off-duty officer. At that point, the officer attempted to arrest the man. Video then shows the officer striking the man in the head and face, including with his right hand, which was holding handcuffs. The man suffered abrasions, bruising and swelling to his face and was treated at the hospital. He was referred for examination by an ophthalmologist due to the injuries to his left eye caused by the officer. The man was charged with aggravated battery to the officer and the Canadian consulate was notified of the charges.

110.   The experiences of the named Plaintiffs, described in Part IV, similarly exemplify the City of Chicago's escalation policies. Mr. Sharkey and Mr. Carter were subjected to police violence despite both being engaged in conduct that did not mandate a police response, let alone a violent one. In Mr. Campbell's case, officers escalated what was, at most, a city ordinance violation (being in the roadway during a protest), which led to the unwarranted use of force. Both Ms. Linwood and Ms. Jackson

were also subject to brutal police force for no reason, and solely at the behest of a club

security guard who decided he did not want to let them in the club.

111.    Over and over, Chicago Police insert themselves into situations that do

not require police intervention, and use aggressive tactics that inevitably give rise to

violent outcomes.

### The Scope of the Problem is Larger than Reported

112.    The DOJ investigation noted that video evidence provided proof of the

above-described pattern and practice of excessive force. Officers' versions of events

surrounding uses of force are regularly undercut by such evidence. The Laquan

McDonald shooting was one such incident, but the DOJ investigation uncovered many

others.

113.    Thus, the DOJ investigation determined that the scope of the CPD's use of

force problem was larger than documented:

> "Given the large volume of reported incidents not captured on video, this
> suggests that the extent of unreasonable force by CPD officers may be larger than
> is possible to discern from CPD's scant force reports and force investigations
> alone. Indeed, the inaccurate descriptions of events that were undercut by video
> we reviewed bore striking similarities to descriptions provided by officers in
> numerous cases with no video."

### C. The City of Chicago, Through the Chicago Police Department, Employs a Code of Silence, Sanctioning and Perpetuating its Officers' Excessive Use of Force.

#### 1. CPD Officers Abide by a Code of Silence.

114.    The CPD maintains and promotes a "code of silence" by which police officers are trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing. Any officer who violates this code is penalized by the CPD.

115.    The code of silence is not a passive function of employment but a deliberate effort on the part of the City leadership and CPD officials to cover up the misconduct of other officers, in violation of CPD policy. CPD Rule 14 prohibits officers from making false statements, but this rule is rarely enforced. Instead, officers know not to intervene in the face of deliberate police misconduct, including excessive uses of force, as detailed herein.

116.    Police officers are educated at the CPD about the tenets of this code of silence. They are instructed:

> "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

59

117.    In *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

118.    Years later, nothing has changed. In December 2015, in a speech to Chicago aldermen, Mayor Emanuel acknowledged that Chicago Police use a "code of silence" to conceal abuses and wrongdoing by their colleagues.

119.    In December 2016, then-president of the police union, Dean Angelo, stated in an interview with the media that "there's a code of silence everywhere, everybody has it…so why would [the Chicago Police] be any different?"

120.    In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

121.    In May 2016, in a whistleblower lawsuit filed by CPD officers stemming from corruption in the CPD Narcotics Unit, including by CPD Sergeant Watts, lawyers for the City admitted that Chicago Police observe a "code of silence,"

122.    The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." One CPD sergeant informed DOJ

investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street." The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

123.    The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying."

### 2. The City of Chicago Fails to Discipline, Supervise, and Monitor its Officers, which Contributes to the Code of Silence.

124.    The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers. Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence. These policies, practices, and customs directly contribute to the code of silence.

125.    Specifically, the City of Chicago knowingly, deliberately, and recklessly fails:

    a.  to devise and impart meaningful and consistent discipline for officers who violate the constitutional rights of others, including by allowing for reduced punishment via mediation, arbitration, and other channels of review;

b. to properly investigate allegations of misconduct against officers, including by not investigating complaints unless the complainant meets onerous requirements, not investigating certain types of misconduct entirely, and permitting behaviors that corrupt the fact-finding process of the investigation;

c. to investigate and discipline individual and groups of officers who have engaged in patterns of abuse and brutality; and

d. to adequately track complaints against CPD officers to identify patterns within the CPD, repeat offending officers, or additional measures that are needed to prevent constitutional violations by CPD officers.

126. Instead, the City conducts biased investigations into police misconduct that are designed to insulate officers from discipline.

127. As a result of the CPD's wholesale failure of accountability, few complaints get sustained overall—only 1.4 percent of all closed complaints from January 2011 through March 2016. The DOJ found that in the five years preceding its investigation, less than 2 percent of the 30,000 total complaints of police misconduct were sustained.

128. The number of sustained complaints is even smaller for complaints brought by people of color. Between 2011 and 2016, only 1 percent of misconduct

complaints filed by Black individuals and 1.4 percent of complaints filed by Latinxs resulted in at least one allegation being sustained, while 2.7 percent of complaints filed by whites resulted in at least one allegation being sustained. Thus, complaints filed by white individuals were two-and-a-half times more likely to be sustained than complaints filed by Black individuals, and nearly two times more likely to be sustained than complaints filed by Latinxs.

129.   The contrast is even more stark for complaints relating to excessive force. Two percent of all allegations of excessive force involving Black complainants and only 1 percent of such allegations brought by Latinx complainants were sustained, as compared to 6 percent of allegations of excessive force involving white complainants. Thus, white complainants were three times more likely than Black complainants to have their allegations of excessive force upheld, and six times more likely than Latinx complainants.

130.   The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct."

131.   For instance, even when officer discipline is initially recommended, the findings are often overturned. In 2015, according to the Task Force Report, arbitrators reduced disciplinary recommendations in 56.4 percent of cases and eliminated

discipline in 16.1 percent of cases. In total, arbitrators reduced or eliminated discipline in 73 percent of cases.

132.    Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty. From 2007 to 2015, more than 1,500 CPD officers acquired ten or more Complaint Registers ("CRs"). Sixty-five of these officers had 30 or more CRs. These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers. They also underreport the problem. While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited.

133.    The CPD's formal early intervention programs, Behavioral Intervention System and Personnel Concerns, which the Department claims are designed to identify and address problematic or abusive officer behavior, are rarely used. The number of officers involved in these programs dropped from 276 in 2007 to zero in 2013. In 2015, only 13 officers were enrolled. The City employs officers who have accumulated more than 50 misconduct complaints but who have never been enrolled in any of the CPD's "early" intervention programs.

134.    The CPD reporting policies and practices further undermine accountability for uses of force. CPD policy outlines the types of use of force incidents that require the completion of a Tactical Response Report ("TRR"). Theoretically,

64

officers are supposed to enter information in a TRR justifying the use of force to superiors. In practice, officers provide little information about uses of force in these reports, and almost none of the detail necessary to evaluate whether the use was appropriate. The TRR format further encourages the use of boilerplate language by abusive officers, as described below.

135.    TRRs are systematically approved by supervisors without meaningful review. Although CPD policy requires a supervisor to respond to the scene and conduct investigations of every use of force, including non-shooting uses of force, the DOJ found that supervisors rarely do so.

136.    Sergeants reviewing instances of use of force are not required to investigate whether the force used in a given situation was reasonable or lawful or whether policies, equipment, or training could be modified or augmented to prevent future uses of force.

137.    Supervisors are not held accountable for failures to report the misconduct of their subordinates. As a result, supervisors regularly refuse to accept complaints of officer misconduct reported by community members. CPD supervisors themselves also consistently fail to submit the required paperwork relating to use of force incidents.

138.    Unsurprisingly, as a result of this failed system, a CPD supervisor never found an officer's use of force unjustified in any of the thousands of use of force reports submitted between 2005 and 2015.

139.    Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force. As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides insufficient specificity to understand the force used or resistance encountered." The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

140.    Overall, the boilerplate reports and omissions in required paperwork and utter lack of supervisor investigation pertaining to officer uses of force result from the City's failure to provide adequate discipline, supervision, and oversight within the CPD.

141.    The City's police accountability structures further contribute to the CPD's code of silence.

142.    The CPD has a multi-tiered system for reviewing misconduct allegations. IPRA, which is formally external to the CPD, serves as the intake agency for all complaints of police misconduct. IPRA is led by a chief administrator, who is appointed

by the mayor and confirmed by City Council. IPRA's budget is also set by City Council. The agency only has jurisdiction to investigate certain types of misconduct, including allegations of excessive force, domestic violence, biased-based verbal abuse, coercion, weapons discharges, and deaths in custody. Thus, IPRA handles roughly 30% of officer complaints. The majority are referred to CPD's Bureau of Internal Affairs ("BIA"), which handles investigations related to officer-involved criminal conduct and various rule violations. BIA assigns some misconduct complaints to district commanders for investigation. Chicago also has a Police Board made up of nine private citizens appointed by the Mayor with the City Council's consent. The Police Board is not an investigatory body, but finalizes CPD disciplinary decisions both by presiding over evidentiary hearings and resolving discipline disputes between IPRA and the Superintendent.

143.    Police misconduct investigations by IPRA and BIA investigators serve to legitimate police abuse and immunize officers from discipline, while offering the pretense that police misconduct is being investigated by the City. Despite their knowledge of the widespread operation of the code of silence in the CPD, neither BIA nor IPRA effectively disciplines officers who conceal the misconduct of other CPD employees.

Case 3:16-cv-00742-BAJ-RLB   Document 51-3   06/15/17   Page 68 of 132

144.    The DOJ investigation determined that "IPRA and BIA treat such efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." In this vein, investigators "employ a higher standard to sustain claims against officers for making false statements . . . and they rarely expand their investigations to charge accused and witness officers with lying to cover up misconduct."

145.    These agencies also systematically fail to collect all available evidence in investigations or to determine whether officers' stories match the evidence. Investigators do not review investigative records to ascertain whether officers who are witnesses to potential misconduct have lied in police reports or whether supervisors have approved reports without ensuring their veracity.

