No. 19-

In the

## Supreme Court of the United States

DeRAY McKESSON,

*Petitioner,*

*v.*

JOHN DOE,

*Respondent.*

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit

## PETITION FOR A WRIT OF CERTIORARI

David D. Cole
American Civil Liberties
  Union Foundation
915 15th Street, NW
Washington, DC 20005

Katie Schwartzmann
Bruce Hamilton
American Civil Liberties
  Union Foundation of
  Louisiana
P.O. Box 56157
New Orleans, LA 70156

William P. Gibbens
Ian Atkinson
Schonekas, Evans, McGoey
  & McEachin, LLC
909 Poydras Street, Suite 1600
New Orleans, LA 70112

David T. Goldberg
  *Counsel of Record*
Donahue, Goldberg, Weaver
  & Littleton, LLP
109 South Fifth Street,
  Suite 4201
Brooklyn, NY 11249
(212) 334-8813
david@donahuegoldberg.com

Ben Wizner
Vera Eidelman
Brian Hauss
Emerson Sykes
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Petitioner*

293101

EXHIBIT
C

## QUESTION PRESENTED

Do the First Amendment and this Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), foreclose a state law negligence action making a "leader" of a protest demonstration personally liable in damages for injuries inflicted by an unidentified person's violent act there, when it is undisputed that the leader neither authorized, directed, nor ratified the perpetrator's act, nor engaged in or incited violence of any kind?

ii

## CERTIFICATE OF PARTIES, PROCEDINGS AND RELATED CASES

In addition to the parties on the caption, Black Lives Matter Network, Inc., was a party to the proceedings before the Court of Appeals but does not join this petition.

### PROCEEDINGS

*Doe v. Mckesson*, U.S. District Court for
the Middle District of Louisiana, Civ. Action
No. 16–00742–BAJ–RLB. Judgment entered
September 28, 2017; and

*Doe v. Mckesson,* U.S. Court of Appeals
for the Fifth Circuit, No. 17-30864.
Judgment entered August 8, 2019

iii

# TABLE OF CONTENTS

**Page**

Question Presented ..................................................... i

Parties, Proceedings, and Related Cases ................. ii

Appendix Contents..................................................... vi

Table of Authorities ................................................ vii

Opinions Below ........................................................ 1

Jurisdiction................................................................ 1

Constitutional and Statutory Provisions Involved ... 1

Introduction.............................................................. 2

Statement ................................................................. 5

Reasons for Granting the Petition........................... 13

I. The Fifth Circuit's rule defies *Claiborne*
and contravenes bedrock First
Amendment principles ...................................... 13

   A. The Fifth Circuit's decision conflicts with—
and discards—*Claiborne*'s central holding... 13

     1. The constitutional issue resolved against
petitioner is the exact one
*Claiborne* decided.......................................... 13

     2. *Claiborne* squarely and unambiguously
foreclosed the negligence principle

iv

the Fifth Circuit upheld ................................. 14

3. Claiborne foreclosed state law liability
based on relabeling third-party acts as
"consequences." ............................................. 18

B. The Fifth Circuit decision conflicts with
fundamental principles of First Amendment
jurisprudence ................................................. 20

1. Important First Amendment precedents
stand against the Fifth Circuit's
forfeiture-by-misdemeanor theory ............... 21

2. The Fifth Circuit's rule wholly ignores the
First Amendment's precision-of-regulation
mandate. ......................................................... 23

3. The Fifth Circuit's decision ignored the First
Amendment's central concern with indirect
speech suppression ....................................... .24

II. The critical importance of the rights the
*Claiborne* secures makes this Court's
intervention necessary ....................................... 26

A. The novel "negligent protest" damages action
the Fifth Circuit embraced poses a potent
threat to rights of speech and association .... 26

B. The Claiborne protections remain vitally
important ........................................................ 30

v

III. The First Amendment protections
the Fifth Circuit disabled should be
reinstated now, not later ................................. 31

Conclusion .............................................................. 34

vi

## APPENDIX CONTENTS

**Page**

APPENDIX A – OPINION OF THE UNITED
STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT, DATED AUGUST 8, 2019 .......... 1a

APPENDIX B – OPINION OF THE UNITED
STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT, DATED APRIL 24, 2019 ........... 22a

APPENDIX C – OPINION OF THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA,
DATED SEPTEMBER 28, 2017 ............................ 39a

vii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002)............................................ 17

*Bates v. Little Rock,* 361 U.S. 516 (1960) ............... 25

*Bell v. Whitten*, 722 So.2d 1057 (1998).................... 15

*Bill Johnson's Restaurants, Inc. v. NLRB,*
    461 U.S. 731 (1983)............................................ 29

*Boyer v. Johnson*, 360 So.2d 1164 (La. 1978).......... 22

*Boykin v. La. Transit Co.*,
    707 So.2d 1225 (La. 1998) ................................... 9

*Brandenberg v. Ohio,* 395 U.S. 444 (1969).......... 3, 17

*Byers v. Edmondson*, 712 So. 2d 681
    (La. App. 1 Cir. 1998) ........................................ 17

*Carey v. Brown*, 447 U.S. 455 (1980)...................... 14

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)............................................ 12

*Cloer v. Gynecology Clinic, Inc.*,
    528 U.S. 1099 (2000)................................... 26, 30

viii

*Cox Broadcasting Corp. v. Cohn,*
  420 U.S. 485 (1975)........................................ 32, 33

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)............ 33

*Eastern Railroad Presidents Conference v. Noerr
  Motor Freight Inc.*, 365 U.S. 127 (1961)............ 15

*Elfbrandt v. Russell*, 384 U.S. 11 (1966) .................. 3

*Fort Wayne Books, Inc. v. Indiana,*
  489 U.S. 46 (1989)............................................... 34

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992)........................... 24, 27, 28, 31

*Galloway v. Dep't of Transp. & Dev.,*
  654 So. 2d 1345 (La. 1995) ................................. 22

*Gann v. Matthews,*
  873 So. 2d 701 (App. 1st Cir. 2004).................... 15

*Garrison v. Louisiana*, 379 U.S. 64 (1964).............. 14

*Gibson v. Florida Legislative Investigation
  Committee,* 372 U.S. 539 (1963) ......................... 25

*Gooding v. Wilson*, 405 U.S. 518 (1972) .................. 32

*Hague v. CIO*, 307 U.S. 496 (1939).......................... 14

ix

*Harris v. Pizza Hut of Louisiana, Inc.,*
    455 So.2d 1364 (1984)......................................... 15

*Healy v. James,* 408 U.S. 169, 185 (1972) ............... 17

*Herndon v. Lowry*, 301 U.S. 242 (1937) ........... 17, 27

*Hurley v. IGLIB*, 515 U.S. 557 (1995) ..................... 14

*Juhl v. Airington*,
    936 S.W.2d 640 (Tex. 1996).................... 18, 29, 30

*Lam v. Ngo*, 111 Cal. Rptr. 2d 582
    (Cal. App. 4th Dist. 2001)............................. 20, 23

*Lazard v. Foti*, 859 So.2d 656 (La. 2003) ................. 9

*Louisiana ex rel. Gremillion v. NAACP*,
    366 U.S. 293 (1961)............................................ 25

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........ 23, 26

*Marsh v. Alabama*, 326 U.S. 501 (1946) ................. 22

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)............................................ 34

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)............................................ 25

*NAACP v. Button*, 371 U.S. 415 (1963) ............. 15, 25

x

*NAACP v. Alabama ex rel. Flowers*,
    377 U.S. 288 (1964)...................................... 24, 25

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886...............................................*passim*

*New York Times v. Sullivan*,
    376 U.S. 254 (1964)...........................................26

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)..........20, 30

*Noto v. United States*, 367 U.S. 290 (1961).............28

*Nwanguma v. Trump*,
    903 F.3d 604 (6th Cir. 2018)..............................30

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017)..................................24, 31

*Planned Parenthood of Columbia/Willamette, Inc.*
    *v. American Coalition of Life Activists*,
    290 F.3d 1058 (9th Cir. 2002)...........................18

*Posecai v. Wal-Mart*, 752 So.2d 762 (La.1999)..........9

*Roach v. Liberty Mut. Ins.*,
    279 So. 2d 775 (La. 1973)..................................22

*Scales v. United States*, 367 U.S. 203 (1961)..........17

*Shelton v. Tucker*, 364 U.S. 479 (1960)..................23

xi

*Snyder v. Phelps*, 562 U.S. 443 (2011).................... 29

*State v. Pierre*, 631 So. 2d 427 (La. 1994) .............. 21

*UM*W *v. Gibbs*, 383 U.S. 715 (1966)......................... 3

*United States v. L. Cohen Grocery Co.*,
    255 U.S. 81 (1921)................................................ 27

*United States v. Stevens*, 559 U.S. 460 (2010) ........ 20

*Virginia v. Black*, 538 U.S. 343 (2003) ................... 22

*Wayte v. United States,* 470 U.S. 598 (1985)........... 29

**Statutes:**

Louisiana Civil Code article 2315 ............................ 1

Louisiana Rev. Statutes § 14.97.............. 1, 10, 21, 23

28 U.S.C.§ 1254........................................................ 1

28 U.S.C. § 1257.................................................... 32

28 U.S.C. § 1332...................................................... 6

xii

**Miscellaneous:**                              **Page(s)**

Judgment, *Mckesson v. Baton Rouge*,
    No. 3:16-cv-00520 (M.D. La. Oct. 27, 2017) ....... 21

Restatement (Third) of Torts: Liability
    for Physical and Emotional Harm § 19 (2010) .. 11

John C.P. Goldberg & Benjamin Zipursky,
    *Intervening Wrongdoing In Tort*,
    44 Wake Forest L. Rev. 1211 (2009) .................. 16

## PETITION FOR A WRIT OF CERTIORARI

---

### OPINIONS BELOW

The opinion, on rehearing, of the United States Court of Appeals for the Fifth Circuit (Pet. App., *infra*, 1a–21a) is reported at 935 F.3d 233.  An initial (withdrawn) opinion of the Court of Appeals (Pet. App., *infra*, 22a–38a) was reported at 922 F.3d 604. The opinion of the district court (Pet. App., *infra*, 39a–62a) is reported at 272 F. Supp.3d 841 (M.D. La. 2017).

### JURISDICTION

The judgment of the Court of Appeals was entered on August 8, 2019.  On October 28, 2019, Justice Alito extended the time for filing a petition for a writ of certiorari to December 6, 2019. The jurisdiction of this Court is invoked under 28 U.S.C.§ 1254.

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment to the Constitution of the United States provides, in pertinent part, that "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

Louisiana Rev. Statutes § 14.97 provides that "Simple obstruction of a highway of commerce is the intentional or criminally negligent placing of anything

or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult.

"Whoever commits the crime of simple obstruction of a highway of commerce shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both."

## INTRODUCTION

Nearly four decades ago, this Court established a federal constitutional rule limiting state law damages liability for the "unlawful acts of others" occurring "in the context of … activity" protected by the First Amendment, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). That case arose from a long-running civil rights boycott that included "elements of majesty," *id.* at 888, but also acts and threats of violence. The Mississippi Supreme Court had affirmed a judgment holding the boycott's leaders personally liable for large damages on the ground that, under state law, the violence rendered the boycott illegal.

In holding that judgment unconstitutional, this Court recognized both the significance of the State's interest in forestalling violence and the dangers to First Amendment freedoms that its damages remedy posed: Given the regularity with which violence and First Amendment activity co-occur and the vagaries of state law liability rules, only the most intrepid citizens would exercise their rights and risk ruinous liability if they could be held liable for the wrongful acts of *others*. This would be especially true for people like the *Claiborne* petitioners, pressing to "realize the political and economic power available to them," *id.* at

2

928, whose fates would rest with judges and jurors disposed to see violence rather than "majesty" in their activities.

This Court's answer was a "federal rule of law" to govern state liability rules for wrongs arising "in the presence of activity protected by the First Amendment," *id.* at 916. States retain undiminished authority to impose damages on protest participants and leaders who *themselves* perpetrate violence. But states may hold a leader personally responsible for wrongs committed by *others* only when the leader himself "authorized, directed, or ratified" the violence. *Id.* at 927.

This constitutional rule consciously tracked those established in landmark decisions recognizing First Amendment limits on liability for incitement and association—which similarly arise at the nexus of protected activity and actual harm—*see Brandenberg v. Ohio,* 395 U.S. 444 (1969); *Elfbrandt v. Russell*, 384 U.S. 11 (1966), and decisions restricting state damages remedies in labor-management cases, in order to "accommodate federal labor policy." *Claiborne*, 458 U.S. at 918 (discussing *UMW v. Gibbs*, 383 U.S. 715 (1966)).

