# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 17-30864

———————

United States Court of Appeals
Fifth Circuit

**FILED**

December 16, 2019

Lyle W. Cayce
Clerk

OFFICER JOHN DOE, Police Officer,

        *Plaintiff - Appellant*

v.

DERAY MCKESSON; BLACK LIVES MATTER; BLACK LIVES MATTER
NETWORK, INCORPORATED,

        *Defendants - Appellees*

———————

Appeal from the United States District Court
for the Middle District of Louisiana

———————

Before JOLLY, ELROD, and WILLETT, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

We WITHDRAW the court's prior opinion of August 8, 2019, and substitute the following opinion.

During a public protest against police misconduct in Baton Rouge, Louisiana, an unidentified individual hit Officer John Doe with a heavy object, causing him serious physical injuries. Following this incident, Officer Doe brought suit against "Black Lives Matter," the group associated with the protest, and DeRay Mckesson, one of the leaders of Black Lives Matter and the organizer of the protest. Officer Doe later sought to amend his complaint to add Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants.

EXHIBIT
D

No. 17-30864

The district court dismissed Officer Doe's claims on the pleadings under Federal Rule of Civil Procedure 12(b)(6), and denied his motion to amend his complaint as futile. Because we conclude that the district court erred in dismissing the case against Mckesson on the basis of the pleadings, we REMAND for further proceedings relative to Mckesson. We further hold that the district court properly dismissed the claims against Black Lives Matter. We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings consistent with this opinion.

I.

On July 9, 2016, a protest illegally blocked a public highway in front of the Baton Rouge Police Department headquarters.[1] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby convenience store. The dismissed complaint further alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers

---

[1] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

No. 17-30864

began making arrests of those blocking the highway and participating in the violence.

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson; and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants.

## II.

The district court granted both of Mckesson's motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against #BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc., the district court held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social

No. 17-30864

movement and a "hashtag" as defendants, the district court dismissed his case with prejudice.  Officer Doe timely appealed.

## III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017).  "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)).  To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets omitted)).  Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted) (quoting *Iqbal*, 556 U.S. at 680).[2]

---

[2] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992).  Where the issue appears on the face of the complaint, other courts have done the same and treated it as a Rule 12(b)(6) motion. *See, e.g.*, *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F. Supp. 2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity . . . creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity . . . appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)).  Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

No. 17-30864

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical in practice to the Rule 12(b)(6) standard. *Id.* When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed. R. Civ. P. 15(a)(2).

IV.

We start with whether we have jurisdiction to hear this case, raising sua sponte its potential absence. Neither the district court nor any party addressed this issue in prior proceedings or on appeal. Officer Doe sued Mckesson and Black Lives Matter.[3]  The complaint alleges that Black Lives Matter is a national unincorporated association, *Doe v. Mckesson*, 272 F. Supp. 3d 841, 849 (M.D. La. 2017), which, for diversity purposes, is a citizen of every state where a member is a citizen, *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1258 (5th Cir. 1988). Officer Doe, as the party invoking federal jurisdiction, bore the burden of establishing jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). But the complaint fails to allege with sufficiency the membership of Black Lives Matter.[4]  Such failure to establish diversity jurisdiction normally warrants remand—if there was some reason to believe that jurisdiction exists, i.e., some reason to believe both that Black Lives

---

[3] We are addressing here Officer Doe's claims against Black Lives Matter Network, Inc., the potential unincorporated association, not against #BlackLivesMatter, the hashtag.

[4] In his Proposed Amended Complaint, Officer Doe did allege that Black Lives Matter is a "chapter-based national unincorporated association that is organized under the laws of the State of California, though it allegedly is also a partnership that is a citizen of California and Delaware." *Doe*, 272 F. Supp. 3d at 851 (internal quotations omitted). But since an association, or a partnership for that matter, is considered a citizen of every state in which its constituent members/partners are citizens, Officer Doe still failed to allege Black Lives Matter's citizenship by omitting the citizenship of its constituent members.

5

No. 17-30864

Matter's citizenship could be demonstrated with a supplemented record *and* that it is diverse from the plaintiff—or dismissal of the case.  *See MidCap Media Fin., LLC v. Pathway Data, Inc.*, 929 F.3d 310, 316 (5th Cir. 2019).

Yet we need not resort to either here.  Even assuming arguendo that Black Lives Matter were nondiverse and thus that the parties were nondiverse at the time of filing this lawsuit, such "lack of [diversity] jurisdiction can be cured when the non-diverse party is dismissed in federal court."  *16 Front Street, L.L.C. v. Miss. Silicon, L.L.C.*, 886 F.3d 549, 556 (5th Cir. 2018).  This "method of curing a jurisdictional defect ha[s] long been an exception to the time-of-filing rule." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572 (2004); *see, e.g.*, *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 73 (1996) (holding that "diversity became complete" when a nondiverse party settled and was dismissed from the case and that therefore "[t]he jurisdictional defect was cured") (emphasis removed); *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 744 (5th Cir. 2019) (holding that the dismissal of nondiverse defendants for failure of service of process "created complete diversity; and, therefore, the district court had jurisdiction") (citations omitted).

Here, the district court took judicial notice that Black Lives Matter was a social movement and therefore a non-juridical entity lacking the capacity to be sued.  *Doe*, 272 F. Supp. 3d at 850; s*ee infra* Part V.C.  The court subsequently dismissed Black Lives Matter as a defendant.  *Doe*, 272 F. Supp. 3d at 850.  If complete diversity did not exist before, this dismissal created the complete diversity (since Officer Doe and Mckesson are citizens of different states) necessary for jurisdiction in this case.  For that reason, we have jurisdiction to hear this case.[5]

---

[5] All three judges on this panel agree with this conclusion.

No. 17-30864

V.

A.

We next address Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn— vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the point of our beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for, or that the assailant's "physical movements [were] subject to the control or right to control" of, Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546,

7

No. 17-30864

552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id.* In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of . . . a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite a riot/protest." Disregarding Officer Doe's conclusory allegations, we find that Officer Doe has not alleged facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with the unknown assailant to attack Officer Doe or knew of the attack and specifically ratified it. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's conspiracy claim must and does fail.

No. 17-30864

3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *see Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'" (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific duties of care based on consideration of

> various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of

No. 17-30864

precedent; and the direction in which society and its institutions are evolving.

*Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint alleges that Mckesson planned to block a public highway as part of the protest. And the complaint specifically alleges that Mckesson was in charge of the protests and was seen and heard giving orders throughout the day and night of the protests. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. Indeed, the complaint alleges that Mckesson himself was arrested during the demonstration. It was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was likely to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway.

