No. 19-

In the

# Supreme Court of the United States

DeRay Mckesson,

*Petitioner,*

*v.*

John Doe,

*Respondent.*

On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Fifth Circuit

## PETITION FOR A WRIT OF CERTIORARI

David D. Cole
American Civil Liberties
 Union Foundation
915 15th Street, NW
Washington, DC 20005

Katie Schwartzmann
Bruce Hamilton
American Civil Liberties
 Union Foundation of
 Louisiana
P.O. Box 56157
New Orleans, LA 70156

William P. Gibbens
Ian Atkinson
Schonekas, Evans, McGoey
 & McEachin, LLC
909 Poydras Street, Suite 1600
New Orleans, LA 70112

David T. Goldberg
 *Counsel of Record*
Donahue, Goldberg, Weaver
 & Littleton
109 South Fifth Street,
 Suite 4201
Brooklyn, NY 11249
(212) 334-8813
david@donahuegoldberg.com

Ben Wizner
Vera Eidelman
Brian Hauss
Emerson Sykes
American Civil Liberties
 Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Petitioner*

294849

EXHIBIT
G

## QUESTION PRESENTED

Do the First Amendment and this Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), foreclose a state law negligence action making a leader of a protest demonstration personally liable in damages for injuries inflicted by an unidentified person's violent act there, when it is undisputed that the leader neither intended, authorized, directed, nor ratified the perpetrator's act, nor engaged in or incited violence of any kind?

ii

## CERTIFICATE OF PARTIES, PROCEDINGS AND RELATED CASES

In addition to the parties on the caption, Black Lives Matter Network, Inc., was a party to the proceedings before the Court of Appeals but does not join this petition.

### PROCEEDINGS

*Doe v. Mckesson*, U.S. District Court for
the Middle District of Louisiana, Civ. Action
No. 16–00742–BAJ–RLB. Judgment entered
September 28, 2017;

*Doe v. Mckesson,* U.S. Court of Appeals
for the Fifth Circuit, No. 17-30864.
Judgment entered August 8, 2019 (withdrawn
December 16, 2019);

*Doe v. Mckesson,* U.S. Court of Appeals
for the Fifth Circuit, No. 17-30864.
Judgment entered December 16, 2019; and

*Doe v. Mckesson,* U.S. Court of Appeals
for the Fifth Circuit, No. 17-30864.
Order denying rehearing en banc, issued
January 28, 2020.

A motion to dismiss a petition for certiorari,
No. 19-730, which sought review of the
(withdrawn) August 8 decision, is currently
before this Court.

iii

# TABLE OF CONTENTS

**Page**

Question Presented .....................................................i

Parties, Proceedings, and Related Cases .................ii

Appendix Contents .....................................................v

Table of Authorities....................................................vi

Opinions Below............................................................1

Jurisdiction...................................................................1

Constitutional and Statutory Provisions Involved ... 1

Introduction .................................................................2

Statement ....................................................................5

Reasons for Granting the Petition...........................14

I. The Fifth Circuit's rule defies *Claiborne*
   and contravenes bedrock First
   Amendment principles.......................................16

A. *Claiborne* squarely forecloses imposing
    liability for third-party wrongdoing
    based on a protest leader's negligence ..............17

B. *Claiborne* equally forecloses liability for
    third-party wrongs based on directing
    *some* (different) "tortious activity." ...................22

iv

C. The Fifth Circuit's forfeiture-by-
misdemeanor theory ignores
First Amendment fundamentals. ...................... 24

II. The critical importance of the rights
*Claiborne* secures makes this Court's
intervention necessary ........................................ 29

III. The First Amendment protections
the Fifth Circuit disabled should be
reinstated now, not later .................................. 34

Conclusion .............................................................. 37

v

## APPENDIX CONTENTS

**Page**

APPENDIX A – OPINION OF THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT,
DATED DECEMBER 16, 2019 ............................. 1a

APPENDIX B – OPINION OF THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA,
DATED SEPTEMBER 28, 2017 ......................... 55a

APPENDIX C –ORDER AND OPINIONS
OF THE UNITED STATES COURT
OF APPEALS FOR THE FIFTH CIRCUIT
ON DENIAL OF REHEARING EN BANC,
DATED JANAURY 28, 2020 ............................... 79a

APPENDIX D – OPINION OF THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT,
DATED AUGUST 8, 2019 (WITHDRAWN,
DECEMBER 16, 2019) ....................................... 90a

APPENDIX E – OPINION OF THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT,
DATED APRIL 24, 2019 (WITHDRAWN,
AUGUST 8, 2019) .............................................. 110a

vi

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) ............................................. 19

*Bartnicki v. Vopper,* 532 U.S. 514 (2001) .......... 25, 28

*Bell v. Whitten*, 722 So.2d 1057
  (La. Ct. App. 1998) ............................................. 36

*Bill Johnson's Restaurants, Inc. v. NLRB,*
  461 U.S. 731 (1983) ............................................. 34

*Boyer v. Johnson*, 360 So.2d 1164 (La. 1978) .......... 22

*Boykin v. La. Transit Co.*,
  707 So.2d 1225 (La. 1998) ..................................... 8

*Brandenburg v. Ohio,* 395 U.S. 444 (1969) ......... 3, 19

*Brown v. Entm't Merchants Ass'n,*
  564 U.S. 786 (2011) ............................................. 19

*Brown v. Louisiana*, 383 U.S. 131 (1966) ............... 30

*Byers v. Edmondson*, 712 So. 2d 681
  (La. Ct. App. 1998) ............................................. 19

vii

*Carey v. Brown*, 447 U.S. 455 (1980) ...................... 21

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ............................................ 10

*Cloer v. Gynecology Clinic, Inc.*,
    528 U.S. 1099 (2000) .................................... 14, 29

*Cox v. Louisiana.,* 379 U.S. 536 (1965) ................... 30

*Cox Broadcasting Corp. v. Cohn*,
    420 U.S. 485 (1975) ....................................... 35, 36

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ........... 36

*Eastern Railroad Presidents Conference v. Noerr*
    *Motor Freight Inc.*, 365 U.S. 127 (1961) ............. 26

*Elfbrandt v. Russell*, 384 U.S. 11 (1966) ................. 3

*The Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) ............................................ 28

*Fort Wayne Books, Inc. v. Indiana*,
    489 U.S. 46 (1989) ............................................. 37

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ................................. 27, 32, 33

viii

*Gann v. Matthews,*
    873 So.2d 701 (La. Ct. App. 2004) ..................... 36

*Gooding v. Wilson*, 405 U.S. 518 (1972) ................ 35

*Hague v. CIO*, 307 U.S. 496 (1939) ......................... 21

*Harris v. Pizza Hut of La., Inc.,*
    455 So.2d 1364 (1984) ........................................ 36

*Healy v. James,* 408 U.S. 169 (1972) ...................... 19

*Herndon v. Lowry*, 301 U.S. 242 (1937)............ 19, 32

*Juhl v. Airington,*
    936 S.W.2d 640 (Tex. 1996) ......................... 31, 34

*Kolender v. Lawson*, 461 U.S. 352 (1983)............... 33

*Lam v. Ngo*, 111 Cal. Rptr. 2d 582
    (Cal. Ct. App. 2001)............................................. 23

*McCullen v. Coakley*, 573 U.S. 464 (2014).............. 27

*Marsh v. Alabama*, 326 U.S. 501 (1946)................. 25

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974)............................................. 37

*NAACP v. Button*, 371 U.S. 415 (1963) .................. 26

ix

*NAACP v. Alabama ex rel. Flowers,*
   377 U.S. 288 (1964) ............................................ 27

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) .................................... *passim*

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................ 28, 29, 31

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ............... 29

*Noto v. United States*, 367 U.S. 290 (1961) ............ 30

*Nwanguma v. Trump,*
   903 F.3d 604 (6th Cir. 2018) .............................. 31

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .................... 25

*Scales v. United States*, 367 U.S. 203 (1961) ....... 3, 19

*Schenck v. Pro-Choice Network,*
   519 U.S. 357 (1997) ............................................ 31

*Shelton v. Tucker*, 364 U.S. 479 (1960) ................. 26

*Snyder v. Phelps*, 562 U.S. 443 (2011) .................... 33

*Taylor v. Louisiana.*, 370 U.S. 154 (1962) .............. 30

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ... 29

x

*United States v. L. Cohen Grocery Co.*,
    255 U.S. 81 (1921) ................................................ 32

*United States v. Stevens*, 559 U.S. 460 (2010) ......... 23

*Virginia v. Black*, 538 U.S. 343 (2003) ................... 25

*Wayte v. United States,* 470 U.S. 598 (1985) ........... 34

**Statutes:**

28 U.S.C. § 1332 ........................................................ 6

Louisiana Rev. Statutes § 14:97 ..................... *passim*

**Miscellaneous:**

Judgment, *Mckesson v. Baton Rouge*,
    No. 3:16-cv-00520 (M.D. La. Oct. 27, 2017) ....... 24

## PETITION FOR A WRIT OF CERTIORARI

---

### OPINIONS BELOW

The opinion of the United States Court of Appeals for the Fifth Circuit on *sua sponte* panel rehearing is reported at 945 F.3d 818 and reproduced at Pet.App.1a-54a. The opinion of the district court (Pet.App.55a-78a) is reported at 272 F. Supp.3d 841 (M.D. La. 2017). An order and opinions on denial of rehearing *en banc* (Pet.App.79a-89a) is reported at 947 F.3d 874. The court's earlier (withdrawn) rehearing and initial opinions (Pet.App.90a-109a and 110a-127a, respectively) are reported at 935 F.3d 253 and 922 F.3d 604.

### JURISDICTION

On January 28, 2020, the court of appeals issued an order denying rehearing *en banc* of its December 16, 2019 decision. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254.[1]

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment to the Constitution of the United States provides, in pertinent part:

> Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

---

[1] The decision the court of appeals withdrew on December 16, 2019 had been the subject of a petition for certiorari, timely filed ten days earlier. Petitioner has sought dismissal of that petition, No. 19-730, pursuant to Supreme Court Rule 46.

Louisiana Civil Code article 2315(A) provides:

> Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

Louisiana Rev. Statutes § 14:97 provides:

> Simple obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult.

## INTRODUCTION

Nearly four decades ago, in *NAACP v. Claiborne Hardware Co.*, the Court established a constitutional rule limiting state law damages liability for the "unlawful conduct of others" occurring "in the context of … activity" protected by the First Amendment. 458 U.S. 886, 916, 927 (1982). That case arose from a long-running civil rights boycott that included "elements of majesty," *id.* at 888, but also threats and acts of violence. The Mississippi Supreme Court had affirmed a judgment holding the boycott's primary leader, Charles Evers, personally liable for large damages on the ground that, under state tort law, the violence rendered the boycott illegal.

In holding that judgment unconstitutional, *Claiborne* recognized both the significance of the State's interest in preventing harmful conduct and the dangers to First Amendment freedoms that Mississippi's damages remedy posed: Given the

2

prospect that an individual protest participant—or someone else present at a demonstration—will engage in law-breaking, only the most intrepid citizens would exercise their rights if doing so made them personally liable for others' wrongdoing. *Claiborne*'s answer was a "federal rule of law" restricting state liability rules for wrongs arising in "the presence of [First Amendment] activity." *Id.* at 916. States retain undiminished authority to impose damages on protest participants and leaders who *themselves* inflict harm. But the Constitution forbids holding a protest leader personally responsible for illegal acts committed *by others* unless the leader himself incited or "authorized, directed, or ratified" the "specific" harm-inflicting acts. *Id.* at 927.

*Claiborne*'s stringent personal culpability requirement consciously tracked principles this Court established in landmark decisions recognizing First Amendment limits on liability for incitement and association, which similarly arise at the nexus of protected activity and actual harm. *See Brandenburg v. Ohio,* 395 U.S. 444 (1969); *Scales v. United States*, 367 U.S. 203 (1961); *Elfbrandt v. Russell*, 384 U.S. 11 (1966). In those cases, as in *Claiborne*, the Constitution forbids liability for third-party wrongs that a speaker foresaw and contributed to, but did not specifically intend to bring about.

The present case called for a straightforward application of *Claiborne*, but it yielded something strikingly different. Respondent, a police officer, filed a state law tort suit seeking recovery for injuries he suffered when struck by a projectile while on duty at a civil rights demonstration. He sued not the

3

unidentified rock-thrower, but petitioner, a prominent social justice advocate, for "conducting" the demonstration "negligently." Pet.App.10a, 12a. A Fifth Circuit panel recognized there was no plausible allegation that petitioner directed, authorized, or ratified the rock-throwing (or any violence), but ruled that the First Amendment *did not* bar holding him liable for respondent's injuries. The panel affirmed that holding in a revised opinion on rehearing, and again in a third opinion, issued *sua sponte* four months after the second, over the dissent of Judge Willett, who, upon reflection, had concluded that the court's rule was "foreclosed squarely by this Court's controlling decision [in *Claiborne*]." Pet.App.44a. The full court declined to rehear the case, by an 8-8 vote.

The Court should review—and reverse—the Fifth Circuit's decision and reinstate the *Claiborne* rule. The lower court's departure from this Court's controlling precedent could hardly be more stark. What the Fifth Circuit held the Constitution to permit is precisely what *Claiborne Hardware* ruled it forbids: Holding a protest leader liable in tort damages for specific wrongs, committed by someone else, that he neither authorized nor intended. And the panel, in announcing and defending its *Claiborne*-evading conclusion, cast aside the principle animating *Claiborne*'s prohibition against sweeping rules of civil liability: that the presence of First Amendment activity demands "precision of regulation."

The reasons why this Court's intervention is needed extend beyond the important interests in securing compliance with binding precedent. Restoring the *Claiborne* protection is critical because

4

the rights of protest it secures are so valuable; and because those rights are especially vulnerable to suppression under the tort law regime the Fifth Circuit approved.

There is no basis for—and great harm in—withholding review until this case has been litigated to judgment under the Fifth Circuit's rule. This Court has repeatedly recognized that when the First Amendment entitles a defendant to dismissal, it is no small matter to compel him to endure protracted litigation under state law. In fact, the prospect, adverted to in several opinions below, that petitioner eventually may prevail on nonconstitutional grounds is a powerful reason for intervening now. Far from "mooting" the constitutional ruling that divided the court below, any such victory for petitioner would leave in place, and put beyond this Court's reach, the Fifth Circuit's insupportable and disruptive First Amendment rule.

## STATEMENT

1. On July 5, 2016, Alton Sterling, a Black resident of Baton Rouge, Louisiana, was shot and killed by on-duty police officers responding to an anonymous 911 call. In the days after, members of the city's Black community took to the streets—including, on the evening of July 9, the area in front of police headquarters—to express their anguish, celebrate Mr. Sterling's life, and press for accountability and change. As with protests prompted by police violence elsewhere, one way those assembled conveyed their dismay was by insisting, to the police before them, the community, and the watching world, that "Black Lives Matter."

5

The July 9 protest was, on respondent's own account, initially peaceful, although after "activist[s] began pumping up the crowd," Compl.¶17, some demonstrators hurled plastic water bottles in the direction of police, some of whom were in riot gear, while others, including respondent, were massed to make arrests. *Id.*¶¶16,18.[2] And when the bottles "ran out," an unidentified person threw a "rock like" object that struck and injured respondent. *Id.*¶20.

2. Respondent brought this personal injury suit in federal court, averring that the damages sought exceeded $75,000, *see* 28 U.S.C. § 1332, naming as defendants DeRay Mckesson—petitioner here—and "Black Lives Matter," Compl.¶3, described as an "unincorporated association" on whose "behalf" Mckesson "staged" the demonstration. *Id.* Respondent did not seek recovery against the unidentified assailant.[3]

The complaint did not allege that Mckesson himself engaged in or directed violence of any kind. Rather, respondent alleged that Mckesson "knew or should have known … that violence would result" from the demonstration he "staged"; was "present during the protest" and "did nothing to calm the crowd"; and had "directed" demonstrators to protest on the public road in front of police headquarters. Compl.¶¶12, 19, 28. If proven, respondent

---

[2] Given the case's procedural posture, petitioner treats as true the well-pleaded factual allegations of the complaint.

[3] Respondent sought to proceed anonymously, but both the district court and the court of appeals ruled that he failed to state a lawful basis for doing so. Pet.App.28a n.12.

maintained, these allegations would give rise to liability for negligence, civil conspiracy, and *respondeat superior.*

3. The district court dismissed the suit, concluding that "Black Lives Matter" is a "social movement," not the sort of entity that may be sued in federal court, Pet.App.58a-59a, and that the claims against Mckesson were defeated by *Claiborne*'s rule governing civil liability for other persons' wrongful acts committed "in the context of constitutionally-protected activity." 458 U.S. at 916. Because there was no plausible allegation that Mckesson personally "authorized, directed, or ratified" or otherwise manifested "a specific intent to further" the injury-causing assault, *id.* at 925-27, the court ruled, the First Amendment precluded state law damages liability. Pet.App.61a.

4. A panel of the Fifth Circuit, in an initial published opinion, a second one issued on rehearing, and a third issued *sua sponte* months later when Judge Willett reconsidered and dissented, reinstated respondent's negligence claim.

Each panel opinion began by deciding the viability under state law of the tort claims. Respondent's vicarious liability claim failed, the court held, because he did not "allege facts that support an inference that the unknown assailant 'perform[ed] a continuous service'" for Mckesson or that the rock-thrower's "'physical movements [were] subject to *** [Mckesson's] right to control." *Id*.115a. As for civil conspiracy, the panel concluded that while respondent did "allege[] facts that support an inference that Mckesson agreed with unnamed others to

7

demonstrate illegally on a public highway," the absence of allegations "that Mckesson colluded with the unknown assailant to attack Officer Doe [or] knew of the attack and ratified it" was fatal. *Id*.116a-117a.

The panel reached a different conclusion respecting respondent's effort to hold Mckesson liable in "negligen[ce,] for organizing and leading the Baton Rouge demonstration," when he "knew or should have known" that an act of violence could occur there. *Id*.117a. The court concluded that petitioner owed a duty to respondent and other officers and bystanders, stating that Louisiana recognizes a "universal" obligation "to use reasonable care so as to avoid injury to another." *Id*.118a (quoting *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1231 (La. 1998)).

In assessing the other elements of the negligence cause of action, the court attached special significance to allegations that petitioner and other protesters had marched onto the road in front of police headquarters, noting that "[b]locking a public highway is a criminal act under Louisiana law." *Id*.118a (citing La. Rev. Stat. § 14:97). It was "patently foreseeable," the court reasoned, that police would respond "by clearing the highway and, when necessary, making arrests," a development that, in turn, carried a "foreseeable risk of violence" to "officers, bystanders, and demonstrators." *Id*.119a. Thus, although "[i]t may have been an unknown demonstrator who threw the hard object," the court held, "Mckesson's negligent actions were the 'but for' causes of" respondent's injury." *Id.*

Having concluded that petitioner could be sued under state law, the court "t[ook] a step back" to

8

consider the Constitution. *Id.*120a. The fact that Mckesson did not participate in or support violence raised no First Amendment "bar" the court reasoned, *id.*121a, because the complaint alleged both negligence and directing the "tortious and illegal" act of "occupying [a] public highway," *id.*, and because *Claiborne* permits liability for "the *consequences*" of those "tortious activit[ies]"—*i.e.*, the arrests, the assailant's hurling the rock, and respondent's injuries, *id.*120a-121a (quoting 458 U.S. at 927) (emphasis added).

5. Petitioner sought *en banc* reconsideration, maintaining that the panel's decision, which had been issued without oral argument, was irreconcilable with *Claiborne* and other landmark precedents and would broadly chill exercise of core First Amendment rights. After calling for and receiving a response—but again without hearing argument—the court granted *panel* rehearing, withdrew the initial opinion, and issued a substitute.

The new opinion reached the same result and largely replicated the initial opinion's discussion of the nonconstitutional issues. It did, however, expand on the First Amendment holding. "Even if we assume that Officer Doe seeks to hold Mckesson 'liable for the unlawful conduct of others' within the meaning of *Claiborne Hardware*," the court explained, the First Amendment did not require dismissal. *Id.*101a. Rather, all respondent needed to do "to counter Mckesson's First Amendment defense" was to "plausibly allege that his injuries" were a "consequence[]" of *some* "tortious activity" that petitioner "authorized, directed, or ratified" "in

9

violation of his duty of care," *id.*—a requirement the court held was met by allegations that he encouraged misdemeanor traffic-impeding.

The court "perceive[d] no Constitutional issue with Mckesson['s] being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of another that were [a] foreseeable … result," deeming such liability "a standard aspect of state law," which *Claiborne* did not "intend[] to *** eliminat[e]." *Id.* 102a.

While acknowledging that the alleged negligence "took place in the context of a political protest," *id.*, the court posited that "*Claiborne Hardware* does not insulate … petitioner from liability *** simply because he, and those he associated with, also intended to communicate a message." *Id. Claiborne*, the court emphasized, had recognized that "the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." *Id.* (quoting 458 U.S. at 916) (internal quotation marks and citations omitted). Here, likewise, "the criminal conduct" Mckesson allegedly "ordered" was not "protected by the First Amendment," because a law prohibiting impeding highway traffic is "a reasonable time, place, and manner restriction." *Id.*103a (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

The opinion expressed confidence that "no First Amendment protected activity [would be] suppressed by allowing the consequences of Mckesson's conduct to be addressed by state tort law." *Id.*

10

6. On December 16, 2019, four months after the panel's rehearing opinion and ten days after Mckesson filed a petition for certiorari, the Fifth Circuit, *sua sponte*, withdrew *that* opinion and issued a third one, reflecting that the formerly unanimous panel had become sharply divided.

Judge Willett—who had joined the prior two opinions in full—explained that he had come to disagree with the court's resolution of both the tort law and First Amendment issues. His dissent began by raising doubts about the "exotic" negligent protest tort theory, suggesting that the duty question should have been certified to the state supreme court. *Id.*38a, 53a. But "[e]ven assuming that Mckesson could be sued under Louisiana law for 'negligently' leading a protest at which someone became violent," *id.*39a, Judge Willett explained, such a claim would be "foreclosed—squarely—by controlling Supreme Court precedent" and "constitutional fundamentals," *id.*44a, 53a.

Emphasizing that *Claiborne* "impose[d] restraints" on "what (and whom) state tort law may punish" for harms occurring in the context of protected activity and set a very "high[] bar" for derivative liability, Judge Willett concluded that respondent's allegations "utterly fail[ed]" to supply the constitutionally required "link [between] Mckesson's role as leader of the protest demonstration [and] the mystery attacker's violent act." *Id.*39a, 43a, 50a, 61a.