146.    From 2011 to 2016, only 98 Rule 14 charges were sustained against officers. In only one of those cases did IPRA initiate Rule 14 charges against an officer who had witnessed and was concealing another officer's misconduct.

147.    The Laquan McDonald case is emblematic of BIA's and IPRA's willingness to ignore Rule 14 violations. Neither BIA nor IPRA pursued Rule 14 charges against any of the officers who witnessed the shooting and wrote reports that were inconsistent with what actually happened.

148. The City has also failed to take appropriate corrective measures or disciplinary action against CPD officers who intimidate potential complainants and witnesses. This includes a refusal to investigate officers who file false assault and battery charges against the victims of, and witnesses to, police abuse.

149. Further eroding transparency in use of force investigations, the City of Chicago has failed to take sufficient corrective and disciplinary action to ensure that CPD officers do not tamper with dash- or body-cameras to conceal video and audio evidence of police misconduct. According to a January 2016 CPD report, in 80 percent of the CPD's dash-cameras, the audio functionality either failed to work or had been tampered with. Officers were found to have regularly damaged antennae, hidden microphones in squad car glove compartments, or removed microphone batteries. Yet investigators rarely investigate these incidents, and the CPD lacks any policy directly providing that officers who intentionally fail to use their body-cameras will be subject to discipline.

150. The Chicago Police Board, too, advances the code of silence and ensures the inadequate discipline of CPD officers. In certain cases—including those in which the Superintendent has recommended termination of an officer, suspension of over one year, or suspension of a supervisor for over 30 days—the Police Board is responsible for

Case: 3:16-cv-02542-BAJ-RLB   Document 51-3   06/15/07   Page 70 of 132

reviewing and determining discipline. But the Police Board's review suffers from various structural deficiencies, including:

    a.   the Board's reliance on a convoluted hearing process in which officers conduct hearings and subsequently provide the Board with a second-hand record of the hearing;

    b.   the prohibition against the Board's access to an accused officer's complete complaint and disciplinary file, notwithstanding the fact it is permitted full access to the officer's "complimentary" history;

    c.   the City's failure to provide sufficient training for Board members and hearing officers; and

    d.   the poor quality and untimely nature of the cases brought before the Board due to deficiencies in the underlying investigations.

151.    The Police Board's structural deficiencies have exacerbated the City's failure to hold officers accountable for misconduct and have thereby contributed to the CPD's systematic use of unreasonable force. Even absent these systemic deficiencies, the scope of the Board's review does not include the countless cases in which officers were incorrectly determined not to have committed the alleged misconduct and, accordingly, fails to address the broader defects in the City's monitoring and discipline processes.

152.    Recent changes to the City's accountability structures do not address the pattern and practice of constitutional violations alleged herein.

153.    In October 2016, the City passed an ordinance to replace IPRA with what it now calls the Civilian Office of Police Accountability (COPA). But COPA, like IPRA before it, lacks independence from City Hall. The mayor controls the selection, appointment, and removal of the agency's chief administrator. COPA requires City approval to retain outside counsel. COPA's jurisdiction, while expanded from that of IPRA, does not include serious issues of police misconduct, including the ability to investigate allegations of sexual assault by police officers.

154.    The DOJ found that the City's proposed reforms, including COPA, did "not sufficiently address many of the problems we discovered in the City's deeply flawed investigative system." COPA's serious flaws include but are not limited to: a deep uncertainty over whether the proposed budget will support existing investigative duties and the agency's expanded obligations, reliance on mediation for many serious cases, and a lack of independence despite structural reforms.

155.    Most importantly, because none of the reforms address the flawed culture of accountability observed under IPRA, "COPA's expanded investigative authority simply exacerbates these investigative problems."

156.     The DOJ concluded that the City had to implement "more than a name change to repair the broken trust that surrounds this investigative agency, particularly since most residents remember the last time the City employed this same rebranding strategy eight years ago when it replaced OPS with IPRA . . . . [T]he systemic and entrenched nature of the deficiencies we identified cannot be remedied by these reforms alone."

> **3. The City Maintains Specific Investigative Policies and Practices Under Which Officers Know They Can Commit Misconduct with Impunity.**

157.     Consistent with its flawed disciplinary practices described above, the City maintains a set of investigative policies that allow officers to perpetrate excessive force with impunity. In this way, the City has ratified the code of silence.

158.     The City of Chicago impedes the investigation of police misconduct by requiring affidavits in support of complaints, prohibiting anonymous complaints, and requiring that the name of the complainant be disclosed to the accused officer early in the process. As the DOJ found, "given the code of silence within CPD and a potential fear of retaliation, there are valid reasons a complainant may seek to report police misconduct anonymously, particularly if the complainant is a fellow officer."

159.     City policy allows CPD officers to wait 24 hours before making a statement on a shooting, so that officers can have private, unrecorded conversations

with fellow officers, police leadership, and union staff in the interim between the use of force and reporting process. The DOJ called this procedure "highly troubling," for "[i]f false or mistaken narratives justifying shootings are created during these private conversations and advanced in reports and officer statements, it is exceedingly difficult for even well-trained and diligent investigators to accurately evaluate whether the shooting was justified."

160. The DOJ confirmed that "[t]he possibility of officer collusion in this setting is more than theoretical," citing documented incidents of officer collusion in the 2014 Laquan McDonald shooting as well as in the 2016 shooting of Paul O'Neal. In the O'Neal shooting, not only were rank and file officers recorded confirming with each other that they all had the same perception of the event, but a CPD command official was also recorded condoning the behavior.

161. Under City policy, investigators are prohibited from bringing Rule 14 charges based on a video unless an officer is allowed to view the video first and amend any false or inconsistent prior statements, even if these amendments materially change the officer's prior statements.

162. The City, as a matter of policy, will not investigate police misconduct incidents that are more than five years old, absent authorization from the Superintendent. This ban on investigation of older incidents of misconduct applies even

to incidents that include serious misconduct or that may establish a pattern of misconduct. The DOJ found this practice particularly problematic given that "CPD's culture and code of silence…prevent disclosure of serious misconduct in a timely fashion." As a matter of policy, the City also destroys most evidence of police misconduct after five years. This document destruction provision prevents the CPD from monitoring and tracking historical patterns of officer misconduct.

163.    As a result of these entrenched tenets of protectionism, officers know they will face neither sanction nor discipline for their own misconduct or for concealing the misconduct of others. As evidence of this, in the five-year period prior to the DOJ investigation, the City investigated 409 police shootings and found only two were unjustified.

164.    In sum, the police code of silence—recognized by the federal government, the Task Force, the mayor, a federal jury, and many police officers—was the driving force behind much of the misconduct alleged in this Complaint. That code facilitated, encouraged, and enabled the Defendant Officers to engage in abusive conduct without discipline or intervention. They knew other officers would cover for them when they physically abused the Plaintiffs. They also knew they would not be subject to discipline for failing to report the misconduct of their colleagues.

165. The DOJ determined that the lack of meaningful investigation into the majority of force incidents has "helped create a culture in which officers expect to use force and not be questioned about the need for or propriety of that use. In this way, CPD's failure to adequately review officer use of force on a regular basis has combined with CPD's failure to properly train and supervise officers to perpetuate a pattern of unlawful use of force within CPD."

166. As a direct and proximate result of the CPD's code of silence, and inadequate disciplinary, monitoring and supervisory structure, and the City's failure to address these obvious shortfalls, CPD officers, including the Defendant Officers, have violated and continue to violate the constitutional rights of those they are sworn to protect.

**D. The City Fails to Adequately Train Chicago Police Department Officers.**

167. At all relevant times, the CPD, as a matter of policy, practice and custom, fails to adequately train its officers, including the Defendant Officers. This deliberate lack of training on the use of force has resulted in the wholly foreseeable and widespread violation of people's rights, including the rights of the Plaintiff class. It has also resulted in the perpetuation of physical harm to individuals who have suffered electrocution, broken bones, cuts, bruises, and even death, due to the City's failings.

168.    The CPD's Education and Training Division provides peace officer training for all law enforcement agencies in Illinois. Consequently, the systemic deficiencies outlined here are replicated in training programs of police officers across the State.

169.    The DOJ investigation found that the CPD does not provide officers with appropriate direction, supervision, or support to ensure that policing is lawful and effective. This failure to train pervades all aspects of CPD training, from training of recruits at the Academy and in the field to in-service training for experienced officers.

170.    Of particularly relevance to the violations alleged here, the CPD has failed to institute training to address the racial bias that permeates the CPD and influences the decision-making of its officers. Chicago is famously lauded as one of most diverse cities in the world—and also one of the most segregated along racial and ethnic lines. Yet, the CPD's training does nothing to effectively equip CPD officers with the knowledge and insight necessary to understand and protect communities that may look very different from their own. CPD lacks effective training related to implicit and explicit bias, cultural competency and awareness, procedural justice, ethics, community dignity, community perceptions of the police in Chicago, and the effect of racial and ethnic segregation on Chicago's communities. Effective training on these and other related

topics, when accompanied by concrete reforms to problematic policies and practices, has been found to reduce uses of force in other jurisdictions.

171.    Training in the CPD Academy does not instill new recruits with adequate knowledge of constitutional policing. The Academy provides recruits with 1,000 hours of training on various topics but pays little attention as to whether the content is being effectively delivered or if the training matches recruits' needs. The DOJ noted that Academy training lacked detail and there was little attempt to engage recruits with the content of the lessons. One training supervisor described Academy training as "check the box training, meaning that the emphasis is on making a record of having provided training as opposed to actually providing effective instruction."

172.    Training materials are outdated and fail to integrate evolving legal standards or departmental policies. The DOJ noted that use of force trainings for officers relied on a video made 35 years ago, before several key Supreme Court decisions that changed the legal standards for evaluating the reasonableness of use of force.