The present case called for a straightforward application of *Claiborne*, but it yielded something strikingly different. Respondent, a police officer, filed a state law tort suit seeking recovery for injuries suffered when struck by a projectile while on duty at a civil rights demonstration. He sought damages from petitioner, a prominent social justice advocate—not for hurling the rock, but for (allegedly) "leading" and conducting the demonstration "negligently," in the face of a foreseeable risk that violence would occur.

3

After the courts below sifted through the complaint's implausible and sometimes inscrutable allegations, they concluded there was no plausible basis for inferring that petitioner authorized, directed, or ratified the assault that injured respondent (or any violence).

In a remarkable decision, the Fifth Circuit held the negligence claim should proceed, "perceiv[ing] no constitutional issue" with the negligence theory and holding that *Claiborne* was "not a bar" to personal injury damages, because the assault and ensuing damages were a "consequence" of petitioner's own unlawful conduct, *i.e.*, breaching a duty of care owed the officer. Pet. App. 13a-14a.

That decision warrants review—and reversal—by this Court. The gulf between the holding below and this Court's controlling precedent is as wide as it could be; the Fifth Circuit saw the First Amendment as "no bar" to the very foreseeability-based liability for the unlawful acts of others explicitly condemned by *Claiborne* and decades of important precedents.

The decision below directly contravenes *Claiborne* and bedrock First Amendment principles, and effectively reinstates the Mississippi Supreme Court's rule, unanimously rejected in *Claiborne*, that protest leaders may be held personally liable for injuries caused by the violent acts of others if they are a foreseeable, but unintended "consequence" of conducting a protest, whenever state law deems doing so just and reasonable.

The need for intervention here goes beyond the value of securing adherence to precedent—though federal appellate decisions that contravene this Court's controlling decisions as thoroughly as does the

4

one here surely are rare. Rather, review is imperative for the same reason it was in *Claiborne*—because the surpassing importance of the rights the federal rule of law safeguards and the potency of the threats it protects against.

The Court should overturn the Fifth Circuit's disruptive rule and reinstate the *Claiborne* rule in that circuit now. There is no basis for—and great risk in—postponing decision until this case has been litigated to judgment without First Amendment protections, let alone allowing the spurious rule of law to "percolate" elsewhere. Immediate review under these circumstances is supported by this Court's longstanding practice, spares petitioner the heavy burdens of lengthy litigation, and secures the free speech rights the Fifth Circuit's liability regime actively deters. Indeed, were the Court to deny review and were petitioner ultimately to prevail on factual or nonconstitutional grounds, that victory would leave residents of States in the Fifth Circuit saddled with the Fifth Circuit's deeply wrong, but hard-to-challenge First Amendment rule.

## STATEMENT

1. On July 5, 2016, Alton Sterling, a Black resident of Baton Rouge, Louisiana, was shot and killed by two on-duty police officers responding to an anonymous 911 call. Soon after, members of the city's Black community took to the streets, including the area in front of Police Department headquarters, to express their anguish, celebrate Mr. Sterling's life and humanity, and convey the need for accountability and transformative change. As with protests prompted by police violence elsewhere, one way those assembled conveyed their dismay was by insisting, to the police

5

before them, their community, and the watching world, that "Black Lives Matter."

The Baton Rouge protests were, by all accounts, initially peaceful, although respondent's complaint alleged that instances of unruliness occurred after "activist[s] began pumping up the crowd," Compl. ¶17. In particular, the complaint alleges that on the night of July 9, with a phalanx of armed police in "riot gear" and others massed at the scene, some demonstrators stole water bottles from a convenience store and threw them in the police's direction. *Id.* ¶18.[1] And when those "ran out," the complaint alleged, an unidentified person threw a "rock-like" object that struck and injured respondent. *Id.* ¶20.

2. Respondent brought suit in federal court, averring that the damages sought exceeded $75,000. *See* 28 U.S.C. § 1332. Compl. ¶1.[2] As defendants, the complaint named DeRay Mckesson—petitioner here—and "Black Lives Matter," (*Id.* ¶3), which it described as an "unincorporated association" on whose "behalf" Mckesson led the demonstration. *Id.* It did not seek recovery against the unidentified assailant.

The complaint did not allege that Mckesson had himself thrown anything or engaged in violence of any kind. Rather, respondent sought to hold petitioner liable for personal injury damages, because, he

---

[1] Given the procedural posture of the case, petitioner treats the complaint's well-pleaded allegations as true.

[2] Respondent proceeded anonymously, making unsubstantiated assertions that he feared retribution. Both the district court and the court of appeals held he failed to state a lawful basis for allowing him to proceed in that fashion. Pet. App. 20a n.8.

6

alleged, Mckesson was "present during the protest and ... did nothing to calm the crowd." *Id.* ¶19. Respondent further alleged that petitioner "directed" demonstrators to protest on the public road in front of police headquarters and "knew or should have known … that violence would result" from the demonstration he "staged." *Id.* ¶28. If proven, respondent maintained, these allegations would give rise to liability under theories of negligence, civil conspiracy, and respondeat superior.

**3.** The district court dismissed the suit, concluding that "Black Lives Matter" is a "social movement," not the sort of entity that may be sued in federal court, Pet. App. 51a, and holding that the allegations against petitioner failed to state a claim, *id.* 44a–47a.

The court acknowledged the seriousness of the injuries for which respondent sought recovery, but held that his claims were barred by *NAACP v. Claiborne Hardware*'s special rule, governing civil damages liability for the wrongs of others "committed in the context of constitutionally-protected activity" safeguarded by the First Amendment. 458 U.S. at 916: A protest participant or leader who did not himself engage in violence may be liable for damages caused by another's acts only upon proof that the nonviolent defendant personally "authorized, directed, or ratified" an associate's violence or that he otherwise manifest "a specific intent to further" the perpetrator's violent aims. *Id.* at 926–27. *Claiborne's* rule, the district court explained, reflects recognition that while the Constitution "does not protect violence," Pet. App. 44a, it restricts the bases for imposing *responsibility* for the violent acts of *others*, in order to safeguard the exercise of First Amendment

7

rights of speech, association, petitioning, and assembly.

The court then ruled that respondent's effort to amend the complaint—consisting principally of adding "Black Lives Matter Network, Inc." and the hashtag "#BlackLivesMatter" to the roster of defendants (and then serving Mckesson as their "agent")—failed because the amendments proposed would not cure the complaint's defects. *Id.* 52a-60a.

4. A panel of the Fifth Circuit, in an initial published opinion and a substitute on rehearing—each issued without oral argument—affirmed in part, but revived the claim that petitioner should be liable in "negligence" for the injuries the rock-thrower inflicted.

The appeals court explained that because it disagreed with the district court as to whether First Amendment protections were implicated, *id.* 26a–27a, it would begin by deciding the viability of the tort claims under state law. The vicarious liability claim failed, the court held, because respondent did not "allege facts that support an inference that the unknown assailant 'perform[ed] a continuous service'" for Mr. Mckesson (or "Black Lives Matter") or that his "'physical movements [were] subject to … [their] right to control." *Id.*

The panel next explained why the complaint—shorn of its impermissibly conclusory allegations—did not state a plausible claim for civil conspiracy. While the complaint did "allege[] facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway," the court reasoned, it did not plead "facts that would allow a jury to conclude that Mckesson colluded with the

8

unknown assailant to attack Officer Doe, knew of the attack and ratified it." *Id.* 28a.

The court reached a different conclusion respecting Doe's effort to hold Mckesson liable in "negligen[ce,] for organizing and leading the Baton Rouge demonstration," based on the inference that he "knew or should have known" that an act of violence could occur there. *Id.* 29a. Under Louisiana law, the court explained, a cause of action for negligence requires proof that "(1) [plaintiff] suffered an injury; (2) the defendant owed [him] a duty of care; (3) the duty was breached…; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached." *Id.* (quoting *Lazard v. Foti*, 859 So.2d 656, 659 (La. 2003)).

The court viewed the duty issue as straightforward, stating that Louisiana law imposes a "universal" obligation in negligence cases "to use reasonable care so as to avoid injury to another." *Id.* (quoting *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1231 (La. 1998)).[3]

In assessing the other elements, the court attached special significance to the allegation that petitioner had led demonstrators onto the road in front of police headquarters. It noted that "[b]locking

---

[3] The opinion quoted—but did not further discuss—a Louisiana Supreme Court decision holding that duty determinations depend both "on the facts, circumstances, and context of each case" and on a list of "moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties…" *Id.* 29a–30a (quoting *Posecai v. Wal-Mart*, 752 So.2d 762, 766 (La. 1999)).

9

a public highway is a criminal act under Louisiana law." *Id.* 30a (citing La. Rev. Stat. § 14:97). It was "patently foreseeable," the court reasoned, that police would respond "by clearing the highway and, when necessary, making arrests," a development that, in turn, carried a "foreseeable risk of violence" to "officers, bystanders, and demonstrators." *Id.* Thus, although "[i]t may have been an unknown demonstrator who threw the hard object," the court held, "Mckesson's negligent actions were the 'but for' causes of" respondent's injury." *Id.* 10a.

Having concluded that petitioner could be sued under state law, the court "t[ook] a step back" to consider the Constitution. *Id.* 31a. The court held that the absence of plausible allegations that petitioner engaged in or in any way supported violence was immaterial. *Id.* 32a. Rather, because respondent's complaint plausibly alleged both negligence and the "tortious and illegal" act of "occupying [a] public highway," *id.* 33a, the court concluded that the First Amendment was "not a bar" to imposing liability for what it described as "the *consequences*"—*i.e.*, the arrests, the assailant's hurling the rock, and the injuries that ensued. *Id.* 32a–33a.

After affirming the district court's ruling that the claims against "Black Lives Matter" could not proceed, the court expressed its expectation that, on remand, the district court would consider "in the light of [the court's] decision" respondent's requests to add new parties and new allegations and discovery demands, as well as "any new motions" he might file. Pet. App. 37a.

5. Petitioner timely sought rehearing *en banc*, asking the full Fifth Circuit to hear oral argument and

10

reconsider the panel's First Amendment ruling, highlighting its direct conflict with *Claiborne* and the significance of the rights at stake.

After calling for and receiving a response—but again without hearing argument—the Fifth Circuit granted *panel* rehearing, withdrew the initial opinion and issued a substitute. The revised opinion reached precisely the same disposition as had the initial one, and, with isolated exceptions, replicated verbatim the initial opinion's discussion of the nonconstitutional issues.

The rehearing opinion did, however, expand on its holding the First Amendment inapplicable. "Even if we assume that Officer Doe seeks to hold Mckesson 'liable for the unlawful conduct of others' within the meaning of *Claiborne Hardware*," the court explained, the First Amendment would not require dismissal of Officer Doe's complaint. *Id.* 12a. All respondent needed to do "to counter Mckesson's First Amendment defense at the pleading stage," it explained, was "plausibly allege that his injuries were one of the "consequences' of *some* "tortious activity," which itself was "authorized, directed, or ratified" by petitioner "in violation of his duty of care." *Id.*

The court explained that it "[p]erceive[d] no Constitutional issue with Mckesson['s] being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of a another that were foreseeable as a result of that negligent conduct," describing "[t]he permissibility of such liability [as] a standard aspect of state law." *Id.* 13a (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010)). *Claiborne* did not, the court stated, "restructure state tort law by

11

eliminating this principle of negligence liability." *Id.*

While acknowledging that petitioner's "negligent conduct took place in the context of a political protest," the court concluded that "*Claiborne Hardware* does not insulate [him] from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message." *Id.* *Claiborne*, the Fifth Circuit observed, had recognized that "[t]he use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." *Id.* (quoting 458 U.S. at 916) (internal quotation marks and citations omitted). Here, likewise, "the criminal conduct" Mckesson allegedly "ordered" was not "itself protected by the First Amendment," because a law prohibiting impeding highway traffic is "a reasonable time, place, and manner restriction." *Id.* 14a (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

The rehearing opinion offered a similar explanation for why its ruling did not run afoul of *Claiborne*'s prohibition against basing civil damages on "associations with others," absent proof that "the group … 'itself possessed unlawful goals … [and] that the individual …. specific[ally] intended to further" those unlawful goals. 458 U.S. at 920. The Fifth Circuit held that this principle did not protect petitioner, because respondent alleged that petitioner harbored "a specific intent to further [demonstrators'] illegal aim[]… to block a public highway." *Id.* 14a n.4.