By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration. This is not, as the dissenting opinion contends, a "duty to protect others from the criminal activities of third persons." *See Posecai*, 752 So. 2d at 766. Louisiana does not recognize such a duty. It does, however, recognize a duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence. *See Brown v. Tesack*, 566 So. 2d 955 (La. 1990). The former means a business owner has no duty to provide security guards in

10

No. 17-30864

its parking lot if there is a very low risk of crime. *See Posecai*, 752 So. 2d at 770. The latter means a school can be liable when it negligently disposes of flammable material in an unsecured dumpster and local children use the liquid to burn another child. *See Brown*, 566 So. 2d at 957. That latter rule applies here too: Mckesson owed Doe a duty not to negligently precipitate the crime of a third party. And a jury could plausibly find that a violent confrontation with a police officer was a foreseeable effect of negligently directing a protest.[6]

Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

The amended complaint only bolsters these conclusions. It specifically alleges that Mckesson led protestors down a public highway in an attempt to block the interstate. The protestors followed. During this unlawful act,

---

[6] The dissenting opinion attempts to distinguish *Brown* by pointing out that "we are dealing with the criminal acts of an adult, not a child." But the dissenting opinion does not explain why the child/adult distinction should matter. The potential for future violent actions by adults can be just as foreseeable as the potential for future violent actions by children.

No. 17-30864

Mckesson knew he was in violation of law and livestreamed his arrest. Finally, the plaintiff's injury was suffered during this unlawful action. The amended complaint alleges that it was during this struggle of the protestors to reach the interstate that Officer Doe was struck by a piece of concrete or rock-like object. It is an uncontroversial proposition of tort law that intentionally breaking, and encouraging others to break, the law is relevant to the reasonableness of one's actions.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *Doe*, 272 F. Supp. 3d at 847 (quoting *Claiborne Hardware*, 458 U.S. at 927). The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

12

No. 17-30864

The district court appears to have assumed that in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Even if we assume that Officer Doe seeks to hold Mckesson "liable for the unlawful conduct of others" within the meaning of *Claiborne Hardware*, the First Amendment would not require dismissal of Officer Doe's complaint. 458 U.S. at 927. In order to counter Mckesson's First Amendment defense at the pleading stage, Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the Baton Rouge police and the protesters, and that Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway.

We focus here on the fact that Mckesson "directed . . . specific tortious activity" because we hold that Officer Doe has adequately alleged that his injuries were the result of Mckesson's *own* tortious conduct in directing an illegal and foreseeably violent protest. In Mckesson's petition for rehearing, he expresses concern that the panel opinion permits Officer Doe to hold him liable for the tortious conduct of *others* even though Officer Doe merely alleged that he was negligent, and not that he specifically intended that violence would result. We think that Mckesson's criticisms are misplaced. We perceive no

13

No. 17-30864

constitutional issue with Mckesson being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of another that were foreseeable as a result of that negligent conduct. The permissibility of such liability is a standard aspect of state law. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). There is no indication in *Claiborne Hardware* or subsequent decisions that the Supreme Court intended to restructure state tort law by eliminating this principle of negligence liability.

A close reading of *Claiborne Hardware* makes this clear. In that case, the Mississippi Supreme Court had found defendants liable for malicious interference with plaintiff's business when they executed a sustained boycott against white-owned businesses for the purpose of securing "equal rights and opportunities for Negro citizens." *See Claiborne Hardware*, 458 U.S. at 899 (internal quotations omitted). That holding depended on the conclusion that "force, violence, or threats" were present. *See id.* at 895 (citing 393 So. 2d 1290, 1301 (Miss. 1980)). This was a departure from the holding of the state chancery court. As the United States Supreme Court clarified, "[t]he Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott." *Id.* at 915. This distinction is key: Before the United States Supreme Court, the only unlawful activities at issue involved "force, violence, or threats." If the "force, violence, [and] threats" had been removed from the boycott, the remaining conduct would not have been tortious at all.

This posture is central to understanding what *Claiborne Hardware* did, and more importantly, did not, hold. When *Claiborne Hardware* speaks of violence, it speaks of the only unlawful activity at issue in the case. Consider

14

No. 17-30864

its observation that "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918. It could not award compensation for the consequences of nonviolent activity because the only potentially tortious conduct at issue was violent. Indeed, the court expressly declined to reach the question of how it would have ruled if the nonviolent aspects of the boycott had been found to be tortious violations of an appropriately tailored state law. *See id.* at 915 n.49.

Yet the dissenting opinion reads *Claiborne Hardware* as creating a broad categorical rule: "*Claiborne Hardware* . . . insulates nonviolent protestors from liability for others' conduct when engaging in political expression, even intentionally tortious conduct, not intended to incite immediate violence." How does it reach this conclusion? It relies on the *Claiborne Hardware* chancery court opinion that grounded liability in nonviolent protest. But the Mississippi Supreme Court and the United States Supreme Court grounded liability solely in the presence of "force, violence or threats." *Id.* at 895. The United States Supreme Court did not invent a "violence/nonviolence distinction" when it explained that "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918. It merely applied black-letter tort law: Because the only tortious conduct in *Claiborne Hardware* was violent, no nonviolent conduct could have proximately caused the plaintiff's injury. *See id.* ("Only those losses proximately caused by unlawful conduct may be recovered.").

For the same reason, the *Claiborne Hardware* opinion makes frequent reference to unlawful conduct when, under the dissenting opinion's view, it should have spoken of violence. *See, e.g., id.* at 920 ("For liability to be imposed by reason of association alone, it is necessary to establish that the group itself

15

No. 17-30864

possessed unlawful goals and that the individual held a specific intent to further those illegal aims."); *id.* at 925 ("There is nothing unlawful in standing outside a store and recording names."); *id.* at 926 ("Unquestionably, these individuals may be held responsible for the injuries that they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained."); *id.* at 927 ("There are three separate theories that might justify holding Evers liable for the unlawful conduct of others."); *id.* at 933 ("At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose."). In every instance, if the Court were creating a violence/nonviolence distinction it would have replaced "unlawful" with "violent." It did not, because it created no such demarcation. Rather, it addressed the case before it, where the only tortious conduct was violent.[7]

This supposed violence/nonviolence distinction also does not square with the case law. Take *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). That case held that a public officer cannot "recover[] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. But defamation is a nonviolent tort, and statements made about public officers are often shouted during political protests. If the dissenting opinion's

---

[7] The dissenting opinion concedes that the First Amendment does not "protect[] individuals from all liability as long as their speech was nonviolent." Rather, the dissenting opinion contends, "*Claiborne Hardware* supports the proposition that an individual cannot be held liable for *violence* if his speech did not 'authorize[], direct[], or ratif[y]' *violence*." But the basis of potential liability in this case is Mckesson's *actions and conduct* in directing the illegal demonstration, not his speech and advocacy. Elsewhere, the dissenting opinion describes its thesis this way: "encouraging [] unlawful activity cannot expose Mckesson to liability for *violence* because he didn't instruct anyone to commit *violence*." But that still overreads *Claiborne Hardware*; if this were the rule, then a protest leader who directs protesters to occupy an empty business could not be held liable for a violent confrontation that foreseeably follows between a protester and a business owner or police officer.

16

No. 17-30864

interpretation is correct, then it would seem that even the narrow "actual malice" exception to immunity was eliminated by *Claiborne Hardware*, at least for statements made during a protest.