Judge Willett then disputed the majority's claims that its regime was reconcilable with *Claiborne*. If liability for an independent actor's violence could

11

constitutionally be imposed as a "consequence" of a leader's "own" negligent oversight of a protest, he pointed out, the *Claiborne Hardware* court would have upheld the damages verdict against Charles Evers. *Id.*44a nn.41, 42. And, Judge Willett continued, the majority's "alternative liability theory"—that petitioner could be liable for respondent's injuries because he "directed *** [the] specific tortious activity" of impeding a public highway—fared no better. Even if encouraging that misdemeanor were somehow a civil wrong against a police officer, Judge Willett explained, it is, under *Claiborne*, a constitutionally impermissible basis for "expos[ing] Mckesson to liability" for the rock-thrower's act of "*violence.*" *Id.*44a, 49a.

Judge Willett concluded by connecting this case to courageous, though not wholly violence-free, pro-democracy demonstrations taking place in Hong Kong and to milestones in this Nation's protest tradition, noting that the Sons of Liberty are venerated for "dumping tea into Boston Harbor" and that Martin Luther King's Selma-to-Montgomery March involved "occup[ying] public roadways." *Id.*52a. Had the majority's views prevailed, he continued, Dr. King and other leaders of "America's street-blocking civil rights movement" could, constitutionally, have been subject to "ruinous [personal] liability" for any instance of violence that arose from demonstrators' confrontations with hostile onlookers and police. *Id.*53a.

The revised majority opinion, after confirming that appellate jurisdiction was proper, responded to Judge Willett. On negligence, the majority denied it

12

had approved a duty to prevent third-party criminality—only "a duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence." *Id.*12a. On the First Amendment, the majority faulted Judge Willett for not "close[ly] reading" *Claiborne* and warned of the "staggering consequences" of according "immunity" for "nonviolent tort[s]" that are "[committed] during a protest." *Id.*16a, 20a, 21a & n.8.

7. Six weeks after the panel's third opinion, the Fifth Circuit issued an order announcing that one or more of its members had requested an *en banc* poll and that the request had yielded an 8-8 tie.

Several judges added their views. Judge Ho concurred in denying rehearing, suggesting that Mckesson was likely to prevail on remand on Louisiana's "professional rescuer" rule, which precludes officers from pursuing negligence claims for personal injuries resulting "from the very emergency [they were] hired to remedy." *Id.*81a (citation omitted). On the "more challenging First Amendment questions," Judge Ho posited that *Claiborne Hardware* was distinguishable because the state tort liability there was "premised on the *content* of expressive activity." *Id.*83a. "If the defendants had advocated in *favor* of the white merchants," he asserted, "no [Mississippi] court would have held them liable for such speech," but the Fifth Circuit's tort theory would apply "with equal force to pro-police protestors *** who unlawfully obstruct a public highway and then break out into violence." *Id.*83a, 85a.

13

Judges Higginson and Dennis authored separate dissenting opinions. Judge Higginson explained why "[p]rotestors of all types and causes have been blocking streets in Louisiana for decades," without being sued on claims like respondent's: The possibility a police officer will be struck by a person opposing an arrest for simple highway obstruction is outside the "particular risk" that Section 14:97 addresses. Pet.App.88a, 89a. Judge Dennis lamented that the court, by permitting the panel's "freewheeling form of strict liability" to stand, had "grievously failed to … apply the longstanding protections of the First Amendment." *Id.*87a.

## REASONS FOR GRANTING THE PETITION

This Court's intervention is needed now for two reasons. First, the Fifth Circuit's constitutional rule could not be more wrong. The decision below plainly conflicts with the directly controlling precedent of this Court in *Claiborne*—a decision recognized to be among this Court's "most significant" First Amendment precedents. *Cloer v. Gynecology Clinic, Inc.*, 528 U.S. 1099, 1099 (2000) (Scalia, J., dissenting from denial of cert.). And the decision below is likewise irreconcilable with closely related landmark decisions restricting liability for incitement and guilt by association. *Claiborne* held that the First Amendment forbids holding a protest leader personally liable for unlawful acts of other persons that he did not incite, authorize, direct, ratify, or otherwise specifically intend. The Fifth Circuit held here that mere negligence suffices. That rule not only jettisons *Claiborne*'s holding, it entirely

14

misunderstands the nature and constitutional underpinnings of this Court's rule.

Second, review is needed here for the same reasons it was in *Claiborne*: because the speech and associational rights at issue are both so integral to self-government and so "fragile." 458 U.S. at 931. The theories of civil damages liability the Fifth Circuit's rule permits pose an existential threat to the exercise of the very First Amendment rights the *Claiborne* rule is meant to safeguard. For would-be protesters, a rule that provides for limitless and standardless personal liability for wrongs the person did not encourage or approve, committed by unknown others, is functionally a rule of compelled silence—particularly for those who espouse unpopular opinions. Indeed, the panel majority remarkably made no effort to deny Judge Willett's observation that history-making nonviolent protests led by Dr. Martin Luther King would have been among the first casualties of the court's rule.

The extraordinary course of proceedings below further attests to the need for this Court's intervention. Without ever hearing argument, the Fifth Circuit panel issued three opinions over an eight-month span, the last responding to a dissenting opinion of a member who had come to conclude, after twice joining the court's opinions, that its rule contravened First Amendment fundamentals. Eight judges then voted for *sua sponte en banc* reconsideration, with two describing the tie vote as a "grievous[ ] fail[ure]." Pet.App.87a. At this juncture, only this Court can reinstate the important protections nullified by the Fifth Circuit's decision.

15

## I. The Fifth Circuit's decision defies *Claiborne* and contravenes bedrock First Amendment principles.

In overturning the district court's straightforward conclusion that respondent's negligent protest claim is barred by *Claiborne*'s stringent rule for derivative liability in the First Amendment context, the Fifth Circuit's opinions offered three distinct, but overlapping rationales: (1) that recovery was permissible under *Claiborne*'s rule for direct liability; (2) that *Claiborne*'s intent requirement for derivative liability may be satisfied by allegations that a protest leader "directed" *something* tortious, even if not the harm-causing behavior; and (3) that a protest leader loses all First Amendment protection if he does or directs anything unlawful.

All three rationales fail. First, if this case, involving injuries inflicted by an unknown third-party's independent violent act, does not trigger the rule governing liability for "other persons'" wrongdoing, then nothing does. Second*, Claiborne* could hardly be more clear that such derivative liability is constitutionally permissible only for harms caused by those "*specific* tortious activit[ies]" a protest leader authorizes or directs. 458 U.S. at 927. Third, *Claiborne* makes clear that while protest activity is not immune from *all* regulation, it may not be subject to the speech-stifling rules of attenuated damages liability. No one disputes that Mckesson could be held responsible for the misdemeanor of impeding traffic on a public street (or directing others to do so), were the allegations true. But it does not follow that he may be held liable for an unidentified person's violent

16

act he never authorized or incited, merely because the rock-thrower allegedly was angered by arrests on that charge. The First Amendment forbids it.

## A. *Claiborne* squarely forecloses imposing liability for third-party wrongdoing based on a protest leader's negligence.

*Claiborne Hardware* announced a clear and definitive rule for suits seeking to hold a protest leader liable in damages for the "unlawful conduct of others" in the context of a protest: They are unconstitutional, unless the leader herself incited, authorized or otherwise intended the specific harm-inflicting behavior. *See* 458 U.S. at 927. The Fifth Circuit nonetheless held that the absence of any such culpable connection poses no First Amendment "bar" to holding petitioner responsible for injuries the unknown rock-thrower inflicted. Pet.App.22a. It reasoned that the assault was a "consequence[]" of petitioner's "*own*" "tortious" failure to "conduct" a protest in a way that took "reasonable care" to avoid contributing to third-party violence. The negligent protest theory, the court further insisted, was constitutional *because* it applied "a standard aspect of state law," that *Claiborne* "did not "intend[ ] to …eliminat[e]." *Id.*16a.

That conclusion represents a radical misunderstanding of this Court's squarely controlling decision, one that would nullify First Amendment protections in every case where they matter, including in *Claiborne Hardware* itself.

To begin, *Claiborne* did not, as the majority below posited, "apply black-letter tort law" to overturn the

17

damages award against Charles Evers. Pet.App.18a. Rather, this Court held that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." 458 U.S. at 916-17. The Court then applied that constitutional rule *to reject* "standard aspect[s] of [Mississippi] tort law" that would have been unproblematic in settings not involving First Amendment activity. The rule is straightforward: Whatever state law provides, damages liability for unlawful acts committed in the context of a protest requires a stringent showing of personal, culpable involvement. Specifically, a protest leader may constitutionally be held accountable for harms he personally "directly and proximately" inflicts and for those caused by others acts he incited "authorized, directed, or ratified." 458 U.S. at 918, 927. Full stop.

*Claiborne*'s rigorous specific intent requirement was no slip of the judicial pen. It was the decision's central, rigorously supported holding. And it expressly rested on First Amendment limitations recognized in historic decisions addressing incitement and associational liability. *Id*. at 918-20, 927-28. The lines of precedent the Court relied upon confronted almost exactly the same question presented in *Claiborne*—and here: whether and how States may regulate First Amendment activity based on its contribution to unlawful acts by others. And those precedents' answer, arrived at through generations of struggle, *is Claiborne*'s: The Constitution forbids imposing liability for advocacy or association that only foreseeably leads others to commit unlawful acts; rather, there must at a minimum be proof a defendant

18

specifically intended the harm to occur. *See Brandenburg*, 395 U.S. at 447; *Scales*, 367 U.S. at 229; *Healy v. James,* 408 U.S. 169, 185-86 (1972); *cf. Herndon v. Lowry*, 301 U.S. 242, 262 (1937) (invalidating statute authorizing punishment if a defendant could have "forecast that, as a result of a chain of causation" his speech will lead a "group to resort to force").

This Court and lower courts, as Judge Willett explained, have applied these principles in related settings, rejecting measures that penalize First Amendment activity based on a judgment that it contributes to harmful, even seriously criminal behaviors. *See, e.g., Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253-57 (2002) (striking down ban on "virtual child pornography," notwithstanding congressional findings that such materials enable sexual abuse of children); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 798 (2011) (invalidating law restricting sales of video games found to cause young players to behave aggressively); *Byers v. Edmondson*, 712 So. 2d 681, 691 (La. App. 1 Cir. 1998) (forbidding negligence claim based on filmmaker's contribution to murder, holding that "[p]roof of intent," not "mere foreseeability" is required).[4]

---

[4] To be clear, the *Claiborne* rule does not, as the majority below assumed, confine protester liability to intentional torts. If a driver of a sound-truck veers onto a sidewalk, injuring a pedestrian, the driver may be held liable for those damages. The rule *does*, however, restrain impositions of derivative liability. If a citizen attacked a police officer for failing to cite the sound-truck operator for violating a noise ordinance, the officer's suit *against the driver* would be impermissible, even if he could show such an assault was foreseeable.

19

The version of the *"Claiborne* rule" the Fifth Circuit embraced would make the result in *Claiborne Hardware* itself inexplicable. It is not true that the "*only potentially tortious* conduct at issue [in *Claiborne*] was violen[ce]," Pet.App.17a (emphasis added). Charles Evers *did* do something that Mississippi courts held "tortious" and "unlawful" under state law: he organized a boycott that included acts and threats of violence. (Indeed, this Court assumed that such activity *could* give rise to liability had it been economically, rather than politically, motivated, *see* 458 U.S. at 914). And the damages verdict this Court held unconstitutional charged Evers with the "consequences."

As Judge Willett emphasized, the claim against Evers could readily have been pleaded under the Fifth Circuit's negligent protest theory, claiming that the losses were a foreseeable consequence of Evers' breaching a "universal" duty to "conduct" a boycott free of violence. Such a claim would have been materially *stronger* than on the allegations here: The economic losses on which the Mississippi merchants recovered were, unlike the personal injuries here, ones Evers *did* himself intend; the violent acts (though not sanctioned by Evers) apparently contributed to the success of the protest he led, 458 U.S. at 933; and the boycott was conducted through a formal, hierarchical structure in which the perpetrators of the violence had a defined, official role. And Evers ominously reminded boycott defectors that police could not protect them from retribution in their homes "at night." *Id*. at 902. Here, by contrast, there is no allegation that Mckesson said anything even

20

remotely supportive of violence; indeed, there is no allegation as to anything he said during the protest.

The majority and concurrence below strained to find *some* basis for distinguishing the two cases, positing that the cause of action in *Claiborne* was invalidated as "content-based," Pet.App.83a (Ho, J.), and that this case, unlike *Claiborne*, involved "conduct" regulation, *id*.19a & n.7. Not so. Neither of the state court opinions in *Claiborne* gave any indication that the same damages remedy would have been unavailable against a Ku Klux Klan leader who oversaw a boycott of *pro*-civil-rights businesses that included comparable instances of violence.[5] And the Mississippi courts did not hold Evers responsible solely for delivering inflammatory speeches; his liability was justified by his role as "manager[]" and "primary leader[]" of the at-times-violent boycott. 458 U.S. at 897, 926. The tort claim here seeks liability based on petitioner's leading a street demonstration calling on officials to discharge their Equal Protection duties—an activity occupying no less "high [a] rung [in] the hierarchy of First Amendment [values]," *Carey v. Brown*, 447 U.S. 455, 467 (1980), than the boycott in *Claiborne*. *See Hague v. CIO*, 307 U.S. 496, 515 (1939) (Roberts, J.) (noting historic role of streets for protest).

---

[5] If, by "content-based," Judge Ho meant only that Evers would not have been sued had he spoken *against* the boycott, the same is true here. Had Mckesson urged protesters to stay home, he would not have been the demonstration's "leader," and suing him for violence that occurred there would not be merely unconstitutional. It would be unthinkable.

21

## B. *Claiborne* equally forecloses liability for third-party harms based on directing *some* (different) "tortious activity."

The Fifth Circuit's alternative theory for permitting Mckesson to be sued for respondent's personal injuries—because he allegedly directed other persons' "tortious and unlawful act" of demonstrating in the street, in violation of Louisiana Section 14:97—is no more tenable.

This Court *did not* hold, as the panel majority maintained, that the First Amendment may be "counter[ed]" "simply" by a plaintiff's alleging that his "injuries were one of the 'consequences' of [some] 'tortious activity,'" a protest leader "authorized, directed, or ratified," Pet.App.15a. Rather, in language that the opinion below conspicuously truncated, this Court held that the First Amendment requires *specific* intent, not transferred intent. Under *Claiborne*, only "a finding that [the leader] authorized, directed, or ratified *specific* tortious activity would justify holding him responsible for the consequences of *that* activity." 458 U.S. at 927 (emphasis added).

Even if leading demonstrators onto a public street could somehow breach a duty owed respondent, that was not the specific tortious activity that "proximately cause[d]" respondent harm. 458 U.S. at 918, 927. He was injured by a different tortious activity altogether—the projectile throwing, which Mckesson concededly *did not* incite, authorize, or intend. No speaker of ordinary English would describe respondent as the "victim" of the highway-impeding—any more than a police officer slandered while

22

arresting a sit-in protester could claim his reputational injury was inflicted by an organizer's directing a trespass. The manifest concern of Section 14:97 is traffic movement, not rock-throwing—let alone protecting police officers from the possibility that an arrest under the statute will incite someone else to attack an officer.[6] Indeed, Louisiana courts have held that an individual who blocked a car in order to detain and physically attack its elderly driver could not be punished under the highway-blocking law even for his own premeditated violence. *See State v. Winnon*, 681 So.2d 463, 468 (La. App. 2d Cir. 1996) (interpreting provision addressing "aggravated" violations).

The state appellate decision in *Lam v. Ngo*, 111 Cal. Rptr. 2d 582 (Cal. Ct. App. 2001), illustrates how the *Claiborne* rule properly operates. The court there recognized that a protest organizer's violation of a court-ordered buffer zone could subject him to a contempt sanction. But it held that that wrongful activity could not, consistently with the First Amendment, expose him to liability for other protesters' acts of tire-slashing and intimidation—

---

[6] Louisiana, like many jurisdictions, does not treat statutory violations as automatically "tortious," recognizing that measures "may have been designed to protect someone other than the plaintiff, or to protect the plaintiff from some evil other than the injury for which recovery is sought." *Boyer v. Johnson*, 360 So.2d 1164, 1168–69 (La. 1978). *Cf. United States v. Stevens*, 559 U.S. 460, 475 (2010) (invalidating statute criminalizing depictions of "unlawful" animal-killing, noting that laws prohibit killings for diverse reasons, including ones wholly unrelated to combatting cruelty).

23

specific unlawful conduct that the leader did not "authorize[], direct[], or ratif[y]." *Id.* at 593.

The *Claiborne Hardware* First Amendment rule is not a technicality to be "counter[ed]" or "overcome"— or "dodge[d]," Pet.App.43a, 53a (Willett, J.)—through artful pleading or semantic ingenuity. It imposes a stringent limitation on "the grounds" on which and "persons" on whom States may impose damages liability for wrongful acts committed in the context of the First Amendment, 458 U.S. at 916-17, forbidding damages liability absent a tight "link [between a defendant's] role as leader of [a] protest demonstration [and an] attacker's violent act." Pet.App.43a. The Fifth Circuit's decision "grievously failed to … apply th[ose] longstanding protections." Pet.App.86a (Dennis, J., dissenting).

## C. The Fifth Circuit's forfeiture-by-misdemeanor theory ignores First Amendment fundamentals.

The court of appeals' third justification for departing from *Claiborne*—that petitioner allegedly directed the misdemeanor of protesting in the street— fares no better. Protesting on a public highway (or directing others to), the court reasoned, is "unprotected" against the damages liability sought here—because it, like the "[t]he use of weapons, gunpowder, and gasoline," is "illegal." Pet.App.16a, 22a (quoting 458 U.S. at 916).[7]

---

[7] Petitioner was arrested and charged with violating Section 14:97. But the prosecutor dismissed those charges in short order—and it is a matter of public record that respondent's municipal employer settled a civil rights case alleging illegal

24

That thesis, as Judge Willett pointed out, immediately relegates proud landmarks in the Nation's protest tradition to the First Amendment shadows and misunderstands *Claiborne* and the pillars of this Court's doctrine on which its rule rests.

Civil liability for perpetrating—or authorizing— "the use of weapons" is constitutionally unproblematic not because it is *criminal*, but because it directly inflicts harms—"consequences"—for which the weapon-user is personally responsible (and for which a person directing him is equally culpable), even when politically motivated. *Cf. Rumsfeld v. FAIR*, 547 U.S. 47, 65-66 (2006) (affirming that actions do not become protected "[S]peech" simply because "the person engaging in the conduct intends thereby to express an idea").

But the notion that First Amendment protections are wholly disabled whenever protest activity offends some criminal statute is irreconcilable with decisions dating back generations. As early as *Marsh v. Alabama*, 326 U.S. 501 (1946), the Court vindicated the free speech rights of persons whose exercise occurred while violating criminal trespass laws. *Cf. Virginia v. Black*, 538 U.S. 343 (2003) (vacating on First Amendment grounds conviction of defendant for burning a cross on Black family's private property). Indeed, in *Bartnicki v. Vopper*, 532 U.S. 514 (2001),

---

arrest and agreed, in exchange for dismissal, to pay for expungement of the record of that arrest and to compensate petitioner for the time he was detained on that charge. *See* Judgment, *Mckesson v. Baton Rouge*, No. 3:16-cv-00520 (M.D. La. Oct. 27, 2017).

the Court held unconstitutional a civil remedy based on a violation of a criminal law, notwithstanding that the underlying criminal prohibition was constitutional and that the remedy (unlike here) was accorded only to the person directly harmed by the criminal violation.

Nor, contrary to the majority opinion below, can concerns about avoiding special treatment—or "immunity"—for wrongs "done for a political reason," Pet.App.21a, support carving out an exception to the *Claiborne* rule. *Claiborne* itself *is* a rule of special treatment: This Court's central holding was that the federal Constitution forbids attributions of liability in "the presence of [First Amendment] protected activity," 458 U.S. at 916-17, that would be unexceptionable in other contexts. The Court invoked decisions such as *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), which held that general antitrust-law proscriptions against anticompetitive agreements could not be applied to petitioning activities, and *NAACP v. Button*, 371 U.S. 415 (1963), which overturned enforcement against civil rights litigators of a state's generally permissible professional regulation.

What this Court's precedent, properly understood, requires is not "immunity," Pet.App.21a, but "precision of regulation." *Claiborne*, 458 U.S. at 916. Even when pursuing valid and important objectives, *Claiborne* affirmed, the government may not "broadly stifle fundamental personal liberties when the[ir] end can be more narrowly achieved." *Id.* at 920 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). That

26

principle allows a State to fine a protest leader who directs others to impede highway traffic for doing that and also to impose damages liability on a politically motivated rock-hurler—but not to make the trespasser liable in damages for the rock-throwing. *See, e.g., NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 308 (1964) (invalidating order banishing civil rights group from State, because illegal conduct at issue "suggest[ed] no legitimate governmental objective which [would] require[] such restraint").

This principle shows the error of assuming, as the Fifth Circuit did, that the First Amendment allows holding Mckesson liable for the rock-thrower's actions *because* the ban on impeding traffic is a "time, place, and manner" restriction. Pet.App.22a. Such measures are permissible only to the extent they are content-neutral and do not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). (Indeed, such laws are subject to judicial scrutiny *because* they burden protected activity.)

Thus, accepting that *Section 14:97* is valid and enforceable does not establish the constitutionality of the civil liability regime the Fifth Circuit approved, which makes demonstrating on a public road the gateway for open-ended damages liability for others' violent acts. The latter regime has a high "potential for becoming a means of suppressing a particular point of view," *see* p.32, *infra*, and is thus "inherently inconsistent with a valid time, place, and manner regulation," *Forsyth v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citation omitted). But at the

27

least, justifying so exotic and speech-burdening a regime would require demonstrating why familiar, *Claiborne*-compliant means for addressing violence are inadequate. *See Bartnicki,* 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."); *see also The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (invalidating, on narrow-tailoring grounds, sweeping civil remedy against publisher of confidential information).

Nor is there anything "[il]logic[al]," Pet.App.21a, about a First Amendment rule that permits "criminal liability" for impeding traffic, but not sweeping "civil liability" for rock-throwing a protest leader did not support, committed by persons over whom he had no control. There is a fundamental difference between direct and derivative liability.  And there are many reasons why "'[t]he fear of [civil] damage awards *** may be markedly more inhibiting than the fear of prosecution under a criminal statute,'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964)—including that criminal standards and penalties are fixed in advance and calibrated to the seriousness of the violation.

This case illustrates the point: It has now reached its fourth year—and the Fifth Circuit's main ground for reinstating respondent's suit is a "plausible" allegation that Mckesson committed a misdemeanor—notwithstanding that the criminal charge was dropped in 2016, the record of arrest expunged, and petitioner (and the other arrested demonstrators) paid compensation. *See* n.7, *supra.*

28

## II. The critical importance of the rights *Claiborne* secures makes this Court's intervention necessary.

This Court's intervention is needed here for the same reasons it was in *Claiborne*: because the rights at issue are both integral to "self-government," 458 U.S. at 913, and highly "fragile," *id.* at 931. Street protests have enabled Americans to secure basic citizenship rights and persuade government officials to change unwise, unjust, and unconstitutional policies throughout our nation's history. Such protests heighten tension and discomfort. The presence of third-party violence is no indicator of a leader's culpability or of the unworthiness of the views pressed. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("[U]nder our system of government," Free Speech may "serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.")