173.    Many recruits leave the Academy without learning key lessons needed to ensure constitutional policing. The DOJ asked several officers to articulate when a use of force would be justified. Only one out of six even came close to stating the proper standard.

174.     Deficient training makes it impossible for the CPD to identify which recruits need further training and which recruits should be dismissed from the force because they are unable to police constitutionally or effectively. This is demonstrated by the fact that Academy attrition rates are close to zero, far below the average levels at police academies across the country.

175.     Similar to training in the Academy, Field Training for recruits is also deficient. The DOJ investigation found that the CPD Field Training Program "*actively undermines*, rather than reinforces, constitutional policing."

176.     CPD officials interviewed by the DOJ confirm the weaknesses of Field Training. Officials described the program as a "hot mess," "terrible," and simply "warm butts in seats."

177.     The Field Training Program is understaffed. There are not enough Field Training Officers ("FTOs") to observe and provide instruction or to develop an effective rapport with officers in the field. While the CPD has a goal of having 150 available FTOs, the DOJ Findings Report estimates that the number of currently available FTOs is between 60 and 75. This understaffing leads to placing recruits on patrols without a FTO prior to the completion of the Field Training Program. The DOJ described this practice as "dangerous" and stated that it "demonstrates CPD's disregard of the training necessary for new officers to do their jobs safely, effectively, and lawfully."

178.    Furthermore, relevant qualifications such as leadership, mentorship, and instructional skills are not considered when selecting new FTOs. An officer's disciplinary record will not bar an officer from being an FTO unless it resulted in a suspension of longer than seven days in the past year or if there were three or more suspensions in the past five years. Once FTOs are in place, they are never evaluated or held accountable for the success or failure of their training. There is neither regular auditing of the Field Training Program nor solicitation of feedback from recruits about what aspects of Field Training can be improved.

179.    In-service training is similarly inadequate. After the Academy, officers are not required to participate in any annual live training. In-service training is only offered sporadically and consists largely of reactive trainings, videos, or e-learning online courses. The DOJ reported that one officer summed up the entire in-service training program as "Watch a Video." CPD supervisors also acknowledged to the DOJ that officers do not pay attention to the video or e-learning trainings and that they were generally ineffective.

180.    There is no regular in-service training refreshing officers on important basic skills, such as when deadly force is justified. Officers reported to the DOJ that after they left the Academy they were never required to retrain on any basic skills:

"[I]nterviews were unanimous in their belief that the lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments."

181.    In-service training also fails to teach officers about changes in technology, the law, community expectation, Department policies, or national police practices.

182.    The in-service training that is provided is ad-hoc, disorganized and reactive to the latest crisis. For example, when the CPD implemented training around Investigatory Stop Reports in order to resolve an ACLU lawsuit, officers found the training to be inconsistent, contradictory, and confusing. It focused on how to fill out the required forms but utterly failed to address the broader context of constitutional policing and how to effectively and lawfully conduct stops, searches, and arrests.

183.    The CPD's Education and Training Division lacks the staff and resources to ensure that training is effective. The Division is understaffed and instructors are not selected based on skills or qualifications. The physical space used for training is in disrepair. Training equipment is old and breaks frequently. The expert retained by the DOJ found the shooting range at the Academy to be "exceptionally substandard."

## II. THE CITY OF CHICAGO AND THE CHICAGO POLICE DEPARTMENT'S POLICY AND PRACTICE OF EXCESSIVE FORCE OVERWHELMINGLY AND DISPARATELY IMPACTS MEMBERS OF THE BLACK AND LATINX COMMUNITIES.

184.    There are deep disparities in who is targeted by the CPD under the City's use of force policies and practices. These statistical inequities are not academic; they are due to explicit and implicit biases on the part of the CPD and a failed system of training, monitoring, and accountability that encourages the excessive and discriminatory use of force. Their result is that the City's Black and Latinx communities—adults and children—incur serious, physical harm at the hands of police officers at overwhelmingly higher rates than non-Black, non- Latinx individuals in the City.

185.    Racial discrepancies in use of force have increased substantially over the last decade. The proportion of CPD's uses of force against Black people crept upward between 2005 and 2015, even as the Black population of Chicago *fell* relative to other groups.

186.    These racial inequities are not only found in majority-Black neighborhoods on the South and West Sides of Chicago. Looking at data from 2013 to 2015, after the CPD's district realignment, of the five police districts with the highest rates of force against Black people, four are majority-white districts. Black people are only 1 percent of the population of the Jefferson Park district on the far Northwest Side of Chicago, but they make up 14 percent of the CPD's use of force cases against adults

81

in that district. Similarly, Black residents are just 9 percent of the population in the Near North district, but make up nearly 60 percent of adult uses of force by the CPD.

187.    Disparate uses of force are not restricted to majority-minority communities with higher crime rates. Black people are also subjected to force at higher rates in low-crime neighborhoods. The five police districts with the highest rates of force against Blacks per resident from 2013 to 2015 include the four police districts with the lowest murder rates in the city.

188.    Young Black men are particularly likely to bear the brunt of police violence. According to 2010 census data, Black men between the ages of 20 and 34 comprise 3 percent of the population of Chicago, but were nearly 40 percent of those subject to a CPD use of force between 2005 and 2015. On an annual basis, Black men between the ages of 20 and 34 are subjected to force at a rate of 18 incidents per 1,000 residents. White men in the same age range, in contrast, experience force at a rate of roughly 1.3 cases per 1,000 residents.

189.    Racial disparities exist in the most serious types of CPD violence. Black people made up 75 percent of those who were shot at by the CPD between 2005 and 2015, and Latinxs comprised 16 percent of CPD shootings. Whites were targets of only 6 percent of CPD shootings. Black people in the City of Chicago were shot at by police more than twelve times as often as whites during the same time period.

82

190.    Black people in Chicago were also the subjects of more than three quarters of all CPD Taser uses. The CPD reported using Tasers on Black people nine times more often than they used Tasers on whites between 2005 and 2015. Latinxs were also a higher percentage of Taser victims—subject to 14 percent of Taser uses, compared to whites, who were the subject of 8 percent of Taser uses.

191.    In 2014, We Charge Genocide, a grassroots, inter-generational effort to center the voices and experiences of the young people most targeted by police violence in Chicago, prepared a report for the United Nations Committee Against Torture on the state of the CPD. It described police-driven violence in the City as "endemic," and concluded: "Young people of color in communities across Chicago are consistently profiled, targeted, harassed, and subjected to excessive force by the (predominantly White) CPD—leaving far too many physically injured, killed, and emotionally scarred."

192.    Black and Latinx children are the subjects of 97 percent of all incidents involving police use of force against young people. The CPD has reported that 83 percent of the instances of police use of force against young people involved Black children and 14 percent involved Latinx children.

193.    All these statistics reflect the lived reality expressed time and time again by those in the community, including by the members of the organizational Plaintiffs.

83

III.     **THE CITY OF CHICAGO IS INCAPABLE OF REFORMING ITSELF AND FEDERAL COURT OVERSIGHT IS THE ONLY MEANS OF ENSURING TRUE CHANGE TO THE CHICAGO POLICE DEPARTMENT.**

194.     In 2007, when the CPD's Special Operations Unit was disbanded, the interim superintendent of police, Dana Starks, said the CPD would more closely keep track of its officers.

195.     But it has repeatedly been unable and unwilling to do so. The CPD's disciplinary apparatus has undergone multiple changes over the decades, with little actual improvement in accountability. Each of these changes has occurred in the wake of public outcry over the City's abusive and discriminatory law enforcement practices. But each set of reforms has failed to alter the deep-seated policies, practices, and culture of discriminatory police violence outlined in this Complaint.

196.     This history of unsuccessful reforms makes clear that the CPD is incapable of policing itself.

197.     The City created the Office of Professional Standards (OPS) in 1974, in response to public concerns over CPD internal investigations of police abuse. But OPS lacked any independence from the outset. OPS was headed by a chief administrator who was under the police department's jurisdiction, appointed by the mayor, and vulnerable to pressure by the police union. OPS investigations were characterized by a total lack of transparency and effectiveness.

198. OPS, under each of its leaders, lacked subpoena power, publicized little about its investigations, and made no effort to track trends and patterns in police abuse. The burden remained on the complainant to prove allegations of misconduct against police. Investigations took years, if they happened at all. OPS rarely sustained complaints of police brutality.

199. Not only was OPS ineffective, it engaged in the wholesale concealment of police abuse. Most famously, OPS participated in the cover up of the Burge scandal. It suppressed evidence of police torture for months, while Burge remained on the force.

200. OPS also failed to hold accountable officers who engaged in quotidian displays of abuse and misconduct. In 1999, two innocent youths, LaTanya Haggerty and Robert Russ, were killed by police. Neither were armed. The officer who shot Russ got a mere 15-day suspension. In 2002, Officer Jerome Finnegan, who had by that time amassed more than 70 citizen complaints (all of which were unsustained), was accused of beating a Chicago firefighter and threatening to put drugs on him. OPS failed to investigate him, and continued to turn a blind eye to his misconduct until federal prosecutors indicted Finnegan for criminal offenses. In 2004, a female university professor was beaten by Officer James Chevas, an officer with more than 50 complaints filed against him. The woman was charged with aggravated battery while OPS cleared

Chevas of wrongdoing. A federal jury found otherwise, and held the city liable for battery and malicious prosecution.

201.    In 2007, the City established IPRA as a supposed solution to OPS's failings and in response to a lack of public faith in the Department's ability to address police misconduct. IPRA was implemented in the wake of a spate of police shootings and unchecked brutality, including Chicago Police Officer Anthony Abbate's violent beating of a female bartender captured on videotape. IPRA, like OPS before it, was intended to counter decades of complaints of biased and incompetent investigations into police misconduct.

202.    As the DOJ investigation found, IPRA was but a continuation of OPS. It had a strong institutional bias and organizational culture that promoted the protection of police.