The rehearing opinion concluded by expressing confidence that "no First Amendment protected activity [would be] suppressed by allowing the consequences of Mckesson's conduct to be addressed by state tort law." *Id.* 14a.

12

## REASONS FOR GRANTING THE PETITION

**I.  The Fifth Circuit's rule defies *Claiborne* and contravenes bedrock First Amendment principles.**

> **A.  The Fifth Circuit's decision conflicts with—and discards—*Claiborne's* central holding.**

>> 1.  The constitutional issue resolved against petitioner is the exact one *Claiborne* decided decades ago.

That the court of appeals could "perceive no constitutional issue" as to whether petitioner may be liable in damages under state law for an act of violence perpetrated by "another person" "in the context" of a political demonstration is a strong sign of how disconnected its ruling is from this Court's decision. That constitutional issue is *precisely* the one *Claiborne* addressed, prompting this Court to establish a federal rule restricting the "grounds" on which states may impose civil damages liability for the "unlawful acts of others" in the context of a political protest. 458 U.S. at 927, 929-30.

Under this Court's controlling rule, the court of appeals was obliged to recognize, as had the district court, that petitioner is not among the persons who—consistently with the First Amendment—"may be held accountable for [the] damages" respondent suffered at the hands of the rock-thrower—an act petitioner, indisputably, did not authorize, direct, or ratify. To the extent Louisiana tort law would authorize liability based on a protest leader's negligence—*i.e.*, proof that another person's violence was a foreseeable, but not intended, result of the

13

protest, that principle may not constitutionally be applied to petitioner.

The court of appeals asserted, with no further elaboration, that the *Claiborne* rule did "not fit the situation we address today," Pet. App. 12a. Not so. This case and *Claiborne* are, in every constitutionally relevant sense, indistinguishable.

Respondent here, as in *Claiborne*, seeks to hold petitioner liable for injuries caused by someone else. As in *Claiborne*, those harms arose in the context of First-Amendment-protected activity. The tort claim seeks to impose liability for alleged negligence in conducting a political protest "a use of [public] streets that has 'from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.'" *Hurley v. IGLIB*, 515 U.S. 557, 579 (1995) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.)). He and the many others assembled before the Baton Rouge police headquarters in July 2016 did so not merely to speak out on matters of public concern—already assigned "the highest rung [in] the hierarchy of First Amendment [protection]," *Carey v. Brown*, 447 U.S. 455, 467 (1980)—but specifically to "petition the Government for a redress of grievances," U.S. Const. amend. 1, and call fellow citizens' attention to failures by their government officials to discharge their responsibilities under the Equal Protection Clause. Such activity "is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

2.  *Claiborne* squarely and unambiguously foreclosed the negligence principle the Fifth Circuit upheld.

14

The Fifth Circuit's conclusion that the negligent-protest cause of action is "[c]onstitutional" *because* damages liability for negligently enabling a criminal act committed by a third-party is a "standard aspect of state law" Pet. App. 13a—and because this Court's opinion did not expressly displace it—misunderstands *Claiborne*.

The central thrust of *Claiborne* is not that state tort law principles overcome First Amendment limitations, but rather that the federal Constitution forbids extravagant state-law attributions rules, whatever their pedigree, that would be unexceptionable were First Amendment activity not present, The problem with the professional ethics rules in *NAACP v. Button*, 371 U.S. 415 (1963), and the antitrust rules in *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961), was not that they were less well-established than the one here, but that their broadest applications imposed stifling burdens on speech and association. Indeed, the theories on which the *Claiborne* plaintiffs prevailed at trial included state *statutes*, which almost certainly could have been applied to similar concerted action outside the First Amendment setting. *See* 458 U.S. at 915 n.49; *accord Cloer v. Gynecology Clinic, Inc.*, 528 U.S. 1099 (2000) (Scalia, J., dissenting from denial of cert).[4]

---

[4] The "principles" and "aspects" of tort law on which respondent's claim relies appear, in any event, a good deal *less* "standard" than the court assumed. Louisiana does not, as a general rule, impose a "duty to protect others from the criminal activities of third persons." *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364, 1371 (1984). Nor does the State allow police officers to recover for injuries suffered in performing their job responsibilities. *See, e.g.*, *Bell v. Whitten*, 722 So.2d 1057 (1998).

15

The Fifth Circuit's premise that the *Claiborne* opinion's silence as to any particular tort principle or "aspect" should be construed as approval likewise misunderstands the character and operation of this Court's rule. It is a general rule, which displaces— "eliminates"—any aspect of state law that falls below the First Amendment floor.

In any event, the particular "aspect of negligence law" the court of appeals upheld here—authorization of liability for another person's unlawful behavior based on foreseeability, rather than intent—is the one *Claiborne* most explicitly eliminates. This Court's decision states in clear terms the First Amendment minimum for attributing liability for violent "acts of other persons": It requires proof of authorization, direction, or ratification. 458 U.S. at 927, 929-30. Imposing damages liability based on violent acts that a protest leader foresaw, but did not intend, is what the Constitution was held to forbid.

*Claiborne*'s specific culpable intent requirement was no slip of the judicial pen. It was the central, rigorously supported, holding of the unanimous Court. And it expressly rested on the First Amendment limitations recognized in landmark decisions involving incitement and associational liability. 458 U.S. at 918-20, 927-28. Those cases

---

Indeed, Louisiana courts rejecting such liability have reasoned that "[p]olice officers are hired to protect others from criminal activities, are expected to effect arrests as part of their duties and [can] expect a criminal to resist arrest." *Gann v. Matthews*, 873 So. 2d 701 (App. 1st Cir. 2004). *Cf.* John C.P. Goldberg & Benjamin Zipursky, *Intervening Wrongdoing In Tort*, 44 Wake Forest L. Rev. 1211, 1244 (2009) (describing cited Restatement section as "running roughshod over standard ways of understanding responsibility").

16

confronted almost exactly the same question presented to the courts below here: whether and how States may regulate based on First Amendment activity's contribution to foreseeable violent acts of others. And those precedents' answer, arrived at through generations of struggle, *is Claiborne*'s: The First Amendment forbids imposing liability for advocacy that directly and foreseeably leads others to commit violent acts, absent proof the advocate intended the violence to occur, *see Brandenberg v. Ohio*, 395 U.S. 444 (1969); and "civil or criminal disabilities may not be imposed" for affiliating with an organization with violent purposes unless the individual "specific[ally] inten[ds] to further those purposes." 458 U.S. at 932; *Scales v. United States*, 367 U.S. 203, 229 (1961); *Healy v. James,* 408 U.S. 169, 185–86 (1972); *cf. Herndon v. Lowry*, 301 U.S. 242, 262 (1937) (invalidating statute authorizing punishment if a "defendant [could have] forecast that, as a result of a chain of causation, his speech will lead [a] group to resort to force").[5]

These rules recognize that "[h]olding speakers responsible for an impact they did not intend endanger[s] the First Amendment protection accorded

---

[5] Decisions of this Court and lower courts have applied these principles in other settings, rejecting on First Amendment grounds government efforts to impose liability for activity that enables serious criminal activity. *See, e.g., Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253-57 (2002) (holding that First Amendment forbids ban on "virtual child pornography," notwithstanding congressional findings that such materials enable sexual abuse of children and undermine enforcement of laws barring "actual" materials); *Byers v. Edmondson*, 712 So. 2d 681, 690 (La. App. 1 Cir. 1998) (forbidding negligence claim based on filmmaker's contribution to murder, holding that "[p]roof of intent," not "mere foreseeability" is required).

17

advocacy of political change," *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1108 (9th Cir. 2002) (Berzon, J., dissenting from denial of rehearing). That is the basis for the *Claiborne* protection. *See Juhl v. Airington*, 936 S.W.2d 640, 648 (Tex. 1996) (Gonzalez, J., concurring) ("[W]e cannot] allow [plaintiff] to prevail [on negligence theory] and still protect the protestors' right to free speech and peaceable assembly.")

### 3. *Claiborne* foreclosed state law liability based on relabeling third party acts as "consequences"

The *only* support the Fifth Circuit claimed for holding that the First Amendment poses "no[] bar" to holding Mckesson liable for the unintended, unlawful acts of an unidentified other person is an upside-down reading of a phrase in the *Claiborne* opinion itself. Because this Court affirmed that liability for "consequences of [protesters'] own tortious activity," remains permissible, the court of appeals maintained, Pet. App. 12a, respondent could recover damages for his personal injuries as a "consequence" of petitioner's "*own*" wrongdoing—his breach of a "universal" duty to conduct a protest in a manner that avoids foreseeably violent acts by others. *Id*. 9a-10a.

This suggestion fails. The statement the Fifth Circuit seized upon described the permissible grounds for *direct* responsibility—a species of liability unquestioned by the *Claiborne* petitioners. Indeed, the language was little more than a restatement of what *Claiborne* affirmed before announcing restrictive federal limits on state law remedies: "The First Amendment does not protect *violence* nor does it constrain liability for the *losses* that are caused by

18

violence." 458 U.S. at 916–17 (emphasis added). The contested issue in *Claiborne* was *derivative* responsibility for another person's violence. And this Court surely did not hold—as the Fifth Circuit posited—that the Constitution allows States to impose liability for acts of violence a protest leader personally intended or approved ***and***, alternatively, for acts by others he *did not* intend, as a "consequence" of his "own" negligent contribution. Specific intent is the exclusive basis for imposing damages.

Indeed, giving "tortious" the capacious meaning the Fifth Circuit's theory requires would make *Claiborne*'s specific holding unintelligible. Charles Evers *did* do something state courts had held "unlawful"—organizing a boycott that included violent acts—and the verdict held unconstitutional charged him with its "consequences." The judgment's constitutional defect was the "grounds" on which Mississippi law made him responsible for the others' acts. 458 U.S. at 928-29.

The Fifth Circuit's suggestion that the absence of violent intent here was not fatal under *Claiborne's* derivative liability—that respondent's injuries could be recovered as a "consequence" of petitioner's directing others to unlawfully walk onto a public highway, Pet. App. 12a—merely substitutes one patent error for another. It keeps the *level* of intent above the *Claiborne* floor, but ignores the *specific* intent requirement. The First Amendment is not overcome when a protest leader directs another person do *something* unlawful, but rather the "specific" act that "directly and proximately" caused the injuries for which recovery is sought. 458 U.S. at 918; *see also id.* at 920 (noting that First Amendment permits associational liability only where others

19

"possessed unlawful goals and the individual held a specific intent to further *those* illegal aims") (emphasis added); *Lam v. Ngo*, 111 Cal. Rptr. 2d 582, 592 (Cal. App. 4th Dist. 2001) (*Claiborne* is "quite clear" in requiring proof of a protest organizer's "authorization, direction, or ratification of 'specific' constitutionally unprotected tortious activity … before [he] can be held responsible for the consequences of [that] activity.") (quoting 458 U.S. at 927).

**B. The Fifth Circuit decision conflicts with fundamental principles of First Amendment jurisprudence.**

1. Important First Amendment precedents stand against the Fifth Circuit's forfeiture-by-misdemeanor theory.

The Fifth Circuit reasoned that because Mckesson allegedly encouraged protesters to walk onto a road, or "public highway," and Louisiana law treats that as a misdemeanor, *Claiborne* should not apply. Pet. App. 12a. But one unlawful act in the context of a protest does not rob the entire protest—or the underlying expressive association—of First Amendment protection. "[Criminal laws have grown so exuberantly [that] … almost anyone can be arrested for *something*." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1730 (2019) (Gorsuch, J., concurring and dissenting). But criminal laws can serve many different purposes, wholly unrelated to personal injury or violence—let alone preventing third-party resistance that arresting violators might arouse. *See United States v. Stevens*, 559 U.S. 460, 475 (2010) (highlighting diversity of reasons, unrelated to animal cruelty, for laws making killing animals illegal, noting '[l]ivestock regulations

20

... designed to protect the health of human beings" and rules designed to raise revenue).