Neither do recent cases vindicate this understanding. The Seventh Circuit examined a boycott similar to the one in *Claiborne Hardware*, this time a boycott by a union of a hotel and those doing business with the hotel. *See 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708 (7th Cir. 2014). The court found that it was "undisputed that the Union delegations all attempted to communicate a message on a topic of public concern." *Id.* at 723. But the court nonetheless held that the boycotters could be found liable if they had crossed the line into illegal coercion, because "prohibiting some of the Union's conduct under the federal labor laws would pose no greater obstacle to free speech than that posed by ordinary trespass and harassment laws." *Id.* The court's benchmark for liability was illegality, not violence. The court concluded that if "the Union's conduct in this case is equivalent to secondary picketing, and inflicts the same type of economic harm, it too may be prohibited without doing any harm to First Amendment liberties." *Id.* The dissenting opinion cannot be squared with this outcome.

Finally, the violence/nonviolence distinction does not make sense. Imagine protesters speaking out on a heated political issue are marching in a downtown district. As they march through the city, a protester jaywalks. To avoid the jaywalker, a car swerves off the street, and the driver is seriously injured. If the dissenting opinion's interpretation of *Claiborne Hardware* is correct, the First Amendment provides an absolute defense to liability for the jaywalker in a suit by the driver. The dissenting opinion says that "preventing tortious interference is not a proper justification for restricting free speech (unlike preventing violence)" because *Claiborne Hardware* cemented a "violence/nonviolence distinction." The theory seems to be that because

17

No. 17-30864

tortious interference is nonviolent, it cannot be tortious if done for a political reason. So too with every nonviolent tort? What about nonviolent *criminal* offenses done for a political reason? The dissenting opinion does not seem to believe that engaging in a protest provides a protestor immunity for violating La. Rev. Stat. Ann. § 14:97. What is the logic behind immunizing protestors from nonviolent civil liability while retaining their nonviolent criminal liability?[8]

We of course acknowledge that Mckesson's negligent conduct took place in the context of a political protest. It is certainly true that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Claiborne Hardware*, 458 U.S. at 916–17. But *Claiborne Hardware* does not insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message. *See id.* at 916 ("[T]he use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." (internal quotation marks and citations omitted)). Furthermore, although we do not understand the petitioner to be arguing that the Baton Rouge police violated the demonstrators' First Amendment rights by attempting to remove them from the highway, we note that the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (reasonable time, place, and manner restrictions do not violate the First Amendment). As such,

---

[8] The dissenting opinion does not engage with our reading of *Claiborne Hardware*, nor does it grapple with the staggering consequences of its approach.

No. 17-30864

no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's conduct to be addressed by state tort law.

Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment.[9] We emphasize that this means only that, given the facts that Doe alleges, he *could* plausibly succeed on this claim. We make no statement (and we cannot know) whether he will.

C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute"

---

[9] We emphasize, however, that our opinion does not suggest that the First Amendment allows a person to be punished, or held civilly liable, simply because of his associations with others, unless it is established that the group that the person associated with "itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. But we also observe that, in any event, Officer Doe's allegations are sufficient to state a claim that Black Lives Matter "possessed unlawful goals" and that Mckesson "held a specific intent to further those illegal aims." *See id.* Officer Doe alleges that Black Lives Matter "*plann[ed]* to block a public highway," and, in his amended complaint, that Mckesson and Black Lives Matter traveled to Baton Rouge "for the *purpose* of . . . rioting." (emphasis added).

No. 17-30864

in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned.  Fed. R. Evid. 201(b).  "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations."  *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998).  In *Taylor*, we held that another court's state-actor determination was not an "adjudicative fact" within the meaning of Rule 201 because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review."  *Id.* at 830–31.  We further held that the state-actor determination was not beyond reasonable dispute where it "was, in fact, disputed by the parties" in the related case.  *Id.* at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort."  The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest.  This difference is sufficient under our case law to preclude judicial notice.

We should further say that we see the cases relied on by the district court as distinguishable.  Each deals with judicial notice of an aspect of an entity, not its legal form.  *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259–60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964)

20

No. 17-30864

(noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States . . . was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national unincorporated association with chapter [sic] in many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined . . . by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name." The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id.*

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728–729 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and possession of an insurance policy); *see also Concerned*

No. 17-30864

*Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 675
(E.D. La. 2010) (relying on organization's formal and determinate membership
structure). Lacking at least some of these indicators, Louisiana courts have
been unwilling to find an intent to create an unincorporated association. *See,
e.g.*, *Ermert*, 559 So. 2d at 474–475 (finding that hunting group was not an
unincorporated association because it did not own or lease the property that it
was based on, required the permission of one of its alleged members to use the
property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that
Black Lives Matter is an unincorporated association. His only allegations are
that Black Lives Matter: (1) was created by three women; (2) has several
leaders, including Mckesson; (3) has chapters in many states; and (4) was
involved in numerous protests in response to police practices. He does not
allege that it possesses property, has a formal membership, requires dues, or
possesses a governing agreement. As such, the complaint lacks any indication
that Black Lives Matter possesses the traits that Louisiana courts have
regarded as indicative of an intent to establish a juridical entity. We have no
doubt that Black Lives Matter involves a number of people working in concert,
but "an unincorporated association . . . . does not come into existence or
commence merely by virtue of the fortuitous creation of a community of
interest or the fact that a number of individuals have simply acted together."
*Id*. at 474. Therefore, we find that the district court did not err in concluding
that Officer Doe's complaint has failed plausibly to allege that Black Lives
Matter is an entity capable of being sued.[10]

---

[10] We do not address whether Officer Doe could state a claim against an entity whose
capacity to be sued was plausibly alleged, nor do we address whether Mckesson could be held
liable for the actions of that entity under state law.

No. 17-30864

VI.

In sum, we hold that Officer Doe has not adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[11] The district court therefore erred by concluding that it would be futile for Doe to amend his complaint. We also hold that the district court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued. Therefore, the judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.[12]

_____

[11] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then decide whether, in the light of our remand, discovery would be appropriate.

[12] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related

No. 17-30864

AFFIRMED in part, REVERSED in part, and REMANDED.

---

to this lawsuit.  In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit.  The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face."  As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186.  We agree with the district court and affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

No. 17-30864

DON R. WILLETT, Circuit Judge, concurring in part, dissenting in part:

I originally agreed with denying Mckesson's First Amendment defense.[1] But I have had a judicial change of heart. Further reflection has led me to see this case differently, as explained below. Admittedly, judges aren't naturals at backtracking or about-facing. But I do so forthrightly. Consistency is a cardinal judicial virtue, but not the only virtue. In my judgment, earnest rethinking should underscore, rather than undermine, faith in the judicial process. As Justice Frankfurter elegantly put it 70 years ago, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."[2]

\*     \*     \*

Officer John Doe was honoring his oath to serve and protect the people of Baton Rouge when an unidentified violent protestor hurled a rock-like object at his face. Officer Doe risked his life to keep his community safe that day—same as every other day he put on the uniform. He deserves justice.

Unquestionably, Officer Doe can sue the rock thrower. But I am unconvinced he can sue the protest leader. First, it is unclear whether DeRay Mckesson owed Officer Doe a duty under Louisiana law to protect him from the criminal acts of others. I would certify that threshold—and potentially dispositive—issue to the Supreme Court of Louisiana. Second, the Constitution that Officer Doe swore to protect itself protects Mckesson's rights to speak, assemble, associate, and petition. First Amendment freedoms, of course, are not absolute—and there's the rub: Did Mckesson stray from lawfully exercising his own rights to unlawfully exorcising Doe's. I don't believe he did.[3]

---

[1] *Doe v. Mckesson*, 922 F.3d 604 (5th Cir.), *superseded on panel rehearing*, 935 F.3d 253 (5th Cir. 2019) (*Mckesson II*).