Of the multiple First Amendment errors reflected in the decision below, the most important may be in the assertion that "no First Amendment protected activity [would be] suppressed" by permitting tort liability in these circumstances. Pet.App.22a. The fundamental principle driving *Claiborne*—and the landmark precedents on which it relies—is that loose and attenuated liability rules chill the exercise of First Amendment rights. Rather than safeguarding "breathing space" for the exercise of constitutional rights, *Sullivan*, 376 U.S. at 272, the legal regime the Fifth Circuit substituted for *Claiborne* is a veritable knee on the chest, and "a terrifying deterrent to legitimate, peaceful First Amendment activity." *Cloer*,

29

528 U.S. at 1099 (Scalia, J., dissenting from denial of cert.).

First, the Fifth Circuit's constitutional rule unambiguously permits States to subject protest leaders to unlimited liability for any unlawful act of others occurring at demonstrations involving nonviolent civil disobedience. On that understanding, many of the Nation's most celebrated and consequential exercises of First Amendment rights would have surrendered all protection against ruinous personal liability. *See, e.g., Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966); *Cox v. Louisiana*, 379 U.S. 536 (1965); *Taylor v. Louisiana*, 370 U.S. 154, 155 (1962). In practice, the Fifth Circuit's "criminal violation" exception allows strict liability for almost every demonstration. The dense thicket of ordinances enacted to maximize police officers' power to make public-order arrests means "almost anyone can be [accused of] *something*" in that setting, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1730 (2019) (Gorsuch, J., concurring in part and dissenting in part).

The Fifth Circuit rule not only dramatically lowers the culpability requirement *Claiborne* established, it fatally undermines the clarity, certainty, and objectivity that are the cardinal virtues of this Court's rule. Under *Claiborne,* the touchstone for permissible derivative liability is specific intent: A leader who does not personally direct, authorize, or incite violence will not be liable if it occurs. In the Fifth Circuit, liability depends on a grab-bag of subjective post-hoc policy judgments by individual judges and jurors.

30

And, as decided cases attest, the *Claiborne* rule, like the First Amendment itself, is viewpoint-neutral. It offers protection to protesters across the political spectrum. *See Juhl v. Airington*, 936 S.W.2d 640, 642-43 (Tex. 1996) (citing *Claiborne* in dismissing negligence claims against anti-abortion protesters); *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018) (citing *Claiborne* in affirming dismissal of negligence suit seeking damages from political candidate for violent acts committed at campaign rally). Indeed, it is of particular value to dissenting protesters—be they same-sex marriage opponents in Berkeley or gun control proponents in Boise—who take to the streets to persuade their fellow citizens to reconsider locally orthodox opinions.

There is no better illustration of the need for *Claiborne* protections than the "negligent protesting" tort the decision below sustained. The theory, premised on "duties" that "leaders" owe police and bystanders on a public street, applies particularly to activity that lies "at the heart of the First Amendment," *Schenck v. Pro-Choice Network*, 519 U.S. 357, 377 (1997). Moreover, the reasons why "'[t]he fear of [civil] damage awards *** may be markedly more inhibiting than the fear of [criminal] prosecution under a criminal statute,'" *Sullivan*, 376 U.S. at 277, apply with maximal force.

Citizens who feel passionately enough about an injustice to risk arrest or misdemeanor fines for protest activity will balk at damages liability orders of magnitude larger—based on third party conduct they cannot control and post-hoc determinations by judges and juries as to whether liability in any particular

31

case is reasonable as a matter of policy. Such a radically open-ended regime is the "equivalent of \*\*\* a statute which in terms merely penalize[s] and punish[es] all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury." *Herndon*, 301 U.S. at 263 (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)).

Moreover, any rule that holds protest leaders personally liable for foreseeable but unintended third-party misconduct will have *unequal* speech-suppressive effects, disadvantaging would-be protesters with the fewest means and those who would address subjects that arouse virulent opposition—or impassioned support or both (or are particularly unpopular with police). Under the Fifth Circuit regime, like the one held unconstitutional in *Forsyth County*, leaders "wishing to express views" that stir strong feelings among "bottle throwers \*\*\* [must expect] to pay more." 505 U.S. at 134.

Indeed, nothing in the majority opinion's exposition of the negligence tort confines a leader's state-law duty to accounting for unwelcome, but foreseeable violence *on his "side."* As Judge Willett highlighted, some of the violent acts that occurred at Dr. King's 1968 Memphis march—unlike what occurred in Birmingham—were committed by persons parading with him. Pet.App.53a-54a. But if liability is authorized for all violent acts that are a foreseeable "consequence" of protest tactics precipitating tension with law enforcement, Dr. King would have been answerable in damages not only for unlawful conduct of his allies, but for Bull Connor's depredations. And

32

if *Forsyth County does* preempt imposition of tort liability on a heckler's-veto basis, the resulting regime, making a leader personally liable for foreseeable violent acts of "sympathizers," would be viewpoint-based guilt by association, flouting the principle that a shared belief in an ultimate lawful goal is an impermissible basis for imposing responsibility for someone's else's wrongdoing. *See, e.g., Noto v. United States*, 367 U.S. 290, 299-300 (1961).

Furthermore, vague rules, this Court has often recognized, not only have powerful chilling effects; they also invite "discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). It would be surprising if a jury determined the various negligence elements the same way in a case where an injury arose at a demonstration expressing a locally popular viewpoint and one where the defendant is perceived as an "outside activist" and the injured party, a local police officer. As *Snyder v. Phelps* explained, when liability turns on "[a] highly malleable standard," there is "a real danger of [the jury's] becoming an instrument for the suppression of [First Amendment activity]." 562 U.S. 443, 458 (2011).

Even when imposition of an adverse jury verdict is, objectively, a low risk, litigation itself will be a burdensome ordeal for a protest leader named as a civil defendant, who has no entitlement to court-provided counsel. Worse yet, these burdens may be—and often are—imposed intentionally, for the *purpose* of suppressing disfavored points of view. However imperfectly upheld, prosecutors are under a constitutional obligation not to initiate cases based on

33

political disagreement. *See Wayte v. United States,* 470 U.S. 598, 608 (1985). Private parties, in contrast, may bring suit, select defendants, and make litigation decisions with the aim of inflicting hardship on speakers and movements whose political views they disapprove. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 744 (1983).[8]

## III. The First Amendment protections the Fifth Circuit disabled should be reinstated now, not later.

The clarity and seriousness of the errors below, and the fragile, but fundamental nature of the rights at stake, support deciding the question presented now, either through summary reversal or plenary review.

This is not a situation where further "percolation" would be beneficial or justifiable. The First Amendment issue "percolated" for many years, with baleful consequences, before this Court decided it in 1982, announcing a clear rule that squarely controls respondent's lawsuit. And until the *Claiborne* rule is reinstated there, the 33 million residents of Fifth Circuit States must exercise their First Amendment rights under the threat of lawsuits and damages awards this Court has held unconstitutional. Even in circuits where the *Claiborne* rule has not been

---

[8] Justice Gonzalez's concurrence in *Juhl v. Airington* identified a reason why suits by police officers injured on duty are especially troubling: Protesters whose convictions were held unconstitutional "could … then be sued by the arresting officers for negligence"—a "back-door attack [on First Amendment rights] by state actors." 936 S.W.2d at 648.

34

discarded, the Fifth Circuit's decision works harm, by providing protest opponents with a roadmap for burdensome suits that likewise "dodge" this Court's settled precedent and is thus a deterrent to protest. These disruptive effects should be stanched, not encouraged.

The most potent effects will occur in "cases" that never make their way into court, let alone to this Court. Persons who, as a result of the Fifth Circuit's rule, "refrain from exercising their right[]" to demonstrate, *Gooding v. Wilson*, 405 U.S. 518, 521 (1972), will not be sued for negligent protesting. And while vague or overbroad statutory provisions can be challenged and enjoined before speech is chilled, there is no plausible mechanism, other than a decision of this Court, for would-be speakers to obtain judicial assurance they will be constitutionally protected against liability for unintended, but foreseeable third-party wrongdoing.

Nor, contrary to the suggestions in various opinions below, are this case's early procedural posture, *see* Pet.App.14a—or the prospect that petitioner may defeat liability on the facts or on state law grounds—reason for withholding review. The First Amendment issue has been conclusively decided, and there is nothing tentative or fact-specific about the Fifth Circuit's resolution of it. Even assuming petitioner eventually will prevail on *some* ground, the First Amendment question here is whether the case should proceed "at all." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 485 (1975). It is no small matter to require petitioner to engage in lengthy litigation under a rule of law this Court foreclosed decades ago.

35

And the terms of the Fifth Circuit's remand suggest a potentially lengthy slog: The majority opinion opened the door to respondent's adding new parties and claims and directed the district court to consider respondent's efforts to subject petitioner to discovery in light of the ruling. *See* Pet.App.27a & n.11. "Vindication of freedom of expression [should not] await the outcome of protracted litigation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Indeed, the plethora of apparent errors regarding state law identified by Judges Willett, Ho, and Higginson support the need for review here.[9] A victory for petitioner on state-law grounds would be *a defeat* for the First Amendment rights of protesters in the Fifth Circuit, for whom the divided decision would remain the binding, final word, leaving protesters "operating in the shadow of *** a rule of law *** the constitutionality of which is"—at the least—"in serious doubt." *Cox*, 420 U.S. at 486.

For similar reasons, the scenario that Judge Willett preferred—where the state supreme court would have first decided the duty question, thereby

---

[9] As those opinions highlighted, Louisiana tort law does not impose a "duty to protect others from the criminal activities of third persons." *Harris v. Pizza Hut of La., Inc.,* 455 So.2d 1364, 1371 (1984), unless the parties have a preexisting "special relationship." Pet.App.32a (Willett, J.). Nor does state law allow police officers to recover for injuries suffered in performing their job responsibilities. *See, e.g., Bell v. Whitten*, 722 So.2d 1057 (La. Ct. App. 1998); *Gann v. Matthews*, 873 So.2d 701 (La. Ct. App. 2004); Pet.App.80a-82a (Ho, J., concurring). *See also id.*87a (Higginson, J., dissenting from denial) (explaining that risk to arresting officers is outside any tort duty that Section 14:97 could impose).

36

(potentially) obviating a First Amendment decision—no longer has anything to offer. This Court has long emphasized that the general policies favoring leaving constitutional questions unresolved do not apply in the First Amendment setting. It is "intolerable" not ideal, to "leave unanswered," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 246-47 (1974), important questions concerning the "limits the First Amendment places on state" law. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 56 (1989). But at this point, a resounding victory on the duty issue under Louisiana law would not "moot" the First Amendment issue, Pet.App.31a-32a, but rather cement in place the Fifth Circuit's rule (which would still govern Mississippi and Texas cases)—and put it beyond this Court's reach and power to correct.[10]

## CONCLUSION

The petition for a writ of certiorari should be granted and the Fifth Circuit's decision summarily reversed, or, in the alternative, the Court should set the case for plenary review.

---

[10] Even for Louisiana, a favorable ruling would unlikely be the panacea Judge Willett envisioned: It would remain possible that the court would rule for Mckesson in a fact-specific way or a categorical way that left important questions unanswered: If, for example, the state court agreed with Judge Ho as to police-officer plaintiffs, the regime the Fifth Circuit announced would continue to govern protest-leader liability where an assailant's rock-throwing injures an opponent or bystander.

37

Respectfully submitted,

| | |
|---|---|
| David D. Cole | David T. Goldberg |
| AMERICAN CIVIL LIBERTIES | *Counsel of Record* |
| UNION FOUNDATION | DONAHUE, GOLDBERG, |
| 915 15th Street, NW | WEAVER & LITTLETON |
| Washington, DC 20005 | 109 S. 5th Street, Suite 4201 |
| | Brooklyn, NY 11249 |
| Ben Wizner | (212) 334-8813 |
| Vera Eidelman | david@donahuegoldberg.com |
| Brian Hauss | |
| Emerson Sykes | Katie Schwartzmann |
| AMERICAN CIVIL LIBERTIES | Bruce Hamilton |
| UNION FOUNDATION | AMERICAN CIVIL LIBERTIES |
| 125 Broad Street, 18th Floor | UNION FOUNDATION |
| New York, NY 10004 | OF LOUISIANA |
| | P.O. Box 56157 |
| William P. Gibbens | New Orleans, LA 70156 |
| Ian Atkinson | |
| SCHONEKAS, EVANS, MCGOEY | |
| & MCEACHIN, LLC | |
| 909 Poydras Street, Suite 1600 | |
| New Orleans, LA 70112 | |

MARCH 2020

38

**APPENDIX**

1a

In the

United States Court of Appeals for the Fifth Circuit.

No. 17-30864

OFFICER JOHN DOE, Police Officer,
Plaintiff-Appellant

v.

DERAY MCKESSON; BLACK LIVES MATTER;
BLACK LIVES MATTER NETWORK,
INCORPORATED, Defendants-Appellees

Appeal from the United States District Court for the
Middle District of Louisiana

December 16, 2019

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

We WITHDRAW the court's prior opinion of
August 8, 2019, and substitute the following opinion.

During a public protest against police
misconduct in Baton Rouge, Louisiana, an
unidentified individual hit Officer John Doe with a
heavy object, causing him serious physical injuries.
Following this incident, Officer Doe brought suit
against "Black Lives Matter," the group associated
with the protest, and DeRay Mckesson, one of the
leaders of Black Lives Matter and the organizer of the
protest. Officer Doe later sought to amend his
complaint to add Black Lives Matter Network, Inc.
and #BlackLivesMatter as defendants. The district
court dismissed Officer Doe's claims on the pleadings

2a

under Federal Rule of Civil Procedure 12(b)(6), and denied his motion to amend his complaint as futile. Because we conclude that the district court erred in dismissing the case against Mckesson on the basis of the pleadings, we REMAND for further proceedings relative to Mckesson. We further hold that the district court properly dismissed the claims against Black Lives Matter. We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings consistent with this opinion.

## I.

On July 9, 2016, a protest illegally blocked a public highway in front of the Baton Rouge Police Department headquarters.[1] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby convenience store. The dismissed complaint further

---

[1] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

3a

alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers began making arrests of those blocking the highway and participating in the violence.

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson; and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

 Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants.

## II.

The district court granted both of Mckesson's

4a

motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against #BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc., the district court held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social movement and a "hashtag" as defendants, the district court dismissed his case with prejudice. Officer Doe timely appealed.

III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)). To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets omitted)). Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) (internal quotation

5a

marks, brackets, and ellipses omitted) (quoting *Iqbal*, 556 U.S. at 680).[2]

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical in practice to the Rule 12(b)(6) standard. *Id*. When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed. R. Civ. P. 15(a)(2).

---

[2] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992). Where the issue appears on the face of the complaint, other courts have done the same and treated it as a Rule 12(b)(6) motion. *See, e.g.*, *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F. Supp. 2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity ... creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity ... appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)). Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

6a

IV.

We start with whether we have jurisdiction to hear this case, raising sua sponte its potential absence. Neither the district court nor any party addressed this issue in prior proceedings or on appeal. Officer Doe sued Mckesson and Black Lives Matter.[3] The complaint alleges that Black Lives Matter is a national unincorporated association, *Doe v. Mckesson*, 272 F. Supp. 3d 841, 849 (M.D. La. 2017), which, for diversity purposes, is a citizen of every state where a member is a citizen, *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1258 (5th Cir. 1988). Officer Doe, as the party invoking federal jurisdiction, bore the burden of establishing jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). But the complaint fails to allege with sufficiency the membership of Black Lives Matter.[4] Such failure to establish diversity jurisdiction normally warrants remand—if there was some reason to believe that jurisdiction exists, i.e., some reason to believe both that Black Lives Matter's citizenship could be demonstrated with a supplemented record

---

[3] We are addressing here Officer Doe's claims against Black Lives Matter Network, Inc., the potential unincorporated association, not against #BlackLivesMatter, the hashtag.

[4] In his Proposed Amended Complaint, Officer Doe did allege that Black Lives Matter is a "chapter-based national unincorporated association that is organized under the laws of the State of California, though it allegedly is also a partnership that is a citizen of California and Delaware." *Doe*, 272 F. Supp. 3d at 851 (internal quotations omitted). But since an association, or a partnership for that matter, is considered a citizen of every state in which its constituent members/partners are citizens, Officer Doe still failed to allege Black Lives Matter's citizenship by omitting the citizenship of its constituent members.

7a

*and* that it is diverse from the plaintiff—or dismissal of the case. *See MidCap Media Fin., LLC v. Pathway Data, Inc.*, 929 F.3d 310, 316 (5th Cir. 2019).

Yet we need not resort to either here. Even assuming arguendo that Black Lives Matter were nondiverse and thus that the parties were nondiverse at the time of filing this lawsuit, such "lack of [diversity] jurisdiction can be cured when the non-diverse party is dismissed in federal court." *16 Front Street, L.L.C. v. Miss. Silicon, L.L.C.*, 886 F.3d 549, 556 (5th Cir. 2018). This "method of curing a jurisdictional defect ha[s] long been an exception to the time-of-filing rule." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572 (2004); *see, e.g.*, *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 73 (1996) (holding that "diversity became complete" when a nondiverse party settled and was dismissed from the case and that therefore "[t]he jurisdictional defect was cured") (emphasis removed); *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 744 (5th Cir. 2019) (holding that the dismissal of nondiverse defendants for failure of service of process "created complete diversity; and, therefore, the district court had jurisdiction") (citations omitted).

Here, the district court took judicial notice that Black Lives Matter was a social movement and therefore a non-juridical entity lacking the capacity to be sued. *Doe*, 272 F. Supp. 3d at 850; *see infra* Part V.C. The court subsequently dismissed Black Lives Matter as a defendant. *Doe*, 272 F. Supp. 3d at 850. If complete diversity did not exist before, this dismissal created the complete diversity (since Officer Doe and Mckesson are citizens of different states) necessary for jurisdiction in this case. For that reason, we have

8a

jurisdiction to hear this case.[5]

V.

A.

We next address Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn—vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the

---

[5] All three judges on this panel agree with this conclusion.

9a

point of our beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for, or that the assailant's "physical movements [were] subject to the control or right to control" of, Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id.* In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of ... a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite a riot/protest." Disregarding Officer Doe's conclusory allegations, we find that Officer Doe has not alleged

10a

facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with the unknown assailant to attack Officer Doe or knew of the attack and specifically ratified it. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's conspiracy claim must and does fail.

3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was

11a

within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *see Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.' " (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific duties of care based on consideration of

> various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving.

*Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint alleges that Mckesson

12a

planned to block a public highway as part of the protest. And the complaint specifically alleges that Mckesson was in charge of the protests and was seen and heard giving orders throughout the day and night of the protests. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. Indeed, the complaint alleges that Mckesson himself was arrested during the demonstration. It was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was likely to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway.

By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration. This is not, as the dissenting opinion contends, a "duty to protect others from the criminal activities of third persons." *See Posecai*, 752 So. 2d at 766. Louisiana does not recognize such a duty. It does, however, recognize a duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence. *See Brown v. Tesack*, 566 So. 2d 955 (La. 1990). The former means a business owner has no duty to provide security guards in its parking lot if there is a very low risk of crime. *See Posecai*, 752 So. 2d at 770. The latter means a school can be liable when it negligently disposes of flammable material in an unsecured dumpster and

13a

local children use the liquid to burn another child. *See Brown*, 566 So. 2d at 957. That latter rule applies here too: Mckesson owed Doe a duty not to negligently precipitate the crime of a third party. And a jury could plausibly find that a violent confrontation with a police officer was a foreseeable effect of negligently directing a protest.[6]

Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

---

[6] The dissenting opinion attempts to distinguish *Brown* by pointing out that "we are dealing with the criminal acts of an adult, not a child." But the dissenting opinion does not explain why the child/adult distinction should matter. The potential for future violent actions by adults can be just as foreseeable as the potential for future violent actions by children.

14a

The amended complaint only bolsters these conclusions. It specifically alleges that Mckesson led protestors down a public highway in an attempt to block the interstate. The protestors followed. During this unlawful act, Mckesson knew he was in violation of law and livestreamed his arrest. Finally, the plaintiff's injury was suffered during this unlawful action. The amended complaint alleges that it was during this struggle of the protestors to reach the interstate that Officer Doe was struck by a piece of concrete or rock-like object. It is an uncontroversial proposition of tort law that intentionally breaking, and encouraging others to break, the law is relevant to the reasonableness of one's actions.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious

15a

act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *Doe*, 272 F. Supp. 3d at 847 (quoting *Claiborne Hardware*, 458 U.S. at 927). The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

The district court appears to have assumed that in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Even if we assume that Officer Doe seeks to hold Mckesson "liable for the unlawful conduct of others" within the meaning of *Claiborne Hardware*, the First Amendment would not require dismissal of Officer Doe's complaint. 458 U.S. at 927. In order to counter Mckesson's First Amendment defense at the pleading stage, Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the

16a

Baton Rouge police and the protesters, and that Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway.

We focus here on the fact that Mckesson "directed ... specific tortious activity" because we hold that Officer Doe has adequately alleged that his injuries were the result of Mckesson's *own* tortious conduct in directing an illegal and foreseeably violent protest. In Mckesson's petition for rehearing, he expresses concern that the panel opinion permits Officer Doe to hold him liable for the tortious conduct of *others* even though Officer Doe merely alleged that he was negligent, and not that he specifically intended that violence would result. We think that Mckesson's criticisms are misplaced. We perceive no constitutional issue with Mckesson being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of another that were foreseeable as a result of that negligent conduct. The permissibility of such liability is a standard aspect of state law. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). There is no indication in *Claiborne Hardware* or subsequent decisions that the Supreme Court intended to restructure state tort law by eliminating this principle of negligence liability.

A close reading of *Claiborne Hardware* makes this clear. In that case, the Mississippi Supreme Court had found defendants liable for malicious interference with plaintiff's business when they

17a

executed a sustained boycott against white-owned businesses for the purpose of securing "equal rights and opportunities for Negro citizens." *See Claiborne Hardware*, 458 U.S. at 899 (internal quotations omitted). That holding depended on the conclusion that "force, violence, or threats" were present. *See id.* at 895 (citing 393 So. 2d 1290, 1301 (Miss. 1980)). This was a departure from the holding of the state chancery court. As the United States Supreme Court clarified, "[t]he Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott." *Id.* at 915. This distinction is key: Before the United States Supreme Court, the only unlawful activities at issue involved "force, violence, or threats." If the "force, violence, [and] threats" had been removed from the boycott, the remaining conduct would not have been tortious at all.