203.    IPRA, like OPS, has failed to consider individual officers' prior misconduct in investigating charges. IPRA, like OPS, has failed to investigate patterns of officer abuse city-wide. It has countenanced false reports by officers, refused as a matter of practice to sustain complaints despite clear evidence of officer misconduct, refused to investigate officers who covered up the misconduct of fellow officers (including the officers who covered up the Laquan McDonald shooting), never

recommended the termination of on-duty officers who unlawfully shot citizens, and like OPS, maintained a deep institutional bias in favor of police.

204.    Now, in the wake of the Laquan McDonald shooting and cover-up and subsequent DOJ investigation, the City has offered COPA and other reform gestures in response to public pressure and the threat of federal oversight. But COPA has serious flaws, as outlined above. And the City has proven that it lacks the political will to address its pattern of excessive and discriminatory use of force, or follow through on its promises of reform after political crisis or imminent threat of federal oversight subsides.

205.    The history of the City of Chicago's response to the McDonald shooting is illustrative of the municipality's unwillingness to confront systematic police abuse.

206.    After the shooting, the City issued a false press release and defended it as justified. It thereafter suppressed the video footage of McDonald's death for more than a year, despite the fact that it showed CPD Officer Van Dyke unloading 16 shots into 17-year old McDonald – including at least 14 while he lay on the ground – without cause. The City, in fact, actively opposed the public dissemination of the video. When a Cook County judge eventually ordered its release, the video confirmed not only that the shooting was unlawful, but that City officials, including the Superintendent of the CPD, the City's Law Division, and the Mayor's Office, as well as officers on the scene at the

time of the shooting, had deliberately concealed Van Dyke's misconduct by issuing false police and media reports.

207.    Yet, even after the video went public, and in the midst of widespread protests and national scrutiny, the mayor continued to deny there were systemic problems in CPD's use of force. Emanuel claimed McDonald's death was the act of a "bad apple," and maintained publicly that he did not support a federal investigation of the police force. He eventually reversed course and admitted systemic problems, including the continued existence of the police code of silence, but only in response to public pressure and intense media scrutiny calling for independent oversight.

208.    Upon the release of the 2017 DOJ Findings Report, Mayor Emanuel finally conceded that there had been decades of complaints regarding misconduct by CPD officers. He said that the DOJ Findings Report was "a moment of truth for the city," and repeated pledges for reform. Mayor Emmanuel signed an "Agreement in Principle" with federal officials in January 2017 to commit to negotiate a consent decree, culminating in the appointment of a federal monitor.

209.    But the City continues to maintain and enable a deep-seated culture of denial and violence in the CPD that is resistant to reform. In recent months, with the change in the federal administration, the Mayor has retreated from his prior commitments. He now contends the City does not need federal court oversight, and in

fact, the mayor's aides have stated that Emanuel *never* sought judicial oversight of the CPD. At the same time, newly-elected Fraternal Order of Police President Kevin Graham, a patrol officer with the CPD, has disagreed publicly with the DOJ Findings Report, and Emanuel's erstwhile pledges of reform.

210.    Time and again, the City has revealed that it is institutionally unable to end its years-long practice of civil rights violations. Federal judicial intervention is the only means by which the rights of Plaintiffs and the class they represent will be vindicated.

211.    It is also clearly justified. Community members, Illinois stakeholders and federal officials have all acknowledged that the CPD engages in a pattern and practice of unconstitutional force, and that a consent decree and federal court oversight are necessary to address the CPD's systemic deficiencies and constitutional abuses.

212.    Superintendent Eddie Johnson admitted that some of the findings in the DOJ Report were "difficult to read" and that the Department "need[s] to do better." He acknowledged that he is "realistic about the fact that there is much, much, much more work that needs to be done" in making reforms to the department.

213.    Zachary Fardon, who served as U.S. Attorney for the Northern District of Illinois when the DOJ initiated its investigation of the CPD and released its report, issued an "Open Letter" on March 13, 2017, encouraging the City to enter into a consent

decree in order to address "the systemic deficiencies in training, supervision and

accountability" within the CPD.  He stated that a consent decree with an independent

monitor was "the only way" to eradicate the system-wide problems within the CPD.

214.    Upon the conclusion of the DOJ investigation in January 2017, former U.S.

Attorney General Loretta Lynch announced that the CPD had a pattern of

unconstitutional force, "largely attributable to systemic deficiencies within CPD and the

city."

215.    Christy Lopez, a former DOJ attorney who helped lead that investigation

stated in early June 2017 that she had "never seen a department that screams out for a

consent decree more than Chicago."

216.    Vanita Gupta, the former head of the DOJ's Civil Rights Division, declared

that the City of Chicago must implement broad reforms via a consent decree overseen

by the federal courts to remedy "deep and long-standing" policing concerns in Chicago.

217.    And Illinois Attorney General Lisa Madigan has just called for

"enforceable" reform to the CPD, which she states requires a court-ordered consent

decree.

218.    Because of the City's intrinsic inability to reform itself, court oversight is

the only solution to the longstanding problems of police violence.

## IV.   VIOLATIONS OF THE INDIVIDUAL PLAINTIFFS' RIGHTS BY THE DEFENDANT OFFICERS.

219.   The rights of the named Plaintiffs were violated by the Defendant Officers as part of the CPD's pattern and practice of discriminatory policing, excessive force, failure to train, monitor and supervise, and the pervasive code of silence, as outlined above. As a direct result of the policies described herein, these officers were encouraged and led to believe that they could brutalize each of the named Plaintiffs with impunity. They knew that their fellow officers, who observed the abuse, would not report them or otherwise intervene to stop them from harming the named Plaintiffs. The City of Chicago's policies and practices were the moving force behind the alleged misconduct.

### A.  Immanuel Campbell

220.   On the evening of July 9, 2016, around the intersection of Roosevelt Road and Michigan Avenue, Mr. Campbell was engaged in a peaceful demonstration, the goal of which was to bring attention to the topic of police misconduct in Chicago.

221.   During the demonstration, Mr. Campbell and other participants were approached by several officers, including Defendants Coriell, Ostrowski, McGuire, and Boylan.

222.   While Mr. Campbell stood unresisting with hands at his sides, these officers pushed him into a crowd of other officers and then to the ground. They physically beat him. The Defendant Officers had no grounds to use force on Mr.

Campbell. At no time did Mr. Campbell commit any crime, or assault or threaten to assault the officers.

223.    The Defendant Officers then arrested Mr. Campbell without probable cause to cover up the excessive force they used during the peaceful demonstration. They handcuffed Mr. Campbell, took him to the police station, and kept him in custody for several hours. They charged him with a city ordinance violation of obstruction of traffic by a non-motorist, as well as a misdemeanor offense of resisting arrest. These charges were wholly unfounded. Yet, as a result, Mr. Campbell faced a sentence of up to 364 days in jail and was forced to defend himself in a court of law.

224.    Mr. Campbell thereafter received medical treatment at Carle Hospital in Urbana, Illinois on July 11, 2016. He was diagnosed with and treated for multiple contusions that he sustained during his encounter with the Defendant Officers.

225.    On January 17, 2017, all charges against Mr. Campbell were dismissed in a manner indicative of his innocence. Nevertheless, Mr. Campbell, a member of the University of Illinois football team, was let go from the team as a result of the false arrest.

226.    Mr. Campbell was subjected to humiliation, public ridicule and embarrassment as a result of the Defendant Officers' actions. Mr. Campbell regularly

participates in mental health therapy sessions to deal with the trauma he suffered at the hands of the Defendant Officers.

227.    Mr. Campbell was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive force, inadequate discipline and training, and in furtherance of the code of silence, as described above.

228.    Mr. Campbell was subjected to unlawful arrest and excessive force in large part because he was a Black man in the City of Chicago, and because he chose to peaceably attend a protest against the use of police excessive force targeted at Black individuals.

229.    The location in which Mr. Campbell was abused, the South Loop area of Downtown, is in the 1st District, which has a population that is 21 percent Black, but in which Blacks comprise 66 percent of all adults subjected to force between 2013 and 2015. Black adults in the district were subject to force at a rate of about 6 per 1,000 residents—seven times the rate of white people—from 2013 to 2015. Young Black men were subject to force in that period at an estimated rate of 21 incidents per 1,000 residents per year. Thus, a young Black man has a roughly 19 percent chance of having forced used on him over a ten-year span. Blacks also make up 75 percent of those detained in formal investigatory stops in that district. From January 2016 to March 2017,

Black adults were stopped at a rate of about 88 times per 1,000 residents, or more than 11 times the rate of white people.

230. The incident involving Mr. Campbell took place at the corner of four police beats (114, 123, 131 and 132). Between 2013 and April 2016, 202 individuals were subject to force in these beats—122 of them were Black. There were also nine Taser uses in that time by the CPD, and six of them were against Black subjects.

231. The Defendant Officers who attacked Mr. Campbell have a history of misconduct. Since joining the CPD, Defendant McGuire has been accused of misconduct on at least 14 separate occasions and required to justify his use of force to his superiors on at least 5 occasions; Defendant Coriell has been accused of misconduct on at least 7 separate occasions and required to justify his use of force on at least 3 occasions; Defendant Ostrowski has been accused of misconduct on at least 2 occasions and required to justify his use of force on at least 4 occasions; and Defendant Boylan has been accused of misconduct on at least 2 separate occasions and required to justify his use of force on 8 separate occasions. The misconduct complaints against these Defendants include allegations of unnecessary use of force while on duty. Yet the Defendant Officers have directly benefited from the City's policies and practices of granting impunity to officers who commit misconduct. None of the Defendant Officers has ever been disciplined by the CPD for use of force.

### B. Rubin Carter

232.     On April 8, 2017, Plaintiff Rubin Carter was visiting the West Town neighborhood of the City of Chicago. Mr. Carter, a resident of Forest Park, Illinois, often frequented that Chicago neighborhood, which is where his cousin resides.