The "criminal law" on which the Fifth Circuit staked its First Amendment exception illustrates that. L.R.S. § 14:97, titled "simple obstruction of a public highway," makes it a misdemeanor to "perform[] any act … on any … road, … which will render movement thereon more difficult." That offense, which does not require proof of personal injury or violence, carries a maximum fine of $200—upon a finding of guilt beyond a reasonable doubt.[6] Its manifest concern is protecting the movement of traffic, not guarding against the prospect that someone's directing a protester to a road will induce an arrest, which, in turn, will elicit another person's violent response. Even if it is unlawful for protestors to demonstrate on the street, rather than a sidewalk—or direct them to do so, no speaker of ordinary English would describe respondent as a "victim" of that offense. Petitioner of course could not be prosecuted for battery—or violently resisting arrest—on a "transferred intent" theory. *See State v. Pierre*, 631 So. 2d 427, 428 (La. 1994).[7]

---

[6] Petitioner was in fact arrested and charged with violating that provision. But those charges were dismissed by the prosecutor in short order—and it is a matter of public record that respondent's employer subsequently settled a civil rights case alleging illegal arrests and agreed, in exchange for dismissal, to pay for expungement of the record of that arrest and to compensate petitioner for the time he was detained on that charge. *See* Judgment, *Mckesson v. Baton Rouge*, No. 3:16-cv-00520 (M.D. La. Oct. 27, 2017).

[7] In fact, Louisiana tort law embodies the same principle. "The doctrine of negligence per se has been rejected in Louisiana," *Galloway v. Dep't of Transp. & Dev.*, 654 So. 2d 1345,

21

The Fifth Circuit's suggestion that protesting on a public highway (or inducing others to do so is a misdemeanor) is "unprotected"—because it, like the "[t]he use of weapons, gunpowder, and gasoline," is illegal—misunderstands First Amendment fundamentals. Pet. App. 13a (quoting 458 U.S. at 916). Liability for such acts is constitutionally unproblematic not because they are *criminal*, but because they directly inflict harms—"consequences"—for which a weapon-user is accountable, even when his motivations were political. *See* 458 U.S. at 918. A protest that steps from the sidewalk to a street does not, by violating a misdemeanor provision, become an unprotected "masquerade under the guise of advocacy," disentitled to First Amendment protection.

The notion that First Amendment protections—including *Claiborne*'s limitations on tenuous impositions of civil damages liability—are rendered inoperative by "illegal" activity was the premise of the state court decision this Court overturned. 458 U.S. 895–96. In fact, decisions dating back to *Marsh v. Alabama*, 326 U.S. 501 (1946), have vindicated free speech rights of persons whose exercise occurred while violating criminal trespassing laws. *See also, e.g.*, *Virginia v. Black*, 538 U.S. 343 (2003) (vacating

---

1347 (La. 1995), "because [criminal] statute[s] may have been designed to protect someone other than the plaintiff, or to protect the plaintiff from some evil other than the injury for which recovery is sought." *Boyer v. Johnson*, 360 So.2d 1164, 1168–69 (La. 1978). Leading cases have rejected civil liability for third-party acts that were foreseeable to the law-violator, but were not the reason for enacting the criminal law. *Roach v. Liberty Mut. Ins.*, 279 So. 2d 775, 777 (La. 1973) (violator of "lock statute" not accountable for "carelessness of a thief who steals the vehicle").

conviction of defendant for burning a cross on Black family's property).

2.  The Fifth Circuit's rule wholly ignores the First Amendment's precision-of-regulation mandate.

The First Amendment principle that allows a State to fine a protest leader for impeding traffic and also impose damages liability on a politically motivated rock-hurler—but not to make the trespasser liable in damages for the rock-throwing— is the command that, even when pursuing valid and important objectives, government may not "broadly stifle fundamental personal liberties when the[ir] end can be more narrowly achieved." 458 U.S. at 920 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). That principle is central to *Claiborne,* but entirely absent from the decision below. *See also Lam v. Ngo*, 111 Cal.Rptr.2d at 593 (fact that organizer violated court-ordered buffer zone could subject him to contempt sanction, but did permit liability for tire-slashing and intimidation that were not "authorized, directed or ratified by [him]").

In fact, that principle animates the doctrine the Fifth Circuit rehearing opinion claimed supported its "no protection" theory. See Pet. App. 14a (asserting that Section 14.97 is a content-neutral, time-place-manner regulations). Such measures are not constitutional *per se*. They may be upheld only when they do not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Indeed, two very recent decisions of this Court applying that test have struck down measures for

23

failing it. *See id.*; *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017).

More important, any speech burdens that *Section 14.97* imposes are different in kind and degree from ones imposed by a rule that makes straying onto a public road the trigger for limitless personal damages liability for independent third-party violence the trespasser (or person encouraging trespass) neither directed nor intended. *Cf. Forsyth v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (a regime with "potential for becoming a means of suppressing a particular point of view," is "inherently inconsistent with a valid time, place, and manner regulation") (citation omitted). Indeed, justifying *that* regime—the Fifth Circuit's rule—would require demonstrating why Section 14.97 and other familiar, *Claiborne*-compliant means at the government's disposal for addressing violence or highway interference or personal injury are inadequate. *See NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 308 (1964) (invalidating order banishing civil rights group from State, because illegal conduct alleged "suggest[ed] no legitimate governmental objective which [would] require[] such restraint").

3. The Fifth Circuit's decision ignored the First Amendment's central concern with indirect speech suppression.

The rehearing opinion's pronouncement that the regime it approved effected no suppression of First Amendment protected activity, Pet. App. 14a, is naturally understood as restating the court's (erroneous) assumption that a demonstration that veers onto a highway thereby forfeits *all* "protection"—not just against targeted regulations,

24

but also against ruinous damage liability for third-party violence a protest leader did not approve. But that statement also spotlights the failure of the court's "*Claiborne*" ruling actually to engage with this Court's *Claiborne* decision. In arriving at federal rule of law in *Claiborne*, this Court looked beyond the burdens on the parties before it and gave great weight to the broader First Amendment harms that lawsuits like Claiborne Hardware's inevitably inflict on vital, but "fragile" protections. 458 U.S. at 931. Indeed, this Court's recognition that threats of civil liability under loose standards have powerful suppressive effects, handing political opponents a potent tool for "destruction by lawsuit," *id.* at 933, was based on direct experience, not speculation. *See id.* at 930 n.75 (citing *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958); *Bates v. Little Rock,* 361 U.S. 516 (1960)*; Louisiana ex rel. Gremillion v. NAACP,* 366 U.S. 293 (1961); *NAACP v. Button,* 371 U.S. 415 (1963); *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539 (1963); and *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288 (1964)).

Protecting against burdens on rights of speech and association and guarding against arbitrary, viewpoint-based damages verdicts are not primarily the office of state tort law, but rather of the United States Constitution. The Fifth Circuit's decision failed to recognize that and to fulfill its responsibility to uphold and enforce the *Claiborne* rule.

25

## II. The critical importance of the rights *Claiborne* secures makes this Court's intervention necessary.

### A. The novel "negligent protest" damages action the Fifth Circuit embraced poses a potent threat to rights of speech and association.

The Fifth Circuit's negligent protest tort, no less than the loose and manipulable grounds on which personal damages liability was imposed in *Claiborne*, will serve as "a terrifying deterrent to legitimate, peaceful First Amendment activity." *Cloer*, 528 U.S. at 1099 (Scalia, J., dissenting from denial of cert.).

The negligent protesting theory applies particularly to political demonstrations, which are "classic forms of speech that lie at the heart of the First Amendment," *Schenck v. Pro-Choice Network*, 519 U.S. 357, 377 (1997). Moreover, the reasons why "'[t]he fear of [civil] damage awards ... may be markedly more inhibiting than the fear of prosecution under a criminal statute,'" *New York Times v. Sullivan*, 376 U.S. 254, 277 (1964), apply especially in this setting. The scope and magnitude of personal damages liability any would-be protest leader confronts is limitless and unknowable, determined by the severity of injuries to unknown "police and bystanders," Pet. App. 10a-11a, and inflicted through violent acts by others present on the street whom the leader neither knew nor controlled.

Citizens who feel passionately enough about an injustice to collectively risk arrest or misdemeanor fines for protest activity will balk at damages liability

26

orders of magnitude larger—for having breached "duties" imposed post-hoc, based on a judge's views of "the particular facts, circumstances, and context" of the protest *and* balancing a list "moral, social, and economic" considerations *and* a jury's determinations as to whether the protest leader took "reasonable care" of "police, bystanders, and other protesters" and whether some third-party's violent act was caused by the "breach." Such a radically open-ended regime is the "equivalent of … a statute which in terms merely penalize[s] and punishe[s] all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury," *Herndon v. Lowry*, 301 U.S. 242, 263 (1937) (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)).

And it is the polar opposite of *Claiborne*'s clear and certain rule, which makes a protest organizer's specific violent intent (or lack thereof) the only touchstone for imposing liability for harms inflicted by another person's violent acts.

Moreover, any rule that seeks to combat violence by making leaders personally liable for injuries that are a consequence of what someone else foreseeably does at a demonstration will have *unequal* speech-suppressive effects, disadvantaging would-be protesters with the fewest means and those who seek to address subjects that arouse virulent opposition— or impassioned support or both (or are particularly unpopular with police). Not unlike the regime the Court held unconstitutional in *Forsyth County*, "[t]hose wishing to express views" that stir strong feelings among "bottle throwers …. [must expect] to pay more." 505 U.S. at 134.

27

Indeed, nothing in the Fifth Circuit's exposition of the negligence tort or its discussion of the First Amendment confines a leader's state-law duty to accounting for unwelcome, but foreseeable violence *on his "side."* Unlike in Birmingham, violence that occurred at Martin Luther King's 1968 Memphis march originated with persons parading by his side; but if liability may be freely imposed for violence foreseeably resulting from protests that heighten confrontation with law enforcement or violate minor laws, Dr. King could have been forced to pay damages for Bull Connor's depredations. And if *Forsyth County does* preempt tort liability on a heckler's-veto basis, the resulting regime, making a protest leader personally liable in damages for foreseeable violent acts of "sympathizers," would flout the principle that a shared belief in some ultimate goal is an impermissible basis for imposing responsibility for an associate's specific criminal acts. *See*, *e.g.*, *Noto v. United States*, 367 U.S. 290, 299-300 (1961).

In practice, the combination of a limitless liability rule and the presence—an inevitability when protests occur on public streets—of potentially violent "allies"—will operate as a species of government-compelled speech, requiring leaders to redirect their message away from the concerns that impelled them to protest and toward calming sympathetic "bottle throwers." In real-world conditions, the regime will be a rule of compelled silence: In a potentially volatile situation, the prudent course for a protest leader will be simply to go home. *But see Claiborne*, 458 U.S. at 920 (the First Amendment forbids imposition of a "legal duty to 'repudiate'").

Nor are the regime's affronts to First Amendment values limited to overdeterrence. As this Court has

28

long recognized, vague rules not only have powerful chilling effects; they also invite discriminatory enforcement. It would be surprising if a jury determined the various negligence elements the same way in a case where an injury arose at a protest with a locally popular message and in one where the defendant is perceived as an "outside activist" and the injured party, a local police officer. As *Snyder v. Phelps* explained, when liability turns on "[a] highly malleable standard," there is "a real danger of [the jury's] becoming an instrument for the suppression of [First Amendment activity]." 562 U.S. 443, 458 (2011).

Even when imposition of an adverse jury verdict is, objectively, a low risk, litigation itself will be a burdensome ordeal for a protest leader named as a civil defendant, who is not entitled to court-provided counsel. Worse yet, these burdens may be—and often are—imposed intentionally, for the *purpose* of suppressing disfavored speech. However imperfectly upheld, prosecutors are under a constitutional obligation not to initiate cases based on political disagreement. *See Wayte v. United States,* 470 U.S. 598, 608 (1985). Private parties, in contrast, may bring suit, select defendants, and make litigation decisions with the sole purpose of inflicting hardship on speakers and movements whose political views they disapprove. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 744 (1983).[8]

---

[8] Justice Gonzalez's concurrence in *Juhl v. Airington*, 936 S.W.2d 640 (1996), identified a reason why suits by police officers injured on duty are especially troubling: Protesters whose convictions were held unconstitutional "could … then be sued by the arresting officers for negligence"—a "back-door attack [on First Amendment rights] by state actors." *Id.* at 648.

29

Finally, although the Fifth Circuit opinion here described petitioner's alleged conduct as both "criminal" and "tortious," Pet. App. 12a—*i.e.*, punishable under a misdemeanor statute *and* breaching a never-before-recognized duty of reasonable care owed police, it did not suggest that a "criminal" act is a prerequisite for liability. Even if that were the rule, it would do little to limit the liability risk—and still less to reduce the chill. "[A]lmost anyone can be arrested for *something*." *Nieves*, 139 S. Ct. at 1730 (Gorsuch, J., concurring in part and dissenting in part). Still more people may plausibly be alleged, under liberal pleading standards, to have violated a criminal law. That is most true with respect to street demonstrations, where localities often enact a dense thicket of measures, on the basis of which police can make public-order arrests.