[2] *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

[3] Although I now dissent on the First Amendment issue, I still agree with the majority opinion that: (1) we have jurisdiction over this appeal; (2) Mckesson cannot be held

No. 17-30864

## I

Respectfully, the majority opinion is too quick to conclude that Mckesson's organization and leadership of the Black Lives Matter protest amounted to negligence. Under Louisiana law, a person generally has "no duty to protect others from the criminal activities of third persons."[4] And to determine whether to impose such a duty, "the court must make a policy decision in light of the unique facts and circumstances presented."[5] This case raises consequential questions of Federal constitutional law—but only *potential* questions. If Louisiana law does not impose a duty on protest organizers to protect officers from the criminal violence of individual protestors, then the First Amendment issues, however important, are moot.

The majority opinion concludes that Mckesson, as protest organizer, can be held liable for Officer Doe's injuries because the Constitution "does not insulate [Mckesson] from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message."[6] Putting aside whether the Constitution, in fact, supports precisely that,[7] the starting-point question is whether Mckesson's conduct was negligent at all.

---

vicariously liable for the assailant's actions; (3) Officer Doe failed to state a civil conspiracy claim; (4) Officer Doe failed to adequately allege that Black Lives Matter is an unincorporated association capable of being sued under Louisiana law; and (5) Officer Doe is not entitled to proceed anonymously.

[4] *Posecai v. Wal-Mart Stores, Inc.,* 752 So. 2d 762, 766 (La. 1999).

[5] *Id.*

[6] Maj. Op. at 18.

[7] *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). *Claiborne Hardware*, in part, addresses what protest conduct can give rise to tort liability consistent with the First Amendment, something that requires "precision of regulation" even when holding someone liable for his own actions in connection with protected speech. *Id.* at 916.

No. 17-30864

And step one of that inquiry is determining whether a duty exists—a pure question of law.[8]

The majority concludes that the foreseeable risk of violence alone imposed a duty on Mckesson to exercise reasonable care to avoid that violence. But I am unaware of any Louisiana case imposing a duty to protect against the criminal acts of a third party absent a special relationship that entails an independent duty.[9] The majority, as it must, accepts that Louisiana does not

---

[8] *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003).

[9] *See Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 101 (5th Cir. 1990) ("Ordinarily, Louisiana law imposes no duty to protect against the criminal acts of third persons. However, a duty to protect against foreseeable criminal misconduct may arise from a special relationship." (internal citations omitted)); *Wellons v. Grayson*, 583 So. 2d 1166, 1168–69 (La. App. 1 Cir. 1991) (explaining that, for a party to have an obligation to protect against the criminal acts of others, "some special relationship must exist in order for that duty to arise"). For instance, in *Posecai*, the Supreme Court of Louisiana examined whether a business owed a duty to its customers to protect against criminal acts that were reasonably foreseeable to occur in the business's parking lot. 752 So. 2d at 766. Importantly, the business unquestionably owed some duty to the customer because the customer was an invitee on the property; the question was how far that duty extended. And because, on balance, the risk of criminal activity was reasonably foreseeable and the burden of imposing a duty to protect against that risk was minimal, the court chose to impose a duty on the business. *Id.* at 768.

Consider also *Brown v. Tesack*, relied upon by the majority. 566 So. 2d 955 (La. 1990). In *Brown*, there was no question that the school had a duty to properly dispose of hazardous materials. *Id.* at 957. The school "specifically recognized" that certain flammable liquids created an unreasonable risk to the children who played on the school's property. *Id.* As in *Posecai*, the question before the Supreme Court of Louisiana was whether this pre-existing duty extended to protecting against the acts of third parties (i.e., one child abusing the flammable liquids and burning another child). *Id.* The court concluded that because the harm that occurred was not only a foreseeable consequence of a breach of the school's already existing duty, but was a "*foreseen*" harm, protecting against the risk of children taking and misusing the hazardous liquids was within the scope of the school's underlying duty to properly dispose of the liquids. *Id.* at 957–58. Further, the underlying duty in *Brown* was tied to the heightened standard of care involving children, which is not an issue in our case. *See id.* at 957 ("A duty was owed both to these children and to their potential victims. . . . We agree . . . that 'children who possess a flammable substance can be expected to light it, to attract other children to join in the play and to commit criminal acts or engage in other misadventures.'" (quoting *Brown,* 556 So.2d at 89. (Plotkin, J., dissenting) ("[T]here is no difference between the recognizable risk of a minor's misuse of an inherently dangerous object and the likelihood that the minor will cause personal or property damages to others[.]"))).

No. 17-30864

recognize such a duty. Instead, it argues, Louisiana law imposes a "duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence."[10] Respectfully, this is a semantic distinction without an analytic difference. And it is a distinction unsupported by Louisiana law.[11] Doe asserts that Mckesson "did nothing to calm the crowd," but under *Claiborne Hardware*, a duty to repudiate "cannot arise unless, absent repudiation, an individual could be found liable for those acts."[12] Duty is the first inquiry. And possibly the last.

Recently, in another Louisiana tort case, we stressed, "If guidance from state cases is lacking, 'it is not for us to adopt innovative theories of recovery

---

Here, the harm to Officer Doe was not within the scope of the highway-obstruction statute that the majority alleges Doe violated, and Mckesson owed no pre-existing duty to Doe because of a special relationship between them. Finally, the majority opinion, while *quoting* the multi-factor balancing analysis required by the Louisiana Supreme Court in *Posecai*, never gets around to actually *applying* it. Rather, the majority simply assumes that because the harm was foreseeable, a duty necessarily exists. Louisiana law requires more.

[10] Maj. Op. at 10.

[11] The majority opinion attempts to distinguish between a duty to *protect* against a crime and a duty not to *precipitate* one. But I have certainly not found any case that describes such a difference or recognizes the majority's proposed duty. *See, e.g.*, *Harris v. Pizza Hut of La., Inc.*, 45 So.2d 1364, 1369–70 (La. 1984) ("Louisiana has for some time employed the duty-risk analysis to determine legal responsibility in tort claims. The pertinent inquiries are: . . . II. Whether there was a duty on the part of the defendant which was imposed to *protect* against the risk involved . . . . (emphasis added)). And, despite the majority's contention otherwise, both *Posecai* and *Brown* concern a duty to protect against the criminal acts of others, which exists only where there is a pre-existing special relationship that itself imposes a duty. *See Posecai*, 752 So. 2d at 766; *Brown*, 566 So.2d at 957 ("[A]ll rules of conduct . . . exist for purposes. They are designed to protect *some* persons under *some* circumstances against *some* risks . . . (quoting Wex Malone, *Ruminations on Cause-In-Fact*, 9 Stan. L. Rev. 60, 73 (1956)) (emphasis and ellipses in original)). The majority opinion never grapples with Louisiana's unequivocal expression that for a person to be held liable for the consequences of others' actions, there must be a pre-existing duty between the acting and the liable parties. This necessity does not go away simply because the majority has rephrased the duty at issue.