This posture is central to understanding what *Claiborne Hardware* did, and more importantly, did not, hold. When *Claiborne Hardware* speaks of violence, it speaks of the only unlawful activity at issue in the case. Consider its observation that "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918. It could not award compensation for the consequences of nonviolent activity because the only potentially tortious conduct at issue was violent. Indeed, the court expressly declined to reach the question of how it would have ruled if the nonviolent aspects of the boycott had been found to be tortious violations of an appropriately tailored state law. *See id.* at 915 n.49.

18a

Yet the dissenting opinion reads *Claiborne Hardware* as creating a broad categorical rule: "*Claiborne Hardware* ... insulates nonviolent protestors from liability for others' conduct when engaging in political expression, even intentionally tortious conduct, not intended to incite immediate violence." How does it reach this conclusion? It relies on the *Claiborne Hardware* chancery court opinion that grounded liability in nonviolent protest. But the Mississippi Supreme Court and the United States Supreme Court grounded liability solely in the presence of "force, violence or threats." *Id.* at 895. The United States Supreme Court did not invent a "violence/nonviolence distinction" when it explained that "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918. It merely applied black-letter tort law: Because the only tortious conduct in *Claiborne Hardware* was violent, no nonviolent conduct could have proximately caused the plaintiff's injury. *See id.* ("Only those losses proximately caused by unlawful conduct may be recovered.").

For the same reason, the *Claiborne Hardware* opinion makes frequent reference to unlawful conduct when, under the dissenting opinion's view, it should have spoken of violence. *See, e.g., id.* at 920 ("For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims."); *id.* at 925 ("There is nothing unlawful in standing outside a store and recording names."); *id.* at 926 ("Unquestionably, these individuals may be held

19a

responsible for the injuries that they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained."); *id.* at 927 ("There are three separate theories that might justify holding Evers liable for the unlawful conduct of others."); *id.* at 933 ("At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose."). In every instance, if the Court were creating a violence/nonviolence distinction it would have replaced "unlawful" with "violent." It did not, because it created no such demarcation. Rather, it addressed the case before it, where the only tortious conduct was violent.[7]

This supposed violence/nonviolence distinction also does not square with the case law. Take *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). That case held that a public officer cannot "recover[] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement

---

[7] The dissenting opinion concedes that the First Amendment does not "protect[] individuals from all liability as long as their speech was nonviolent." Rather, the dissenting opinion contends, "*Claiborne Hardware* supports the proposition that an individual cannot be held liable for *violence* if his speech did not 'authorize[], direct[], or ratif[y]' *violence*." But the basis of potential liability in this case is Mckesson's *actions and conduct* in directing the illegal demonstration, not his speech and advocacy. Elsewhere, the dissenting opinion describes its thesis this way: "encouraging [] unlawful activity cannot expose Mckesson to liability for *violence* because he didn't instruct anyone to commit *violence*." But that still overreads *Claiborne Hardware*; if this were the rule, then a protest leader who directs protesters to occupy an empty business could not be held liable for a violent confrontation that foreseeably follows between a protester and a business owner or police officer.

20a

was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. But defamation is a nonviolent tort, and statements made about public officers are often shouted during political protests. If the dissenting opinion's interpretation is correct, then it would seem that even the narrow "actual malice" exception to immunity was eliminated by *Claiborne Hardware*, at least for statements made during a protest.

Neither do recent cases vindicate this understanding. The Seventh Circuit examined a boycott similar to the one in *Claiborne Hardware*, this time a boycott by a union of a hotel and those doing business with the hotel. *See 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708 (7th Cir. 2014). The court found that it was "undisputed that the Union delegations all attempted to communicate a message on a topic of public concern." *Id.* at 723. But the court nonetheless held that the boycotters could be found liable if they had crossed the line into illegal coercion, because "prohibiting some of the Union's conduct under the federal labor laws would pose no greater obstacle to free speech than that posed by ordinary trespass and harassment laws." *Id.* The court's benchmark for liability was illegality, not violence. The court concluded that if "the Union's conduct in this case is equivalent to secondary picketing, and inflicts the same type of economic harm, it too may be prohibited without doing any harm to First Amendment liberties." *Id.* The dissenting opinion cannot be squared with this outcome.

Finally, the violence/nonviolence distinction does

21a

not make sense. Imagine protesters speaking out on a heated political issue are marching in a downtown district. As they march through the city, a protester jaywalks. To avoid the jaywalker, a car swerves off the street, and the driver is seriously injured. If the dissenting opinion's interpretation of *Claiborne Hardware* is correct, the First Amendment provides an absolute defense to liability for the jaywalker in a suit by the driver. The dissenting opinion says that "preventing tortious interference is not a proper justification for restricting free speech (unlike preventing violence)" because *Claiborne Hardware* cemented a "violence/nonviolence distinction." The theory seems to be that because tortious interference is nonviolent, it cannot be tortious if done for a political reason. So too with every nonviolent tort? What about nonviolent *criminal* offenses done for a political reason? The dissenting opinion does not seem to believe that engaging in a protest provides a protestor immunity for violating La. Rev. Stat. Ann. § 14:97. What is the logic behind immunizing protestors from nonviolent civil liability while retaining their nonviolent criminal liability?[8]

We of course acknowledge that Mckesson's negligent conduct took place in the context of a political protest. It is certainly true that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Claiborne Hardware*, 458 U.S. at 916-17. But *Claiborne Hardware* does not

---

[8] The dissenting opinion does not engage with our reading of *Claiborne Hardware*, nor does it grapple with the staggering consequences of its approach.

22a

insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message. *See id.* at 916 ("[T]he use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." (internal quotation marks and citations omitted)). Furthermore, although we do not understand the petitioner to be arguing that the Baton Rouge police violated the demonstrators' First Amendment rights by attempting to remove them from the highway, we note that the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (reasonable time, place, and manner restrictions do not violate the First Amendment). As such, no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's condut to be addressed by state tort law.

Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment. [9] We emphasize that this

---

[9] We emphasize, however, that our opinion does not suggest that the First Amendment allows a person to be punished, or held civilly liable, simply because of his associations with others, unless it is established that the group that the person associated with "itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. But we also observe that, in any

23a

means only that, given the facts that Doe alleges, he *could* plausibly succeed on this claim. We make no statement (and we cannot know) whether he will.

## C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute" in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed. R. Evid. 201(b). "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir.

---

event, Officer Doe's allegations are sufficient to state a claim that Black Lives Matter "possessed unlawful goals" and that Mckesson "held a specific intent to further those illegal aims." *See id*. Officer Doe alleges that Black Lives Matter "*plann[ed]* to block a public highway," and, in his amended complaint, that Mckesson and Black Lives Matter traveled to Baton Rouge "for the *purpose* of ... rioting." (emphasis added).

24a

1998). In *Taylor*, we held that another court's state-actor determination was not an "adjudicative fact" within the meaning of Rule 201 because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review." *Id.* at 830-31. We further held that the state-actor determination was not beyond reasonable dispute where it "was, in fact, disputed by the parties" in the related case. *Id.* at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort." The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest. This difference is sufficient under our case law to preclude judicial notice.

 We should further say that we see the cases relied on by the district court as distinguishable. Each deals with judicial notice of an aspect of an entity, not its legal form. *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259-60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower

25a

court took judicial notice of the fact that the Communist Party of the United States ... was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national unincorporated association with chapter [sic] in many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined ... by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name." The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id.*

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership

26a

structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728-29 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and possession of an insurance policy); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 675 (E.D. La. 2010) (relying on organization's formal and determinate membership structure). Lacking at least some of these indicators, Louisiana courts have been unwilling to find an intent to create an unincorporated association. *See, e.g.*, *Ermert*, 559 So. 2d at 474-75 (finding that hunting group was not an unincorporated association because it did not own or lease the property that it was based on, required the permission of one of its alleged members to use the property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that Black Lives Matter is an unincorporated association. His only allegations are that Black Lives Matter: (1) was created by three women; (2) has several leaders, including Mckesson; (3) has chapters in many states; and (4) was involved in numerous protests in response to police practices. He does not allege that it possesses property, has a formal membership, requires dues, or possesses a governing agreement. As such, the complaint lacks any indication that Black Lives Matter possesses the traits that Louisiana courts have regarded as indicative of an intent to establish a juridical entity. We have no doubt that Black Lives Matter involves a number of people working in concert, but "an unincorporated association .... does not come into

27a

existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together." *Id*. at 474. Therefore, we find that the district court did not err in concluding that Officer Doe's complaint has failed plausibly to allege that Black Lives Matter is an entity capable of being sued.[10]

## VI.

In sum, we hold that Officer Doe has not adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[11] The district court therefore erred by concluding that it would be futile for Doe to amend his complaint. We also hold that the district

---

[10] We do not address whether Officer Doe could state a claim against an entity whose capacity to be sued was plausibly alleged, nor do we address whether Mckesson could be held liable for the actions of that entity under state law.

[11] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then decide whether, in the light of our remand, discovery would be appropriate.

court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued. Therefore, the judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.[12]

---

[12] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related to this lawsuit. In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit. The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face." As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186. We agree with the district court and affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property."

29a

AFFIRMED in part, REVERSED in part, and REMANDED.

---

*Craig v. Harney*, 331 U.S. 367, 374 (1947).

30a

DON R. WILLETT, Circuit Judge, concurring in part, dissenting in part:

I originally agreed with denying Mckesson's First Amendment defense.[1] But I have had a judicial change of heart. Further reflection has led me to see this case differently, as explained below. Admittedly, judges aren't naturals at backtracking or about-facing. But I do so forthrightly. Consistency is a cardinal judicial virtue, but not the only virtue. In my judgment, earnest rethinking should underscore, rather than undermine, faith in the judicial process. As Justice Frankfurter elegantly put it 70 years ago, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."[2]

\* \* \*

Officer John Doe was honoring his oath to serve and protect the people of Baton Rouge when an unidentified violent protestor hurled a rock-like object at his face. Officer Doe risked his life to keep his community safe that day—same as every other day he put on the uniform. He deserves justice.

Unquestionably, Officer Doe can sue the rock thrower. But I am unconvinced he can sue the protest leader. First, it is unclear whether DeRay Mckesson owed Officer Doe a duty under Louisiana law to protect him from the criminal acts of others. I would certify that threshold—and potentially

---

[1] *Doe v. Mckesson*, 922 F.3d 604 (5th Cir.), *superseded on panel rehearing*, 935 F.3d 253 (5th Cir. 2019) (*Mckesson II*).

[2] *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

31a

dispositive—issue to the Supreme Court of Louisiana. Second, the Constitution that Officer Doe swore to protect itself protects Mckesson's rights to speak, assemble, associate, and petition. First Amendment freedoms, of course, are not absolute—and there's the rub: Did Mckesson stray from lawfully exercising his own rights to unlawfully exorcising Doe's. I don't believe he did.[3]

## I.

Respectfully, the majority opinion is too quick to conclude that Mckesson's organization and leadership of the Black Lives Matter protest amounted to negligence. Under Louisiana law, a person generally has "no duty to protect others from the criminal activities of third persons."[4] And to determine whether to impose such a duty, "the court must make a policy decision in light of the unique facts and circumstances presented."[5] This case raises consequential questions of Federal constitutional law—but only *potential* questions. If Louisiana law does not impose a duty on protest organizers to protect officers from the criminal violence of individual protestors, then the First Amendment

---

[3] Although I now dissent on the First Amendment issue, I still agree with the majority opinion that: (1) we have jurisdiction over this appeal; (2) Mckesson cannot be held vicariously liable for the assailant's actions; (3) Officer Doe failed to state a civil conspiracy claim; (4) Officer Doe failed to adequately allege that Black Lives Matter is an unincorporated association capable of being sued under Louisiana law; and (5) Officer Doe is not entitled to proceed anonymously.

[4] *Posecai v. Wal-Mart Stores, Inc.,* 752 So. 2d 762, 766 (La. 1999).

[5] *Id.*

32a

issues, however important, are moot.

The majority opinion concludes that Mckesson, as protest organizer, can be held liable for Officer Doe's injuries because the Constitution "does not insulate [Mckesson] from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message."[6] Putting aside whether the Constitution, in fact, supports precisely that,[7] the starting-point question is whether Mckesson's conduct was negligent at all. And step one of that inquiry is determining whether a duty exists—a pure question of law.[8]

The majority concludes that the foreseeable risk of violence alone imposed a duty on Mckesson to exercise reasonable care to avoid that violence. But I am unaware of any Louisiana case imposing a duty to protect against the criminal acts of a third party absent a special relationship that entails an independent duty.[9] The majority, as it must, accepts

---

[6] Maj. Op. at 21a–22a.

[7] *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). *Claiborne Hardware*, in part, addresses what protest conduct can give rise to tort liability consistent with the First Amendment, something that requires "precision of regulation" even when holding someone liable for his own actions in connection with protected speech. *Id.* at 916.

[8] *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003).

[9] *See Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 101 (5th Cir. 1990) ("Ordinarily, Louisiana law imposes no duty to protect against the criminal acts of third persons. However, a duty to protect against foreseeable criminal misconduct may arise from a special relationship." (internal citations omitted));

33a

*Wellons v. Grayson*, 583 So. 2d 1166, 1168-69 (La. App. 1 Cir. 1991) (explaining that, for a party to have an obligation to protect against the criminal acts of others, "some special relationship must exist in order for that duty to arise"). For instance, in *Posecai*, the Supreme Court of Louisiana examined whether a business owed a duty to its customers to protect against criminal acts that were reasonably foreseeable to occur in the business's parking lot. 752 So. 2d at 766. Importantly, the business unquestionably owed some duty to the customer because the customer was an invitee on the property; the question was how far that duty extended. And because, on balance, the risk of criminal activity was reasonably foreseeable and the burden of imposing a duty to protect against that risk was minimal, the court chose to impose a duty on the business. *Id.* at 768.

Consider also *Brown v. Tesack*, relied upon by the majority. 566 So. 2d 955 (La. 1990). In *Brown*, there was no question that the school had a duty to properly dispose of hazardous materials. Id. at 957. The school "specifically recognized" that certain flammable liquids created an unreasonable risk to the children who played on the school's property. *Id.* As in *Posecai*, the question before the Supreme Court of Louisiana was whether this pre-existing duty extended to protecting against the acts of third parties (*i.e.*, one child abusing the flammable liquids and burning another child). *Id.* The court concluded that because the harm that occurred was not only a foreseeable consequence of a breach of the school's already existing duty, but was a "*foreseen*" harm, protecting against the risk of children taking and misusing the hazardous liquids was within the scope of the school's underlying duty to properly dispose of the liquids. *Id.* at 957-58. Further, the underlying duty in *Brown* was tied to the heightened standard of care involving children, which is not an issue in our case. *See id.* at 957 ("A duty was owed both to these children and to their potential victims …. We agree … that 'children who possess a flammable substance can be expected to light it, to attract other children to join in the play and to commit criminal acts or engage in other misadventures.'" (quoting *Brown*, 556 So.2d at 89 (Plotkin, J., dissenting) ("[T]here is no difference between the recognizable risk of a minor's misuse of

34a

that Louisiana does not recognize such a duty. Instead, it argues, Louisiana law imposes a "duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence."[10] Respectfully, this is a semantic distinction without an analytic difference. And it is a distinction unsupported by Louisiana law.[11] Doe asserts that

---

an inherently dangerous object and the likelihood that the minor will cause personal or property damages to others[.]")).

   Here, the harm to Officer Doe was not within the scope of the highway-obstruction statute that the majority alleges Doe violated, and Mckesson owed no pre-existing duty to Doe because of a special relationship between them. Finally, the majority opinion, while *quoting* the multi-factor balancing analysis required by the Louisiana Supreme Court in *Posecai*, never gets around to actually *applying* it. Rather, the majority simply assumes that because the harm was foreseeable, a duty necessarily exists. Louisiana law requires more.

   [10] Maj. Op. at 12a.

   [11] The majority opinion attempts to distinguish between a duty to *protect* against a crime and a duty not to *precipitate* one. But I have certainly not found any case that describes such a difference or recognizes the majority's proposed duty. *See, e.g.*, *Harris v. Pizza Hut of La., Inc.*, 45 So.2d 1364, 1369-70 (La. 1984) ("Louisiana has for some time employed the duty-risk analysis to determine legal responsibility in tort claims. The pertinent inquiries are: ... II. Whether there was a duty on the part of the defendant which was imposed to *protect* against the risk involved .... (emphasis added)). And, despite the majority's contention otherwise, both *Posecai* and *Brown* concern a duty to protect against the criminal acts of others, which exists only where there is a pre-existing special relationship that itself imposes a duty. *See Poseca*i, 752 So. 2d at 766; *Brown*, 566 So.2d at 957 ("[A]ll rules of conduct ... exist for purposes. They are designed to protect *some* persons under *some* circumstances against *some* risks ... (quoting Wex Malone, *Ruminations on Cause-In-Fact*, 9 Stan. L. Rev. 60, 73 (1956)) (emphasis and ellipses in original)). The majority opinion never grapples with

Mckesson "did nothing to calm the crowd," but under *Claiborne Hardware*, a duty to repudiate "cannot arise unless, absent repudiation, an individual could be found liable for those acts."[12] Duty is the first inquiry. And possibly the last.

Recently, in another Louisiana tort case, we stressed, "If guidance from state cases is lacking, 'it is not for us to adopt innovative theories of recovery under state law.'"[13] Wise words. I would be chary of making policy decisions that create or expand Louisiana tort duties. Given the fateful First Amendment issues, and the dearth of on-point guidance from Louisiana courts, I would certify this *res nova* negligence question to the Supreme Court of Louisiana: Does a protest's foreseeable risk of violence impose a duty upon the protest organizer, such that he can be held personally liable for injuries inflicted by an unknown assailant? Because if there's no duty, there's no negligence. And if there's no negligence, there's no case. And if there's no case, there's no need to fret about the First Amendment.

This is not a federal constitutional case unless it is first a state tort case. As such, certification is counseled, if not compelled, by the twin doctrines of constitutional avoidance and abstention. We recently

Louisiana's unequivocal expression that for a person to be held liable for the consequences of others' actions, there must be a pre-existing duty between the acting and the liable parties. This necessity does not go away simply because the majority has rephrased the duty at issue.

[12]  458 U.S. at 925 n.69.

[13]  *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) (quoting *Mayo v. Hyatt Corp.*, 898 F.2d 47, 49 (5th Cir. 1990)).

36a

remarked that "the doctrine of constitutional avoidance is rooted in basic considerations of federalism," [14] adding that where a ruling on constitutionality "could be avoided by interpretation of Louisiana law, we must give due consideration to this non-constitutional ground for decision." [15] This caution is less prudish than prudent, and has a venerable, generations-long pedigree. The Supreme Court, almost 80 years ago, held that "where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions." [16]

After all, state judiciaries are equal partners in our shared duty "to say what the law is." [17] Bombshell federal cases dominate most headlines. But as this same panel recently emphasized, "American justice is dispensed—overwhelmingly—in state, not federal, judiciaries." [18] How much? "[A] whopping 96 percent of all cases." [19] As Justice Scalia self-deprecatingly

---

[14] *St. Joseph Abbey v. Castille*, 700 F.3d 154, 168 (5th Cir. 2012).

[15] *Id.* at 167.

[16] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 667 (2006) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941)).

[17] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

[18] *Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 470-71 (5th Cir. 2019) (citing Jennifer W. Elrod, *Don't Mess with Texas Judges: In Praise of the State Judiciary,* 37 HARV. J.L. & PUB. POL'Y 629 (2013)).

[19] *New NCSC Video Explains That State Courts Are Where the Action Is*, NAT. CTR. FOR STATE COURTS (Nov. 28, 2018), https://www.ncsc.org/Newsroom/at-the-Center/2018/Nov-28.asp

37a

observed, state law (and state courts) matter far more to citizens' everyday lives: "If you ask which court is of the greatest importance to an American citizen, it is not my court."[20]

State judiciaries are fundamental, not ornamental, and have been since the Founding, when Hamilton lauded them as "the immediate and visible guardian of life and property."[21] (Indeed, the federal judiciary didn't even *exist* for the first several years after independence.) Hamilton's reassurance has endured for 232 years. Earlier this year, we again extolled the front-and-center role of state judiciaries: "For most Americans, Lady Justice lives in the halls of state courts."[22]

In this case, Louisiana law poses a threshold, potentially decisive question. Only the Supreme Court of Louisiana can adjudicate it authoritatively. Certification—inviting the state high court's definitive word—serves the dual goals of abstention and avoidance by obviating (perhaps) the need to confront the First Amendment at all. Avoiding unnecessary federal constitutional rulings honors our bedrock commitment to federalism. On this point, we

---

x.

[20] *Thompson*, 913 F.3d at 471 (quoting *Justice Scalia Honors U.S. Constitution,* GEO. WASH. TODAY (Sept. 18, 2013), https://gwtoday.gwu.edu/justice-scalia-honors-us-constitution).

[21] THE FEDERALIST NO. 17 (Alexander Hamilton).

[22] *Thompson*, 913 F.3d at 470 (citing John Schwartz, *Critics Say Budget Cuts for Courts Risk Rights*, N.Y. TIMES, Nov. 27, 2011, at A18 (quoting a former justice of the Colorado Supreme Court)).

38a

have not minced words: "[T]he Supreme Court has long recognized that concerns for comity and federalism may require federal courts to either abstain from deciding federal constitutional issues that are entwined with the interpretation of state law or certify the questions of state law to the state's highest court for an authoritative interpretation of them before reaching the merits of the cases." [23] Indeed, as the Supreme Court has itself stressed, our carefully wrought system of federalism is best served by avoiding "the friction of a premature constitutional adjudication." [24] And certification of state-law questions may be particularly important in First Amendment cases.[25]

To my mind, there is no need for *Erie* guesses or crystal balls. Federal-to-state certification is a remarkable device: workable, efficient, and guaranteed to yield a doubt-free answer. Zero guesswork, *Erie* or otherwise. And this case, by any traditional measure, hits the certification bull's-eye: The state-law answer is uncertain, and the federal-law question is (maybe) unnecessary. The first adjudication of this unresolved issue, one that portends far-reaching impact given the ubiquity of "negligent protests," should be decisive and authoritative, one on which the people of Louisiana can rely.

True, certification is entirely discretionary, not

---

[23] *Carmouche*, 449 F.3d at 667.

[24] *Pullman*, 312 U.S. at 500.

[25] *See* Clay Calvert, *Certifying Questions in First Amendment Cases: Free Speech, Statutory Ambiguity, and Definitive Interpretations*, 60 B.C.L. REV. 1349, 1352 (2019).

obligatory. And the tipping point for certification-worthiness eludes mathematical precision; it's wholly subjective, with a patent, eye-of-the-beholder flavor.[26] But this case seems a Certification 101 exemplar that calls for cooperative judicial federalism. If consequential state-law ground is to be plowed, I believe the Supreme Court of Louisiana should do the plowing.