233.     At about 11 p.m., at the corner of Rockwell Street and Chicago Avenue, Mr. Carter was stopped by CPD Officers Miguel Villanueva and Josue A. Ortiz. Defendants Villanueva and Ortiz shot Mr. Carter repeatedly with a Taser gun in his stomach and chest. Defendant Ortiz continued to tase Mr. Carter as he lay on the ground in excruciating pain. The Defendant Officers had no grounds to discharge the Taser into Mr. Carter. At no time did Mr. Carter commit any crime, or assault or threaten to assault the officers.

234.     After being tased, the Defendant Officers arrested Mr. Carter without probable cause and charged him with two counts of aggravated assault on a peace officer. These charges were unfounded.

235.     Defendant Officers Villanueva and Ortiz authored police reports that falsely stated Mr. Carter posed a physical threat to the officers. Mr. Carter posed no such threat and was breaking no laws when the Defendant Officers repeatedly attacked him.

236.    As a result of the Taser attack Mr. Carter suffered serious pain and an exacerbation of a pre-existing heart condition. He required medical care at Norwegian American Hospital, where he was brought by the Defendant Officers after his false arrest. Mr. Carter was also subjected to humiliation, public ridicule, and embarrassment as a result of the Defendant Officers' actions

237.    The charges against Mr. Carter remain pending. Despite the fact that the Taser attack was unwarranted and the summary of the incident in Mr. Carter's arrest reports entirely fabricated, the Defendant Officers' supervisors signed off on the arrest, approving the officers' misconduct. Defendant Villanueva failed to report Defendant Ortiz's misuse of the Taser gun.

238.    Mr. Carter was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive force, and inadequate discipline and training, and in furtherance of the code of silence, as described above.

239.    Mr. Carter was stopped and tased in large part because he was a Black man in the City of Chicago. At the time of the attack on Mr. Carter, the Defendant Officers were deployed in Beat 1211 in the 12th district of Chicago, on the Near West Side. Use of force data shows that Black people, who make up 18 percent of residents in the 12th district, comprise 52 percent of the individuals subject to police force between

96

2013 and 2015. Young Black men are subject to force roughly three and a half times as often as young white men, even though there are more than twice as many white residents of the district. Overall, young Black men have an estimated 9 percent chance of being subject to force over a ten year period. Black people in the 12th district are also subject to a disparate rate of investigatory stops by police—they make up 49 percent of all investigative stops, and are stopped at ten times the rate of their white peers.

240. Defendant Ortiz, who attacked Mr. Carter, has a long history of misconduct. Since joining the CPD, he has been accused of committing misconduct, including excessive force and unnecessary physical contact, on at least 24 occasions. He has been required to justify his use of force to his superiors on at least 16 occasions. Yet, Defendant Ortiz has directly benefited from the City's policies and practices of granting impunity to officers who commit misconduct. He has never been disciplined by the CPD for use of force.

**C. Markees Sharkey**

241. On October 6, 2015, Plaintiff Markees Sharkey was visiting his girlfriend in the West Pullman neighborhood of Chicago. Mr. Sharkey is himself a resident of the South Side of Chicago.

242. While Mr. Sharkey was at the residence, Defendant Officers Cade and Morris arrived at the house and began escorting Mr. Sharkey out.

243.    Defendant Officer Bolin then arrived at Mr. Sharkey's girlfriend's residence. Defendant Bolin blocked Mr. Sharkey's exit from the house and started yelling profanities at the Plaintiff. Throughout the encounter, Defendant Bolin referred to Mr. Sharkey as a "motherfucker" and a "stupid ass nigger." He also threatened repeatedly to beat Mr. Sharkey.

244.    Defendant Bolin then handcuffed Mr. Sharkey, placed him in the back of a marked police vehicle, and without reading him rights and without probable cause, placed him under arrest. Defendant Officers Cade and Morris, who were also present at the time, did nothing to intervene to prevent Defendant Bolin's unlawful arrest or stop him from making derogatory and racist comments toward Mr. Sharkey.

245.    While en route to the police station at the 5th district, Defendant Bolin pulled the police car over to the side of the street and began beating Mr. Sharkey about the back, head, shoulders and legs with his baton. While hitting him, Defendant Bolin cursed at Mr. Sharkey and continued making racial slurs. Defendant Bolin had no cause to physically abuse Mr. Sharkey.

246.    Defendant Cade and Morris, who were following Defendant Bolin in a separate police car, pulled over and told Defendant Bolin to stop abusing Mr. Sharkey. Yet neither Defendant Cade nor Defendant Morris reported Defendant Bolin's misconduct.

247.     At the 5th district police station, Mr. Sharkey was placed in lockup and charged with aggravated assault to a police officer. The charges were unfounded. Defendant Bolin trumped them up to conceal his own excessive use of force against Mr. Sharkey.

248.     As a result of Defendant Bolin's abuse, Mr. Sharkey suffered physical pain and bruising all over his body. Mr. Sharkey was also subjected to humiliation, public ridicule and embarrassment as a result of the Defendant Officers' actions.

249.     The charges against Mr. Sharkey remain pending. A teenager at the time of the incident, Mr. Sharkey has now been incarcerated for almost a year and been unable to attend regular school or maintain employment. He has missed countless gatherings and holidays with his family. Due to his young age, he is incarcerated in protective custody at the Cook County Jail under highly restrictive conditions.

250.     Despite the fact that the baton attack was unwarranted, and the summary of the incident in Mr. Sharkey's arrest reports fabricated, the Defendant Officers' supervisors signed off on the arrest, approving the officers' misconduct. Defendants Cade and Morris failed to report any of Defendant Bolin's misconduct.

251.     Mr. Sharkey was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive

force, and inadequate discipline and training, and in furtherance of the code of silence, as described above.

252. Mr. Sharkey was arrested and beaten in large part because he was a Black teenager in the City of Chicago. Defendant Bolin attacked Mr. Sharkey within Beat 524 of the 5th district, which is more than 95 percent Black. CPD use of force overwhelmingly targets Black people in that district. The bordering 22nd district (which includes Mount Greenwood, Beverly, and Morgan Park) has significant racial disparities in force. Black people comprise 61 percent of the population in that district but 88 percent of those subject to force by police between 2013 and 2015. A third of the 22nd district's population is white, but only 9 percent of subjects of police force are white. Young Black men in the 22nd District were subject to more than thirteen times more uses of force than their white peers. In the 5th District beats, there have been 686 force incidents since 2004, 97 percent of which involved Black people. This includes 51 tasings and 26 cases where police shot at someone (five since 2014). Based on CPD rates of force, in the 5th district, young Black men have an estimated 10 percent chance of being subject to police force over a ten year period.

253. Young Black men in the both the 5th and 22nd districts are also subject to disparate rates of investigatory stops by police. In the 5th district, young Black men are stopped approximately seven times the average rate for adults citywide; in the 22nd

district, young Black men account for 20 times as many stops as young white men, even though Black residents outnumber whites by a ratio of less than two to one.

254.    Defendant Bolin, who attacked Mr. Sharkey, has a long history of misconduct. Since joining the force, he has been accused of misconduct, including excessive force, on at least 17 separate occasions, and he has been required to justify his use of force to his superiors at least 11 times. Yet, Defendant Bolin has directly benefited from the City's policies and practices of granting impunity to officers who commit misconduct. He has never been disciplined by the CPD for use of force.

### D. Deonte Beckwith

255.    Mr. Beckwith was falsely arrested on the evening July 16, 2016 in the South Shore neighborhood of Chicago, where he is a resident.

256.    Defendant Officers Jonas, Polson, Jung and Pena stopped Mr. Beckwith without any probable cause to believe that he had committed a crime, as Mr. Beckwith pulled his car into his garage to his home.

257.    As Mr. Beckwith got out of his car with his hands up, the Defendant Officers pulled Mr. Beckwith's hands behind his back and put him in handcuffs.

258.    The Defendant Officers threw Mr. Beckwith to the ground, while he was handcuffed.

259.     The Defendants later maliciously beat Mr. Beckwith, while he was still handcuffed, without any legal justification.

260.     As a result of the Defendant Officers' brutality, Mr. Beckwith suffered serious bruising, swelling, cuts and pain to his head, face and shoulders, as well as a cut to the side of his head that required stitches. The Officers' use of force caused blood vessels to pop in Mr. Beckwith's eye. He was treated for his injuries at the hospital.

261.     In order to conceal their use of excessive force, the Defendant Officers falsely arrested and charged Mr. Beckwith with aggravated battery of a police officer and resisting arrest.

262.     Mr. Beckwith was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive force, inadequate discipline and training, and in furtherance of the code of silence, as described above.

263.     Mr. Beckwith was arrested and beaten in large part because he was a Black man in the City of Chicago. The Defendant Officers attacked him within Beat 333 of the 3rd District, which is 94 percent Black, and in which Black people comprise 97 percent of those subject to police use of force. Since 2004, 579 individuals—almost all Black—have been the victims of police force within Beat 333 and nearby Beats 331, 332, and 334. In that same time period, 15 individuals were shot at and 59 were tased by the

police. Young Black men in the 3rd District have an estimated 11 percent chance of being subject to police force over a ten year period.

264.    Young Black men in the district are also subject to police stops at a disparate rate—270 stops per 1,000 residents over the 1.25 year period for which stop information is available. Black individuals make up 97 percent of those subject to formal investigatory stops. Young Black men in the 3rd District are stopped at roughly 7 times the citywide average for adults.

265.    Some of the Defendants who attacked Mr. Beckwith have long histories of misconduct. Defendant Jung, for example, has been accused of misconduct, including unnecessary physical contact, illegal arrest, illegal search, and failure to submit proper reports, at least 59 times, and he has been required to justify his use of force to his superiors on at least 27 occasions over the course of his career. Yet, Defendant Jung has directly benefited from the City's policies and practices of granting impunity to officers who commit misconduct. He has never been disciplined by the CPD for use of force.