## B. The *Claiborne* protections remain vitally important.

Although the *Claiborne* decision, like those announcing constitutional limitations on incitement and group-based liability, is, in some sense a product of the times in which it was forged, it is no relic. *See Cloer*, 528 U.S. at 1099 (2000) (Scalia, J., dissenting from denial of cert.) (counting *Claiborne* among the Court's "significant" First Amendment decisions). Like those doctrines—and the First Amendment itself—its protections are viewpoint-neutral. *See Juhl* 936 S.W.2d at 642–43, (citing *Claiborne* in dismissing negligence claims against anti-abortion protesters); *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018) (citing *Claiborne* in dismissing negligence suit seeking damages from political candidate for violent acts committed at campaign rally); *see also, e.g.,*

30

*Forsyth County*, 505 U.S. at 137 (citing decisions protecting Jehovah's Witnesses to vindicate protest rights of white supremacists); *Packingham*, 137 S. Ct. at 1737 (relying on abortion protest decision to uphold free speech rights of registered sex offender).

Indeed, the rule is of particular value to the rights of protestors—be they same-sex marriage opponents in Berkeley, California or gun control proponents in Boise, Idaho—who take to the streets to persuade their fellow citizens to reconsider locally orthodox opinions.

### III. The First Amendment protections the Fifth Circuit disabled should be reinstated now, not later.

The clarity and seriousness of the errors below, and the nature of the rights at stake, support deciding the question presented now, whether through plenary or summary consideration.

This is not a situation where "further percolation" is beneficial or justifiable. The issue "percolated" for many years, with baleful consequences, before this Court decided it, unanimously, in 1982 and announced a clear rule that squarely controls respondent's lawsuit. Until the *Claiborne* rule is reinstated there, the 33 million residents of Fifth Circuit States must exercise their First Amendment rights subject to lawsuits and damages awards that this Court has held unconstitutional.

Even in circuits where the *Claiborne* rule has not been discarded, the Fifth Circuit's decision poses a danger, providing a roadmap for protest opponents to file suits that would—and should—be barred by this Court's precedent, and thus a deterrent to would-be

31

protesters, who must consider whether a court might follow the Fifth Circuit's lead. These disruptive effects should be stanched, not encouraged.

The most troubling chilling effects will occur in "cases" that never make their way to court, let alone this Court. Persons who, as a result of the rule, "refrain from exercising their rights" to demonstrate will not be sued for negligent protesting because they, instead, simply will not protest. *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). Vague or overbroad statutory provisions can be facially challenged and enjoined before speech is chilled. But here, there is no plausible mechanism, aside from a decision of this Court, for would-be speakers to obtain judicial assurance that they will be constitutionally protected against liability for unintended third-party misconduct.

Nor, finally, is this case's "early procedural posture"—or the prospect that petitioner will defeat liability once the complaint's allegations are tested reason for withholding review. The First Amendment issue has been conclusively decided, and there is nothing tentative or fact-specific about the Fifth Circuit's resolution of it.

As in *Cox Broadcasting Corp. v. Cohn*, where the Court granted review of a non-final decision of a *state* court, *see* 28 U.S.C. § 1257, the First Amendment question here is whether the case should proceed "at all." 420 U.S. 469, 485 (1975). It is no small matter to require petitioner to engage in lengthy litigation—at his own expense—under a rule of law this Court foreclosed decades ago, one that may not constitutionally be applied to him or others.

32

Even assuming petitioner eventually will prevail on *some* ground, the terms of the Fifth Circuit's remand suggest a lengthy slog: The opinion encouraged respondent to propose new amendments "in light of" its erroneous theory and seemingly nudged the district court to look favorably on such motions and on respondent's efforts to subject petitioner to discovery.

In any event, a victory for petitioner on nonconstitutional grounds would be a defeat for the First Amendment rights of protesters in the Fifth Circuit, for whom this decision would remain the binding, final word and for those elsewhere frightened by the prospect that they will be sued and, like petitioner, be required to labor to persuade courts to enforce their *Claiborne* rights.

As the Court has recognized repeatedly, the nature of the particular rights at issue alters the usual rules of restraint that support "hammer[ing] out" legal questions through case-by-case adjudication. "Vindication of freedom of expression [should not] await the outcome of protracted litigation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Withholding immediate review would not only subject protected activity to burdensome litigation, but would leave protesters nationwide "operating in the shadow of … a rule of law … the constitutionality of which is"—at the least—"in serious doubt." *Cox*, 420 U.S. at 486. It "would be intolerable to leave unanswered," *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 246-47 (1974), important questions concerning the "limits the First Amendment

33

places on state" law. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 55 (1989).

## CONCLUSION

The petition for a writ of certiorari should be granted and the decision summarily reversed, or, in the alternative, the Court should set the case for plenary review.

Respectfully submitted.

David D. Cole
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005

Ben Wizner
Vera Eidelman
Brian Hauss
Emerson Sykes
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

William P. Gibbens
Ian Atkinson
SCHONEKAS, EVANS, MCGOEY
    & MCEACHIN, LLC
909 Poydras Street, Suite 1600
New Orleans, LA 70112

David T. Goldberg
    *Counsel of Record*
DONAHUE, GOLDBERG,
    WEAVER & LITTLETON, LLP
109 S. 5th Street, Suite 4201
Brooklyn, NY 11249
(212) 334-8813
david@donahuegoldberg.com

Katie Schwartzmann
Bruce Hamilton
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
    OF LOUISIANA
P.O. Box 56157
New Orleans, LA 70156

DECEMBER 2019

34

**APPENDIX**

1a

United States Court of Appeals, Fifth Circuit.

Officer John DOE, Police Officer,
Plaintiff-Appellant

v.

DeRay MCKESSON; Black Lives Matter; Black
Lives Matter Network, Incorporated,
Defendants-Appellees

No. 17-30864

August 8, 2019

<u>ON PETITION FOR PANEL REHEARING</u>

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

The petition for panel rehearing is hereby
GRANTED. We WITHDRAW the court's prior opinion
of April 24, 2019, and substitute the following opinion.

During a public protest against police misconduct
in Baton Rouge, Louisiana, an unidentified individual
hit Officer John Doe with a heavy object, causing him
serious physical injuries. Following this incident,
Officer Doe brought suit against "Black Lives Matter,"
the group associated with the protest, and DeRay
Mckesson, one of the leaders of Black Lives Matter
and the organizer of the protest. Officer Doe later
sought to amend his complaint to add Black Lives
Matter Network, Inc. and #BlackLivesMatter as
defendants. The district court dismissed Officer Doe's
claims on the pleadings under Federal Rule of Civil

2a

Procedure 12(b)(6), and denied his motion to amend his complaint as futile. Because we conclude that the district court erred in dismissing the case against Mckesson on the basis of the pleadings, we REMAND for further proceedings relative to Mckesson. We further hold that the district court properly dismissed the claims against Black Lives Matter.[1] We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings not inconsistent with this opinion.

I.

On July 9, 2016, a protest took place by blocking a public highway in front of the Baton Rouge Police Department headquarters.[2] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby

---

[1] We do not address any of the allegations raised by the Proposed Amended Complaint. *See* note 5, *infra*.

[2] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

3a

convenience store. The dismissed complaint further alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers began making arrests of those blocking the highway and participating in the violence.

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants.

II.

4a

The district court granted both of Mckesson's motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against #BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc. the district court held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social movement and a "hashtag" as defendants, the district court dismissed his case with prejudice. Officer Doe timely appealed.

## III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)). To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets omitted)). Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807

5a

F.3d 657, 684 (5th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted) (quoting *Iqbal*, 556 U.S. at 680).[3]

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical in practice to the Rule 12(b)(6) standard. *Id*. When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed.

---

[3] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992). Where the issue appears on the face of the complaint, other courts have done the same and treated it as a Rule 12(b)(6) motion. *See, e.g.*, *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F.Supp.2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity . . . creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity . . . appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)). Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

6a

R. Civ. P. 15(a)(2).

IV.

A.

We begin by addressing Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn—vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the point of our

7a

beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for or that the assailant's "physical movements [were] subject to the control or right to control" of Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id.* In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of . . . a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite a riot/protest." Disregarding Officer Doe's conclusory

8a

allegations, we find that Officer Doe has not alleged facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with the unknown assailant to attack Officer Doe or knew of the attack and specifically ratified it. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's conspiracy claim must and does fail.

3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the

9a

conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *See Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'" (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific duties of care based on consideration of "various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint specifically alleges that

10a

it was Mckesson himself who intentionally led the demonstrators to block the highway. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. As such, it was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was most nearly certain to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration.

Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and

11a

bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

## B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *See id.* at 927. The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

The district court appears to have assumed that

12a

in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Even if we assume that Officer Doe seeks to hold Mckesson "liable for the unlawful conduct of others" within the meaning of *Claiborne Hardware*, the First Amendment would not require dismissal of Officer Doe's complaint. *Id.* In order to counter Mckesson's First Amendment defense at the pleading stage Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the Baton Rouge police and the protesters, and that Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway.

We focus here on the fact that Mckesson "directed . . . specific tortious activity" because we hold that Officer Doe has adequately alleged that his injuries were the result of Mckesson's *own* tortious conduct in organizing a foreseeably violent protest. In Mckesson's petition for rehearing, he expresses

13a

concern that the panel opinion permits Officer Doe to hold him liable for the tortious conduct of *others* even though Officer Doe merely alleged that he was negligent, and not that he specifically intended that violence would result. We think that Mckesson's criticisms are misplaced. We perceive no Constitutional issue with Mckesson being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of a another that were foreseeable as a result of that negligent conduct. The permissibility of such liability is a standard aspect of state law. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). There is no indication in *Claiborne Hardware* or subsequent decisions that the Supreme Court intended to restructure state tort law by eliminating this principle of negligence liability.

We of course acknowledge that Mckesson's negligent conduct took place in the context of a political protest. It is certainly true that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Claiborne Hardware*, 468 U.S. at 916–17. But *Claiborne Hardware* does not insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message. *See id.* at 916 ("[T]he use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy.") (internal

14a

quotation marks and citations omitted). Furthermore, although we do not understand the petitioner to be arguing that the Baton Rouge police violated the demonstrators' First Amendment rights by attempting to remove them from the highway, we note that the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (reasonable time, place, and manner restrictions do not violate the First Amendment). As such, no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's condut to be addressed by state tort law.

Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment.[4]

---

[4] We emphasize, however, that our opinion does not suggest that the First Amendment allows a person to be punished, or held civilly liable, simply because of his associations with others, unless it is established that the group that the person associated with "itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. But we also observe that, in any event, Officer Doe's allegations are sufficient to state a claim that Black Lives Matter "possessed unlawful goals" and that Mckesson "held a specific intent to further those illegal aims." *See id*. Officer Doe alleges that Black Lives Matter "*plann[ed]* to block a public highway," and, in his amended complaint, that Mckesson and Black Lives Matter traveled to Baton Rouge "for

15a

## C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute" in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed. R. Evid. 201(b). "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998). In *Taylor*, we held that another court's state actor determination was not an "adjudicative fact" within the meaning of Rule 201 because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review." *Id.* at 830–31. We further held that the state-actor determination was not beyond

---

the *purpose* of . . . rioting." (emphasis added).

16a

reasonable dispute where it "was, in fact, disputed by the parties" in the related case. *Id.* at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort." The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest. This difference is sufficient under our case law to preclude judicial notice.