[12] 458 U.S. at 925 n.69.

No. 17-30864

under state law.'"[13] Wise words. I would be chary of making policy decisions that create or expand Louisiana tort duties. Given the fateful First Amendment issues, and the dearth of on-point guidance from Louisiana courts, I would certify this *res nova* negligence question to the Supreme Court of Louisiana: Does a protest's foreseeable risk of violence impose a duty upon the protest organizer, such that he can be held personally liable for injuries inflicted by an unknown assailant? Because if there's no duty, there's no negligence. And if there's no negligence, there's no case. And if there's no case, there's no need to fret about the First Amendment.

This is not a federal constitutional case unless it is first a state tort case. As such, certification is counseled, if not compelled, by the twin doctrines of constitutional avoidance and abstention. We recently remarked that "the doctrine of constitutional avoidance is rooted in basic considerations of federalism,"[14] adding that where a ruling on constitutionality "could be avoided by interpretation of Louisiana law, we must give due consideration to this non-constitutional ground for decision."[15] This caution is less prudish than prudent, and has a venerable, generations-long pedigree. The Supreme Court, almost 80 years ago, held that "where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions."[16]

After all, state judiciaries are equal partners in our shared duty "to say

---

[13] *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) (quoting *Mayo v. Hyatt Corp.*, 898 F.2d 47, 49 (5th Cir. 1990)).

[14] *St. Joseph Abbey v. Castille*, 700 F.3d 154, 168 (5th Cir. 2012).

[15] *Id*. at 167.

[16] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 667 (2006) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941)).

No. 17-30864

what the law is."[17] Bombshell federal cases dominate most headlines. But as this same panel recently emphasized, "American justice is dispensed— overwhelmingly—in state, not federal, judiciaries."[18] How much? "[A] whopping 96 percent of all cases."[19] As Justice Scalia self-deprecatingly observed, state law (and state courts) matter far more to citizens' everyday lives: "If you ask which court is of the greatest importance to an American citizen, it is not my court."[20]

State judiciaries are fundamental, not ornamental, and have been since the Founding, when Hamilton lauded them as "the immediate and visible guardian of life and property."[21] (Indeed, the federal judiciary didn't even *exist* for the first several years after independence.) Hamilton's reassurance has endured for 232 years. Earlier this year, we again extolled the front-and-center role of state judiciaries: "For most Americans, Lady Justice lives in the halls of state courts."[22]

In this case, Louisiana law poses a threshold, potentially decisive question. Only the Supreme Court of Louisiana can adjudicate it authoritatively. Certification—inviting the state high court's definitive word—

---

[17] *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

[18] *Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 470–71 (5th Cir. 2019) (citing Jennifer W. Elrod, *Don't Mess with Texas Judges: In Praise of the State Judiciary,* 37 HARV. J.L. & PUB. POL'Y 629 (2013)).

[19] *New NCSC Video Explains That State Courts Are Where the Action Is*, NAT. CTR. FOR STATE COURTS (Nov. 28, 2018), https://www.ncsc.org/Newsroom/at-the-Center/2018/Nov-28.aspx.

[20] *Thompson*, 913 F.3d at 471 (quoting *Justice Scalia Honors U.S. Constitution,* GEO. WASH. TODAY (Sept. 18, 2013), https://gwtoday.gwu.edu/justice-scalia-honors-us-constitution).

[21] THE FEDERALIST NO. 17 (Alexander Hamilton).

[22] *Thompson*, 913 F.3d at 470 (citing John Schwartz, *Critics Say Budget Cuts for Courts Risk Rights*, N.Y. TIMES, Nov. 27, 2011, at A18 (quoting a former justice of the Colorado Supreme Court)).

No. 17-30864

serves the dual goals of abstention and avoidance by obviating (perhaps) the need to confront the First Amendment at all. Avoiding unnecessary federal constitutional rulings honors our bedrock commitment to federalism. On this point, we have not minced words: "[T]he Supreme Court has long recognized that concerns for comity and federalism may require federal courts to either abstain from deciding federal constitutional issues that are entwined with the interpretation of state law or certify the questions of state law to the state's highest court for an authoritative interpretation of them before reaching the merits of the cases."[23] Indeed, as the Supreme Court has itself stressed, our carefully wrought system of federalism is best served by avoiding "the friction of a premature constitutional adjudication."[24] And certification of state-law questions may be particularly important in First Amendment cases.[25]

To my mind, there is no need for *Erie* guesses or crystal balls. Federal-to-state certification is a remarkable device: workable, efficient, and guaranteed to yield a doubt-free answer. Zero guesswork, *Erie* or otherwise. And this case, by any traditional measure, hits the certification bull's-eye: The state-law answer is uncertain, and the federal-law question is (maybe) unnecessary. The first adjudication of this unresolved issue, one that portends far-reaching impact given the ubiquity of "negligent protests," should be decisive and authoritative, one on which the people of Louisiana can rely.

True, certification is entirely discretionary, not obligatory. And the tipping point for certification-worthiness eludes mathematical precision; it's

---

[23] *Carmouche*, 449 F.3d at 667.

[24] *Pullman*, 312 U.S. at 500.

[25] *See* Clay Calvert, *Certifying Questions in First Amendment Cases: Free Speech, Statutory Ambiguity, and Definitive Interpretations*, 60 B.C.L. Rev. 1349, 1352 (2019).

No. 17-30864

wholly subjective, with a patent, eye-of-the-beholder flavor.[26] But this case seems a Certification 101 exemplar that calls for cooperative judicial federalism. If consequential state-law ground is to be plowed, I believe the Supreme Court of Louisiana should do the plowing.

It is principally the role of state judges to define and delimit state causes of action. And state supreme courts have an irreplaceable duty: to be supreme and to speak supremely. We should let them do so, particularly when doing so may obviate a knotty federal question. I would leave this ruling on Louisiana negligence law to those elected to rule on Louisiana negligence law. I would seek conclusive word from the conclusive court as to what state law prescribes and proscribes. I would not guess, predict, or speculate. I would certify.

II

Even assuming that Mckesson could be sued under Louisiana law for "negligently" leading a protest at which someone became violent, the First Amendment "imposes restraints" on what (and whom) state tort law may punish.[27] Just as there is no "hate speech" exception to the First

---

[26] Disclosure: My dozen years as a state high court jurist likely make me more inclined to certify (as does my judgment that the majority reaches the wrong constitutional result). As this is a federal constitutional case only if it is first a viable state negligence case, a state supreme court justice would reasonably think it *her* job to decide an unsettled state-law issue of far-reaching significance.