It is principally the role of state judges to define and delimit state causes of action. And state supreme courts have an irreplaceable duty: to be supreme and to speak supremely. We should let them do so, particularly when doing so may obviate a knotty federal question. I would leave this ruling on Louisiana negligence law to those elected to rule on Louisiana negligence law. I would seek conclusive word from the conclusive court as to what state law prescribes and proscribes. I would not guess, predict, or speculate. I would certify.

## II.

Even assuming that Mckesson could be sued under Louisiana law for "negligently" leading a protest at which someone became violent, the First Amendment "imposes restraints" on what (and whom) state tort law may punish.[27] Just as there is

---

[26] Disclosure: My dozen years as a state high court jurist likely make me more inclined to certify (as does my judgment that the majority reaches the wrong constitutional result). As this is a federal constitutional case only if it is first a viable state negligence case, a state supreme court justice would reasonably think it *her* job to decide an unsettled state-law issue of far-reaching significance.

[27] *Claiborne Hardware*, 458 U.S. at 916-17 ("Specifically, the presence of activity protected by the First Amendment

40a

no "hate speech" exception to the First Amendment,[28] "negligent" speech is also constitutionally protected.[29] And under *Claiborne Hardware* (and a wealth of precedent since), raucous public protest—even "impassioned" and "emotionally charged" appeals for the use of force—is protected unless clearly intended to, and likely to, spark immediate violence.[30]

---

imposes restraints on the grounds that may give rise to damages liability and on the person who may be held accountable for those damages."). As to what activity may be subject to liability, the Court held: "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered." *Id*. at 918. As to who can be held liable for that violent conduct, the Court held: "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id*. at 920.

[28] *Matal v. Tam*, 137 1744 (2017) (making clear that viewpoint discrimination—including against hateful speech that demeans—is unconstitutional).

[29] *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 278-80 (1964) (prohibiting public officials from recovering damages for negligently made "defamatory falsehoods" because permitting liability for such negligence would impose a "pall of fear and timidity ... upon those who would give voice to public criticism," creating "an atmosphere in which the First Amendment freedoms cannot survive").

[30] 458 U.S. at 927-28 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (protecting speech of Ku Klux Klan leader who threatened "revengeance" if "suppression" of the white race continued, and defining "incitement" to mean speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action")).

41a

In *Claiborne Hardware*, involving a years-long and sometimes violent boycott that tortiously interfered with white-owned businesses, the Court unanimously held that the "highly charged political rhetoric" of Charles Evers—who "unquestionably played the primary leadership role in the organization of the boycott"—was constitutionally protected even though Evers vilified and urged violence against boycott breakers, warning, "if we catch any of you going in any of them racist stores, we're gonna break your damn neck."[31] The Court made clear that the First Amendment does not protect words "that provoke immediate violence"[32] or "that create an immediate panic."[33] But "mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment."[34] Because Evers only *advocated* for violence, but did not provoke or incite imminent acts of violence, the Court said his fiery words "did not exceed the bounds of protected speech."[35] The Court noted there was "no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence."[36] In this case, there is not even a competent *allegation* of such behavior.

Officer Doe does not assert that Mckesson

---

[31] *Id.* at 926-28.

[32] *Id.* at 927.

[33] *Id.*

[34] *Id.* (emphasis in original).

[35] *Id.* at 929.

[36] *Id.*

42a

perpetrated violence himself. Rather, he asserts that Mckesson "incited the violence." But Doe's barebones complaint specifies no words or actions by Mckesson that may have done so. For Rule 12(b)(6) purposes, we accept well-pleaded facts as true and view them in the light most favorable to the plaintiff.[37] But "a legal conclusion couched as a factual allegation" need not be accepted as true.[38] Gauzy allegations that offer only "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" do not suffice.[39] Doe's allegations—"[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[37] *SGK Props., L.L.C. v. U.S. Bank Nat'l Ass'n*, 881 F.3d 933, 943 (5th Cir. 2018). Confusingly, the majority opinion relies on Officer Doe's proposed amended complaint even though the district court denied Doe's request to file an amended complaint. The controlling complaint for the purposes of our analysis should be Doe's original complaint. *See Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 112 n.2 (5th Cir. 2019) (accepting facts as alleged in Third Amended Complaint, even where district court improperly denied plaintiff's request to file its Proposed Fourth Amended Complaint, because the Third Amended Complaint was "the live pleading at the time of dismissal"); *Stem v. Gomez*, 813 F.3d 205, 209, 215-17 (5th Cir. 2016) (relying on facts as alleged in original complaint where district court denied leave to amend); *Leal v. McHugh*, 731 F.3d 405, 407 & n.1 (5th Cir. 2013) (same). But even if I accepted the facts alleged in Doe's Amended Complaint as true, the First Amendment would still prohibit imposing liability against Mckesson for the violent acts of others because, as the majority agrees, Mckesson did not authorize, direct, or ratify any violent conduct.

[38] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[39] *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The majority opinion rightly disregards Doe's "conclusory allegations" against Black Lives Matter. *See* Maj. Op. at 8.

43a

conclusory statements"—fail the 12(b)(6) plausibility standard.[40]

Doe strings together various unadorned contentions—that Mckesson was "present during the protest," "did nothing to calm the crowd," "directed" protestors to gather on the public street in front of police headquarters, and "knew or should have known ... that violence would result" from the protest that Mckesson "staged." Even taking these impermissibly conclusory allegations as true, the complaint lacks sufficient factual detail to state a claim for negligence, much less to overcome Mckesson's First Amendment defense. For example, Doe does *not* allege:

> • What orders Mckesson allegedly gave, how he led the protest, or what he said or did to incite violence.

> • How Mckesson "controlled" or "directed" the unidentified assailant who injured Officer Doe.

> • How statements that Mckesson made to the media after the protest amount to a ratification of violence.

Without these and other fleshed-out facts, the complaint utterly fails to link Mckesson's role as leader of the protest demonstration to the mystery attacker's violent act. In short, Doe's skimpy complaint is heavy on well-worn conclusions but light on well-pleaded facts.

---

[40] *Iqbal*, 556 U.S. at 678.

44a

Indeed, the lone "inciteful" speech quoted in Doe's complaint is something Mckesson said not to a fired-up protestor but to a mic'ed-up reporter—the day *following* the protest: "The police want protestors to be too afraid to protest." Tellingly, not a single word even obliquely references violence, much less advocates it. Temporally, words spoken *after* the protest cannot possibly have incited violence *during* the protest. And tacitly, the majority opinion seems to discard the suggestion that Mckesson uttered anything to incite violence against Officer Doe.

With "speech" off the table, the majority seems to endorse an alternative liability theory—that Mckesson "authorized, directed, or ratified specific tortious activity"[41] by leading others to block a public highway. The majority credits Doe's abstract, one-sentence contention that Mckesson "knew or should have known that violence would result."[42] Mind you, Doe's complaint contains no specific allegations that Mckesson advocated imminent violence, just this bald, conclusory assertion that he negligently allowed violence to occur.

This novel "negligent protest" theory of liability seems incompatible with the First Amendment and foreclosed—squarely—by controlling Supreme Court precedent. Even assuming, for argument's sake, that

---

[41] *Claiborne Hardware*, 458 U.S. at 927 ("[A] finding that [Evers] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity.").

[42] *See* Maj. Op. at 21a–22a ("But *Claiborne Hardware* does not insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message." (emphasis in original)).

45a

Mckesson directed others to stand in the highway[43] and that violating this criminal law constitutes a tort,[44] I disagree with the suggestion that directing *any* tort would strip a protest organizer of First Amendment protection. Even Evers of *Claiborne Hardware* would be liable under the majority's analysis. After all, the economic harm inflicted in *Claiborne Hardware* was "the result of [Evers's] *own* tortious conduct in organizing a foreseeably violent protest."[45] Evers engaged in the tort of "malicious interference with the plaintiff's business."[46] He even threatened during a meeting that "any 'uncle toms' who broke the boycott would 'have their necks broken'

---

[43] The majority opinion states that "Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway," adding that Doe "specifically alleges that Mckesson led protestors down a public highway in an attempt to block the interstate." But the lone assertion of purposeful highway-blocking in Doe's scanty complaint is this sentence: "DEFENDANTS conspired to violate the law by planning to block a public highway." Even if "planning" equates to directing, the majority properly holds that Doe failed to state a claim that Mckesson engaged in any conspiracy. *Id.* at 260.

[44] La. Rev. Stat. Ann. § 14:97.

[45] Maj. Op. at 16a (emphasis in original). Similarly, in *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, the Supreme Court held that a campaign with an anticompetitive purpose and effect was permissible under the First Amendment, even though the Sherman Act prohibits individuals from restraining trade or creating monopolies, because "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." 365 U.S. 127, 138 (1961).

[46] *Claiborne Hardware*, 458 U.S. at 891.

46a

by their own people."[47] And violence was not just foreseeable; "several" clashes had already occurred.[48] Despite all that, the Supreme Court ruled Evers to be constitutionally protected. Because Evers did not specifically direct *violence*, the Supreme Court was unwilling to find him liable for *violence*.[49] And because preventing tortious interference is not a proper justification for restricting free speech (unlike preventing violence), it refused to hold Evers liable for the economic harms resulting from the boycott he led.[50]

---

[47] *Id.* at 900 n.28.

[48] *Id.* at 903.

[49] *Id.* at 927.

[50] *Id.* at 914-15 ("[T]he petitioners certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign[;] ... however ... [t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself .... We hold that the nonviolent elements of petitioners' activities are entitled to the protection of the First Amendment."). The majority opinion overlooks these statements by the Supreme Court and instead points to proceedings that occurred in the state chancery and supreme courts to argue that the tortious conduct that Evers unequivocally led was not at issue before the *Claiborne Hardware* Court. But the Court never made such an assertion. To the contrary, the Supreme Court observed that it was not deciding "the extent to which a narrowly tailored statute designed to prohibit certain forms of anticompetitive conduct or certain types of secondary pressure may restrict protected First Amendment activity. No such statute is involved in this case. Nor are we presented with a boycott designed to secure aims that are themselves prohibited by a valid state law." *Id.* at 915 n.49. The Supreme Court did not here say that no one committed tortious conduct; the Court affirmed that a generic statute

47a

In other words, when the Supreme Court observed that Evers could be held liable if he "authorized, directed, or ratified specific tortious activity," it was clarifying that Evers could be held liable for *violence* he directly incited because violence is a tortious activity that unequivocally falls outside First Amendment protection. [51] This violence/nonviolence distinction[52] is cemented later

---

against tortious interference is not the type of narrowly tailored law that can restrict protected First Amendment speech. And because it is not such a narrowly tailored law, directing others to violate it could not impose liability on Evers generally, and it certainly could not impose liability on him for the *violence* of others. *Id.* at 914-15; *see also Brandenburg*, 395 U.S. at 448 ("A statute which fails to draw [a] distinction [between teaching about the need for violence and "steeling" a group to commit violence] impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control.").

[51] *Claiborne Hardware*, 458 U.S. at 927. This is not to say the First Amendment protects individuals from all liability as long as their speech was nonviolent. Instead, *Claiborne Hardware* supports the proposition that an individual cannot be held liable for *violence* if his speech did not "authorize[], direct[], or ratif[y]" *violence*. *Id.* ("[A] finding that [Evers] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of *that* activity." (emphasis added)).

[52] The majority opinion latches onto the phrase "violence/nonviolence distinction" and appears to oversimplify it. As reiterated throughout this dissent, *see, e.g.*, *supra* note 51, I do not contend that the First Amendment protects individuals from all tortious activity as long as it is nonviolent. Instead, I affirm the Supreme Court's holding that a person cannot be held liable for *violent conduct* that he did not intentionally incite or commit. And it is *violent conduct* that is at issue here. Certainly, a libeler can be held liable for the *reputational harms* caused by

48a

in *Claiborne Hardware* when the Court restates the same three-verb standard to explain why Evers could not be liable despite his intentionally tortious activity, including speech that advocated violence: "[A]ny such theory fails for the simple reason that there is no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence."[53] The takeaway seems clear: The First Amendment only allows civil liability for violent conduct that "occurs in the context of constitutionally protected activity" when that activity involves violence or threats of violence.[54]

The majority opinion avers (though, notably, the

---

his libelous speech, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348-50 (1974), because defamation statutes are proper, narrowly tailored restrictions on the First Amendment. But a libeler may not be held liable for the violent acts of others that the libeler did not intend to incite with his libelous speech. *See Brandenburg*, 395 U.S. at 447-48; *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987) (refusing to impose civil liability against Hustler for "inciting" accidental asphyxiation, observing that "[m]ere negligence ... cannot form the basis of liability under the incitement doctrine"); *see also Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 798 (2011) (holding that even if violent video games make people more aggressive, California could not prohibit their sale to children). And even if the libeler could be held so responsible, generic negligence statutes do not meet the first necessary condition of being narrowly tailored restrictions on free speech. *See infra*, note 56. Without a doubt, Evers defamed certain targets of his speech, yet the Court still refused to hold him liable for violence. *See, e.g., Claiborne Hardware*, 458 U.S. at 935-36 (describing specific local store owners as "racists" and "bigots" and implying they were murderers, rapists, and liars).

[53] *Id.* at 929.

[54] *Id.* at 916.

49a

complaint does not) that Mckesson directed protestors to block a public highway. [55] But encouraging that unlawful activity cannot expose Mckesson to liability for *violence* because he didn't instruct anyone to commit *violence*.[56] The Supreme Court requires "extreme care" when attaching liability to protest-related activity.[57] The majority's "tortious conduct + foreseeable violence = liability for violence" formula—with no parsing between *violent*

---

[55] *See supra* note 43.

[56] *Claiborne Hardware*, 458 U.S. at 916, 921, 927. The majority opinion summarily concludes that Louisiana's road-blocking statute is a proper time, place, manner restriction, Maj. Op. at 18. But absent briefing from the parties, I am uncomfortable reaching such a consequential constitutional conclusion. *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 553-58 (1965) (invalidating a Baton Rouge ordinance that criminalized blocking public streets and only allowed parades or meetings with prior permission of an official who had unfettered discretion).

Also, to the extent that a tort duty can arise from the violation of statutes against obstructing highways, "recovery will be allowed only if a rule of law on which plaintiff relied included within its limits protections against the particular risk that plaintiff's interests encountered." *Lazard*, 859 So. 2d at 661. And Louisiana's prohibitions on highway-blocking "have as their focus the protection of other motorists." *State v. Winnon*, 681 So. 2d 463, 466 (La. App. 2 Cir. 1996). More attenuated harm is likely outside the scope of a defendant's duty under La. Rev. Stat. Ann. § 14:97. *See, e.g.*, *Thomas v. Ballard*, 577 So. 2d 149, 151 (La. App. 1 Cir. 1991). I could find no Louisiana case extending the scope of the negligence duty created by La. Rev. Stat. Ann. § 14:97 beyond the traffic-accident context. And I thus doubt that an intentional assault on a police officer is the "particular risk" addressed by the statute. *Lazard*, 859 So. 2d at 661.

[57] *Claiborne Hardware*, 458 U.S. at 927.

50a

tortious conduct (actionable) and *nonviolent* tortious conduct (nonactionable)—is at odds with the "precision of regulation" required to overcome the First Amendment.[58] Indeed, if it were that easy to plead around *Claiborne Hardware* and hold protest leaders personally liable for the violence of an individual protestor, there would be cases galore holding as much. The majority opinion cites none.

The bar set by *Claiborne Hardware* is much higher than the majority opinion gives it credit for. For example, plaintiffs may only recover "losses proximately caused by unlawful conduct."[59] This requires naming "specific parties who agreed to use unlawful means" and "identifying the impact of such unlawful conduct."[60] Doe's complaint does not allege specific facts indicating an agreement or any kind of agency relationship between Mckesson and the unidentified protestor, or that Mckesson encouraged or incited violent acts. Officer Doe does not allege facts supporting that Mckesson had an affirmative duty to intervene, and under *Claiborne Hardware*, protest organizers cannot be held strictly liable for the violent actions of rogue individuals.[61]

To reconcile the majority opinion (negligently disregarding potential violence is *not* protected) with *Claiborne Hardware* (intentionally advocating violence *is* protected), we must accept that one who

---

[58] *Id.* at 916, 921

[59] *Id.* at 918.

[60] *Id.* at 933-34.

[61] *Id.* at 920 ("Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence.")..

51a

expressly and purposely calls for violence is somehow not behaving negligently to the risk that violence may result. But "[m]ere negligence ... cannot form the basis of liability under the incitement doctrine[.]"[62] To hold otherwise seems fanciful, as does allowing common-law tort principles to trump constitutional free-speech principles.[63] *Claiborne Hardware* held that Evers's leadership of an intentionally tortious and foreseeably violent boycott did not forfeit his First Amendment defense. Reading *Claiborne Hardware* as authorizing liability for violence on the basis of urging *any* unlawful activity—no matter how attenuated from the violence that ultimately occurred—paints with startlingly broad strokes.

Holding Mckesson responsible for the violent acts of others because he "negligently" led a protest that carried the *risk* of *potential* violence or urged the blocking of a road is impossible to square with Supreme Court precedent holding that only tortious activity meant to incite imminent violence, and likely to do so, forfeits constitutional protection against liability for violent acts committed by others.[64] With greatest respect, I disagree with the majority opinion's First Amendment analysis—both its substance and its necessity.

III

---

[62] *Hustler Magazine, Inc.*, 814 F.2d at 1024.

[63] *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, (1983) ("For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end .... ").

[64] *See, supra,* note 52.

52a

In Hong Kong, millions of defiant pro-democracy protesters have taken to the streets, with demonstrations growing increasingly violent. In America, political uprisings, from peaceful picketing to lawless riots, have marked our history from the beginning—indeed, from *before* the beginning. The Sons of Liberty were dumping tea into Boston Harbor almost two centuries before Dr. King's Selma-to-Montgomery march (which, of course, occupied public roadways, including the full width of the bloodied Edmund Pettus Bridge).

\* \* \*

Officer Doe put himself in harm's way to protect his community (including the violent protestor who injured him). And states have undeniable authority to punish protest leaders and participants who *themselves* commit violence. The rock-hurler's personal liability is obvious, but I do not believe that Mckesson's is—for at least two reasons.

First, this is a negligence case, and I would not take it as a given that Mckesson owed an identifiable legal duty under Louisiana law. If no duty was owed, then no First Amendment analysis is necessary. Before weighing United States Supreme Court precedent on a fateful Federal question, I would invite the Louisiana Supreme Court to issue precedent on a fundamental State question. The tort analysis may well obviate the constitutional analysis.

Second, even assuming that Mckesson owed a duty, Doe's skeletal complaint does not plausibly assert that Mckesson forfeited First Amendment protection by inciting violence. Not one of the three elements of "incitement"—intent, imminence,

likelihood—is competently pleaded here.[65] Nor does the complaint competently assert that Mckesson directed, intended, or authorized this attack. Our Constitution explicitly protects nonviolent political protest. And *Claiborne Hardware*, among "our most significant First Amendment" cases,[66] insulates nonviolent protestors from liability for others' conduct when engaging in political expression, even intentionally tortious conduct, not intended to incite immediate violence. The Constitution does not insulate violence, but it does insulate citizens from responsibility for *others'* violence.

"Negligent protest" liability against a protest leader for the violent act of a rogue assailant is a dodge of *Claiborne Hardware* and clashes head-on with constitutional fundamentals. Such an exotic theory would have enfeebled America's street-blocking civil rights movement, imposing ruinous financial liability against citizens for exercising core First Amendment freedoms.[67]

Dr. King's last protest march was in March 1968, in support of striking Memphis sanitation workers. It was prelude to his assassination a week later, the day

---

[65] *See Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech ... do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

[66] *Cloer v. Gynecology Clinic, Inc.*, 528 U.S. 1099 (2000) (Scalia, J., dissenting from denial of petition for a writ of certiorari).

[67] The march from Selma to Montgomery—54 miles, 54 years ago—was no sidewalk stroll.

54a

after his "I've Been to the Mountaintop" speech. Dr. King's hallmark was nonviolent protest, but as he led marchers down Beale Street, some young men began breaking storefront windows. The police moved in, and violence erupted, harming peaceful demonstrators and youthful looters alike. Had Dr. King been sued, either by injured police or injured protestors, I cannot fathom that the Constitution he praised as "magnificent"—"a promissory note to which every American was to fall heir"[68]—would countenance his personal liability.

Summing up: I would certify the threshold negligence question to the Supreme Court of Louisiana. Failing that, and given the flimsiness of Doe's complaint, I would hold that the First Amendment shields Mckesson from tort liability for the rock thrower's criminal act. In all other respects, I concur.

---

[68] Martin Luther King, Jr., I Have a Dream (Aug. 28, 1963), *in* I HAVE A DREAM: WRITINGS AND SPEECHES THAT CHANGED THE WORLD 101 (James M. Washington ed., 1992).

55a

United States District Court, M.D. Louisiana.

Officer John DOE

v.

DeRay MCKESSON et al.

Civil Action No.: 16–00742–BAJ–RLB

RULING AND ORDER

Signed September 28, 2017

BRIAN A. JACKSON, CHIEF JUDGE.

Before the Court are Defendant DeRay Mckesson's Motion to Dismiss (Doc. 15) ("Defendant's Rule 12 Motion"), Defendant DeRay Mckesson's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(a) (Doc. 43) ("Defendant's Rule 9 Motion"), and Plaintiff's Motion to File Amended Complaint for Damages (Doc. 52) ("Plaintiff's Motion to Amend"). Plaintiff filed a memorandum in opposition to Defendant's Rule 12 Motion, (see Doc. 21), Defendant DeRay Mckesson filed a reply memorandum in support of the Motion, (see Doc. 29), and Plaintiff filed a surreply in opposition to the Motion, (see Doc. 38). Plaintiff also filed a memorandum in opposition to Defendant's Rule 9 Motion. (See Doc. 44). The Court held oral argument on Defendant's Rule 12 and Rule 9 Motions.

"[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981). Because of its nature as a fundamental guarantee under the First

56a

Amendment to the United States Constitution, "[t]he right to associate does not lose all constitutional protection merely because some members of [a] group may have participated in conduct," such as violence, "that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982). Thus, when a tort is committed in the context of activity that is otherwise protected by the First Amendment, courts must use "precision" in determining who may be held liable for the tortious conduct so that the guarantees of the First Amendment are not undermined. *Id.* at 916 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

Plaintiff's alleged injuries in this case—which he claims to have suffered in the line of duty as a police officer while responding to a demonstration—are not to be minimized. Plaintiff has failed, however, to state a plausible claim for relief against an individual or entity that both has the capacity to be sued and falls within the precisely tailored category of persons that may be held liable for his injuries, which he allegedly suffered during activity that was otherwise constitutionally protected. For the reasons explained herein, Defendant DeRay Mckesson's Motion to Dismiss (Doc. 15) and Defendant DeRay Mckesson's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(a) (Doc. 43) are GRANTED, Plaintiff's Motion to File Amended Complaint for Damages (Doc. 52) is DENIED, and this matter is DISMISSED WITH PREJUDICE.