**E.  Chante Linwood**

266.    On April 3, 2016, Chante Linwood was visiting the Gold Coast neighborhood with friends, including Plaintiff Rachel Jackson, with plans to attend a club on Division Street. Ms. Linwood is a Chicago resident who works as a popular

deejay, and is a mother of two young children. At the time of the incident she was pregnant with her second child.

267.    Ms. Linwood and her friends had plans to investigate the space at the club for possible future deejaying opportunities. They had been told by others—current DJs at the club—to stop by, that their names would be on the club's entrance list, and that their entrance fee would be paid.

268.    When Ms. Linwood and her friends attempted to enter the club they were refused entrance for improper footwear. Though their names were on the list, the security guard at the door was aggressive and told them they "would never get into" the club. Ms. Linwood and her friends subsequently left the doorway of the establishment, and stood on the adjoining public sidewalk. The security guard then told them to get off the sidewalk, and called over officers with the CPD.

269.    Since the early 2000's, the City of Chicago and its police officers have worked in conjunction with clubs and lounges in the Downtown and Near North districts to discourage Black and Latinx young adults from attending the entertainment areas in those communities. In furtherance of this effort, business owners and the police have colluded to allow bouncers to engage in racial profiling of potential guests, and to aggressively remove Black and Latinx adults from entrances to clubs. Ms. Linwood was subjected to this racist policy of exclusion.

270.   Ms. Linwood was then detained by Chicago Police Sergeant Lawrence Gade Jr. and Officer John Lavorata. Without cause, the Defendant Officers performed an emergency takedown of Ms. Linwood, slamming her into a building on Division Street, and pulling her hair back from her head. The Defendant Officers shoved her into the ground, and placed their knees on her back. Ms. Linwood screamed in pain during the entire encounter. The Defendant Officers then placed handcuffs on her, and in the process, wrenched her shoulders behind her back, causing her further pain.

271.   As a result of the Defendants' abuse, Ms. Linwood suffered severe shoulder pain. She was unable to lift up her arms for days after the occurrence. Her injuries were compounded by the fact that she suffers from fibromyalgia. She was also subjected to humiliation, public ridicule and embarrassment as a result of the Defendant Officers' actions.

272.   Ms. Linwood was thereafter charged with resisting arrest and disorderly conduct. These charges were filed by the Defendant Officers to conceal their own misconduct in subjecting her to excessive force.

273.   The Defendant Officers did not read Ms. Linwood her Miranda rights when she was put under arrest. After being arrested, Ms. Linwood was taken into police custody and kept overnight in lockup. She was repeatedly searched by CPD and Cook County jail lockup keepers, and forced to spend the night in cold cells, without a

coat. For hours, she was prohibited by lockup officers from calling her babysitter and informing her she would not be home that night. A lockup officer who refused her request to use the phone told her she had no business being at a club if she was a mother.

274.　Ms. Linwood was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive force, and inadequate discipline and training, and in furtherance of the code of silence, as described above.

275.　Ms. Linwood was subjected to excessive force because she was a Black woman in the City of Chicago. The Defendant Officers attacked her within the Near North Side, in the 18th District, which has one of the largest racial force disparities in the City. The population of the 18th District is 9 percent Black, but Black people comprise 59 percent of adults subject to force in the district between 2013 and 2015. The ratio of uses of force on Black people per Black resident of the district is over 19 times the ratio for whites. In the 18th District, Black people are subject to force at an annual rate of roughly 9 incidents per 1,000 residents (based on data from 2013 to 2015). But this rate is substantially higher for certain groups, particularly younger men and women like Ms. Linwood.

276.     Since 2004, there have been 1,135 individuals subjected to police force in four beats within the 18th District (1821, 1822, 1823, and 1824); 672 of these involved Black subjects. There were also 48 Taser uses over the period in question, 31 of which involved Black subjects.

277.     Black individuals make up 76 percent of those subject to formal investigatory stops in the 18th district; Black people overall were stopped about 146 times per 1,000 residents between January 2016 and March 2017, which is 46 times the stop rate for white people in the district.

278.     The Defendants who attacked Ms. Linwood have long histories of misconduct. Over the course of his career on the force, Defendant Gade Jr., a sergeant, has been accused of misconduct, including unnecessary physical contact, illegal arrest, illegal search, and discriminatory verbal abuse on the basis of race or ethnicity, at least 45 times. He has been required to justify his use of force to his superiors at least 26 times. Defendant Lavorata has been accused of misconduct at least 9 times, and required to justify his use of force on 31 separate occasions. Yet, the Defendant Officers have directly benefited from the City's policies and practices of granting impunity to officers who commit misconduct. They have never been disciplined by the CPD for use of force.

### F. Rachel Jackson

279.    On April 3, 2016, Rachel Jackson was visiting the Gold Coast neighborhood with friends, including Plaintiff Chante Linwood, with plans to attend a club on Division Street. Ms. Jackson is a lifelong Chicago resident who works as a 3rd grade teacher in the Chicago Public School system. She is also a poet and playwright.

280.    Ms. Jackson and her friends intended to investigate the space at the club for possible future deejaying opportunities for Ms. Linwood. They had been told by others—current DJs at the club—to stop by, that their names would be on the club's entrance list, and that their entrance fee would be paid.

281.    When Ms. Jackson and her friends attempted to enter the club, her friends were refused entrance by the club security guard for improper footwear. Ms. Jackson, who was wearing appropriate attire, was told by that same guard that her "shoes may get in" but she "would not." Though Ms. Jackson's and her friends' names were on the list, the security guard at the door was aggressive and told them they "would never get into" the club.

282.    Ms. Jackson and her friends subsequently left the doorway of the establishment, and stood on the adjoining public sidewalk. The security guard then told them to get off the sidewalk, and called over officers with the CPD.

283.    Ms. Jackson, like Ms. Linwood, was subjected to the racist policy of exclusion perpetuated by local club owners and the City of Chicago, as described above.

284.    Ms. Jackson was then stopped and detained by Chicago Police Sergeant Lawrence Gade Jr. and Officer John Lavorata. Upon being called over by the club's security guard, one of the Defendant Officers shoved Ms. Jackson out of the way, and started to abuse Ms. Linwood, as described above. Ms. Jackson saw her friend being slammed into the wall and the ground by the Defendant Officers, and attempted to film the incident with her phone. At that point, one of the Defendant Officers tried to block Ms. Jackson from filming. When Ms. Jackson continued filming the Defendant Officers' abuse, the Defendants slammed her into a wall, and handcuffed her.

285.    Ms. Jackson was thereafter arrested without probable cause and charged with resisting arrest and disorderly conduct. These charges were filed by the Defendant Officers to conceal their own misconduct in subjecting her to excessive force. The Defendant Officers did not read Ms. Jackson her Miranda rights when they subjected her to false arrest.

286.    As a result of the Defendants' actions, Ms. Jackson incurred bruising and abrasions, and significant pain. For days after the incident, she had marks and bruises on her wrists from where the Defendant Officers subjected her to overly tight

handcuffing. She was also subjected to humiliation, public ridicule and embarrassment as a result of the Defendant Officers' actions.

287.    After being arrested, Ms. Jackson was taken into police custody and kept overnight in lockup. She was forced to stay in cold cells, without a coat, and she was unable to eat or sleep. She was repeatedly searched, and taunted and harassed by CPD lockup keepers and employees of the Cook County Jail.

288.    The charges against Ms. Jackson were eventually dismissed, in a manner indicative of innocence.

289.    Ms. Jackson was harmed by the Defendant Officers as they were acting in accordance with the City's policies and practices of discriminatory policing, excessive force, and inadequate discipline and training, and in furtherance of the code of silence, as described above.

290.    Ms. Jackson was subjected to excessive force because she was a Black woman in the City of Chicago. She was harmed in the same area of the City as Ms. Jackson, which has significant racial disparities in the CPD's uses of force and investigatory stops, as described above.

291.    The Defendants who attacked Ms. Jackson have long histories of misconduct, as described above, but have never been disciplined, in accordance with the City's failure to hold accountable officers who commit misconduct.

## CLASS ACTION ALLEGATIONS

292.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs bring this action on behalf of themselves and a class consisting of all persons who, since June 14, 2015, have been, or in the future will be, subjected to the CPD's use of force. Plaintiffs also seek relief on behalf of a sub-class of the Black and Latinx members of the larger class. The Plaintiffs seek declaratory and injunctive relief against the Defendants on behalf of the class.

293.    Plaintiffs and the class members are similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis.

294.    A class action is the only practicable means by which the named Plaintiffs and the class members can challenge the CPD's use of force and its racially discriminatory application. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many class members who have been victimized by the CPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by CPD officers.

295.    The class and subclass are so numerous that joinder of all members is impractical. Plaintiffs estimate that over 3,500 people are subject to force by the CPD each year. Between 2005 and 2015, the CPD used force on an adult approximately 42,500 times. In 30,736 cases the subject was Black, and in 6,364 cases the subject was Latinx.

There are approximately 895,000 Black residents and 786,200 Latinx residents in the City of Chicago, so complaints lodged against the CPD indicate that thousands of Black and Latinx Chicagoans have experienced excessive force. The class also includes a large number of future class members, including non-resident visitors to the City of Chicago.

296.    The declaratory and injunctive relief sought is common to all members of the Plaintiff Class and common questions of law and fact exist as to all members of the Plaintiff Class.

297.    The named Plaintiffs seek a declaration that the Defendants' excessive force practices and their racially discriminatory impact violate the constitutional law and state law rights of the Plaintiff class members, and an injunction prohibiting the continued use of excessive force and other racially discriminatory practices by the CPD.

298.    These common legal and factual questions arise from the Defendants' routine use of excessive force and other discriminatory police practices against Black and Latinxs and other individuals within Chicago. The City's policies are the proximate and direct cause of each of the violations suffered by the individual Plaintiffs and class members. The resolution of these legal and factual issues will determine whether all members of the Plaintiff class are entitled to the relief they seek.