We should further say that we see the cases relied on by the district court as distinguishable. Each deals with judicial notice of an aspect of an entity, not its legal form. *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259–60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States . . . was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national incorporated association with chapter [sic] in

17a

many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined . . . by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name." The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id.*

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728-729 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and possession of an insurance policy); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 675 (E.D. La. 2010) (relying on

organization's formal and determinate membership structure). Lacking at least some of these indicators, Louisiana courts have been unwilling to find an intent to create an unincorporated association. *See, e.g.*, *Ermert*, 559 So. 2d at 474–475 (finding that hunting group was not an unincorporated association because it did not own or lease the property that it was based on, required the permission of one of its alleged members to use the property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that Black Lives Matter is an unincorporated association. His only allegations are that Black Lives Matter: (1) was created by three women; (2) has several leaders, including Mckesson; (3) has chapters in many states; and (4) was involved in numerous protests in response to police practices. He does not allege that it possesses property, has a formal membership, requires dues, or possesses a governing agreement. As such, the complaint lacks any indication that Black Lives Matter possesses the traits that Louisiana courts have regarded as indicative of an intent to establish a juridical entity. We have no doubt that Black Lives Matter involves a number of people working in concert, but "an unincorporated association . . . . does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together." *Id.* at 474. Therefore, we find that the district court did not err in concluding that Officer Doe's complaint has failed plausibly to allege that

19a

Black Lives Matter is an entity capable of being sued.[5]

## V.

In sum, we hold that Officer Doe has not adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[6] We also hold that the district court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued.[7] Therefore, the judgment of the district

---

[5] We do not address as to whether Officer Doe could state a claim against an entity whose capacity to be sued was plausibly alleged, nor do we address whether Mckesson could be held liable for the actions of that entity under state law.

[6] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then decide whether, in the light of our remand, discovery would be appropriate.

[7] Because we find that Officer Doe has successfully pled a claim, we do not reach the district court's denial of Officer Doe's motion for leave to amend. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 268 n.36 (5th Cir. 2009) (citing *Xerox Corp. v.*

20a

court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.[8]

---

*Genmoora Corp.*, 888 F.2d 345, 358 n.70 (5th Cir. 1989)). It follows that we do not address any of the allegations in the Proposed Amended Complaint or the parties it seeks to add. On remand, Officer Doe may seek leave to amend his complaint to add new parties and plead additional facts to support his negligence claim. The district court should determine whether to grant this motion, and any new motions for leave to amend, in the light of our opinion.

   [8] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related to this lawsuit. In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit. The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face." As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186. We agree with the district court and

21a

AFFIRMED in part, REVERSED in part, and REMANDED.

---

affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

22a

United States Court of Appeals, Fifth Circuit.

Officer John DOE, Police Officer,
Plaintiff-Appellant

v.

DeRay MCKESSON; Black Lives Matter;
Black Lives Matter Network, Incorporated,
Defendants-Appellees

No. 17-30864

April 24, 2019

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

During a public protest against police misconduct
in Baton Rouge, Louisiana, an unidentified
individual hit Officer John Doe with a heavy object,
causing him serious physical injuries. Following this
incident, Officer Doe brought suit against "Black
Lives Matter," the group associated with the protest,
and DeRay Mckesson, one of the leaders of Black
Lives Matter and the organizer of the protest. Officer
Doe later sought to amend his complaint to add Black
Lives Matter Network, Inc. and #BlackLivesMatter
as defendants. The district court dismissed Officer
Doe's claims on the pleadings under Federal Rule of
Civil Procedure 12(b)(6), and denied his motion to
amend his complaint as futile. Because we conclude
that the district court erred in dismissing the case
against Mckesson on the basis of the pleadings, we
REMAND for further proceedings relative to
Mckesson. We further hold that the district court
properly dismissed the claims against Black Lives

23a

Matter.[1] We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings not inconsistent with this opinion.

## I.

On July 9, 2016, a protest took place by blocking a public highway in front of the Baton Rouge Police Department headquarters.[2] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby convenience store. The dismissed complaint further alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers began making arrests of those blocking the highway and participating in the violence.

---

[1] We do not address any of the allegations raised by the Proposed Amended Complaint. *See* note 5, *infra*.

[2] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

24a

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants.

II.

The district court granted both of Mckesson's motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against #BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc. the district court

25a

held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social movement and a "hashtag" as defendants, the district court dismissed his case with prejudice. Officer Doe timely appealed.

## III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)). To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets omitted)). Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted) (quoting *Iqbal*, 556 U.S. at 680).[3]

---

[3] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992). Where the issue appears on the face of the complaint, other courts have done the same and

26a

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical in practice to the Rule 12(b)(6) standard. *Id.* When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed. R. Civ. P. 15(a)(2).

IV.

A.

We begin by addressing Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that

---

treated it as a Rule 12(b)(6) motion. *See, e.g., Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F.Supp.2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity . . . creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity . . . appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)). Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

27a

Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn—vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the point of our beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for or that the assailant's "physical movements [were] subject to the control or right to control" of Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id.* In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an

agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of . . . a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite a riot/protest." Disregarding Officer Doe's conclusory allegations, we find that Officer Doe has not alleged facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with the unknown assailant to attack Officer Doe, knew of the attack and ratified it, or agreed with other named persons that attacking the police was one of the goals of the demonstration. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's

29a

conspiracy claim must and does fail.

3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *See Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'" (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific

30a

duties of care based on consideration of "various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint specifically alleges that it was Mckesson himself who intentionally led the demonstrators to block the highway. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. As such, it was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was most nearly certain to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration.

Officer Doe has also plausibly alleged that

31a

Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

## B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect

32a

violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *See id.* at 927. The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

We respectfully disagree. The district court appears to have assumed that in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Assuming that the First Amendment is applicable to Mckesson's conduct, in order to counter its applicability at the pleading stage, Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the Baton Rouge police and the protesters, and that

33a

Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway. Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment.

## C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute" in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed. R. Evid. 201(b). "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998). In *Taylor*, we held that another court's state actor determination was not an "adjudicative fact" within the meaning of Rule 201

34a

because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review." *Id.* at 830–31. We further held that the state-actor determination was not beyond reasonable dispute where it "was, in fact, disputed by the parties" in the related case. *Id.* at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort." The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest. This difference is sufficient under our case law to preclude judicial notice.

We should further say that we see the cases relied on by the district court as distinguishable. Each deals with judicial notice of an aspect of an entity, not its legal form. *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259–60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States . . . was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national incorporated association with chapter [sic] in many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined . . . by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name." The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id*.

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728-729 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and

possession of an insurance policy); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 675 (E.D. La. 2010) (relying on organization's formal and determinate membership structure). Lacking at least some of these indicators, Louisiana courts have been unwilling to find an intent to create an unincorporated association. *See, e.g.*, *Ermert*, 559 So. 2d at 474–475 (finding that hunting group was not an unincorporated association because it did not own or lease the property that it was based on, required the permission of one of its alleged members to use the property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that Black Lives Matter is an unincorporated association. His only allegations are that Black Lives Matter: (1) was created by three women; (2) has several leaders, including Mckesson; (3) has chapters in many states; and (4) was involved in numerous protests in response to police practices. He does not allege that it possesses property, has a formal membership, requires dues, or possesses a governing agreement. As such, the complaint lacks any indication that Black Lives Matter possesses the traits that Louisiana courts have regarded as indicative of an intent to establish a juridical entity. We have no doubt that Black Lives Matter involves a number of people working in concert, but "an unincorporated association . . . . does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together." *Id*. at 474. Therefore, we find that the district court did not err in concluding that Officer Doe's complaint has failed plausibly to allege that Black Lives Matter is an entity capable of being sued.

37a

## V.

In sum, we hold that Officer Doe has not adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[4] We also hold that the district court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued. [5] Therefore, the

---

[4] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then decide whether, in the light of our remand, discovery would be appropriate.

[5] Because we find that Officer Doe has successfully pled a claim, we do not reach the district court's denial of Officer Doe's motion for leave to amend. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 268 n.36 (5th Cir. 2009) (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 358 n.70 (5th Cir. 1989)). It follows that we do not address any of the allegations in the Proposed Amended Complaint or the parties it seeks to add. On remand, Officer Doe may seek leave to amend his complaint to add new parties and plead additional facts to support his negligence claim. The district court should determine whether to grant this motion, and any new motions for leave to amend, in the light of our opinion.

38a

judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.[6]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[6] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related to this lawsuit. In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit. The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face." As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186. We agree with the district court and affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

39a

United States District Court, M.D. Louisiana.

Officer John DOE

v.

DeRay MCKESSON et al.

CIVIL ACTION NO.: 16–00742–BAJ–RLB

Signed September 28, 2017

"[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *Citizens Against Rent Control / Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981). Because of its nature as a fundamental guarantee under the First Amendment to the United States Constitution, "[t]he right to associate does not lose all constitutional protection merely because some members of [a] group may have participated in conduct," such as violence, "that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982). Thus, when a tort is committed in the context of activity that is otherwise protected by the First Amendment, courts must use "precision" in determining who may be held liable for the tortious conduct so that the guarantees of the First Amendment are not undermined. *Id.* at 916 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

Plaintiff's alleged injuries in this case—which he claims to have suffered in the line of duty as a police officer while responding to a demonstration—are not to be minimized. Plaintiff has failed, however, to state a plausible claim for relief against an individual or entity that both has the capacity to be sued and falls

40a

within the precisely tailored category of persons that may be held liable for his injuries, which he allegedly suffered during activity that was otherwise constitutionally protected. For the reasons explained herein, Defendant DeRay Mckesson's Motion to Dismiss (Doc. 15) and Defendant DeRay Mckesson's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(a) (Doc. 43) are GRANTED, Plaintiff's Motion to File Amended Complaint for Damages (Doc. 52) is DENIED, and this matter is DISMISSED WITH PREJUDICE.

## I. BACKGROUND

In his Complaint, Plaintiff—a Baton Rouge Police Department officer—alleges that he responded to a demonstration that took place on July 9, 2016, at the intersection of Airline Highway and Goodwood Boulevard. (See Doc. 1 at ¶¶ 12, 15–16). Plaintiff avers that Defendant DeRay Mckesson ("Mckesson") "le[ ]d the protest," "acting on behalf of" Defendant "Black Lives Matter." (*Id.* at ¶ 3). Plaintiff asserts that "Black Lives Matter" is a "national unincorporated association," of which Mckesson is a "leader and co-founder." (*Id.*).

Although Plaintiff alleges that Mckesson and "Black Lives Matter" "were in Baton Rouge for the purpose of demonstrating, protesting[,] and rioting to incite others to violence against police and other law enforcement officers," (*id.* at ¶ 11), Plaintiff concedes that the demonstration "was peaceful" when it commenced, (*id.* at ¶ 17). Plaintiff avers that "the protest turned into a riot," (*id.* at ¶ 18), however, when "activist[s] began pumping up the crowd," (*id.* at ¶ 17). Thereafter, demonstrators allegedly "began

41a

to loot a Circle K," taking "water bottles" from the business and "hurl[ing]" them at the police officers who were positioned at the demonstration. (*Id.* at ¶ 18). Once the demonstrators had exhausted their supply of water bottles, Plaintiff asserts that an unidentified demonstrator "picked up a piece of concrete or [a] similar rock[-]like substance and hurled [it] into the police." (*Id.* at ¶ 20). Plaintiff allegedly was struck by this object, causing several serious injuries. (*Id.* at ¶ 21).

Plaintiff alleges that Mckesson "was in charge of the protests" and "was seen and heard giving orders throughout the day and night of the protests." (*Id.* at ¶ 17). Mckesson, according to Plaintiff, "was present during the protest and ... did nothing to calm the crowd"; instead, Mckesson allegedly "incited the violence on behalf of ... Black Lives Matter." (*Id.* at ¶ 19).

Plaintiff brought suit, naming Mckesson and "Black Lives Matter" as Defendants. In his Complaint, Plaintiff states claims in negligence and respondeat superior, asserting that Mckesson and "Black Lives Matter" "knew or should have known that the physical contact[,] riot[,] and demonstration that they staged would become violent ... and ... that violence would result." (*Id.* at ¶ 28). The unidentified demonstrator who threw the object that allegedly struck Plaintiff, he avers, was "a member of ... Black Lives Matter" and was "under the control and custody" of Mckesson and "Black Lives Matter." (*Id.* at ¶ 20). Therefore, according to Plaintiff, Mckesson and "Black Lives Matter" "are liable in solido for the injuries caused to" Plaintiff by the unidentified demonstrator. (*Id.* at ¶ 31).

42a

Mckesson thereafter filed Defendant's Rule 12 Motion, asserting that Plaintiff failed to state a plausible claim for relief against him, as well as Defendant's Rule 9 Motion, asserting that "Black Lives Matter" is not an entity that has the capacity to be sued. Plaintiff responded by filing Plaintiff's Motion to Amend, seeking leave of court to amend his complaint to add "#BlackLivesMatter" and Black Lives Matter Network, Inc., as Defendants and to supplement his Complaint with additional factual allegations.