[27] *Claiborne Hardware*, 458 U.S. at 916–17 ("Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the person who may be held accountable for those damages."). As to what activity may be subject to liability, the Court held: "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered." *Id.* at 918. As to who can be held liable for that violent conduct, the Court held: "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

32

No. 17-30864

Amendment,[28] "negligent" speech is also constitutionally protected.[29] And under *Claiborne Hardware* (and a wealth of precedent since), raucous public protest—even "impassioned" and "emotionally charged" appeals for the use of force—is protected unless clearly intended to, and likely to, spark immediate violence.[30]

In *Claiborne Hardware*, involving a years-long and sometimes violent boycott that tortiously interfered with white-owned businesses, the Court unanimously held that the "highly charged political rhetoric" of Charles Evers—who "unquestionably played the primary leadership role in the organization of the boycott"—was constitutionally protected even though Evers vilified and urged violence against boycott breakers, warning, "if we catch any of you going in any of them racist stores, we're gonna break your damn neck."[31] The Court made clear that the First Amendment does not protect words "that provoke immediate violence"[32] or "that create an immediate panic."[33] But "mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment."[34] Because Evers only *advocated* for

---

[28] *Matal v. Tam*, 137 S. Ct. 1744 (2017) (making clear that viewpoint discrimination—including against hateful speech that demeans—is unconstitutional).

[29] *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 278–80 (1964) (prohibiting public officials from recovering damages for negligently made "defamatory falsehoods" because permitting liability for such negligence would impose a "pall of fear and timidity . . . upon those who would give voice to public criticism," creating "an atmosphere in which the First Amendment freedoms cannot survive").

[30] 458 U.S. at 927–28 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (protecting speech of Ku Klux Klan leader who threatened "revengeance" if "suppression" of the white race continued, and defining "incitement" to mean speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action")).

[31] *Id.* at 926–28.

[32] *Id.* at 927.

[33] *Id.*

[34] *Id.* (emphasis in original).

No. 17-30864

violence, but did not provoke or incite imminent acts of violence, the Court said his fiery words "did not exceed the bounds of protected speech."[35] The Court noted there was "no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence."[36] In this case, there is not even a competent *allegation* of such behavior.

Officer Doe does not assert that Mckesson perpetrated violence himself. Rather, he asserts that Mckesson "incited the violence." But Doe's barebones complaint specifies no words or actions by Mckesson that may have done so. For Rule 12(b)(6) purposes, we accept well-pleaded facts as true and view them in the light most favorable to the plaintiff.[37] But "a legal conclusion couched as a factual allegation" need not be accepted as true.[38] Gauzy allegations that offer only "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" do not suffice.[39] Doe's allegations—"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

[35] *Id.* at 929.

[36] *Id.*

[37] *SGK Props., L.L.C. v. U.S. Bank Nat'l Ass'n*, 881 F.3d 933, 943 (5th Cir. 2018). Confusingly, the majority opinion relies on Officer Doe's proposed amended complaint even though the district court denied Doe's request to file an amended complaint. The controlling complaint for the purposes of our analysis should be Doe's original complaint. *See Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 112 n.2 (5th Cir. 2019) (accepting facts as alleged in Third Amended Complaint, even where district court improperly denied plaintiff's request to file its Proposed Fourth Amended Complaint, because the Third Amended Complaint was "the live pleading at the time of dismissal"); *Stem v. Gomez*, 813 F.3d 205, 209, 215–17 (5th Cir. 2016) (relying on facts as alleged in original complaint where district court denied leave to amend); *Leal v. McHugh*, 731 F.3d 405, 407 & n.1 (5th Cir. 2013) (same). But even if I accepted the facts alleged in Doe's Amended Complaint as true, the First Amendment would still prohibit imposing liability against Mckesson for the violent acts of others because, as the majority agrees, Mckesson did not authorize, direct, or ratify any violent conduct.

[38] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[39] *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The majority opinion rightly disregards Doe's "conclusory allegations" against Black Lives Matter. *See* Maj. Op. at 8.

No. 17-30864

statements"—fail the 12(b)(6) plausibility standard.[40]

Doe strings together various unadorned contentions—that Mckesson was "present during the protest," "did nothing to calm the crowd," "directed" protestors to gather on the public street in front of police headquarters, and "knew or should have known . . . that violence would result" from the protest that Mckesson "staged." Even taking these impermissibly conclusory allegations as true, the complaint lacks sufficient factual detail to state a claim for negligence, much less to overcome Mckesson's First Amendment defense. For example, Doe does *not* allege:

- What orders Mckesson allegedly gave, how he led the protest, or what he said or did to incite violence.
- How Mckesson "controlled" or "directed" the unidentified assailant who injured Officer Doe.
- How statements that Mckesson made to the media after the protest amount to a ratification of violence.

Without these and other fleshed-out facts, the complaint utterly fails to link Mckesson's role as leader of the protest demonstration to the mystery attacker's violent act. In short, Doe's skimpy complaint is heavy on well-worn conclusions but light on well-pleaded facts.

Indeed, the lone "inciteful" speech quoted in Doe's complaint is something Mckesson said not to a fired-up protestor but to a mic'ed-up reporter—the day *following* the protest: "The police want protestors to be too afraid to protest." Tellingly, not a single word even obliquely references violence, much less advocates it. Temporally, words spoken *after* the protest cannot possibly have incited violence *during* the protest. And tacitly, the majority opinion seems to discard the suggestion that Mckesson uttered anything to incite violence against Officer Doe.

---

[40] *Iqbal*, 556 U.S. at 678.

No. 17-30864

With "speech" off the table, the majority seems to endorse an alternative liability theory—that Mckesson "authorized, directed, or ratified specific tortious activity"[41] by leading others to block a public highway. The majority credits Doe's abstract, one-sentence contention that Mckesson "knew or should have known that violence would result."[42] Mind you, Doe's complaint contains no specific allegations that Mckesson advocated imminent violence, just this bald, conclusory assertion that he negligently allowed violence to occur.

This novel "negligent protest" theory of liability seems incompatible with the First Amendment and foreclosed—squarely—by controlling Supreme Court precedent. Even assuming, for argument's sake, that Mckesson directed others to stand in the highway[43] and that violating this criminal law constitutes a tort,[44] I disagree with the suggestion that directing *any* tort would strip a protest organizer of First Amendment protection. Even Evers of *Claiborne Hardware* would be liable under the majority's analysis. After all, the economic harm inflicted in *Claiborne Hardware* was "the result of [Evers's] *own* tortious conduct in organizing a foreseeably violent protest."[45] Evers

---

[41] *Claiborne Hardware*, 458 U.S. at 927 ("[A] finding that [Evers] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity.").

[42] *See* Maj. Op. at 18 ("But *Claiborne Hardware* does not insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message." (emphasis in original)).

[43] The majority opinion states that "Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway," adding that Doe "specifically alleges that Mckesson led protestors down a public highway in an attempt to block the interstate." But the lone assertion of purposeful highway-blocking in Doe's scanty complaint is this sentence: "DEFENDANTS conspired to violate the law by planning to block a public highway." Even if "planning" equates to directing, the majority properly holds that Doe failed to state a claim that Mckesson engaged in any conspiracy. *Id.* at 260.

[44] La. Rev. Stat. Ann. § 14:97.