## I. BACKGROUND

In his Complaint, Plaintiff—a Baton Rouge Police Department officer—alleges that he responded to a demonstration that took place on July 9, 2016, at the

57a

intersection of Airline Highway and Goodwood Boulevard. (See Doc. 1 at ¶¶ 12, 15–16). Plaintiff avers that Defendant DeRay Mckesson ("Mckesson") "le[]d the protest," "acting on behalf of" Defendant "Black Lives Matter." (*Id.* at ¶ 3). Plaintiff asserts that "Black Lives Matter" is a "national unincorporated association," of which Mckesson is a "leader and co-founder." (*Id.*).

Although Plaintiff alleges that Mckesson and "Black Lives Matter" "were in Baton Rouge for the purpose of demonstrating, protesting[,] and rioting to incite others to violence against police and other law enforcement officers," (*id.* at ¶ 11), Plaintiff concedes that the demonstration "was peaceful" when it commenced, (*id.* at ¶ 17). Plaintiff avers that "the protest turned into a riot," (*id.* at ¶ 18), however, when "activist[s] began pumping up the crowd," (*id.* at ¶ 17). Thereafter, demonstrators allegedly "began to loot a Circle K," taking "water bottles" from the business and "hurl[ing]" them at the police officers who were positioned at the demonstration. (*Id.* at ¶ 18). Once the demonstrators had exhausted their supply of water bottles, Plaintiff asserts that an unidentified demonstrator "picked up a piece of concrete or [a] similar rock[-]like substance and hurled [it] into the police." (*Id.* at ¶ 20). Plaintiff allegedly was struck by this object, causing several serious injuries. (*Id.* at ¶ 21).

Plaintiff alleges that Mckesson "was in charge of the protests" and "was seen and heard giving orders throughout the day and night of the protests." (*Id.* at ¶ 17). Mckesson, according to Plaintiff, "was present during the protest and ... did nothing to calm the crowd"; instead, Mckesson allegedly "incited the

58a

violence on behalf of ... Black Lives Matter." (*Id.* at ¶ 19).

Plaintiff brought suit, naming Mckesson and "Black Lives Matter" as Defendants. In his Complaint, Plaintiff states claims in negligence and respondeat superior, asserting that Mckesson and "Black Lives Matter" "knew or should have known that the physical contact[,] riot[,] and demonstration that they staged would become violent ... and ... that violence would result." (*Id.* at ¶ 28). The unidentified demonstrator who threw the object that allegedly struck Plaintiff, he avers, was "a member of ... Black Lives Matter" and was "under the control and custody" of Mckesson and "Black Lives Matter." (*Id.* at ¶ 20). Therefore, according to Plaintiff, Mckesson and "Black Lives Matter" "are liable in solido for the injuries caused to" Plaintiff by the unidentified demonstrator. (*Id.* at ¶ 31).

Mckesson thereafter filed Defendant's Rule 12 Motion, asserting that Plaintiff failed to state a plausible claim for relief against him, as well as Defendant's Rule 9 Motion, asserting that "Black Lives Matter" is not an entity that has the capacity to be sued. Plaintiff responded by filing Plaintiff's Motion to Amend, seeking leave of court to amend his complaint to add "# BlackLivesMatter" and Black Lives Matter Network, Inc., as Defendants and to supplement his Complaint with additional factual allegations.

## II. DISCUSSION

The Court finds that Plaintiff's Complaint suffers from numerous deficiencies; namely, the Complaint fails to state a plausible claim for relief against

Mckesson and it names as a Defendant a social movement that lacks the capacity to be sued. In an attempt to ameliorate these deficiencies, Plaintiff has sought leave of court to amend his Complaint to name two additional Defendants—"# BlackLivesMatter" and Black Lives Matter Network, Inc.—and to plead additional factual allegations. Plaintiff's proposed amendment, however, would be futile: Plaintiff fails to remedy the deficiencies contained in his initial Complaint with respect to his claims against Mckesson and "Black Lives Matter," "# BlackLivesMatter"—a *hashtag*—lacks the capacity to be sued, and Plaintiff fails to state a plausible claim for relief against Black Lives Matter Network, Inc. Plaintiff's claims, therefore, must be dismissed, and Plaintiff must be denied the opportunity to amend his Complaint.

### A. Defendant's Rule 12 Motion

Setting aside his conclusory allegations, Plaintiff has pleaded facts that merely demonstrate that Mckesson exercised his constitutional right to association and that he solely engaged in protected speech at the demonstration that took place in Baton Rouge on July 9, 2016. Because Plaintiff has failed to plead sufficient, nonconclusory factual allegations that would tend to demonstrate that Mckesson exceeded the bounds of protected speech, Mckesson cannot be held liable for the conduct of others with whom he associated, and Plaintiff thus has failed to state a plausible claim for relief against Mckesson.

### 1. Legal Standard

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency

60a

of a complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Thus, a complaint need not set out "detailed factual allegations," but a complaint must contain something more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and therefore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

61a

2. Analysis

"The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916, ("Certainly violence has no sanctuary in the First Amendment, and the use of weapons ... may not constitutionally masquerade under the guise of 'advocacy.'" (quoting *Samuels v. Mackell*, 401 U.S. 66, 75 (1971) (Douglas, J., concurring))). "[T]he presence of activity protected by the First Amendment," however, "imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916--17. Thus, while a person may be held liable in tort "for the consequences of [his] violent conduct," a person cannot be held liable in tort "for the consequences of nonviolent, protected activity." *Id.* at 918. "Only those losses proximately caused by unlawful conduct may be recovered." *Id.*

"The First Amendment similarly restricts the ability" of a tort plaintiff to recover damages from "an individual solely because of his association with another." *Id.* at 918–19. "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920. "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* To impose tort liability on an individual for the torts of others with whom he associated, a plaintiff must prove that (1) the individual "authorized, directed, or ratified specific tortious activity"; (2) his public speech was "likely to incite lawless action" and the tort "followed within a

62a

reasonable period"; or (3) his public speech was of such a character that it could serve as "evidence that [he] gave other specific instructions to carry out violent acts or threats." *Id.* at 927.

In his Complaint, Plaintiff alleges that Mckesson "le[]d the protest and violence that accompanied the protest." (*Id.* at ¶ 3). As support for this contention, Plaintiff pleaded that Mckesson "was in charge of the protests[,] and he was seen and heard giving orders throughout the day and night of the protests." (*Id.* at ¶ 17). Further, Plaintiff avers that Mckesson "did nothing to calm the crowd" during the demonstration; rather, Mckesson "incited the violence." (*Id.* at ¶ 19).

All of these allegations are conclusory in nature, however, and they do not give rise to a plausible claim for relief against Mckesson. In order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson "authorized, directed, or ratified specific tortious activity." *Id.* Plaintiff, however, merely states—in a conclusory fashion—that Mckesson "incited the violence" and "g[ave] orders," (*id.* at ¶¶ 17, 19), but Plaintiff does not state in his Complaint how Mckesson allegedly incited violence or what orders he allegedly was giving. Therefore, the Complaint contains a "[t]hreadbare recital[] of the elements" of a cause of action against Mckesson, which Plaintiff only has "supported [with] mere conclusory statements," and therefore Plaintiff's Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

63a

Further, Plaintiff has not pleaded sufficient factual allegations regarding Mckesson's public speech to state a cause of action against Mckesson based on that speech. The only public speech to which Plaintiff cites in his Complaint is a one-sentence statement that Mckesson allegedly made to The New York Times: "The police want protestors to be too afraid to protest." (*Id.* at ¶ 24). Mckesson's statement does not advocate—or make any reference to—violence of any kind, and even if the statement did, "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware*, 458 U.S. at 927. This statement falls far short of being "likely to incite lawless action," which Plaintiff would have to prove to hold Mckesson liable based on his public speech. *Id.*

Nor can Plaintiff premise Mckesson's liability on the theory that he allegedly "did nothing to calm the crowd." *Id.* at ¶ 19). As the United States Supreme Court stated in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence," *id.* at 920.

Plaintiff therefore has failed to plead in his Complaint "factual content that allows the court to draw the reasonable inference that [Mckesson] is liable for the misconduct alleged," and thus Plaintiff's claims against Mckesson must be dismissed. *Iqbal*, 556 U.S. at 678.

B. Defendant's Rule 9 Motion

The Court finds that "Black Lives Matter," as Plaintiff uses that term in his Complaint, refers to a

social movement. Although many entities have utilized the phrase "black lives matter" in their titles or business designations, "Black Lives Matter" itself is not an entity of any sort. Therefore, all claims against "Black Lives Matter" must be dismissed because social movements lack the capacity to be sued.

### 1. Legal Standard

Although a motion to dismiss for lack of capacity is not contemplated by the express provisions of Rule 12, such a motion is treated by courts as a motion to dismiss pursuant to Rule 12(b)(6) when the issue can be resolved by analyzing the face of the complaint. *See Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Oden Metro Turfing, Inc. v. Cont'l Cas. Co.*, No. 12-cv-01547, 2012 WL 5423704, at *2 (W.D. La. Oct. 10, 2012) (citing *Klebanow*, 344 F.2d 294); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1294 (2017 Supp. 2017) ("[I]f the lack of capacity ... appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion for failure to state a claim for relief."). The Court may treat a motion to dismiss for lack of capacity as a motion to dismiss pursuant to Rule 12(b)(6) even if the motion is labelled incorrectly. *See Oden Metro*, 2012 WL 5423704, at *2.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

65a

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos*, 599 F.3d at 461 (quoting *True*, 571 F.3d at 417). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint," however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. When analyzing a motion to dismiss for failure to state a claim, "courts may also consider matters of which they may take judicial notice." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

If a party is not an individual or a corporation, the capacity of that party to be sued "is determined ... by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). "Under Louisiana law, an entity must qualify as a 'juridical person' to possess the capacity to be sued." *Hall v. Louisiana*, 974 F.Supp.2d 957, 962 (M.D. La. 2013). "A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership." La. Civ. Code art. 24. "[F]or an unincorporated association to possess juridical personality, the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert v. Hartford Ins.*, 559 So.2d 467, 474 (La. 1990) (quoting La. Civ. Code art. 24). "Unless such an intent exists, the parties do not create a fictitious person[,] but instead simply incur obligations among themselves." *Id.*

"Consequently, an unincorporated association, as a juridical person distinct from its members, does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together"; rather, "there must also be an agreement whereby two or more persons combine certain attributes to create a separate entity for a legitimate purpose." *Id.*

2. Analysis

Mckesson, in his Rule 9 Motion, argues that the Court should dismiss "Black Lives Matter" as a Defendant in this case because it lacks the capacity to be sued. According to Defendant, "Black Lives Matter" "is a movement and not a juridical entity capable of being sued." (Doc. 43–1 at p. 2). The Court finds that the capacity of "Black Lives Matter" to be sued can be discerned from the face of the pleadings, and therefore it will treat Defendant's Rule 9 Motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Klebanow*, 344 F.2d at 296 n.1.

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it ... is generally known within the trial court's territorial jurisdiction." Fed. R. Evid. 201(b)(1). Courts previously have taken judicial notice of the character, nature, or composition of various social movements. *See, e.g.*, *United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could "easily take judicial notice" of the aims and goals of the "union movement"); *Attorney Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259 (S.D.N.Y. 1981) ("Under the doctrine of judicial

67a

notice, the Court can observe that the 'Republican movement' consists of groups other than, and in addition to, the IRA; but the Court can also notice that the IRA is a 'Republican movement'...."); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States ... was a part of the world Communist movement dominated by the Soviet Union").

In his Complaint, Plaintiff names "Black Lives Matter" as a Defendant, describing "Black Lives Matter" as a "national incorporated association with chapter[s] in many states[,] which is amenable to service of process through a managing member." (Doc. 1 at ¶ 3). Plaintiff alleges that "Black Lives Matter" was "created by Alicia Garza, Patrisse Cullors, and Opal Tometi" and that the "leaders" of "Black Lives Matter" are "Rashad Turner, Johnetta Elzie[,] and DeRay Mckesson." (*Id.* at ¶ 4).

The Court judicially notices that "Black Lives Matter," as that term is used in the Complaint, is a social movement that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers. Fed. R. Evid. 201; *cf. Parise*, 159 F.3d at 801 (holding that the court could "easily take judicial notice" of the aims and goals of the "union movement"); *Irish N. Aid. Comm.*, 530 F. Supp. at 259 ("Under the doctrine of judicial notice, the Court can observe that the 'Republican movement' consists of groups other than, and in addition to, the IRA; but the Court can also notice that the IRA is a 'Republican movement' ...."); *see also Baggett*, 377 U.S. at 376 n.13 (noting that "[t]he lower

68a

court took judicial notice of the fact that the Communist Party of the United States ... was a part of the world Communist movement dominated by the Soviet Union"). Because "Black Lives Matter," as that term is used in the Complaint, is a social movement, rather than an organization or entity of any sort, its advent on social media merely was a "fortuitous creation of a community of interest"; "Black Lives Matter" was not created through a "contract of association" and is not an "entity whose personality 'is distinct from that of its members,'" and therefore it is not a "juridical person" that is capable of being sued. *Ermert*, 559 So.2d at 474 (quoting La. Civ. Code art. 24).

The Court notes that the phrase "black lives matter" has been utilized by various entities wishing to identify themselves with the "Black Lives Matter" movement. Plaintiff himself has identified one such entity and seeks leave of court to add that entity as a Defendant: Black Lives Matter Network, Inc. (See Doc. 52–4 at ¶ 3). These entities undoubtedly are "juridical persons" capable of being sued, and therefore the issue of such an entity's capacity would not impede Plaintiff from filing suit against it. "Black Lives Matter," as a social movement, cannot be sued, however, in a similar way that a person cannot plausibly sue other social movements such as the Civil Rights movement, the LGBT rights movement, or the Tea Party movement. If he could state a plausible claim for relief, a plaintiff could bring suit against entities associated with those movements, though, such as the National Association for the Advancement of Colored People, the Human Rights Campaign, or Tea Party Patriots, because those entities are "juridical persons" within the meaning of

69a

Louisiana law. *See* La. Civ. Code art 24.

Nevertheless, Plaintiff merely has identified "Black Lives Matter" as a Defendant in his Complaint, and that term connotes a social movement that is not a "juridical person" and that lacks the capacity to be sued. *See Ermert*, 559 So.2d at 474. Therefore, "Black Lives Matter" shall be dismissed as a Defendant in this case because it lacks the capacity to be sued. *See id.*

C. Plaintiff's Motion to Amend

Following the filing of Defendant's Rule 12 Motion and Defendant's Rule 9 Motion, as well as the oral argument on those Motions, Plaintiff sought leave of court to amend his Complaint. Plaintiff identifies two additional Defendants in his Proposed Amended Complaint—"# BlackLivesMatter" and Black Lives Matter Network, Inc.—and pleads additional factual allegations. (*See* Doc. 52–4). In his Proposed Amended Complaint, however, Plaintiff nonetheless fails to state a plausible claim for relief against any of the four named Defendants: "Black Lives Matter"—a social movement—and "# BlackLivesMatter"—a hashtag—both lack the capacity to be sued, and Plaintiff has failed to state plausible claims for relief against either Mckesson or Black Lives Matter Network, Inc., that are supported by anything more than conclusory allegations. Therefore, because Plaintiff's Proposed Amended Complaint would be subject to dismissal in its entirety, the Court shall deny Plaintiff leave of court to amend his Complaint.

1. Legal Standard

If a party is not entitled to amend a pleading as a

70a

matter of course pursuant to Rule 15(a)(1), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* "[A] district court may refuse leave to amend," however, "if the filing of the amended complaint would be futile." *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014). In other words, the Court may deny Plaintiff's Motion to Amend "if the complaint as amended would be subject to dismissal." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009).

2. Analysis

a. "# BlackLivesMatter"

Plaintiff, in his Proposed Amended Complaint, seeks to add as a Defendant "# BlackLivesMatter." (*See id.* at ¶ 3). Plaintiff alleges that "# BlackLivesMatter" is a "national unincorporated association [that] is domiciled in California." (*Id.*).

The Court judicially notices that the combination of a "pound" or "number" sign (#) and a word or phrase is referred to as a "hashtag" and that hashtags are utilized on the social media website Twitter in order to classify or categorize a user's particular "tweet," although the use of hashtags has spread to other social media websites and throughout popular culture. *See* Fed. R. Evid. 201; *see also TWTB, Inc. v. Rampick*, 152 F. Supp. 3d 549, 563 n.97 (E.D. La. 2016) ("A hashtag is 'a word or phrase preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet).'" (quoting *Hashtag*, Merriam-Webster Dictionary (2017), https://www.merriam-webster.com/dictionary/hashta

71a

g)). The Court also judicially notices that "#BlackLivesMatter" is a popular hashtag that is frequently used on social media websites. *See* Fed. R. Evid. 201.

Plaintiff therefore is attempting to sue a hashtag for damages in tort. For reasons that should be obvious,[1] a hashtag—which is an *expression* that categorizes or classifies a person's thought—is not a "juridical person" and therefore lacks the capacity to be sued. *See* La. Civ. Code art. 24. Amending the Complaint to add "#BlackLivesMatter" as a Defendant in this matter would be futile because such claims "would be subject to dismissal"; a hashtag is patently incapable of being sued. *Ackerson*, 589 F.3d at 208.

b. "Black Lives Matter"

Plaintiff also seeks to supplement his allegations regarding Defendant "Black Lives Matter." In his Proposed Amended Complaint, Plaintiff avers that "Black Lives Matter" is a "chapter-based national unincorporated association" that is "organized" under the laws of the State of California, though it allegedly is also a "partnership" that is a "citizen" of "California and Delaware." (*Id.*).

For the reasons stated previously in reference to the Court's analysis of Defendant's Rule 9 Motion,

---

[1] The Court notes that if Plaintiff were not bearing his own costs, which otherwise would be borne by the taxpayers, 28 U.S.C. § 1915(e)(2)(B)(i) would permit the Court to dismiss this claim as "frivolous": a lawsuit that alleges that a hashtag—which is, in essence, an idea—is liable in tort for damages can be properly categorized as "fantastic or delusional." *Neitzke v. Williams*, 490 U.S. 319, 328 (1989).

"Black Lives Matter" is a social movement that lacks the capacity to be sued. *See* discussion *supra* Section II.B.2. In fact, in his Proposed Amended Complaint, Plaintiff himself refers to "Black Lives Matter" as a "movement" on multiple occasions. (*See, e.g.*, *id.* at ¶ 11 (describing the "Black Lives Matter movement"); *id.* at ¶ 45 (describing the "Black Lives Matter movement"); *id.* at ¶ 48 (describing the "movement's rioters")). Amending the Complaint to permit Plaintiff to continue to pursue claims against "Black Lives Matter" would be futile because such claims "would be subject to dismissal." *Ackerson*, 589 F.3d at 208. For the reasons stated previously, "Black Lives Matter" is a social movement that is not a "juridical person" and that lacks the capacity to be sued.

c. Mckesson

Plaintiff seeks to amend his complaint to include additional factual allegations in relation to Mckesson's activities and public statements. Plaintiff seeks to supplement his Complaint with allegations that Mckesson (1) made a statement on a television news program, in which he allegedly "justified the violence" that occurred at a demonstration in Baltimore, Maryland, (*id.* at ¶ 9); (2) engaged in a private conversation that allegedly "shows an intent to use protests to have 'martial law' declared nationwide through protests," (*id.* at ¶ 19); (3) allegedly made a statement to a news website that "people take to the streets as a last resort," which—according to Plaintiff—was a "ratification and justification of ... violence," (*id.* at ¶ 48); (4) participated in various interviews or speeches during which he allegedly described himself or was described as a "leader" of the "Black Lives Matter" movement or

73a

a "participant" in various demonstrations, (*see, e.g.*, *id.* at ¶¶ 10, 11, 13, 45, 55, 58); (5) "ratified all action taken during the Baton Rouge protest," (*id.* at ¶ 39); and (6) "incited criminal conduct that cause[d] injury," (*id.* at ¶ 44).

These supplemental factual allegations do not remedy Plaintiff's failure to state a plausible claim for relief against Mckesson. *See* discussion *supra* Section II.A.2. Plaintiff's allegations that Mckesson "ratified all action," (*id.* at ¶ 39), and "incited criminal conduct," (*id.* at ¶ 44), are nothing but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not suffice" to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678. Plaintiff's Proposed Amended Complaint is devoid of any facts, aside from these broad conclusory allegations, that tend to suggest that Mckesson made any statements or engaged in any conduct that "authorized, directed, or ratified" the unidentified demonstrator's act of throwing a rock at Plaintiff. *Claiborne Hardware*, 458 U.S. at 927.

Further, the additional public statements[2] that Plaintiff has pleaded do not support a plausible claim for relief against Mckesson. Rather than including

---

[2] Setting aside Plaintiff's description of it in mere conclusory terms, the conversation in which Plaintiff alleges that Mckesson "show[ed] an intent to use protests to have `martial law' declared nationwide through protests," Doc. 52-4 at ¶ 19, is a *private* conversation that cannot give rise to liability in tort for the actions of other demonstrators. *See Claiborne Hardware*, 458 U.S. at 927 (holding that liability may only be imposed on a person for the tortious acts of others with whom the person associated if his "*public* speech" meets certain criteria (emphasis added)).

74a

the actual statement that Mckesson allegedly made on a television news program, Plaintiff merely pleads that Mckesson "justified the violence," (*id.* at ¶ 9); this is a "[t]hreadbare recital[] of the elements of a cause of action," which is "supported by mere conclusory statements." Iqbal, 556 U.S. at 678. Mckesson's alleged statement that "people take to the streets as a last resort," (*id.* at ¶ 48), similarly cannot give rise to a cause of action: it is not plausible that this statement could be "likely to incite lawless action" or be of such a character that it could serve as "evidence that [he] gave other specific instructions" to the unidentified demonstrator to throw a rock at Plaintiff. *Claiborne Hardware*, 458 U.S. at 927. Moreover, to premise Mckesson's liability on the sole basis of his public statements in which he identified himself as a "leader" of the "Black Lives Matter" movement or a "participant" in various demonstrations, (*see, e.g.*, *id.* at ¶¶ 10, 11, 13, 45, 55, 58), would impermissibly impose liability on Mckesson for merely exercising his right of association. See *id.* at 925-26 ("[M]ere association with [a] group—absent a specific intent to further an unlawful aim embraced by that group—is an insufficient predicate for liability.").

Plaintiff therefore has failed to remedy the deficiencies that the Court identified in his Complaint, *see* discussion *supra* Section II.A.2, and thus permitting Plaintiff to amend his Complaint to add various factual allegations against Mckesson would be futile because such claims nonetheless "would be subject to dismissal." *Ackerson*, 589 F.3d at 208.

d. Black Lives Matter Network, Inc.

75a

Plaintiff, in his Proposed Amended Complaint, seeks to add Black Lives Matter Network, Inc., as a Defendant in this case. Plaintiff discovered the existence of Black Lives Matter Network, Inc., after making a donation through a website that is allegedly identified with the "Black Lives Matter" movement; the receipt from the donation indicated that Black Lives Matter Network, Inc., was the entity that received the donation.