299.    The questions of law or fact common to the class and subclass include, but are not limited to, the following: (i) whether the City maintains a policy or practice of

using excessive force, in particular against Black and Latinx residents of and visitors to Chicago; (ii) whether the City intentionally turns a blind eye to these abuses, promoting a code of silence within the CPD and within the City at large; (iii) whether the City fails to discipline or hold accountable the officers who, on a daily basis, physically harm individuals in this City without just cause or right; and (iv) whether the City fails to adequately train, supervise and monitor the CPD officers who engage in the use of excessive force targeted at Black and Latinx individuals.

300. The named Plaintiffs' claims are typical of those of the class and subclass. Like the other members of the class, the named Plaintiffs have been and likely will be again victims of the CPD's use of force. The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

301. The named Plaintiffs will fairly and adequately represent the interests of the class and subclass. They each possess a strong personal interest in the subject matter of the lawsuit and are represented by counsel with expertise in complex civil rights litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

302. The City has acted on grounds generally applicable to the class: their policies, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

### CLASS LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force
### (All Plaintiffs and the Class Against City of Chicago)

303. Each paragraph of this Complaint is incorporated as if restated fully herein.

304. The City of Chicago has implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of using unreasonable force against the members of the Plaintiff class in violation of the Fourth Amendment.

305. By acting under color of state law to deprive the named Plaintiffs and other class members of their rights under the Fourth Amendment, the City is in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the U.S. Constitution.

306. The CPD's constitutional abuses and violations were, and are, directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged and sanctioned by the City, including: (i) the encouragement, sanctioning, and failure to rectify the CPD's policy and practice of unreasonable force;

114

(ii) the failure to properly screen, train, and supervise CPD officers; (iii) the failure to

adequately monitor and discipline officers; and (iv) the perpetuation of a code of silence

within the City and CPD.

307.     The City has acted with deliberate indifference to the Fourth Amendment

rights of the named Plaintiffs and other members of the class. As a direct and proximate

result of the acts and omissions of the City, the Fourth Amendment rights of the named

Plaintiffs and other class members have been violated.

308.     Unless restrained by order of this Court, a real and immediate threat exists

that the Fourth Amendment rights of the named Plaintiffs and other class members will

be violated by CPD officers in the future. Moreover, because the City's policies,

practices, and/or customs subject the named Plaintiffs and other class members to

unreasonable force often only on the basis of race and/or national origin, the named

Plaintiffs and other class members cannot alter their behavior to avoid future violations

of their constitutional and civil rights at the hands of the CPD.

### COUNT II – 42 U.S.C. § 1983
### Violation of the Equal Protection Clause of the Fourteenth Amendment
### (All Plaintiffs and the Subclass Against the City of Chicago)

309.     Each paragraph of this Complaint is incorporated as if restated fully

herein.

310.    The City of Chicago has implemented, enforced, encouraged, and
sanctioned a policy, practice, and/or custom of using unreasonable force against the
named Plaintiffs and members of the Plaintiff class based solely on their race and
national origin, in violation of the Fourteenth Amendment. This use of unreasonable
force has been and is being conducted predominantly on Black and Latinx individuals
on the basis of racial profiling. The CPD intentionally applies a facially neutral policy in
a discriminatory manner. As a result, the CPD's policy, practice, and/or custom of using
unreasonable force violates the Equal Protection Clause of the Fourteenth Amendment.

311.    Data indicates that the CPD's unreasonable force practice has had a
discriminatory effect on Black and Latinx communities and that Black and Latinx
people are subjected to unreasonable force at far higher rates than are white similarly
situated individuals. Black, Latinx, and white people each make up approximately one-
third of the City's population. Nevertheless, as noted above, Black people comprised 72
percent of the documented cases of force used on an adult between 2005 and 2015,
while white people comprised just over 9 percent. During that same period, Black men
between the ages of 20 and 34 experienced police force at a rate about 14 times that of
their white counterparts, while Black women in the same age range experienced police
force about 10 ten times that of their white counterparts. Likewise, Latinxs were
subjected to force at more than double the rate of whites between 2005 and 2015. As also

noted above, from 2005 to 2015, Black people accounted for 75 percent of those shot at by the CPD and Latinxs comprised 16 percent of police shootings, while whites comprised 6 percent of CPD shootings. Black people were shot at by the CPD more than twelve times as often as whites during the same time period. With respect to children in particular, Black and Latinx youth were the subject of 83 and 14 percent respectively of all incidents involving police use of force against children.

312.    By its acts and omissions, the City has acted under color of state law to deprive the named Plaintiffs and class members of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

313.    The CPD uses unreasonable force with a discriminatory purpose. Defendants pursued this policy precisely because of the adverse effects it has on Black and Latinx individuals.

314.    This discriminatory purpose is evidenced by the CPD's repeated use of racially charged and abusive language. The individual named Plaintiffs, as well as plaintiffs in other pending and settled cases involving allegations of excessive use of force by the CPD, reported that officers using racially charged language during their encounters. CPD officers routinely call Black people the n-word, and direct other racial epithets at both Blacks and Latinxs, including "monkey," "animal," and "savage." Citizens regularly complain about the use of such language by the CPD. As noted

above, for the period from 2011 to March 2016, the CPD complaint database contained 980 police misconduct complaints coded as discriminatory verbal abuse on the basis of race or ethnicity—354 of these complaints were for the use of the n-word. CPD officers also regularly express their discriminatory views on social media, including posting racist statements and graphic pictures with derogatory captions.

315.    The City was and remains deliberately indifferent to the unconstitutional acts committed by CPD officers through their use of unreasonable force. Subordinates of the City have carried out this policy at least in part because of the adverse effects it has had on Black and Latinx individuals, and a reasonable inference can be drawn that supervisors have intended those effects to occur. Despite frequent notice of racial disparities in the use of unreasonable force, most recently in the January 2017 DOJ Findings Report, the City's policies and practices concerning use of force remain fundamentally unchanged. Senior officials also have consistently failed to effectively discipline officers for proven violations. The senior officials themselves have also participated in these violations. These factors show a deliberate indifference on the part of the City over the unlawful consequences of the CPD's use of unreasonable force.

316.    The CPD's constitutional abuses were and are directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City, including: (a) the encouragement, sanctioning,

and failure to rectify the CPD's policy and practice of unreasonable force; (b) the failure to properly screen, train, and supervise CPD officers; (c) the failure to adequately monitor and discipline officers; and (d) the perpetuation of a code of silence within the City and CPD.

317. Unless restrained by order of this Court, a real and immediate threat exists that the Fourteenth Amendment rights of the named Plaintiffs and other class members will be violated by CPD officers in the future. Moreover, because the City's policies, practices, and/or customs subject the named Plaintiffs and other class members to unreasonable force often only on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the CPD.

318. As a direct and proximate result of the aforesaid acts and omissions of the City of Chicago, the Fourteenth Amendment rights of the named Plaintiffs and class members have been violated.

**Count III – State Law Claim**
**Violation of the Illinois Civil Rights Act of 2003, ILCS 23/5**
**(All Plaintiffs and the Subclass Against the City of Chicago)**

319. Each paragraph of this Complaint is incorporated as if restated fully herein.

320.    The criteria and methods that the City of Chicago applies with respect to the use of force, including those relating to training, monitoring, supervising, and disciplining such use, has resulted in the unreasonable use of force by CPD officers against Black and Latinx people, and a code of silence that insulates and perpetuates such unlawful activity.

321.    The City's discriminatory law enforcement practices constitute criteria and methods of administering force that create a disparate impact on Black and Latinx people, in violation of the Illinois Civil Rights Act of 2013, section 5(a)(2).

## INDIVIDUAL LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force and False Arrest
### (All Individual Named Plaintiffs Against Defendant Officers and City of Chicago)

322.    Each paragraph of this Complaint is incorporated as if restated fully herein.

323.    The actions of the Defendants described herein constituted unreasonable and excessive force, without legal cause, in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983.

324.    The actions by the Defendants in falsely detaining, arresting, and imprisoning Plaintiffs without reasonable suspicion or probable cause violated

Plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure,

pursuant to 42 U.S.C. § 1983.

325.    The misconduct described in this Count was objectively unreasonable and

was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly

established constitutional rights.

326.    The actions of the Defendants were the direct and proximate cause of the

violations of Plaintiffs' Fourth Amendment rights, bodily injury, pain, suffering, mental

distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set

forth more fully above.

### COUNT II – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiffs of their Constitutional Rights
### (All Individual Named Plaintiffs Against Defendant Officers and the City)

327.    Each paragraph of this Complaint is incorporated as if restated fully

herein.

328.    Each of the Defendants, acting in concert with other known and unknown

co-conspirators, conspired by concerted action to accomplish an unlawful purpose by

unlawful means.

329.    Each of the Defendants took concrete steps to enter into an agreement to

unlawfully use force on, detain, and arrest the Plaintiffs, knowing they lacked probable

cause to do so, and for the purpose of violating Plaintiffs' Fourth and Fourteenth Amendment rights.

330.    In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Plaintiffs' rights. They accomplished this goal by using excessive force to unlawfully effect the Plaintiffs' arrests, fabricating evidence against the Plaintiffs, and approving trumped up charges against them, which resulted in their unlawful imprisonment.

331.    Each individual Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

332.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including bodily injury, pain, suffering mental distress, anguish, humiliation, loss of income, and legal expenses, as set forth more fully above.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene
### (All Individual Named Plaintiffs Against Defendant Officers)

333.    Each paragraph of this Complaint is incorporated as if restated fully herein.

334.    During the events described above, the individual Defendant Officers stood by without intervening to prevent the violation of Plaintiffs' constitutional rights

under the Fourth and Fourteenth Amendments, even though they had the opportunity and duty to do so.