## II. DISCUSSION

The Court finds that Plaintiff's Complaint suffers from numerous deficiencies; namely, the Complaint fails to state a plausible claim for relief against Mckesson and it names as a Defendant a social movement that lacks the capacity to be sued. In an attempt to ameliorate these deficiencies, Plaintiff has sought leave of court to amend his Complaint to name two additional Defendants—"#BlackLivesMatter" and Black Lives Matter Network, Inc.—and to plead additional factual allegations. Plaintiff's proposed amendment, however, would be futile: Plaintiff fails to remedy the deficiencies contained in his initial Complaint with respect to his claims against Mckesson and "Black Lives Matter," "#BlackLivesMatter"—a *hashtag*—lacks the capacity to be sued, and Plaintiff fails to state a plausible claim for relief against Black Lives Matter Network, Inc. Plaintiff's claims, therefore, must be dismissed, and Plaintiff must be denied the opportunity to amend his Complaint.

## A. Defendant's Rule 12 Motion

43a

Setting aside his conclusory allegations, Plaintiff has pleaded facts that merely demonstrate that Mckesson exercised his constitutional right to association and that he solely engaged in protected speech at the demonstration that took place in Baton Rouge on July 9, 2016. Because Plaintiff has failed to plead sufficient, nonconclusory factual allegations that would tend to demonstrate that Mckesson exceeded the bounds of protected speech, Mckesson cannot be held liable for the conduct of others with whom he associated, and Plaintiff thus has failed to state a plausible claim for relief against Mckesson.

1. Legal Standard

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Thus, a complaint need not set out "detailed

44a

factual allegations," but a complaint must contain something more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and therefore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

2. Analysis

"The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916, ("Certainly violence has no sanctuary in the First Amendment, and the use of weapons ... may not constitutionally masquerade under the guise of 'advocacy.'" (quoting *Samuels v. Mackell*, 401 U.S. 66, 75 (1971) (Douglas, J., concurring))). "[T]he presence of activity protected by the First Amendment," however, "imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17. Thus, while a person may be held liable in tort "for the consequences of [his] violent conduct," a person cannot be held liable in tort "for the consequences of nonviolent, protected activity." *Id.* at 918. "Only those losses proximately caused by unlawful conduct may be recovered." *Id.*

45a

"The First Amendment similarly restricts the ability" of a tort plaintiff to recover damages from "an individual solely because of his association with another." *Id.* at 918–19. "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920. "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* To impose tort liability on an individual for the torts of others with whom he associated, a plaintiff must prove that (1) the individual "authorized, directed, or ratified specific tortious activity"; (2) his public speech was "likely to incite lawless action" and the tort "followed within a reasonable period"; or (3) his public speech was of such a character that it could serve as "evidence that [he] gave other specific instructions to carry out violent acts or threats." *Id.* at 927.

In his Complaint, Plaintiff alleges that Mckesson "le[]d the protest and violence that accompanied the protest." (*Id.* at ¶ 3). As support for this contention, Plaintiff pleaded that Mckesson "was in charge of the protests[,] and he was seen and heard giving orders throughout the day and night of the protests." (*Id.* at ¶ 17). Further, Plaintiff avers that Mckesson "did nothing to calm the crowd" during the demonstration; rather, Mckesson "incited the violence." (*Id.* at ¶ 19).

All of these allegations are conclusory in nature, however, and they do not give rise to a plausible claim for relief against Mckesson. In order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during

46a

the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson "authorized, directed, or ratified specific tortious activity." *Id.* Plaintiff, however, merely states—in a conclusory fashion—that Mckesson "incited the violence" and "g[ave] orders," (*id.* at ¶¶ 17, 19), but Plaintiff does not state in his Complaint how Mckesson allegedly incited violence or what orders he allegedly was giving. Therefore, the Complaint contains a "[t]hreadbare recital[] of the elements" of a cause of action against Mckesson, which Plaintiff only has "supported [with] mere conclusory statements," and therefore Plaintiff's Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Further, Plaintiff has not pleaded sufficient factual allegations regarding Mckesson's public speech to state a cause of action against Mckesson based on that speech. The only public speech to which Plaintiff cites in his Complaint is a one-sentence statement that Mckesson allegedly made to The New York Times: "The police want protestors to be too afraid to protest." (*Id.* at ¶ 24). Mckesson's statement does not advocate—or make any reference to—violence of any kind, and even if the statement did, "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware*, 458 U.S. at 927. This statement falls far short of being "likely to incite lawless action," which Plaintiff would have to prove to hold Mckesson liable based on his public speech. *Id.*

Nor can Plaintiff premise Mckesson's liability on the theory that he allegedly "did nothing to calm the

47a

crowd." *Id.* at ¶ 19). As the United States Supreme Court stated in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence," id. at 920.

Plaintiff therefore has failed to plead in his Complaint "factual content that allows the court to draw the reasonable inference that [Mckesson] is liable for the misconduct alleged," and thus Plaintiff's claims against Mckesson must be dismissed. *Iqbal*, 556 U.S. at 678.

## B. Defendant's Rule 9 Motion

The Court finds that "Black Lives Matter," as Plaintiff uses that term in his Complaint, refers to a social movement. Although many entities have utilized the phrase "black lives matter" in their titles or business designations, "Black Lives Matter" itself is not an entity of any sort. Therefore, all claims against "Black Lives Matter" must be dismissed because social movements lack the capacity to be sued.

### 1. Legal Standard

Although a motion to dismiss for lack of capacity is not contemplated by the express provisions of Rule 12, such a motion is treated by courts as a motion to dismiss pursuant to Rule 12(b)(6) when the issue can be resolved by analyzing the face of the complaint. *See Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a

48a

12(b)(6) motion when the defect appears upon the face of the complaint."); *Oden Metro Turfing, Inc. v. Cont'l Cas. Co.*, No. 12-cv-01547, 2012 WL 5423704, at *2 (W.D. La. Oct. 10, 2012) (citing *Klebanow*, 344 F.2d 294); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1294 (2017 Supp. 2017) ("[I]f the lack of capacity ... appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion for failure to state a claim for relief."). The Court may treat a motion to dismiss for lack of capacity as a motion to dismiss pursuant to Rule 12(b)(6) even if the motion is labelled incorrectly. *See Oden Metro*, 2012 WL 5423704, at *2.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos*, 599 F.3d at 461 (quoting *True*, 571 F.3d at 417). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint," however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. When analyzing a motion to dismiss for failure to state a claim, "courts may also consider matters of which they may take judicial notice." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

49a

If a party is not an individual or a corporation, the capacity of that party to be sued "is determined ... by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). "Under Louisiana law, an entity must qualify as a 'juridical person' to possess the capacity to be sued." *Hall v. Louisiana*, 974 F.Supp.2d 957, 962 (M.D. La. 2013). "A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership." La. Civ. Code art. 24. "[F]or an unincorporated association to possess juridical personality, the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert v. Hartford Ins.*, 559 So.2d 467, 474 (La. 1990) (quoting La. Civ. Code art. 24). "Unless such an intent exists, the parties do not create a fictitious person[,] but instead simply incur obligations among themselves." *Id.* "Consequently, an unincorporated association, as a juridical person distinct from its members, does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together"; rather, "there must also be an agreement whereby two or more persons combine certain attributes to create a separate entity for a legitimate purpose." *Id.*

2. Analysis

Mckesson, in his Rule 9 Motion, argues that the Court should dismiss "Black Lives Matter" as a Defendant in this case because it lacks the capacity to be sued. According to Defendant, "Black Lives Matter" "is a movement and not a juridical entity capable of being sued." (Doc. 43–1 at p. 2). The Court

finds that the capacity of "Black Lives Matter" to be sued can be discerned from the face of the pleadings, and therefore it will treat Defendant's Rule 9 Motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Klebanow*, 344 F.2d at 296 n.1.

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it ... is generally known within the trial court's territorial jurisdiction." Fed. R. Evid. 201(b)(1). Courts previously have taken judicial notice of the character, nature, or composition of various social movements. *See, e.g.*, *United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could "easily take judicial notice" of the aims and goals of the "union movement"); *Attorney Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259 (S.D.N.Y. 1981) ("Under the doctrine of judicial notice, the Court can observe that the 'Republican movement' consists of groups other than, and in addition to, the IRA; but the Court can also notice that the IRA is a 'Republican movement'...."); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States ... was a part of the world Communist movement dominated by the Soviet Union").

In his Complaint, Plaintiff names "Black Lives Matter" as a Defendant, describing "Black Lives Matter" as a "national incorporated association with chapter [sic] in many states[,] which is amenable to service of process through a managing member." (Doc. 1 at ¶ 3). Plaintiff alleges that "Black Lives Matter" was "created by Alicia Garza, Patrisse Cullors, and

51a

Opal Tometi" and that the "leaders" of "Black Lives Matter" are "Rashad Turner, Johnetta Elzie[,] and DeRay Mckesson." (*Id.* at ¶ 4).

The Court judicially notices that "Black Lives Matter," as that term is used in the Complaint, is a social movement that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African–American citizens by law enforcement officers. Fed. R. Evid. 201; *cf. Parise*, 159 F.3d at 801 (holding that the court could "easily take judicial notice" of the aims and goals of the "union movement"); *Irish N. Aid. Comm.*, 530 F. Supp. at 259 ("Under the doctrine of judicial notice, the Court can observe that the 'Republican movement' consists of groups other than, and in addition to, the IRA; but the Court can also notice that the IRA is a 'Republican movement' ...."); *see also Baggett*, 377 U.S. at 376 n.13 (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States ... was a part of the world Communist movement dominated by the Soviet Union"). Because "Black Lives Matter," as that term is used in the Complaint, is a social movement, rather than an organization or entity of any sort, its advent on social media merely was a "fortuitous creation of a community of interest"; "Black Lives Matter" was not created through a "contract of association" and is not an "entity whose personality 'is distinct from that of its members,' " and therefore it is not a "juridical person" that is capable of being sued. *Ermert*, 559 So.2d at 474 (quoting La. Civ. Code art. 24).

The Court notes that the phrase "black lives matter" has been utilized by various entities wishing

52a

to identify themselves with the "Black Lives Matter" movement. Plaintiff himself has identified one such entity and seeks leave of court to add that entity as a Defendant: Black Lives Matter Network, Inc. (See Doc. 52–4 at ¶ 3). These entities undoubtedly are "juridical persons" capable of being sued, and therefore the issue of such an entity's capacity would not impede Plaintiff from filing suit against it. "Black Lives Matter," as a social movement, cannot be sued, however, in a similar way that a person cannot plausibly sue other social movements such as the Civil Rights movement, the LGBT rights movement, or the Tea Party movement. If he could state a plausible claim for relief, a plaintiff could bring suit against entities associated with those movements, though, such as the National Association for the Advancement of Colored People, the Human Rights Campaign, or Tea Party Patriots, because those entities are "juridical persons" within the meaning of Louisiana law. *See* La. Civ. Code art 24.

Nevertheless, Plaintiff merely has identified "Black Lives Matter" as a Defendant in his Complaint, and that term connotes a social movement that is not a "juridical person" and that lacks the capacity to be sued. *See Ermert*, 559 So.2d at 474. Therefore, "Black Lives Matter" shall be dismissed as a Defendant in this case because it lacks the capacity to be sued. *See id*.

C. Plaintiff's Motion to Amend

Following the filing of Defendant's Rule 12 Motion and Defendant's Rule 9 Motion, as well as the oral argument on those Motions, Plaintiff sought leave of court to amend his Complaint. Plaintiff

53a

identifies two additional Defendants in his Proposed Amended Complaint—"#BlackLivesMatter" and Black Lives Matter Network, Inc.—and pleads additional factual allegations. (See Doc. 52–4). In his Proposed Amended Complaint, however, Plaintiff nonetheless fails to state a plausible claim for relief against any of the four named Defendants: "Black Lives Matter"—a social movement—and "# BlackLivesMatter"—a hashtag—both lack the capacity to be sued, and Plaintiff has failed to state plausible claims for relief against either Mckesson or Black Lives Matter Network, Inc., that are supported by anything more than conclusory allegations. Therefore, because Plaintiff's Proposed Amended Complaint would be subject to dismissal in its entirety, the Court shall deny Plaintiff leave of court to amend his Complaint.

### 1. Legal Standard

If a party is not entitled to amend a pleading as a matter of course pursuant to Rule 15(a)(1), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* "[A] district court may refuse leave to amend," however, "if the filing of the amended complaint would be futile." *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014). In other words, the Court may deny Plaintiff's Motion to Amend "if the complaint as amended would be subject to dismissal." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009).