[45] Maj. Op. at 13 (emphasis in original). Similarly, in *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, the Supreme Court held that a campaign with an

36

No. 17-30864

engaged in the tort of "malicious interference with the plaintiff's business."[46]
He even threatened during a meeting that "any 'uncle toms' who broke the
boycott would 'have their necks broken' by their own people."[47] And violence
was not just foreseeable; "several" clashes had already occurred.[48] Despite all
that, the Supreme Court ruled Evers to be constitutionally protected. Because
Evers did not specifically direct *violence*, the Supreme Court was unwilling to
find him liable for *violence*.[49] And because preventing tortious interference is
not a proper justification for restricting free speech (unlike preventing
violence), it refused to hold Evers liable for the economic harms resulting from
the boycott he led.[50]

---

anticompetitive purpose and effect was permissible under the First Amendment, even though
the Sherman Act prohibits individuals from restraining trade or creating monopolies,
because "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we
cannot, of course, lightly impute to Congress an intent to invade these freedoms." 365 U.S.
127, 138 (1961).

[46] *Claiborne Hardware*, 458 U.S. at 891.

[47] *Id*. at 900 n.28.

[48] *Id*. at 903.

[49] *Id*. at 927.

[50] *Id*. at 914–15 ("[T]he petitioners certainly foresaw—and directly intended—that the
merchants would sustain economic injury as a result of their campaign[;] . . . however . . .
[t]he right of the States to regulate economic activity could not justify a complete prohibition
against a nonviolent, politically motivated boycott designed to force governmental and
economic change and to effectuate rights guaranteed by the Constitution itself. . . . We hold
that the nonviolent elements of petitioners' activities are entitled to the protection of the First
Amendment."). The majority opinion overlooks these statements by the Supreme Court and
instead points to proceedings that occurred in the state chancery and supreme courts to argue
that the tortious conduct that Evers unequivocally led was not at issue before the *Claiborne
Hardware* Court. But the Court never made such an assertion. To the contrary, the Supreme
Court observed that it was not deciding "the extent to which a narrowly tailored statute
designed to prohibit certain forms of anticompetitive conduct or certain types of secondary
pressure may restrict protected First Amendment activity. No such statute is involved in this
case. Nor are we presented with a boycott designed to secure aims that are themselves
prohibited by a valid state law." *Id.* at 915 n.49. The Supreme Court did not here say that no
one committed tortious conduct; the Court affirmed that a generic statute against tortious
interference is not the type of narrowly tailored law that can restrict protected First
Amendment speech. And because it is not such a narrowly tailored law, directing others to

No. 17-30864

In other words, when the Supreme Court observed that Evers could be held liable if he "authorized, directed, or ratified specific tortious activity," it was clarifying that Evers could be held liable for *violence* he directly incited because violence is a tortious activity that unequivocally falls outside First Amendment protection.[51] This violence/nonviolence distinction[52] is cemented later in *Claiborne Hardware* when the Court restates the same three-verb standard to explain why Evers could not be liable despite his intentionally

---

violate it could not impose liability on Evers generally, and it certainly could not impose liability on him for the *violence* of others. *Id.* at 914–15; *see also Bradenburg*, 395 U.S. at 448 ("A statute which fails to draw [a] distinction [between teaching about the need for violence and "steeling" a group to commit violence] impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control.").

[51] *Claiborne Hardware*, 458 U.S. at 927. This is not to say the First Amendment protects individuals from all liability as long as their speech was nonviolent. Instead, *Claiborne Hardware* supports the proposition that an individual cannot be held liable for *violence* if his speech did not "authorize[], direct[], or ratif[y]" *violence*. *Id.* ("[A] finding that [Evers] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of *that* activity." (emphasis added)).

[52] The majority opinion latches onto the phrase "violence/nonviolence distinction" and appears to oversimplify it. As reiterated throughout this dissent, *see, e.g., supra* note 51, I do not contend that the First Amendment protects individuals from all tortious activity as long as it is nonviolent. Instead, I affirm the Supreme Court's holding that a person cannot be held liable for *violent conduct* that he did not intentionally incite or commit. And it is *violent conduct* that is at issue here. Certainly, a libeler can be held liable for the *reputational harms* caused by his libelous speech, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50 (1974), because defamation statutes are proper, narrowly tailored restrictions on the First Amendment. But a libeler may not be held liable for the violent acts of others that the libeler did not intend to incite with his libelous speech. *See Bradenburg*, 395 U.S. at 447–48; *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987) (refusing to impose civil liability against Hustler for "inciting" accidental asphyxiation, observing that "[m]ere negligence . . . cannot form the basis of liability under the incitement doctrine"); *see also Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 798 (2011) (holding that even if violent video games make people more aggressive, California could not prohibit their sale to children). And even if the libeler could be held so responsible, generic negligence statutes do not meet the first necessary condition of being narrowly tailored restrictions on free speech. *See infra*, note 56. Without a doubt, Evers defamed certain targets of his speech, yet the Court still refused to hold him liable for violence. *See, e.g., Claiborne Hardware*, 458 U.S. at 935–36 (describing specific local store owners as "racists" and "bigots" and implying they were murderers, rapists, and liars).

No. 17-30864

tortious activity, including speech that advocated violence: "[A]ny such theory fails for the simple reason that there is no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence."[53] The takeaway seems clear: The First Amendment only allows civil liability for violent conduct that "occurs in the context of constitutionally protected activity" when that activity involves violence or threats of violence.[54]

The majority opinion avers (though, notably, the complaint does not) that Mckesson directed protestors to block a public highway.[55] But encouraging that unlawful activity cannot expose Mckesson to liability for *violence* because he didn't instruct anyone to commit *violence*.[56] The Supreme Court requires "extreme care" when attaching liability to protest-related activity.[57] The majority's "tortious conduct + foreseeable violence = liability for violence"

---

[53] *Id*. at 929.

[54] *Id*. at 916.

[55] *See supra* note 43.

[56] *Claiborne Hardware*, 458 U.S. at 916, 921, 927. The majority opinion summarily concludes that Louisiana's road-blocking statute is a proper time, place, manner restriction, Maj. Op. at 18. But absent briefing from the parties, I am uncomfortable reaching such a consequential constitutional conclusion. *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 553–58 (1965) (invalidating a Baton Rouge ordinance that criminalized blocking public streets and only allowed parades or meetings with prior permission of an official who had unfettered discretion).

Also, to the extent that a tort duty can arise from the violation of statutes against obstructing highways, "recovery will be allowed only if a rule of law on which plaintiff relied included within its limits protections against the particular risk that plaintiff's interests encountered." *Lazard*, 859 So. 2d at 661. And Louisiana's prohibitions on highway-blocking "have as their focus the protection of other motorists." *State v. Winnon*, 681 So. 2d 463, 466 (La. App. 2 Cir. 1996). More attenuated harm is likely outside the scope of a defendant's duty under La. Rev. Stat. Ann. § 14:97. *See, e.g.*, *Thomas v. Ballard*, 577 So. 2d 149, 151 (La. App. 1 Cir. 1991). I could find no Louisiana case extending the scope of the negligence duty created by La. Rev. Stat. Ann. § 14:97 beyond the traffic-accident context. And I thus doubt that an intentional assault on a police officer is the "particular risk" addressed by the statute. *Lazard*, 859 So. 2d at 661.

[57] *Claiborne Hardware*, 458 U.S. at 927.

39

No. 17-30864

formula—with no parsing between *violent* tortious conduct (actionable) and *nonviolent* tortious conduct (nonactionable)—is at odds with the "precision of regulation" required to overcome the First Amendment.[58] Indeed, if it were that easy to plead around *Claiborne Hardware* and hold protest leaders personally liable for the violence of an individual protestor, there would be cases galore holding as much. The majority opinion cites none.