While Black Lives Matter Network, Inc., certainly is an entity that has the capacity to be sued, *see* La. Civ. Code art. 24, Plaintiff has failed to state a plausible claim for relief against that entity in his Proposed Amended Complaint. For an entity such as Black Lives Matter Network, Inc., to be held liable in tort for damages caused during a demonstration, a plaintiff must demonstrate that the tortious act was committed by one of the entity's "agents ... within the scope of their actual or apparent authority." *Claiborne Hardware*, 458 U.S. at 930. Such an entity also may "be found liable for other conduct of which it had knowledge and specifically ratified." *Id.*

Plaintiff's only attempt at characterizing the unidentified tortfeasor as an agent of Black Lives Matter Network, Inc., is located in paragraph 37 of the Proposed Amended Complaint, in which Plaintiff alleges that the tortfeasor was a "member of Defendant Black Lives Matter, under the control and custody of Defendants." (*Id.* at ¶ 37). Not only does Plaintiff specifically fail to mention Black Lives Matter Network, Inc., whatsoever, but Plaintiff also fails to allege that such an agency relationship existed between the tortfeasor and "Defendants" with anything more than a "[t]hreadbare recital[] of the

76a

elements" of agency, "supported by [a] mere conclusory statement[]." *Iqbal*, 556 U.S. at 678. Further, Plaintiff has failed to plead that Black Lives Matter Network, Inc., in particular, "had knowledge and specifically ratified" the unidentified tortfeasor's act of throwing a rock at Plaintiff, *Claiborne Hardware*, 458 U.S. at 930; Plaintiff merely alleges, in a conclusory fashion, that "Black Lives Matter leadership ratified all action taken during the protest," *(id.* at ¶ 39), and that "Black Lives Matter promoted and ratified" the tortious conduct that gave rise to this suit, *(id.* at ¶ 44).

These allegations are insufficient to state a plausible claim for relief against Black Lives Matter Network, Inc. Not only are these allegations "conclusory statements," but they also do not identify any connection between this particular entity—Black Lives Matter Network, Inc.—and the particular tortious activity. *Iqbal*, 556 U.S. at 678. As the Supreme Court noted in *Claiborne Hardware*, allowing Plaintiff to proceed against Black Lives Matter Network, Inc., in this case—based solely on these conclusory allegations—"would impermissibly burden the rights of political association that are protected by the First Amendment." 458 U.S. at 931. Therefore, allowing Plaintiff to amend his Complaint to add Black Lives Matter Network, Inc., as a Defendant in this matter would be futile because such claims "would be subject to dismissal";[3] Plaintiff has failed to state a plausible claim for relief against Black Lives Matter Network, Inc., in his Proposed

---

[3] Black Lives Matter Network, Inc., indeed has filed a motion to dismiss in the event that the Court permitted Plaintiff to amend his Complaint to add it as a Defendant. *See* Doc. 68.

77a

Amended Complaint. *Ackerson*, 589 F.3d at 208.

### 3. Conclusion

Therefore, the Court finds that Plaintiff has failed to plead a plausible claim for relief against any of the Defendants that he identified in his Proposed Amended Complaint. The Court thus denies Plaintiff leave to amend his Complaint because the "filing of the amended complaint would be futile." *Varela*, 773 F.3d at 707.

### D. Dismissal with Prejudice

For the reasons stated above, the Court finds that Plaintiff has failed to state a plausible claim for relief against either Mckesson or "Black Lives Matter," the only Defendants named in Plaintiff's initial Complaint. *See* discussion supra Section II.A-.B. Under normal circumstances, the Court would dismiss this matter without prejudice to provide Plaintiff with an opportunity to ameliorate the deficiencies that the Court has identified in his Complaint.

Plaintiff has had ample opportunity, however, following the briefing and argument on Defendant's Rule 12 and Rule 9 Motions to demonstrate to the Court that he can state a plausible claim for relief against an individual or entity. In response to the arguments raised by Mckesson in his Motions and by the Court during oral argument on the Motions, Plaintiff nonetheless produced a Proposed Amended Complaint that not only fails to state a plausible claim for relief against any of the named Defendants, but that also attempts to hold a hashtag liable for damages in tort. The Court therefore finds that granting leave to Plaintiff to attempt to file a Second

78a

Proposed Amended Complaint would be futile. The Court also notes that Plaintiff's attempt to bring suit against a social movement and a hashtag evinces either a gross lack of understanding of the concept of capacity or bad faith, which would be an independent ground to deny Plaintiff leave to file a Second Proposed Amended Complaint. The Court therefore shall dismiss this matter with prejudice. See *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

III. CONCLUSION

Accordingly,

IT IS ORDERED that Defendant DeRay Mckesson's Motion to Dismiss (Doc. 15) is GRANTED.

IT IS FURTHER ORDERED that Defendant DeRay Mckesson's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(a) (Doc. 43) is GRANTED.

IT IS FURTHER ORDERED that the Motion to File Amended Complaint for Damages (Doc. 52) filed by Plaintiff is DENIED.

IT IS FURTHER ORDERED that the above-captioned matter is DISMISSED WITH PREJUDICE.

79a

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 17-30864

OFFICER JOHN DOE, Police Officer,

Plaintiff – Appellant

v.

DERAY MCKESSON; BLACK LIVES MATTER;
BLACK LIVES MATTER NETWORK,
INCORPORATED,

Defendants - Appellees

Appeal from the United States District Court for the
Middle District of Louisiana

ON REQUEST FOR A POLL
Opinion 945 F.3d 818 (5th Cir. Dec. 16, 2019)

January 28, 2020

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

PER CURIAM:

The court having been polled at the request of one
of its members, and a majority of the judges who are
in regular service and not disqualified not having
voted in favor (Fed. R. Ap. P. 35 and 5th Cir. R. 35),
rehearing en banc is DENIED. In the en banc poll,
eight judges in favor of rehearing (Judge Stewart,
Judge Dennis, Judge Southwick, Judge Graves, Judge
Higginson, Judge Costa, Judge Willett, and Judge
Duncan), and eight judges voted against rehearing
(Chief Judge Owen, Judge Jones, Judge Smith, Judge

80a

Elrod, Judge Haynes, Judge Ho, Judge Engelhardt, and Judge Oldham).

Judge Ho concurred with the Court's denial of rehearing en banc, his Concurrence is attached. Judge Dennis, joined by Judge Graves, and Judge Higginson, joined by Judge Dennis, dissent from the Court's denial of rehearing en banc, their Dissents are attached.

ENTERED FOR THE COURT:

E. Grady Jolly
United States Circuit Judge

JAMES C. HO, Circuit Judge, concurring in denial of rehearing en banc:

I agree with my colleagues who voted to grant rehearing en banc that this lawsuit by a police officer against DeRay Mckesson, a leader of the Black Lives Matter movement, should not proceed. I nevertheless voted to deny rehearing en banc. I write to briefly explain why, in the hope that this explanation might help finally bring this suit to an end.

I.

Police officers and firefighters dedicate their lives to protecting others, often putting themselves in harm's way. These are difficult and dangerous jobs, and citizens owe a debt of gratitude to those who are willing and able to perform them. What's more, police officers and firefighters assume the risk that they may be injured in the line of duty. So they are not allowed to recover damages from those responsible for

their injuries, under a common law rule known as the professional rescuer doctrine.

"The professional rescuer doctrine, the fireman's rule, is a common law rule that either bars recovery by a professional rescuer injured in responding to an emergency or requires the rescuer to prove a higher degree of culpability in order to recover." *Gallup v. Exxon Corp.*, 70 F. App'x 737, 738 (5th Cir. 2003) (collecting Louisiana cases). "The Professional Rescuer's Doctrine is a jurisprudential rule that essentially states that a professional rescuer, such as a fireman or a policeman, who is injured in the performance of his duties, 'assumes the risk' of such an injury and is not entitled to damages"— particularly when the "risks arise from the very emergency that the professional rescuer was hired to remedy." *Gann v. Matthews*, 873 So.2d 701, 705–6 (La. Ct. App. 2004).

This doctrine would seem to require immediate dismissal of this suit. After all, there is no dispute that the officer was seriously injured in the line of duty—specifically, while policing a Black Lives Matter protest that unlawfully obstructed a public highway and then turned violent. The officer deserves our profound thanks, sympathy, and respect. But his case would appear to fall squarely within the scope of the doctrine.

None of the panel opinions in this case addressed the professional rescuer doctrine, however—presumably because Mckesson never raised it. I imagine that, if given the chance on remand, he will invoke the doctrine at last, and that the district court will terminate this suit (again) accordingly.

82a

Had Mckesson raised this doctrine at an earlier stage in the suit, there would have been no need to answer the more challenging First Amendment questions that now animate his petition for rehearing en banc. But he did not. So, like the panel, I turn to those questions now.

## II.

Because Mckesson has thus far neglected to invoke the professional rescuer doctrine, the panel confronted novel and interesting First Amendment issues that are arguably worthy of rehearing en banc. But I take some comfort in the fact that, upon closer review of the panel opinions, the constitutional concerns that have generated the most alarm may not be as serious as feared.

The First Amendment indisputably protects the right of every American to condemn police misconduct.[1] And that protection secures the citizen protestor against not only criminal penalty, but civil liability as well. *See*, *e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).

But there are important differences between the theory of liability held invalid in *Claiborne Hardware* and the tort liability permitted by the panel majority here. In *Claiborne Hardware*, the defendants were sued for leading a boycott of white merchants. State courts subsequently held the defendants liable for all of the economic damages caused by their boycott.

---

[1] Indeed, it is important to condemn such misconduct when it occurs. *See*, *e.g.*, *United States v. Taffaro*, 919 F.3d 947, 949-51 (5th Cir. 2019) (Ho, J., concurring in the judgment); *Wilson v. City of Southlake*, 936 F.3d 326, 333-34 (5th Cir. 2019) (Ho, J., concurring in the judgment).

83a

Notably, the theory of liability rejected in *Claiborne Hardware* was inherently premised on the *content* of expressive activity. If the defendants had advocated in *favor* of the white merchants, no court would have held them liable for such speech. So the tort liability theory adopted by the state courts necessarily turned on the content of the defendants' expressive activities. And the Supreme Court rejected this content-based theory of liability as a violation of the First Amendment. *See*, *e.g.*, *id.* at 914 ("[T]he petitioners certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign …. [But t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself.").

By contrast, the theory of liability adopted in this case appears to be neutral as to the content of the Black Lives Matter protest. Unlike *Claiborne Hardware*, liability here turns not on the content of the expressive activity, but on the unlawful obstruction of the public highway and the injuries that foreseeably resulted. This is an important distinction. As *Claiborne Hardware* itself observed: "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918. "Only those losses proximately caused by unlawful conduct may be recovered." *Id.*

So in sum: Content-based damages are generally impermissible, as *Claiborne Hardware* illustrates.

But content-neutral rules typically survive First Amendment challenge. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Our cases make clear … that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'") (collecting cases).

Applying that framework here, I do not understand the panel majority to suggest that Mckesson may be held liable for lawfully protesting police— that would be a textbook violation of established First Amendment doctrine, including *Claiborne Hardware*—but rather for injuries following the unlawful obstruction of a public highway. As the panel explained, "the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway. As such, no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's conduct to be addressed by state tort law." *Doe v. Mckesson*, 945 F.3d 818, 832 (5th Cir. 2019) (citation omitted). In the face of such limiting language, any First Amendment concern about the potential reach of the panel majority opinion strikes me as uncertain and speculative.[2]

---

[2] By contrast, there was no such ambiguity in a recent decision of our court—one that presented even starker First

85a

So if I understand the panel majority's theory of liability correctly, it may be expansive—and it may be wrong as a matter of Louisiana law, as Judge Higginson's typically thoughtful dissent suggests. But it applies with equal force to pro-police protestors (just as it would, say, to pro-life and pro-choice protestors alike) who unlawfully obstruct a public highway and then break out into violence. It is far from obvious, then, that the First Amendment principles articulated in *Claiborne Hardware* would have any bearing here (and we do not ordinarily grant en banc rehearing to resolve questions of state law).

\* \* \*

---

Amendment concerns—yet we nevertheless denied rehearing en banc. *See Zimmerman v. City of Austin*, 888 F.3d 163 (5th Cir. 2018). I say starker because the First Amendment surely protects political speech at least as much as it protects protests—and because a state surely has a greater interest in protecting police officers from assault than in preventing citizens from donating over $350 to a city council race. As the ACLU once noted, "[c]ontributions are crucially important in determining the level of political debate and in implementing the freedom of association guaranteed by the First Amendment …. If anything, Americans spend too little to finance the process by which their government is chosen." Brief of the Appellants, at 27-28, *Buckley v. Valeo*, 424 U.S. 1 (1976). *See also Buckley*, 424 U.S. at 288 (Marshall, J., concurring in part and dissenting in part) ("[A]ll Members of the Court agree … money is essential for effective communication in a political campaign."); *Thompson v. Hebdon*, 140 S. Ct. 348, 350 (2019) (per curiam) ("JUSTICE BREYER's opinion for the plurality observed that 'contribution limits that are too low can … harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability.") (quoting *Randall v. Sorrell*, 548 U.S. 230, 249 (2006)).

86a

Civil disobedience enjoys a rich tradition in our nation's history. But there is a difference between civil disobedience—and civil disobedience without consequence [3] Citizens may protest. But by protesting, the citizen does not suddenly gain immunity to violate traffic rules or other laws that the rest of us are required to follow. The First Amendment protects protest, not trespass.

That said, this lawsuit should not proceed for an entirely different reason—the professional rescuer doctrine. I trust the district court will faithfully apply that doctrine if and when Mckesson invokes it, and dismiss the suit on remand, just as it did before. It is for that reason that I am comfortable concurring in the denial of rehearing en banc.

JAMES L. DENNIS, Circuit Judge, joined by JAMES E. GRAVES, Circuit Judge, dissenting:

I respectfully dissent from the court's refusal to rehear en banc a 2-1 panel opinion that not only misapplies Louisiana's duty-risk analysis, as Judge

---

[3] Indeed, for the civil disobedient, the consequence is the point. *See*, *e.g.*, Henry David Thoreau, *Civil Disobedience* (1849) ("Under a government which imprisons any unjustly, the true place for a just man is also a prison."); Martin Luther King Jr., *Letter from a Birmingham Jail* (1963) ("Of course, there is nothing new about this kind of civil disobedience. It was seen sublimely in the refusal of Shadrach, Meshach, and Abednego to obey the laws of Nebuchadnezzar because a higher moral law was involved. It was practiced superbly by the early Christians, who were willing to face hungry lions and the excruciating pain of chopping blocks before submitting to certain unjust laws of the Roman Empire. To a degree, academic freedom is a reality today because Socrates practiced civil disobedience.").

87a

Higginson's dissent, *infra*, points out, but also fails to uphold the clearly established First Amendment principles enshrined in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *Claiborne Hardware* reaffirmed this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Claiborne*, 458 U.S. at 913 (cleaned up). Thus, when violence or threats of violence "occur[] in the context of constitutionally protected activity, … precision of regulation is demanded," including an inquiry into whether the defendant "authorized, ratified, or directly threatened acts of violence." *Id.* at 916, 929. The panel majority demands no such precision. Instead, it appears to apply a freewheeling form of strict liability having no resemblance to Louisiana law's careful duty-risk analysis, concluding that, because of his association with the demonstrators or his failure to anticipate and prevent the rock throwing incident, Mckesson can be held liable—despite the First Amendment protection historically afforded protest activity—for the acts of a "mystery attacker." *Doe v. Mckesson*, 945 F.3d 818, 842 (5th Cir. 2019) (Willett, J., dissenting). The majority of our colleagues have thus grievously failed to do what should have been done: Take up this case, apply the longstanding protections of the First Amendment, and conclude, as the district court did, that Doe's lawsuit against DeRay Mckesson should be dismissed. *See Doe v. Mckesson*, 272 F. Supp. 3d 841, 852-53 (M.D. La. 2017).

88a

STEPHEN A. HIGGINSON, Circuit Judge, joined by JAMES L. DENNIS, Circuit Judge, dissenting:

The panel opinion holds that the First Amendment affords no protection to McKesson because he was negligent under Louisiana law. I do not believe the Louisiana Supreme Court would recognize a negligence claim in this situation. When a negligence claim is based on the violation of a statute, Louisiana courts allow recovery only if the plaintiff's injury falls within "the scope of protection intended by the legislature." *Lazard v. Foti*, 859 So. 2d 656, 661 (La. 2003). An assault on a police officer by a third-party is not the "particular risk" addressed by the highway obstruction statute. *Id.* Absent the breach of this statutory duty, it is unclear on what basis the panel opinion finds that the protest was foreseeably violent.

To the extent that the panel opinion creates a new Louisiana tort duty, this is "a policy decision" for Louisiana courts—not this court—to make. *See Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *see also Meador v. Apple*, 911 F.3d 260, 267 (5th Cir. 2018). Even if we could make this policy decision ourselves, the panel opinion does not weigh the "moral, social, and economic factors" the Louisiana Supreme Court has identified as relevant, including "the nature of defendant's activity" and "the historical development of precedent." *Posecai*, 752 So. 2d at 766. In light of the vital First Amendment concerns at stake, I respectfully suggest that these considerations counsel against our court recognizing a new Louisiana state law negligence duty here, at least in a case where argument from counsel has not been

89a

received. Protestors of all types and causes have been blocking streets in Louisiana for decades without Louisiana courts recognizing any similar claim.

For these reasons, I dissent.

90a

In the United States Court of Appeals for the Fifth
Circuit

No. 17-30864

OFFICER JOHN DOE, Police Officer,
Plaintiff-Appellant

v.

DERAY MCKESSON; BLACK LIVES
MATTER; BLACK LIVES MATTER NETWORK,
INCORPORATED, Defendants-Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

ON PETITION FOR PANEL REHEARING

August 8, 2019

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

The petition for panel rehearing is hereby
GRANTED. We WITHDRAW the court's prior opinion
of April 24, 2019, and substitute the following
opinion.

During a public protest against police misconduct
in Baton Rouge, Louisiana, an unidentified individual
hit Officer John Doe with a heavy object, causing him
serious physical injuries. Following this incident,
Officer Doe brought suit against "Black Lives
Matter," the group associated with the protest, and
DeRay Mckesson, one of the leaders of Black Lives
Matter and the organizer of the protest. Officer Doe

91a

later sought to amend his complaint to add Black Lives Matter Network, Inc. and # BlackLivesMatter as defendants. The district court dismissed Officer Doe's claims on the pleadings under Federal Rule of Civil Procedure 12(b)(6), and denied his motion to amend his complaint as futile. Because we conclude that the district court erred in dismissing the case against Mckesson on the basis of the pleadings, we REMAND for further proceedings relative to Mckesson. We further hold that the district court properly dismissed the claims against Black Lives Matter.[1] We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings not inconsistent with this opinion.

## I.

On July 9, 2016, a protest took place by blocking a public highway in front of the Baton Rouge Police Department headquarters.[2] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters

---

[1] We do not address any of the allegations raised by the Proposed Amended Complaint. *See* note 5, *infra*.

[2] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby convenience store. The dismissed complaint further alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers began making arrests of those blocking the highway and participating in the violence.

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

 Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and # BlackLivesMatter

93a

as defendants.

## II.

The district court granted both of Mckesson's motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against # BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc. the district court held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social movement and a "hashtag" as defendants, the district court dismissed his case with prejudice. Officer Doe timely appealed.

## III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)). To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and

94a

brackets omitted)). Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted) (quoting *Iqbal*, 556 U.S. at 680).[3]

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical

---

[3] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g., Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992). Where the issue appears on the face of the complaint, other courts have done the same and treated it as a Rule 12(b)(6) motion. *See, e.g., Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F.Supp.2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity … creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity … appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)). Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

95a

in practice to the Rule 12(b)(6) standard. *Id.* When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed. R. Civ. P. 15(a)(2).

IV.

A.

We begin by addressing Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn—vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v.*

96a

*Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the point of our beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for or that the assailant's "physical movements [were] subject to the control or right to control" of Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id.* In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of … a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite

97a

a riot/protest." Disregarding Officer Doe's conclusory allegations, we find that Officer Doe has not alleged facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with the unknown assailant to attack Officer Doe or knew of the attack and specifically ratified it. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's conspiracy claim must and does fail.

### 3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant;

98a

(4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *See Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'" (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific duties of care based on consideration of "various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint specifically alleges that it was Mckesson himself who intentionally led

99a

the demonstrators to block the highway. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. As such, it was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was most nearly certain to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration.

Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's

100a

injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

### B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *See id.* at 927. The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

The district court appears to have assumed that in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts

101a

that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Even if we assume that Officer Doe seeks to hold Mckesson "liable for the unlawful conduct of others" within the meaning of *Claiborne Hardware*, the First Amendment would not require dismissal of Officer Doe's complaint. *Id.* In order to counter Mckesson's First Amendment defense at the pleading stage Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the Baton Rouge police and the protesters, and that Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway.

We focus here on the fact that Mckesson "directed … specific tortious activity" because we hold that Officer Doe has adequately alleged that his injuries were the result of Mckesson's *own* tortious conduct in organizing a foreseeably violent protest. In Mckesson's petition for rehearing, he expresses concern that the panel opinion permits Officer Doe to hold him liable for the tortious conduct of *others* even though Officer Doe merely alleged that he was

102a

negligent, and not that he specifically intended that violence would result. We think that Mckesson's criticisms are misplaced. We perceive no Constitutional issue with Mckesson being held liable for injuries caused by a combination of his own negligent conduct and the violent actions of a another that were foreseeable as a result of that negligent conduct. The permissibility of such liability is a standard aspect of state law. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). There is no indication in *Claiborne Hardware* or subsequent decisions that the Supreme Court intended to restructure state tort law by eliminating this principle of negligence liability.

We of course acknowledge that Mckesson's negligent conduct took place in the context of a political protest. It is certainly true that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Claiborne Hardware*, 468 U.S. at 916–17. But *Claiborne Hardware* does not insulate the petitioner from liability *for his own negligent conduct* simply because he, and those he associated with, also intended to communicate a message. *See id.* at 916 ("[T]he use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy.") (internal quotation marks and citations omitted). Furthermore, although we do not understand the petitioner to be arguing that the Baton Rouge police violated the demonstrators' First Amendment rights by

103a

attempting to remove them from the highway, we note that the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (reasonable time, place, and manner restrictions do not violate the First Amendment). As such, no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's condut to be addressed by state tort law.

Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment.[4]

## C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The

---

[4] We emphasize, however, that our opinion does not suggest that the First Amendment allows a person to be punished, or held civilly liable, simply because of his associations with others, unless it is established that the group that the person associated with "itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. But we also observe that, in any event, Officer Doe's allegations are sufficient to state a claim that Black Lives Matter "possessed unlawful goals" and that Mckesson "held a specific intent to further those illegal aims." *See id*. Officer Doe alleges that Black Lives Matter "*plann[ed]* to block a public highway," and, in his amended complaint, that Mckesson and Black Lives Matter traveled to Baton Rouge "for the *purpose* of … rioting." (emphasis added).