335.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

336.    As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

### Count IV – State Law Claim
### Civil Conspiracy
### (All Individual Named Plaintiffs Against Defendant Officers)

337.    Each paragraph of this Complaint is incorporated as if restated fully herein.

338.    The individual Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

339.    Each of the individual Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on, detain, and arrest the Plaintiffs, knowing they

lacked probable cause to do so, and for the purpose of violating Plaintiffs' Fourth and

Fourteenth Amendment rights.

340.   The individual Defendant Officers committed unlawful overt acts and

were otherwise willful participants in joint activity in furtherance of this conspiracy.

341.   The individual Defendant Officers acted with malice, willfulness, and

reckless indifference to the rights of others.

342.   Each individual Defendant is therefore liable for the violation of Plaintiffs'

rights by any other individual Defendant.

343.   As a direct and proximate result of the Defendants' conspiracy, Plaintiffs

suffered damages, including severe emotional distress and anguish, as a proximate

result of the individual Defendants' misconduct and conspiracy to engage in

misconduct.

### Count V – State Law Claim
### Intentional Infliction of Emotional Distress
### (All Individual Named Plaintiffs Against Defendant Officers)

344.   Each paragraph of this Complaint is incorporated as if restated fully

herein.

345.   The individual Defendant Officers' conduct described above was extreme

and outrageous. The Defendants' actions were rooted in an abuse of power or authority.

Defendants intended to cause, or recklessly disregarded the probability that their

conduct would cause, severe emotional distress to Plaintiffs.

346.    Plaintiffs suffered and continue to suffer emotional distress as a direct and

proximate result of the individual Defendant Officers' actions.

**COUNT VI – State Law Claim**
**Malicious Prosecution**
**(Plaintiffs Campbell and Jackson Against Relevant Defendant Officers)**

347.    Each paragraph of this Complaint is incorporated as if restated fully

herein.

348.    Defendant Officers Coriell, Boylan, and Ostrowski pressed charges against

Immanuel Campbell, knowing them to be without genuine probable cause. The

Defendants made statements to prosecutors with the intent of exerting influence, and to

institute and continue the judicial proceedings against Mr. Campbell.

349.    Defendant Officers Gade Jr. and Lavorata pressed charges against Rachel

Jackson, knowing them to be without genuine cause. The Defendants made statements

to prosecutors with the intent of exerting influence, and to institute and continue the

judicial proceedings against Ms. Jackson.

350.    The Defendant Officers caused Plaintiffs Campbell and Jackson to be

improperly subjected to judicial proceedings for which there was no probable cause.

These proceedings were instituted and continued maliciously, resulting in injury to both Mr. Campbell and Ms. Jackson.

351.    Statements of the Defendant Officers, including police reports, regarding the Plaintiffs' alleged culpability were made with knowledge that said statements were false. They Defendants fabricated police reports so as to bring charges against the Plaintiffs.

352.    The misconduct in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the Plaintiffs' rights.

353.    In January 2017, the prosecution was terminated in Plaintiff Campbell's favor, and in a manner indicative of innocence.

354.    In July 2016, the prosecution was terminated in Plaintiff Jackson's favor, and in a manner indicative of innocence.

355.    As a direct and proximate result of this misconduct, Plaintiffs Campbell and Jackson sustained, and continue to sustain, injuries, including emotional distress.

**COUNT VII – State Law Claim**
**Respondeat Superior**
**(All Individual Named Plaintiffs Against City of Chicago)**

356.    Each paragraph of this Complaint is incorporated as if restated fully herein.

357.     In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

358.     Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

## COUNT VIII – Indemnification
### (All Individual Named Plaintiffs Against City of Chicago)

359.     Each paragraph of this Complaint is incorporated as if restated fully herein.

360.     In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

361.     The individual Defendant Officers acted within the scope of their employment in committing the misconduct described herein. Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs Immanuel Campbell, Rubin Carter, Markees Sharkey, Deonte Beckwith, Chante Linwood, and Rachel Jackson, as well as Organizational Plaintiffs Black Lives Matter Chicago, Blocks Together, Brighton Park Neighborhood

Council, Justice For Families, Network 49, Women's All Points Bulletin, and 411

Movement for Pierre Loury, on behalf of themselves and the putative class they seek to

represent, request that this Court grant the following class-based relief:

a. Issue an Order certifying this case as a class action pursuant to Federal Rules

of Civil Procedure 23(a) and 23(b)(2);

b. Issue a class-wide judgment declaring that the policies, practices, and conduct

of the City of Chicago, through the CPD and as described in this Complaint,

constitute violations of the rights of Plaintiffs and the class they represent

under the U.S. Constitution and Illinois state law;

c. Issue an order granting the following injunctive relief:

i) Enjoining the CPD from its policy, practice and/or custom of
excessive use of force;

ii) Enjoining the CPD from its policy and practice of using force in a
racially discriminatory manner;

iii) Appointing an independent monitoring team that reflects the
diversity of Chicago's communities, and which will report to the
federal court on the status of the CPD's compliance with the order.
The Monitoring Team will have unfettered access to all CPD data,
records, videos and any other materials needed to assess
compliance with the order and will file monitoring reports on a
quarterly basis. The Monitoring Team will be required to
incorporate community perspectives in each monitoring report.
The monitoring reports shall be publicly available via a website, at
public libraries, community centers, and other locations that will
ensure communities' wide-spread access to the reports;

iv) The Plaintiffs seek an order from this Court designed to fundamentally transform the CPD operations related to use of force policies and practices, accountability supervision, discriminatory policing, training, data collection, and transparency, and ensure the CPD provides officers with the comprehensive training and supportive resources that they need to eliminate excessive and discriminatory uses of force. The specific provisions the Plaintiffs seek will include, but are not limited to the following:

a) **USE OF FORCE**: The development and implementation of use of force policy, practices, and training, including force reporting and oversight, that: (i) minimize the use of force to circumstances only when force is necessary, after other available means have been exhausted and, (ii) seek to limit the amount of force used to the least amount necessary under the circumstances, emphasizing principles of de-escalation, and tactics such as time and distance;

b) **ACCOUNTABILITY AND SUPERVISION:** The development and implementation of policies and practices ensuring that: the entire system of police accountability is community-based, impartial, transparent, effective, adequately resourced, and timely. The development and implementation of policies, practices, and training that address head-on the CPD's code of silence. Reformation of the CPD's supervisory practices and incentives to ensure constitutional and accountable policing. Revision to policies, procedures, supervision, and training concerning the use of police cameras and video;

c) **DISCRIMINATORY POLICING:** The development and implementation of policies, procedures, and a comprehensive training module ensuring that CPD officer actions and the CPD's programs and initiatives are free from discrimination on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation or gender identity and that all officers are responsible for intervening to stop instances of discriminatory policing and for reporting such instances to their direct supervisor(s);

d) **REDUCING UNNECESSARY POLICE RESPONSE:** The development and implementation of policies and procedures that reduce unnecessary police response, significantly reduce overall use of force incidents and eliminate racial disparities in the use of force, including but not limited to the following:  a data-driven pre-arrest diversion program that reduces excessive uses of force and racial disparities in the use of force by empowering officers with the discretion to divert people from the formal justice system; a requirement that officers obtain supervisory approval prior to making an arrest for certain minor offenses and offenses often falsely charged in an effort to conceal incidents of excessive force; the measurement, evaluation, and issuance of commendations at the individual, supervisory and agency level for  positive, non-arrest-based community-engagement, crime prevention and conflict resolution;

e) **DATA AND TRANSPARENCY:** The development and implementation of a system of public dissemination of all data and information pertaining to officer misconduct, including but not limited to: (i) judicial findings that an officer is not credible, (ii) civil lawsuits pertaining to all uses of force and the attendant investigations, whether conducted by BIA or COPA, including complainant allegations and, (iii) the release of video and other information in police misconduct and shooting investigations within 48 hours of the incident/receipt of the video. All public data used in the preparation of any reports should be made available as machine-readable data through a publicly accessible portal;

f) **SUPPORTIVE SERVICES FOR SURVIVORS OF POLICE VIOLENCE:** The provision of comprehensive, community-based, trauma-informed support services for individuals who are victims of excessive force and other forms of police misconduct.

130

d.  Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988;

e.  Grant such other relief as this Court deems just and proper.

The individual named Plaintiffs also seek compensatory damages against all Defendants for the violations alleged in this Complaint. They similarly seek punitive damages against the individual Defendant Officers for these violations.

Dated: June 14, 2017                          Respectfully submitted,


                                              /s/ Alexa Van Brunt
                                              One of the Attorneys for the Plaintiffs


Sheila A. Bedi                                Craig Futterman
Alexa Van Brunt                               Randolph N. Stone
Vanessa del Valle                             Mandel Legal Aid Clinic
MacArthur Justice Center                      University of Chicago Law School
Northwestern Pritzker School of Law           6020 S. University Avenue
375 E. Chicago Avenue                         Chicago, Illinois 60637
Chicago, Illinois 60611                       (773) 702-9611
(312) 503-1336

Brandon Schiller                              Andrew M. Stroth
April Preyar                                  Carlton Odim
Shiller Preyar LLC                            Action Injury Law Group
601 S. California Avenue                       191 North Wacker Drive, #2300
Chicago, Illinois 60612                       Chicago, Illinois 60606
(312) 226-4590                                (312) 771-2444

Jeanette S. Samuels
Samuels & Associates, Ltd.
3440 S. Cottage Grove, #504
Chicago, Illinois 60616
(872) 588-8726

Cannon Lambert, Sr.
Karchmar & Lambert, P. C.
211 W. Wacker, Ste. 1400
Chicago, Illinois 60606
(312) 977-1300

Thomas J. Moloney
Roger A. Cooper
Jared Gerber
Nefertiti J. Alexander
Cleary Gottlieb Steen & Hamilton LLP

Emmanuel Andre
Northside Transformative Law Center
1543 W. Morse, 2nd Floor
Chicago, Illinois 60626
(312) 219-6544

One Liberty Plaza
New York, New York 10006
(212) 225-2000

**_Counsel for the Plaintiffs and the class of
similarly situated individuals they seek to represent_**