### 2. Analysis

### a. "# BlackLivesMatter"

54a

Plaintiff, in his Proposed Amended Complaint, seeks to add as a Defendant "#BlackLivesMatter." (*See id.* at ¶ 3). Plaintiff alleges that "#BlackLivesMatter" is a "national unincorporated association [that] is domiciled in California." (*Id.*).

The Court judicially notices that the combination of a "pound" or "number" sign (#) and a word or phrase is referred to as a "hashtag" and that hashtags are utilized on the social media website Twitter in order to classify or categorize a user's particular "tweet," although the use of hashtags has spread to other social media websites and throughout popular culture. *See* Fed. R. Evid. 201; *see also TWTB, Inc. v. Rampick*, 152 F.Supp.3d 549, 563 n.97 (E.D. La. 2016) ("A hashtag is 'a word or phrase preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet).'" (quoting Hashtag, Merriam–Webster Dictionary (2017), https://www.merriam-webster.com/dictionary/hashtag)). The Court also judicially notices that "#BlackLivesMatter" is a popular hashtag that is frequently used on social media websites. *See* Fed. R. Evid. 201.

Plaintiff therefore is attempting to sue a hashtag for damages in tort. For reasons that should be obvious,[1] a hashtag—which is an expression that

---

[1] The Court notes that if Plaintiff were not bearing his own costs, which otherwise would be borne by the taxpayers, 28 U.S.C. § 1915(e)(2)(B)(i) would permit the Court to dismiss this claim as "frivolous": a lawsuit that alleges that a hashtag—which is, in essence, an idea—is liable in tort for damages can be properly categorized as "fantastic or delusional." *Neitzke v. Williams*, 490 U.S. 319, 328 (1989).

55a

categorizes or classifies a person's thought—is not a "juridical person" and therefore lacks the capacity to be sued. *See* La. Civ. Code art. 24. Amending the Complaint to add "#BlackLivesMatter" as a Defendant in this matter would be futile because such claims "would be subject to dismissal"; a hashtag is patently incapable of being sued. *Ackerson*, 589 F.3d at 208.

b. "Black Lives Matter"

Plaintiff also seeks to supplement his allegations regarding Defendant "Black Lives Matter." In his Proposed Amended Complaint, Plaintiff avers that "Black Lives Matter" is a "chapter-based national unincorporated association" that is "organized" under the laws of the State of California, though it allegedly is also a "partnership" that is a "citizen" of "California and Delaware." (*Id.*).

For the reasons stated previously in reference to the Court's analysis of Defendant's Rule 9 Motion, "Black Lives Matter" is a social movement that lacks the capacity to be sued. *See* discussion *supra* Section II.B.2. In fact, in his Proposed Amended Complaint, Plaintiff himself refers to "Black Lives Matter" as a "movement" on multiple occasions. (*See, e.g.*, *id.* at ¶ 11 (describing the "Black Lives Matter movement"); *id.* at ¶ 45 (describing the "Black Lives Matter movement"); *id.* at ¶ 48 (describing the "movement's rioters")). Amending the Complaint to permit Plaintiff to continue to pursue claims against "Black Lives Matter" would be futile because such claims "would be subject to dismissal." *Ackerson*, 589 F.3d at 208. For the reasons stated previously, "Black Lives Matter" is a social movement that is not a "juridical

56a

person" and that lacks the capacity to be sued.

c. Mckesson

Plaintiff seeks to amend his complaint to include additional factual allegations in relation to Mckesson's activities and public statements. Plaintiff seeks to supplement his Complaint with allegations that Mckesson (1) made a statement on a television news program, in which he allegedly "justified the violence" that occurred at a demonstration in Baltimore, Maryland, (*id.* at ¶ 9); (2) engaged in a private conversation that allegedly "shows an intent to use protests to have 'martial law' declared nationwide through protests," (*id.* at ¶ 19); (3) allegedly made a statement to a news website that "people take to the streets as a last resort," which—according to Plaintiff—was a "ratification and justification of ... violence," (*id.* at ¶ 48); (4) participated in various interviews or speeches during which he allegedly described himself or was described as a "leader" of the "Black Lives Matter" movement or a "participant" in various demonstrations, (*see, e.g.*, *id.* at ¶¶ 10, 11, 13, 45, 55, 58); (5) "ratified all action taken during the Baton Rouge protest," (*id.* at ¶ 39); and (6) "incited criminal conduct that cause[d] injury," (*id.* at ¶ 44).

These supplemental factual allegations do not remedy Plaintiff's failure to state a plausible claim for relief against Mckesson. *See* discussion *supra* Section II.A.2. Plaintiff's allegations that Mckesson "ratified all action," (*id.* at ¶ 39), and "incited criminal conduct," (*id.* at ¶ 44), are nothing but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not

57a

suffice" to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678. Plaintiff's Proposed Amended Complaint is devoid of any facts, aside from these broad conclusory allegations, that tend to suggest that Mckesson made any statements or engaged in any conduct that "authorized, directed, or ratified" the unidentified demonstrator's act of throwing a rock at Plaintiff. *Claiborne Hardware*, 458 U.S. at 927.

Further, the additional public statements[2] that Plaintiff has pleaded do not support a plausible claim for relief against Mckesson. Rather than including the actual statement that Mckesson allegedly made on a television news program, Plaintiff merely pleads that Mckesson "justified the violence," (*id.* at ¶ 9); this is a "[t]hreadbare recital[ ] of the elements of a cause of action," which is "supported by mere conclusory statements." Iqbal, 556 U.S. at 678. Mckesson's alleged statement that "people take to the streets as a last resort," (*id.* at ¶ 48), similarly cannot give rise to a cause of action: it is not plausible that this statement could be "likely to incite lawless action" or be of such a character that it could serve as "evidence that [he] gave other specific instructions" to the unidentified demonstrator to throw a rock at

---

[2] Setting aside Plaintiff's description of it in mere conclusory terms, the conversation in which Plaintiff alleges that Mckesson "show[ed] an intent to use protests to have `martial law' declared nationwide through protests," Doc. 52-4 at ¶ 19, is a *private* conversation that cannot give rise to liability in tort for the actions of other demonstrators. *See Claiborne Hardware,* 458 U.S. at 927, 102 S.Ct. 3409 (holding that liability may only be imposed on a person for the tortious acts of others with whom the person associated if his "*public* speech" meets certain criteria (emphasis added)).

58a

Plaintiff. *Claiborne Hardware*, 458 U.S. at 927. Moreover, to premise Mckesson's liability on the sole basis of his public statements in which he identified himself as a "leader" of the "Black Lives Matter" movement or a "participant" in various demonstrations, (*see, e.g.*, *id.* at ¶¶ 10, 11, 13, 45, 55, 58), would impermissibly impose liability on Mckesson for merely exercising his right of association. See *id.* at 925-26 ("[M]ere association with [a] group—absent a specific intent to further an unlawful aim embraced by that group—is an insufficient predicate for liability.").

Plaintiff therefore has failed to remedy the deficiencies that the Court identified in his Complaint, *see* discussion *supra* Section II.A.2, and thus permitting Plaintiff to amend his Complaint to add various factual allegations against Mckesson would be futile because such claims nonetheless "would be subject to dismissal." *Ackerson*, 589 F.3d at 208.

d. Black Lives Matter Network, Inc.

Plaintiff, in his Proposed Amended Complaint, seeks to add Black Lives Matter Network, Inc., as a Defendant in this case. Plaintiff discovered the existence of Black Lives Matter Network, Inc., after making a donation through a website that is allegedly identified with the "Black Lives Matter" movement; the receipt from the donation indicated that Black Lives Matter Network, Inc., was the entity that received the donation.

While Black Lives Matter Network, Inc., certainly

59a

is an entity that has the capacity to be sued, *see* La. Civ. Code art. 24, Plaintiff has failed to state a plausible claim for relief against that entity in his Proposed Amended Complaint. For an entity such as Black Lives Matter Network, Inc., to be held liable in tort for damages caused during a demonstration, a plaintiff must demonstrate that the tortious act was committed by one of the entity's "agents ... within the scope of their actual or apparent authority." *Claiborne Hardware*, 458 U.S. at 930. Such an entity also may "be found liable for other conduct of which it had knowledge and specifically ratified." *Id.*

Plaintiff's only attempt at characterizing the unidentified tortfeasor as an agent of Black Lives Matter Network, Inc., is located in paragraph 37 of the Proposed Amended Complaint, in which Plaintiff alleges that the tortfeasor was a "member of Defendant Black Lives Matter, under the control and custody of Defendants." (*Id.* at ¶ 37). Not only does Plaintiff specifically fail to mention Black Lives Matter Network, Inc., whatsoever, but Plaintiff also fails to allege that such an agency relationship existed between the tortfeasor and "Defendants" with anything more than a "[t]hreadbare recital[] of the elements" of agency, "supported by [a] mere conclusory statement[ ]." *Iqbal*, 556 U.S. at 678. Further, Plaintiff has failed to plead that Black Lives Matter Network, Inc., in particular, "had knowledge and specifically ratified" the unidentified tortfeasor's act of throwing a rock at Plaintiff, *Claiborne Hardware*, 458 U.S. at 930; Plaintiff merely alleges, in a conclusory fashion, that "Black Lives Matter leadership ratified all action taken during the protest," (*id.* at ¶ 39), and that "Black Lives Matter

60a

promoted and ratified" the tortious conduct that gave rise to this suit, (*id.* at ¶ 44).

These allegations are insufficient to state a plausible claim for relief against Black Lives Matter Network, Inc. Not only are these allegations "conclusory statements," but they also do not identify any connection between this particular entity—Black Lives Matter Network, Inc.—and the particular tortious activity. *Iqbal*, 556 U.S. at 678. As the Supreme Court noted in *Claiborne Hardware*, allowing Plaintiff to proceed against Black Lives Matter Network, Inc., in this case—based solely on these conclusory allegations—"would impermissibly burden the rights of political association that are protected by the First Amendment." 458 U.S. at 931. Therefore, allowing Plaintiff to amend his Complaint to add Black Lives Matter Network, Inc., as a Defendant in this matter would be futile because such claims "would be subject to dismissal";[3] Plaintiff has failed to state a plausible claim for relief against Black Lives Matter Network, Inc., in his Proposed Amended Complaint. *Ackerson*, 589 F.3d at 208.

3. Conclusion

Therefore, the Court finds that Plaintiff has failed to plead a plausible claim for relief against any of the Defendants that he identified in his Proposed Amended Complaint. The Court thus denies Plaintiff leave to amend his Complaint because the "filing of the amended complaint would be futile." *Varela*, 773

---

[3] Black Lives Matter Network, Inc., indeed has filed a motion to dismiss in the event that the Court permitted Plaintiff to amend his Complaint to add it as a Defendant. *See* Doc. 68.

61a

F.3d at 707.

   D. Dismissal with Prejudice

For the reasons stated above, the Court finds that Plaintiff has failed to state a plausible claim for relief against either Mckesson or "Black Lives Matter," the only Defendants named in Plaintiff's initial Complaint. *See* discussion supra Section II.A.-B. Under normal circumstances, the Court would dismiss this matter without prejudice to provide Plaintiff with an opportunity to ameliorate the deficiencies that the Court has identified in his Complaint.

    Plaintiff has had ample opportunity, however, following the briefing and argument on Defendant's Rule 12 and Rule 9 Motions to demonstrate to the Court that he can state a plausible claim for relief against an individual or entity. In response to the arguments raised by Mckesson in his Motions and by the Court during oral argument on the Motions, Plaintiff nonetheless produced a Proposed Amended Complaint that not only fails to state a plausible claim for relief against any of the named Defendants, but that also attempts to hold a hashtag liable for damages in tort. The Court therefore finds that granting leave to Plaintiff to attempt to file a Second Proposed Amended Complaint would be futile. The Court also notes that Plaintiff's attempt to bring suit against a social movement and a hashtag evinces either a gross lack of understanding of the concept of capacity or bad faith, which would be an independent ground to deny Plaintiff leave to file a Second Proposed Amended Complaint. The Court therefore shall dismiss this matter with prejudice. See *Cent.*

62a

*Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

III. CONCLUSION

Accordingly,

IT IS ORDERED that Defendant DeRay Mckesson's Motion to Dismiss (Doc. 15) is GRANTED.

IT IS FURTHER ORDERED that Defendant DeRay Mckesson's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(a) (Doc. 43) is GRANTED.

IT IS FURTHER ORDERED that the Motion to File Amended Complaint for Damages (Doc. 52) filed by Plaintiff is DENIED.

IT IS FURTHER ORDERED that the above-captioned matter is DISMISSED WITH PREJUDICE.