The bar set by *Claiborne Hardware* is much higher than the majority opinion gives it credit for. For example, plaintiffs may only recover "losses proximately caused by unlawful conduct."[59] This requires naming "specific parties who agreed to use unlawful means" and "identifying the impact of such unlawful conduct."[60] Doe's complaint does not allege specific facts indicating an agreement or any kind of agency relationship between Mckesson and the unidentified protestor, or that Mckesson encouraged or incited violent acts. Officer Doe does not allege facts supporting that Mckesson had an affirmative duty to intervene, and under *Claiborne Hardware*, protest organizers cannot be held strictly liable for the violent actions of rogue individuals.[61]

To reconcile the majority opinion (negligently disregarding potential violence is *not* protected) with *Claiborne Hardware* (intentionally advocating violence *is* protected), we must accept that one who expressly and purposely calls for violence is somehow not behaving negligently to the risk that violence may result. But "[m]ere negligence . . . cannot form the basis of liability under the incitement doctrine[.]"[62] To hold otherwise seems fanciful, as does allowing

---

[58] *Id.* at 916, 921.

[59] *Id.* at 918.

[60] *Id.* at 933–34.

[61] *Id.* at 920 ("Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence.").

[62] *Hustler Magazine, Inc.*, 814 F.2d at 1024.

No. 17-30864

common-law tort principles to trump constitutional free-speech principles.[63]
*Claiborne Hardware* held that Evers's leadership of an intentionally tortious
and foreseeably violent boycott did not forfeit his First Amendment defense.
Reading *Claiborne Hardware* as authorizing liability for violence on the basis
of urging *any* unlawful activity—no matter how attenuated from the violence
that ultimately occurred—paints with startlingly broad strokes.

Holding Mckesson responsible for the violent acts of others because he
"negligently" led a protest that carried the *risk* of *potential* violence or urged
the blocking of a road is impossible to square with Supreme Court precedent
holding that only tortious activity meant to incite imminent violence, and likely
to do so, forfeits constitutional protection against liability for violent acts
committed by others.[64] With greatest respect, I disagree with the majority
opinion's First Amendment analysis—both its substance and its necessity.

## III

In Hong Kong, millions of defiant pro-democracy protesters have taken
to the streets, with demonstrations growing increasingly violent. In America,
political uprisings, from peaceful picketing to lawless riots, have marked our
history from the beginning—indeed, from *before* the beginning. The Sons of
Liberty were dumping tea into Boston Harbor almost two centuries before Dr.
King's Selma-to-Montgomery march (which, of course, occupied public
roadways, including the full width of the bloodied Edmund Pettus Bridge).

\*     \*     \*

Officer Doe put himself in harm's way to protect his community
(including the violent protestor who injured him). And states have undeniable

---

[63] *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("For
the State to enforce a content-based exclusion it must show that its regulation is necessary
to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . .").

[64] *See, supra,* note 52.

No. 17-30864

authority to punish protest leaders and participants who *themselves* commit violence. The rock-hurler's personal liability is obvious, but I do not believe that Mckesson's is—for at least two reasons.

First, this is a negligence case, and I would not take it as a given that Mckesson owed an identifiable legal duty under Louisiana law. If no duty was owed, then no First Amendment analysis is necessary. Before weighing United States Supreme Court precedent on a fateful Federal question, I would invite the Louisiana Supreme Court to issue precedent on a fundamental State question. The tort analysis may well obviate the constitutional analysis.

Second, even assuming that Mckesson owed a duty, Doe's skeletal complaint does not plausibly assert that Mckesson forfeited First Amendment protection by inciting violence. Not one of the three elements of "incitement"—intent, imminence, likelihood—is competently pleaded here.[65] Nor does the complaint competently assert that Mckesson directed, intended, or authorized this attack. Our Constitution explicitly protects nonviolent political protest. And *Claiborne Hardware*, among "our most significant First Amendment" cases,[66] insulates nonviolent protestors from liability for others' conduct when engaging in political expression, even intentionally tortious conduct, not intended to incite immediate violence. The Constitution does not insulate violence, but it does insulate citizens from responsibility for *others'* violence.

"Negligent protest" liability against a protest leader for the violent act of a rogue assailant is a dodge of *Claiborne Hardware* and clashes head-on with constitutional fundamentals. Such an exotic theory would have enfeebled

---

[65] *See Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech . . . do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

[66] *Cloer v. Gynecology Clinic, Inc.*, 528 U.S. 1099 (2000) (Scalia, J., dissenting from denial of petition for a writ of certiorari).

No. 17-30864

America's street-blocking civil rights movement, imposing ruinous financial liability against citizens for exercising core First Amendment freedoms.[67]

Dr. King's last protest march was in March 1968, in support of striking Memphis sanitation workers. It was prelude to his assassination a week later, the day after his "I've Been to the Mountaintop" speech. Dr. King's hallmark was nonviolent protest, but as he led marchers down Beale Street, some young men began breaking storefront windows. The police moved in, and violence erupted, harming peaceful demonstrators and youthful looters alike. Had Dr. King been sued, either by injured police or injured protestors, I cannot fathom that the Constitution he praised as "magnificent"—"a promissory note to which every American was to fall heir"[68]—would countenance his personal liability.

Summing up: I would certify the threshold negligence question to the Supreme Court of Louisiana. Failing that, and given the flimsiness of Doe's complaint, I would hold that the First Amendment shields Mckesson from tort liability for the rock thrower's criminal act. In all other respects, I concur.

---

[67] The march from Selma to Montgomery—54 miles, 54 years ago—was no sidewalk stroll.

[68] Martin Luther King, Jr., I Have a Dream (Aug. 28, 1963), *in* I HAVE A DREAM: WRITINGS AND SPEECHES THAT CHANGED THE WORLD 101 (James M. Washington ed., 1992).

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

December 16, 2019

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

    No. 17-30864    John Doe v. DeRay Mckesson, et al
                    USDC No. 3:16-CV-742

    ---------------------------------------------------

Enclosed is a copy of the court's decision.  The court has entered
judgment under FED. R. APP. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

FED. R. APP. P. 39 through 41, and 5TH CIR. R.s 35, 39, and 41 govern
costs, rehearings, and mandates.  **5TH CIR. R.s 35 and 40 require
you to attach to your petition for panel rehearing or rehearing en
banc an unmarked copy of the court's opinion or order.**  Please
read carefully the Internal Operating Procedures (IOP's) following
FED. R. APP. P. 40 and 5TH CIR. R. 35 for a discussion of when a
rehearing may be appropriate, the legal standards applied and
sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5TH CIR. R. 41 provides that a motion for
a stay of mandate under FED. R. APP. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under FED. R. APP. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari.**  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

The judgment entered provides that each party bear its own costs on appeal.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Nancy F. Dolly, Deputy Clerk

Enclosure(s)

Mr. Ian Lewis Atkinson
Ms. Christine Marie Calogero
Mr. William P. Gibbens
Mr. David Thomas Goldberg
Mrs. Donna Unkel Grodner