104a

district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute" in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed. R. Evid. 201(b). "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998). In *Taylor*, we held that another court's state actor determination was not an "adjudicative fact" within the meaning of Rule 201 because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review." *Id*. at 830–31. We further held that the state-actor determination was not beyond reasonable dispute where it "was, in fact, disputed by the parties" in the related case. *Id*. at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of

105a

any sort." The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest. This difference is sufficient under our case law to preclude judicial notice.

We should further say that we see the cases relied on by the district court as distinguishable. Each deals with judicial notice of an aspect of an entity, not its legal form. *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259–60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States . . . was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national incorporated association with chapter [sic] in many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined . . . by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name."

106a

The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id.*

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728-729 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and possession of an insurance policy); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 675 (E.D. La. 2010) (relying on organization's formal and determinate membership structure). Lacking at least some of these indicators, Louisiana courts have been unwilling to find an intent to create an unincorporated association. *See, e.g.*, *Ermert*, 559 So. 2d at 474–475 (finding that hunting group was not an unincorporated association because it did not own or lease the property that it

107a

was based on, required the permission of one of its alleged members to use the property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that Black Lives Matter is an unincorporated association. His only allegations are that Black Lives Matter: (1) was created by three women; (2) has several leaders, including Mckesson; (3) has chapters in many states; and (4) was involved in numerous protests in response to police practices. He does not allege that it possesses property, has a formal membership, requires dues, or possesses a governing agreement. As such, the complaint lacks any indication that Black Lives Matter possesses the traits that Louisiana courts have regarded as indicative of an intent to establish a juridical entity. We have no doubt that Black Lives Matter involves a number of people working in concert, but "an unincorporated association . . . . does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together." *Id*. at 474. Therefore, we find that the district court did not err in concluding that Officer Doe's complaint has failed plausibly to allege that Black Lives Matter is an entity capable of being sued.[5]

## V.

In sum, we hold that Officer Doe has not

---

[5] We do not address as to whether Officer Doe could state a claim against an entity whose capacity to be sued was plausibly alleged, nor do we address whether Mckesson could be held liable for the actions of that entity under state law.

108a

adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[6] We also hold that the district court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued.[7] Therefore, the judgment of the district court is AFFIRMED in part, REVERSED in part, and

---

[6] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then decide whether, in the light of our remand, discovery would be appropriate.

[7] Because we find that Officer Doe has successfully pled a claim, we do not reach the district court's denial of Officer Doe's motion for leave to amend. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 268 n.36 (5th Cir. 2009) (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 358 n.70 (5th Cir. 1989)). It follows that we do not address any of the allegations in the Proposed Amended Complaint or the parties it seeks to add. On remand, Officer Doe may seek leave to amend his complaint to add new parties and plead additional facts to support his negligence claim. The district court should determine whether to grant this motion, and any new motions for leave to amend, in the light of our opinion.

109a

the case is REMANDED for further proceedings not inconsistent with this opinion.[8]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[8] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related to this lawsuit. In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit. The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face." As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186. We agree with the district court and affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

110a

In the United States Court of Appeals for the Fifth
Circuit

No. 17-30864

OFFICER JOHN DOE, Police Officer,
Plaintiff-Appellant

v.

DERAY MCKESSON; BLACK LIVES MATTER;
BLACK LIVES MATTER NETWORK,
INCORPORATED, Defendants-Appellees

Appeal from the United States District Court for
the Middle District of Louisiana

April 24, 2019

Before JOLLY, ELROD, and WILLETT, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

During a public protest against police misconduct
in Baton Rouge, Louisiana, an unidentified individual
hit Officer John Doe with a heavy object, causing him
serious physical injuries. Following this incident,
Officer Doe brought suit against "Black Lives
Matter," the group associated with the protest, and
DeRay Mckesson, one of the leaders of Black Lives
Matter and the organizer of the protest. Officer Doe
later sought to amend his complaint to add Black
Lives Matter Network, Inc. and # BlackLivesMatter
as defendants. The district court dismissed Officer
Doe's claims on the pleadings under Federal Rule of
Civil Procedure 12(b)(6), and denied his motion to
amend his complaint as futile. Because we conclude

111a

that the district court erred in dismissing the case against Mckesson on the basis of the pleadings, we REMAND for further proceedings relative to Mckesson. We further hold that the district court properly dismissed the claims against Black Lives Matter.[1] We thus REVERSE in part, AFFIRM in part, and REMAND for further proceedings not inconsistent with this opinion.

## I.

On July 9, 2016, a protest took place by blocking a public highway in front of the Baton Rouge Police Department headquarters.[2] This demonstration was one in a string of protests across the country, often associated with Black Lives Matter, concerning police practices. The Baton Rouge Police Department prepared by organizing a front line of officers in riot gear. These officers were ordered to stand in front of other officers prepared to make arrests. Officer Doe was one of the officers ordered to make arrests. DeRay Mckesson, associated with Black Lives Matter, was the prime leader and an organizer of the protest.

In the presence of Mckesson, some protesters began throwing objects at the police officers. Specifically, protestors began to throw full water bottles, which had been stolen from a nearby convenience store. The dismissed complaint further alleges that Mckesson did nothing to prevent the violence or to calm the crowd, and, indeed, alleges

---

[1] We do not address any of the allegations raised by the Proposed Amended Complaint. *See* note 5, *infra*.

[2] This case comes to us on a motion to dismiss, so we treat all well-pleaded facts as true.

112a

that Mckesson "incited the violence on behalf of [Black Lives Matter]." The complaint specifically alleges that Mckesson led the protestors to block the public highway. The police officers began making arrests of those blocking the highway and participating in the violence.

At some point, an unidentified individual picked up a piece of concrete or a similar rock-like object and threw it at the officers making arrests. The object struck Officer Doe's face. Officer Doe was knocked to the ground and incapacitated. Officer Doe's injuries included loss of teeth, a jaw injury, a brain injury, a head injury, lost wages, "and other compensable losses."

Following the Baton Rouge protest, Officer Doe brought suit, naming Mckesson and Black Lives Matter as defendants. According to his complaint, the defendants are liable on theories of negligence, respondeat superior, and civil conspiracy. Mckesson subsequently filed two motions: (1) a Rule 12(b)(6) motion, asserting that Officer Doe failed to state a plausible claim for relief against Mckesson and (2) a Rule 9(a)(2) motion, asserting that Black Lives Matter is not an entity with the capacity to be sued.

Officer Doe responded by filing a motion to amend. He sought leave to amend his complaint to add factual allegations to his complaint and Black Lives Matter Network, Inc. and # BlackLivesMatter as defendants.

## II.

The district court granted both of Mckesson's motions, treating the Rule 9(a)(2) motion as a Rule 12(b)(6) motion, and denied Officer Doe's motion for

113a

leave to amend, concluding that his proposed amendment would be futile. With respect to Officer Doe's claims against # BlackLivesMatter, the district court took judicial notice that it is a "hashtag" and therefore an "expression" that lacks the capacity to be sued. With respect to Officer Doe's claims against Black Lives Matter Network, Inc. the district court held that Officer Doe's allegations were insufficient to state a plausible claim for relief against this entity. Emphasizing the fact that Officer Doe attempted to add a social movement and a "hashtag" as defendants, the district court dismissed his case with prejudice. Officer Doe timely appealed.

## III.

When considering a motion to dismiss under Rule 12(b)(6), we will not affirm dismissal of a claim unless the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). "We take all factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.* (citing *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017)). To survive, a complaint must consist of more than "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets omitted)). Instead, "the plaintiff must plead enough facts to nudge the claims across the line from conceivable to plausible." *Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) (internal quotation marks, brackets, and ellipses omitted) (quoting *Iqbal*,

114a

556 U.S. at 680).[3]

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). However, where the district court's denial of leave to amend was based solely on futility, we instead apply a de novo standard of review identical in practice to the Rule 12(b)(6) standard. *Id*. When a party seeks leave from the court to amend and justice requires it, the district court should freely give it. Fed. R. Civ. P. 15(a)(2).

IV.

---

[3] Federal Rule of Civil Procedure Rule 9(a)(2) states that, if a party wishes to raise an issue regarding lack of capacity to be sued, "a party must do so by a specific denial." Rule 12(b) does not specifically authorize a motion to dismiss based on a lack of capacity. Nonetheless, we have permitted Rule 12(b) motions arguing lack of capacity. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1992). Where the issue appears on the face of the complaint, other courts have done the same and treated it as a Rule 12(b)(6) motion. *See, e.g.*, *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in [R]ule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."); *Coates v. Brazoria Cty. Tex.*, 894 F.Supp.2d 966, 968 (S.D. Tex. 2012) ("Whether a party has the capacity to sue or be sued is a legal question that may be decided at the Rule 12 stage."); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1294 (3d ed. 2018) ("An effective denial of capacity … creates an issue of fact. Such a denial may be made in the responsive pleading or, if the lack of capacity . . . appears on the face of the pleadings or is discernible there from, the issue can be raised by a motion to dismiss for failure to state a claim for relief." (footnotes omitted)). Thus, we review the district court's dismissal for lack of capacity de novo and apply the Rule 12(b)(6) standard.

115a

A.

We begin by addressing Officer Doe's claims against DeRay Mckesson. The district court did not reach the merits of Officer Doe's underlying state tort claims, but instead found that Officer Doe failed to plead facts that took Mckesson's conduct outside of the bounds of First Amendment protected speech and association. Because we ultimately find that Mckesson's conduct at this pleading stage was not necessarily protected by the First Amendment, we will begin by addressing the plausibility of Officer Doe's state tort claims. We will address each of Officer Doe's specific theories of liability in turn—vicarious liability, negligence, and civil conspiracy, beginning with vicarious liability.

1.

Louisiana Civil Code article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions which they are employed." A "servant," as used in the Civil Code, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 476 (La. 1990). Officer Doe's vicarious liability theory fails at the point of our beginning because he does not allege facts that support an inference that the unknown assailant "perform[ed] a continuous service" for or that the assailant's "physical movements [were] subject to the control or right to control" of Mckesson. Therefore, under the pleadings, Mckesson cannot be held liable under a vicarious liability theory.

116a

2.

We now move on to address Officer Doe's civil conspiracy theory. Civil conspiracy is not itself an actionable tort. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002). Instead, it assigns liability arising from the existence of an underlying unlawful act. *Id*. In order to impose liability for civil conspiracy in Louisiana, a plaintiff must prove that (1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008); *see also* La. Civ. Code art. 2324. "Evidence of . . . a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator." *Stephens v. Bail Enf't*, 690 So. 2d 124, 131 (La. Ct. App. 1997).

Officer Doe's complaint is vague about the underlying conspiracy to which Mckesson agreed, or with whom such an agreement was made. In his complaint, Officer Doe refers to a conspiracy "to incite a riot/protest." Disregarding Officer Doe's conclusory allegations, we find that Officer Doe has not alleged facts that would support a plausible claim that Mckesson can be held liable for his injuries on a theory of civil conspiracy. Although Officer Doe has alleged facts that support an inference that Mckesson agreed with unnamed others to demonstrate illegally on a public highway, he has not pled facts that would allow a jury to conclude that Mckesson colluded with

the unknown assailant to attack Officer Doe, knew of the attack and ratified it, or agreed with other named persons that attacking the police was one of the goals of the demonstration. The closest that Officer Doe comes to such an allegation is when he states that Mckesson was "giving orders" throughout the demonstration. But we cannot infer from this quite unspecific allegation that Mckesson ordered the unknown assailant to attack Officer Doe. Lacking an allegation of this pleading quality, Officer Doe's conspiracy claim must and does fail.

3.

Finally, we turn to Officer Doe's negligence theory. Officer Doe alleges that Mckesson was negligent for organizing and leading the Baton Rouge demonstration because he "knew or should have known" that the demonstration would turn violent. We agree as follows.

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court has adopted a "duty-risk" analysis for assigning tort liability under a negligence theory. This theory requires a plaintiff to establish that (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Lazard v. Foti*, 859 So. 2d 656, 659 (La. 2003). Whether a defendant owes a plaintiff a duty is a question of law. *See Posecai v. Wal-Mart Stores, Inc.*, 752 So. 2d 762, 766 (La. 1999); *Bursztajn v.*

118a

*United States*, 367 F.3d 485, 489 (5th Cir. 2004) ("Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'" (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994))). There is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998). Louisiana courts elucidate specific duties of care based on consideration of "various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Posecai*, 752 So. 2d at 766.

We first note that this case comes before us from a dismissal on the pleadings alone. In this context, we find that Officer Doe has plausibly alleged that Mckesson breached his duty of reasonable care in the course of organizing and leading the Baton Rouge demonstration. The complaint specifically alleges that it was Mckesson himself who intentionally led the demonstrators to block the highway. Blocking a public highway is a criminal act under Louisiana law. *See* La. Rev. Stat. Ann. § 14:97. As such, it was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests. Given the intentional lawlessness of this

119a

aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was most nearly certain to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. By ignoring the foreseeable risk of violence that his actions created, Mckesson failed to exercise reasonable care in conducting his demonstration.

Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. *See Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

We iterate what we have previously noted: Our ruling at this point is not to say that a finding of liability will ultimately be appropriate. At the motion

120a

to dismiss stage, however, we are simply required to decide whether Officer Doe's claim for relief is sufficiently plausible to allow him to proceed to discovery. We find that it is.

B.

Having concluded that Officer Doe has stated a plausible claim for relief against Mckesson under state tort law, we will now take a step back and address the district court's determination that Officer Doe's complaint should be dismissed based on the First Amendment. The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nonetheless, the district court dismissed the complaint on First Amendment grounds, reasoning that "[i]n order to state a claim against Mckesson to hold him liable for the tortious act of another with whom he was associating during the demonstration, Plaintiff would have to allege facts that tend to demonstrate that Mckesson 'authorized, directed, or ratified specific tortious activity.'" *See id.* at 927. The district court then went on to find that there were no plausible allegations that Mckesson had done so in his complaint.

We respectfully disagree. The district court appears to have assumed that in order to state a claim that Mckesson was liable for his injuries, Officer Doe was required to allege facts that created an inference that Mckesson directed, authorized, or ratified the unknown assailant's specific conduct in attacking Officer Doe. This assumption, however, does not fit the situation we address today. Assuming that the First Amendment is applicable to Mckesson's conduct, in order to counter its applicability at the

121a

pleading stage Officer Doe simply needed to plausibly allege that his injuries were one of the "consequences" of "tortious activity," which itself was "authorized, directed, or ratified" by Mckesson in violation of his duty of care. *See id.* ("[A] finding that [the defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Our discussion above makes clear that Officer Doe's complaint does allege that Mckesson directed the demonstrators to engage in the criminal act of occupying the public highway, which quite consequentially provoked a confrontation between the Baton Rouge police and the protesters, and that Officer Doe's injuries were the foreseeable result of the tortious and illegal conduct of blocking a busy highway. Thus, on the pleadings, which must be read in a light most favorable to Officer Doe, the First Amendment is not a bar to Officer Doe's negligence theory. The district court erred by dismissing Officer Doe's complaint—at the pleading stage—as barred by the First Amendment.

## C.

Now we turn our attention to whether Officer Doe has stated a claim against Black Lives Matter. The district court took judicial notice that "'Black Lives Matter,' as that term is used in the Complaint, is a *social movement* that was catalyzed on social media by the persons listed in the Complaint in response to the perceived mistreatment of African-American citizens by law enforcement officers." Based on this conclusion, the district court held that Black Lives Matter is not a "juridical person" capable of being sued. *See Ermert*, 559 So. 2d at 474. We first address the district court's taking of judicial notice, then

122a

Black Lives Matter's alleged capacity to be sued.

Federal Rule of Evidence 201 provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute" in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed. R. Evid. 201(b). "Rule 201 authorizes the court to take notice only of 'adjudicative *facts*,' not legal determinations." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998). In *Taylor*, we held that another court's state actor determination was not an "adjudicative fact" within the meaning of Rule 201 because "[w]hether a private party is a state actor for the purposes of § 1983 is a mixed question of fact and law and is thus subject to our *de novo* review." *Id.* at 830–31. We further held that the state-actor determination was not beyond reasonable dispute where it "was, in fact, disputed by the parties" in the related case. *Id.* at 830.

We think that the district court was incorrect to take judicial notice of a mixed question of fact and law when it concluded that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort." The legal status of Black Lives Matter is not immune from reasonable dispute; and, indeed, it is disputed by the parties—Doe claiming that Black Lives Matter is a national unincorporated association, and Mckesson claiming that it is a movement or at best a community of interest. This difference is sufficient under our case law to preclude judicial notice.

We should further say that we see the cases relied on by the district court as distinguishable. Each

123a

deals with judicial notice of an aspect of an entity, not its legal form. *See United States v. Parise*, 159 F.3d 790, 801 (3d Cir. 1998) (holding that the court could take judicial notice of the *aims* and *goals* of a movement); *Atty. Gen. of U.S. v. Irish N. Aid. Comm.*, 530 F. Supp. 241, 259–60 (S.D.N.Y. 1981) (stating the court could take "notice that the IRA is a 'Republican movement,' *at least insofar as it advocates a united Ireland*" (emphasis added)); *see also Baggett v. Bullitt*, 377 U.S. 360, 376 n.13 (1964) (noting that "[t]he lower court took judicial notice of the fact that the Communist Party of the United States … was *a part of* the world Communist movement" (emphasis added)).

Now, we move on to discuss the merits of Officer Doe's contention that Black Lives Matter is a suable entity. He alleges that Black Lives Matter "is a national incorporated association with chapter [sic] in many states." Under Federal Rule of Civil Procedure 17(b), the capacity of an entity "to sue or be sued is determined … by the law of the state where the court is located." Under Article 738 of the Louisiana Code of Civil Procedure, "an unincorporated association has the procedural capacity to be sued in its own name." The Louisiana Supreme Court has held that "an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit." *Ermert*, 559 So. 2d at 473. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. To show intent, "the object of the contract of association must necessarily be the creation of an entity whose personality 'is distinct from that of its

124a

members.'" *Ermert*, 559 So. 2d at 474 (quoting La. Civ. Code Ann. art. 24). Louisiana law does not provide for a public display of the parties' intent. *Id.*

Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure. *See Bogue Lusa Waterworks Dist. v. La. Dep't of Envtl. Quality*, 897 So. 2d 726, 728-729 (La. Ct. App. 2004) (relying on organization's unfiled articles of incorporation); *Friendship Hunting Club v. Lejeune*, 999 So. 2d 216, 223 (La. Ct. App. 2008) (relying on organization's required dues and possession of an insurance policy); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 675 (E.D. La. 2010) (relying on organization's formal and determinate membership structure). Lacking at least some of these indicators, Louisiana courts have been unwilling to find an intent to create an unincorporated association. *See, e.g.*, *Ermert*, 559 So. 2d at 474–475 (finding that hunting group was not an unincorporated association because it did not own or lease the property that it was based on, required the permission of one of its alleged members to use the property, and lacked formal rules or bylaws).

Officer Doe has not shown in his complaint a plausible inference that Black Lives Matter is an unincorporated association. His only allegations are that Black Lives Matter: (1) was created by three women; (2) has several leaders, including Mckesson; (3) has chapters in many states; and (4) was involved in numerous protests in response to police practices.

125a

He does not allege that it possesses property, has a formal membership, requires dues, or possesses a governing agreement. As such, the complaint lacks any indication that Black Lives Matter possesses the traits that Louisiana courts have regarded as indicative of an intent to establish a juridical entity. We have no doubt that Black Lives Matter involves a number of people working in concert, but "an unincorporated association …. does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together." *Id.* at 474. Therefore, we find that the district court did not err in concluding that Officer Doe's complaint has failed plausibly to allege that Black Lives Matter is an entity capable of being sued.

## V.

In sum, we hold that Officer Doe has not adequately alleged that Mckesson was vicariously liable for the conduct of the unknown assailant or that Mckesson entered into a civil conspiracy with the purpose of injuring Officer Doe. We do find, however, that Officer Doe adequately alleged that Mckesson is liable in negligence for organizing and leading the Baton Rouge demonstration to illegally occupy a highway. We further find that in this context the district court erred in dismissing the suit on First Amendment grounds. As such, Officer Doe has pleaded a claim for relief against DeRay Mckesson in his active complaint.[4] We also hold that the district

---

[4] Officer Doe has complained of the lack of discovery in this case, particularly related to his claims against the corporate defendants. Officer Doe is free to argue before the district court that he is entitled to discovery. The district court may then

126a

court erred by taking judicial notice of the legal status of "Black Lives Matter," but nonetheless find that Officer Doe did not plead facts that would allow us to conclude that Black Lives Matter is an entity capable of being sued.[5]  Therefore, the judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.[6]

decide whether, in the light of our remand, discovery would be appropriate.

[5] Because we find that Officer Doe has successfully pled a claim, we do not reach the district court's denial of Officer Doe's motion for leave to amend. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 268 n.36 (5th Cir. 2009) (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 358 n.70 (5th Cir. 1989)). It follows that we do not address any of the allegations in the Proposed Amended Complaint or the parties it seeks to add. On remand, Officer Doe may seek leave to amend his complaint to add new parties and plead additional facts to support his negligence claim. The district court should determine whether to grant this motion, and any new motions for leave to amend, in the light of our opinion.

[6] On appeal, Officer Doe also argues that the district court erred in denying his request to proceed anonymously as John Doe. He argues that the public nature of his job puts him and his family in danger of additional violence. At the district court, he listed a number of examples of acts of violence against police officers by individuals who may have some connection with Black Lives Matter. In its order, the district court walked through three factors common to anonymous-party suits that we have said "deserve considerable weight." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). These are: (1) whether the plaintiff is "challeng[ing] governmental activity"; (2) whether the plaintiff will be required to disclose information "of the utmost intimacy"; and (3) whether the plaintiff will be "compelled to admit [his] intention to engage in illegal conduct, thereby risking criminal prosecution." *Id.* at 185. The district court concluded that none of these factors applied to the facts of this case. In response to

127a

AFFIRMED in part, REVERSED in part, and REMANDED.

---

Officer Doe's argument regarding potential future violence, the district court noted that the incidents Officer Doe listed did not involve Officer Doe and were not related to this lawsuit. In fact, at oral argument before the district court regarding his motion, Officer Doe conceded that he had received no particularized threats of violence since filing his lawsuit. The district court instead saw the incidents Officer Doe listed as evidence of "the generalized threat of violence that all police officers face." As a result, the district found that Doe had not demonstrated a privacy interest that outweighs the "customary and constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 186. We agree with the district court and affirm the denial of Doe's motion to proceed anonymously. In so holding, we emphasize what the Supreme Court said decades ago: "What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).