# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

July 10, 2023

Mr. Michael L. McConnell
Middle District of Louisiana, Baton Rouge
United States District Court
777 Florida Street
Room 139
Baton Rouge, LA 70801

     No. 17-30864   Doe v. Mckesson
                  USDC No. 3:16-CV-742

Dear Mr. McConnell,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                          Sincerely,

                          LYLE W. CAYCE, Clerk

                          *Shea E. Pertuit*
              By: _____
              Shea E. Pertuit, Deputy Clerk
              504-310-7666

cc:
     Mr. Ian Lewis Atkinson
     Ms. Christine Marie Calogero
     Ms. Vera Eidelman
     Mr. William P. Gibbens
     Mr. David Thomas Goldberg
     Mrs. Donna Unkel Grodner
     Mr. Brian Matthew Hauss
     Mr. Emerson Sykes
     Mr. Ben Wizner



# United States Court of Appeals for the Fifth Circuit

Certified as a true copy and issued as the mandate on Jul 10, 2023

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 16, 2023

Lyle W. Cayce
Clerk

No. 17-30864

OFFICER JOHN DOE, *Police Officer*,

*Plaintiff—Appellant*,

*versus*

DERAY MCKESSON; BLACK LIVES MATTER; BLACK LIVES
MATTER NETWORK, INCORPORATED,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:16-CV-742

Before JOLLY, ELROD, and WILLETT, *Circuit Judges*.

## JUDGMENT

This cause was considered on the record on appeal and the briefs on file.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART, REVERSED IN PART and REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

DON R. WILLETT, *Circuit Judge*, concurring in part, dissenting in part.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
June 16, 2023
Lyle W. Cayce
Clerk

No. 17-30864

---

OFFICER JOHN DOE, *Police Officer*,

*Plaintiff—Appellant*,

*versus*

DERAY MCKESSON; BLACK LIVES MATTER,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:16-CV-742

---

Before JOLLY, ELROD, and WILLETT, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

This case returns to us after remand from the Supreme Court and certification to the Supreme Court of Louisiana. The controversy concerns a Black Lives Matter protest organized and led by Appellee DeRay Mckesson. During that protest, an unidentified demonstrator struck Appellant John Doe, a police officer in the Baton Rouge Police Department, with a heavy object, causing him to sustain severe injuries.

According to Doe's complaint, Mckesson organized the protest such that he knew, or should have known, that violence would likely ensue. Doe

No. 17-30864

says that Mckesson arranged for the protesters to meet in front of the Baton Rouge police station, blocking entry to the station and access to the adjacent streets. Mckesson directed the protest at all times, and when demonstrators looted a grocery store for water bottles to throw at the assembled police officers, he did nothing to try to discourage this, even though he remained in charge. After that, Mckesson personally attempted to lead protesters onto a local interstate to obstruct traffic, a crime under Louisiana law. To prevent the commission of that crime, the police responded and began making arrests. In that confrontation, the unidentified protester struck and injured Doe. All of this occurred, according to Doe, shortly after Mckesson had participated in protests across the country involving violence and property damage.

The district court dismissed Doe's claims, and for the most part, we affirmed. *Doe v. Mckesson*, 945 F.3d 818 (5th Cir. 2019). Specifically, we explained that Doe could not state a claim against Mckesson for respondeat superior because he could not show that Mckesson had the right to direct the unidentified protester's actions. We also explained that Doe could not state a claim against Mckesson for conspiracy because he could not show that Mckesson agreed with the unidentified protester to commit the underlying tort of battery. Finally, we explained that Doe could not state claims against Black Lives Matter because he could not show that it was an unincorporated association, and thus possessing jural capacity to be sued in its own name.

But a panel majority reversed the district court's dismissal of the negligence claim Doe asserted against Mckesson. On the allegations present in Doe's complaint, and based on our understanding of Louisiana tort law, we held that Doe had plausibly alleged that Mckesson organized and led the protest in an unreasonably dangerous manner, in breach of his duty to avoid creating circumstances in which it is foreseeable that another will be injured. In other words, arranging the protest as he did, it is plausible that Mckesson knew or should have known that the police would be forced to respond to the

demonstration, that the protest would turn violent, and that someone might be injured as a result. We also rejected Mckesson's argument that the First Amendment forbids a State from imposing liability in these circumstances. Here, the negligence theory of which Doe seeks to avail himself is tailored to prohibiting unlawful conduct and does not restrict otherwise legitimate expressive activity. One of our colleagues dissented from this holding.

The Supreme Court vacated the previous judgment, explaining that we should have certified the state-law question before considering the constitutional issue. *Mckesson v. Doe*, 141 S. Ct. 48 (2020). On remand, we certified to the Supreme Court of Louisiana the question of whether Louisiana tort law recognizes a negligence cause of action in the circumstances alleged in Doe's complaint. The court answered that question in the affirmative. *Doe v. Mckesson*, 339 So. 3d 524 (La. 2022). With that essential confirmation, the case returns to us. We now renew our prior holdings. The judgment of the district court is REVERSED as to Doe's negligence claim. In addition, because Doe's proposed amended complaint alleges sufficient facts to state a negligence claim, the district court erred in denying Doe's motion for leave to amend. That aspect of the district court's order is likewise REVERSED, but only insofar as Doe may replead his negligence claim against Mckesson. In all other respects, the judgment is AFFIRMED, and the case is REMANDED for further proceedings consistent with this opinion.

I

At this stage, the background facts are well known.[1] Appellee DeRay Mckesson is a leader in the national social movement known as "Black Lives

---

[1] We take these facts from the well-pleaded allegations contained in Doe's original and first-amended complaints. The district court denied Doe's motion for leave to amend, reasoning that Doe's claims would be futile even under the amended complaint. *See Doe v. Mckesson*, 272 F. Supp. 3d 841, 853 (M.D. La. 2017). As explained *infra*, we conclude that

Matter." Throughout 2015 and 2016, and prior to the events at issue here, Mckesson participated in Black Lives Matter protests in Baltimore, McKinney, Ferguson, and Earth City, in which protesters injured dozens of police officers, looted businesses, and damaged private and public property.

Continuing the string of protests, Mckesson planned a Black Lives Matter demonstration for July 9, 2016, in Baton Rouge. On that day, under Mckesson's leadership, protesters congregated in front of the police station for the Baton Rouge Police Department. The congregation blocked access to the police station and the adjacent streets, Airline Highway and Goodwood Boulevard. As a precaution, the police leadership directed officers to monitor the protest and make arrests, if any were necessary. The police organized a front line of officers in riot gear, arranged in front of officers in ordinary uniforms, designated to make arrests. Officer John Doe was one of the latter.

According to the complaint, Mckesson was "in charge" of the protest at all times, and regularly "gave orders" to the demonstrators. The protest began peacefully, but soon escalated and "turned into a riot." According to the complaint, Mckesson "did nothing to stop, quell, or dissuade these actions." The protestors then looted a grocery store, taking water bottles among other things. They began to throw the water bottles at the police. Doe alleges that, rather than attempt to "calm the crowd," Mckesson "incited the violence" and "direct[ed] the activity of the protesters."

Mckesson then led the protestors into the street on Airline Highway, with the purpose of proceeding to and obstructing Interstate 12. The police

---

Doe has plausibly stated a claim for negligence on the allegations identified here. Insofar as the allegations in the proposed amended complaint are necessary to support that conclusion, the district court erred in denying the motion for leave to amend as futile. *E.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 125–28, 127 n.13 (5th Cir. 2019) (evaluating allegations in amended complaint to determine if amendment would be futile).

No. 17-30864

blocked the protestors' advance, but the protestors continued to throw water bottles. When they ran out of those, one demonstrator "picked up a piece of concrete or similar rock like substance" and threw it into the assembled officers. The projectile struck Doe "fully in the face," immediately knocking him down, incapacitated. According to the complaint, Doe's injuries include "loss of teeth, injury to jaw, [and] injury to brain and head." The protestor who threw the projectile was never identified.

Later in 2016, Doe filed a complaint in federal court, naming as defendants Mckesson and Black Lives Matter. He asserted claims based on negligence, *respondeat superior*, and civil conspiracy, and later sought leave to amend to include additional factual allegations and join Black Lives Matter Network, Inc. and #BlackLivesMatter. The district court subsequently dismissed Doe's claims with prejudice and denied his motion for leave to amend. *Doe v. Mckesson*, 272 F. Supp. 3d 841 (M.D. La. 2017).

We affirmed in part and reversed in part. *Doe v. Mckesson*, 945 F.3d 818 (5th Cir. 2019).[2] To begin, we held that Doe failed to prove that Black Lives Matter is an unincorporated association with jural capacity to be sued, and affirmed the district court's dismissal of Doe's claims against that defendant. We further held that Doe failed to plausibly allege his *respondeat-superior* and civil-conspiracy claims and affirmed those claims' dismissal.

---

[2] This panel's first opinion, *Doe v. Mckesson*, 922 F.3d 604 (5th Cir. 2019), was withdrawn following rehearing and replaced with an opinion that clarified the prior holding with respect to Doe's negligence claim. *Doe v. McKesson*, 935 F.3d 253 (5th Cir. 2019). The first two opinions were unanimous. However, one of our distinguished colleagues subsequently changed his view as to the negligence claim. On our own motion, we withdrew the second opinion, and replaced it with a third, in which our colleague dissented in part. *Doe v. Mckesson*, 945 F.3d 818 (5th Cir. 2019); *id.* at 835–47 (Willett, J., concurring in part and dissenting in part).

No. 17-30864

As to Doe's negligence claim, however, we reversed. Doe argued that Mckesson had a duty to exercise reasonable care in organizing the Black Lives Matter protest, and that Mckesson breached that duty in organizing the protest in such a manner where it was reasonably foreseeable that a violent confrontation with the police would result. We understood Louisiana state law to recognize such a theory of negligence liability.

We also rejected Mckesson's argument that imposing liability in these circumstances would violate the First Amendment, as informed by *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). That case gave important guidance on the extent to which state law can impose liability for conduct in "the presence of activity protected by the First Amendment." *Id.* at 916. Under *Claiborne*, where a defendant "authorized, directed, or ratified specific tortious activity," the First Amendment allows state law to impose liability for "the consequences of that activity." *Id.* at 927. That principle, we explained, is consistent with allowing civil liability here. Doe seeks to hold Mckesson liable for the latter's personally conducted tortious actions: negligently organizing and directing a protest in an unsafe manner, such that it was reasonably foreseeable for the police to respond, and violence to ensue. Nothing in the First Amendment prohibits such liability.

After the final panel opinion was published, Mckesson sought rehearing *en banc*, which was denied. *Doe v. Mckesson*, 947 F.3d 874 (5th Cir. 2020). He then sought *certiorari* from the Supreme Court, focusing his petition on the First Amendment question. The Court granted the petition, but did not reach the question on the merits. *Mckesson v. Doe*, 141 S. Ct. 48 (2020). Instead, the Court centered its attention on the fact that Louisiana state law had not expressly recognized a negligence theory like that put forward by Doe. The Court explained that the interpretation of Louisiana law was "too uncertain a premise on which to address" the First Amendment question. *Id.* at 50. For that reason, the Court vacated the panel opinion and remanded

the case to this court to certify to the Supreme Court of Louisiana the question of whether Louisiana law recognizes a negligence action akin to that asserted by Doe. *Id.* at 51; *see* Supreme Court of Louisiana Rule XII, §§ 1–2 (allowing for certification).

Upon remand, this court promptly certified that question, as well as one other. *Doe v. Mckesson*, 2 F.4th 502 (5th Cir. 2021). It came to the court's attention that even if Louisiana law recognized such a cause of action, Doe's recovery might nonetheless be barred by that State's professional rescuer's doctrine. *See id.* at 503–04. That doctrine "essentially states that a professional rescuer, such as a fireman or a policeman, who is injured in the performance of his duties, assumes the risk of such an injury and is not entitled to damages." *Gann v. Matthews*, 873 So. 2d 701, 705 (La. Ct. App. 2004) (internal quotation marks and citation omitted). We thus certified the following two questions to the Supreme Court of Louisiana:

> 1) Whether Louisiana law recognizes a duty, under the facts alleged in the complaint, or otherwise, not to negligently precipitate the crime of a third party?

> 2) Assuming Mckesson could otherwise be held liable for a breach of duty owed to Officer Doe, whether Louisiana's Professional Rescuer's Doctrine bars recovery under the facts alleged in the complaint?

*Mckesson*, 2 F.4th at 504.

The state Supreme Court accepted the certification. *Doe v. Mckesson*, 320 So. 3d 416 (La. 2021) (mem.). It answered the first question "yes," and the second question "no." *Doe v. Mckesson*, 339 So. 3d 524 (La. 2022).

As to the first question, the court understood the panel opinion as "an accurate summary of the pertinent Louisiana law on this issue." *Mckesson*,

No. 17-30864

339 So. 3d at 533. It further explained that the complaint had plausibly alleged a claim based on the negligence theory:

> Under the allegations of fact set forth in the plaintiff's federal district court petition, it could be found that Mr. Mckesson's actions, in provoking a confrontation with Baton Rouge police officers through the commission of a crime (the blocking of a heavily traveled highway, thereby posing a hazard to public safety), directly in front of police headquarters, with full knowledge that the result of similar actions taken by BLM in other parts of the country resulted in violence and injury not only to citizens but to police, would render Mr. Mckesson liable for damages for injuries, resulting from these activities, to a police officer compelled to attempt to clear the highway of the obstruction.

*Id.* As to the second question, the court determined that the professional rescuer's doctrine had been abrogated by subsequent caselaw:

> Accordingly, we answer the Fifth Circuit Court of Appeals' second certified question: In view of the current directive of La. C.C. art. 2323 that "[i]n *any* action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of *all* persons *causing or contributing* to the injury, death, or loss *shall* be determined . . ." (emphasis added) and this court's holding in *Murray v. Ramada Inns, Inc.*, 521 So. 2d 1123, 1132 (La. 1988), abrogating assumption of risk, we conclude that the Professional Rescuer's Doctrine has likewise been abrogated in Louisiana both legislatively and jurisprudentially.

*Id.* at 536.[3] The case now returns to this court for consideration of the merits of the appeal with the benefit of the Supreme Court of Louisiana's guidance.

---

[3] Several Justices of the seven-member court wrote separately. Specifically, three Members wrote concurring opinions, offering separate approaches to the certified questions, but reaching the same result. *See Mckesson*, 339 So. 3d at 537–39 (Weimer, C.J.,

## II

Turning to the analysis, we emphasize as an initial matter that the majority of our prior holdings were not appealed.[4]  Specifically, neither party objected to our affirming the district court's dismissal of all claims as to Black Lives Matter and the *respondeat superior* and civil conspiracy claims as to Mckesson.  Even so, when the Supreme Court vacated the prior judgment, it voided each of the judgment's holdings; that is the nature of vacatur.  As such, we must address each of the original issues on appeal, beginning here with the dismissal of the defendant Black Lives Matter.

The district court took judicial notice that Black Lives Matter is a "*social movement*, rather than an organization or entity of any sort," *Mckesson*, 272 F. Supp. 3d at 850, and dismissed the defendant as lacking capacity to be sued.  Although judicial notice was not warranted here, we ultimately affirm.

As explained in the prior panel opinion, *Mckesson*, 945 F.3d at 832–33, judicial notice is inappropriate for a mixed question of fact and law.  That is the type of question presented here; the legal status of "Black Lives Matter" turns both on the factual background giving rise to the entity's existence and on the legal significance of those facts as a matter of Louisiana law.  It was incorrect to use judicial notice to answer that particular question.

On the merits of the question, Doe asserts that Black Lives Matter is an unincorporated association, which Louisiana law recognizes as an entity with jural capacity.  La. Code Civ. Proc. Ann. art. 738; *see also* Fed. R. Civ. P.

---

concurring); *id.* at 539 (Genovese, J., concurring in the judgment); *id.* at 540–47 (Crain, J., concurring in part).  And one Member dissented.  *Id.* at 547–48 (Griffin, J., dissenting).

[4] In the previous panel opinion, we *sua sponte* considered our jurisdiction, noting that it might conceivably be absent.  We hereby incorporate by reference the related analysis and holding, and conclude that we have jurisdiction over this appeal.  *See Mckesson*, 945 F.3d at 824–25 (Part IV).

17(b) (providing that, for this type of entity, "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located"). As previously noted, "Louisiana courts have looked to various factors as indicative of an intent to create an unincorporated association, including requiring dues, having insurance, ownership of property, governing agreements, or the presence of a formal membership structure." *Mckesson*, 945 F.3d at 834 (collecting cases). Possession of at least some of these characteristics is a necessary condition of establishing intent to create an unincorporated association. *Id.*

Doe fails to allege facts that demonstrate any of those characteristics. Instead, he alleges only that Black Lives Matter has founders and several informal leaders, has several chapters nationwide, and participates in protests and demonstrations across the country. Perhaps these allegations show "a community of interest," or that individuals have "acted together." *Ermert v. Hartford Ins. Co.*, 559 So. 2d 467, 474 (La. 1990). But, without at least some of the characteristics listed above, concerted action is insufficient to establish intent to create an unincorporated association. *Mckesson*, 945 F.3d at 834. We thus affirm the district court's denial of Black Lives Matter as a defendant because Doe has not shown that it has the jural capacity to be sued. As before, we do not address whether Doe could state a claim against Black Lives Matter, if that entity could be sued. *See id.* at 834 n.10.[5]

---

[5] The district court denied Doe's motion for leave to add Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants, holding that amendment would be futile. Specifically, the district court held that Doe failed to state plausible claims for relief as to Black Lives Matter Network, and that #BlackLivesMatter is an expression that lacks jural capacity. *Mckesson*, 272 F. Supp. 3d at 851, 853–54. Doe fails to brief these issues on appeal. They are therefore forfeited. *See, e.g.*, *Garcia v. Orta*, 47 F.4th 343, 349 n.1 (5th Cir. 2022).

## III

Next, we address the claims Doe asserts against Mckesson. We begin with the *respondeat-superior* and civil-conspiracy claims, whose disposal was not contested after our previous panel opinion. We then consider Doe's negligence claim, which of course was the subject of the Supreme Court's order and the Supreme Court of Louisiana's opinion on certification.

## A

As to Doe's vicarious-liability claim, Louisiana law defines the scope of liability as follows: "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." La. Civ. Code Ann. art. 2320; *see also Mckesson*, 945 F.3d at 825–26. And a "servant," in turn, "includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service." *Ermert*, 559 So. 2d at 476.

Here, Doe's complaint fails to meet that standard. *Mckesson*, 945 F.3d at 826. To be sure, Doe alleges that Mckesson organized the protest, was its leader, and often directed the protesters' movements. But those actions are insufficient by themselves to establish agency. Specifically, Doe fails to allege that the protesters "perform[ed] continuous service" for Mckesson, or that their "physical movements" were subject to his "right to control." *Ermert*, 559 So. 2d at 476. We therefore affirm the district court's dismissal of Doe's *respondeat superior* claim asserted against Mckesson.

## B

As to Doe's civil-conspiracy claim, we are mindful that such a cause of action "is not itself an actionable tort." *Mckesson*, 945 F.3d at 826 (citing *Ross v. Conoco, Inc.*, 828 So. 2d 546, 552 (La. 2002)). Operationally, civil

conspiracy assigns liability for an underlying unlawful act to a person who acted in concert with the direct tortfeasor. To impose such liability, a plaintiff must prove the following elements: "(1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result." *Id.* (first citing *Crutcher-Tufts Resources, Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. Ct. App. 2008), and then La. Civ. Code Ann. art. 2324).

The district court was correct to dismiss this claim because Doe fails to allege facts tending to show that Mckesson agreed with the protester who threw the rock or concrete-like object. *See Mckesson*, 945 F.3d at 826. True, Doe alleges that, among other things, Mckesson agreed with the demonstrators to protest in front of the Baton Rouge police station and attempt to block a public highway. But this particular cause of action is derived from the unknown assailant's battery. The facts alleged in Doe's complaint do not show that Mckesson agreed with the assailant to commit this tort.

## C

As to Doe's negligence claim, we first address whether Louisiana tort law allows Doe to pursue such a claim, and if so, whether Doe has plausibly stated such a claim. Obviously, we are bound by the Supreme Court of Louisiana's interpretation of its own state law. We then address if the First Amendment allows a State to impose civil liability on this basis.

### 1

In the prior panel opinion, we set forth our understanding of Louisiana state law as applied to this case. *Mckesson*, 945 F.3d at 826–28. The Supreme Court of Louisiana expressly incorporated that portion of our decision in its opinion on certification. *Mckesson*, 339 So. 3d at 530–33. We hereby reiterate our prior holding.

The origin of Doe's negligence claim is Louisiana Civil Code article
2315. That article provides, "Every act whatever of man that causes damage
to another obliges him by whose fault it happened to repair it." Within that
body of tort liability, Louisiana has adopted a "duty-risk" approach to negli-
gence. Under that approach, a plaintiff must prove five elements: "(1) the
plaintiff suffered an injury; (2) the defendant owed a duty of care to the plain-
tiff; (3) the duty was breached by the defendant; (4) the conduct in question
was the cause-in-fact of the resulting harm; and (5) the risk of harm was
within the scope of protection afforded by the duty breached." *Mckesson*, 945
F.3d at 826 (collecting Louisiana authority).

The parties disputed whether Louisiana law recognizes a duty in these
circumstances. In the course of that dispute, we understood the duty at issue
as follows: "a duty not to negligently precipitate the crime of a third party."
*Mckesson*, 945 F.3d at 827. The existence of a legal duty is a question of state
law, and the Supreme Court of Louisiana expressly concluded that such a
duty exists in the circumstances presented here. *Mckesson*, 339 So. 3d at 533.

The threshold question having been answered, the only remaining is-
sue is whether Doe has plausibly stated this form of a negligence claim. As
before, we conclude that he has. Doe has plainly alleged that he suffered an
injury. He has also plausibly alleged that Mckesson breached his duty in the
course of the latter's organizing and leading the Black Lives Matter protest
at issue here. First and foremost, Doe alleged that Mckesson planned to lead
the demonstrators onto Interstate 12, despite the fact that blocking a public
highway is a crime under Louisiana law. La. Stat. Ann. § 14:97. As we ex-
plained before, that act supports the contention that Mckesson breached his
duty of care as to Doe:

> It was patently foreseeable that the Baton Rouge police would
> be required to respond to the demonstration by clearing the
> highway and, when necessary, making arrests. Given the

intentional lawlessness of this aspect of the demonstration, Mckesson should have known that leading the demonstrators onto a busy highway was likely to provoke a confrontation between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway.

*Mckesson*, 945 F.3d at 827. Other allegations support Doe's contention that Mckesson breached his duty of care. For instance, Doe says that Mckesson had recently participated in other Black Lives Matter protests in which demonstrators blocked public highways, and in which police officers were injured. That allegation would tend to support the argument that Mckesson knew or should have known that the protest at issue here—a protest that Mckesson personally directed at all times—would end in a violent confrontation. Doe also alleges that Mckesson regularly gave orders to the protestors and directed their activity. To be sure, Doe does not allege that Mckesson directed the unidentified assailant to throw the heavy object, or that he directed the protesters to loot the grocery store and throw water bottles at the assembled police officers. But the fact that those events occurred under Mckesson's leadership support the assertion that he organized and directed the protest in such a manner as to create an unreasonable risk that one protester would assault or batter Doe.

It is likewise plausible that Mckesson's conduct was the but-for cause of Doe's injuries, and that the pertinent risk was within the protection designed to be afforded by the duty Mckesson breached. As to the former, "by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the 'but for' causes of Officer Doe's injuries." *Mckesson*, 945 F.3d at 828 (citing *Roberts v. Benoit*, 605 So. 2d 1032, 1052 (La. 1992)). And as to the latter, a central purpose of imposing a duty in these circumstance is to protect those who are

injured as a result of a negligently organized and led protest. As such, the risk of harm to Doe is plainly within the scope of protection afforded by the duty owed by Mckesson here. *See id.*[6]

Following the guidance of the Supreme Court of Louisiana, we therefore must conclude that Louisiana tort law recognizes a negligence claim in these circumstances and that Doe has plausibly alleged such a claim. However, we reiterate that Doe's pleading a negligence claim in no way guarantees that he will *prove* that claim. Doe will be required to present specific evidence satisfying each of the five elements listed above, and Mckesson will of course be entitled to introduce evidence supporting his contention that he did not breach his duty to organize and lead the protest with reasonable care. The only question before us is whether Doe is entitled to proceed to discovery on his negligence claim. We are compelled to conclude that he is.

2

Having confirmed that Louisiana state law recognizes the negligence theory Doe pursues here, and that Doe plausibly alleges such a claim, we now consider Mckesson's argument that imposing liability in these circumstances is prohibited by the First Amendment. We conclude that the First Amendment allows such liability, for largely the same reasons expressed in the prior panel opinion. *Mckesson*, 945 F.3d at 828–32.

---

[6] As noted above, we previously apprehended that Louisiana's professional rescuer's doctrine might apply here and bar Doe's negligence claim. *Mckesson*, 2 F.4th at 503–04. But on certification, the Supreme Court of Louisiana held that the doctrine has been "abrogated in Louisiana both legislatively and jurisprudentially." *Mckesson*, 339 So. 3d at 536. As such, the doctrine poses no bar to Doe's recovery here.

a

As before, our lodestar is the Supreme Court's decision in *Claiborne Hardware*, 458 U.S. 886 (1982). There, the Court reiterated that the "First Amendment does not protect violence." *Id.* at 916. And as a general matter, "[n]o federal rule of law restricts a State from imposing tort liability" for damages "that are caused by violence and by threats of violence." *Id.* But where otherwise tortious conduct "occurs in the context of constitutionally protected activity . . . 'precision of regulation' is demanded." *Id.* at 916 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). Such protected activity "imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17. Although the specific contours of these limitations are not enumerated, the guiding principle is to ensure that any liability is molded to prevent wrongful conduct, not stifle legitimate expressive activity. Rephrased, "A judgment tailored to the consequences of [a defendant's] unlawful conduct may be sustained." *Id.* at 926; *see also id.* at 918 ("Only those losses proximately caused by unlawful conduct may be recovered.").

It is clear that a protestor may be held liable for his or her own wrongful conduct, even if otherwise participating in expressive activity. *Id.* at 918, 926; *accord United States v. Daly*, 756 F.2d 1076, 1081–82 (5th Cir. 1985); *United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998); *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 295–98 (2d Cir. 1992). The Court of Appeals of Minnesota recently applied this principle in a case concerning the state's highway interference law, which is similar to the Louisiana statute at issue here. *Compare* La. Stat. Ann. § 14:97, *with* Minn. Stat. Ann. § 169.305; *see generally State v. Dornfeld*, No. A22-0816, 2023 WL 1956532 (Minn. Ct. App. Feb. 13, 2023). In *Dornfeld*, 600 protesters marched onto Interstate 94 in Minneapolis to participate in a demonstration. The defendant was charged and convicted of being a pedestrian on a

controlled-access highway. In response to the charge, she defended herself by arguing, among other things, that her conviction violated the First Amendment. The court summarily rejected this argument, explaining that unlawful conduct does not become lawful merely by including an expressive component. *See id.* at *3 ("[A]ppellant does not explain her implicit view that her right to free speech supersedes the rights of those travelling on a controlled-access highway to travel in safety, nor does she explain why her arrest deprived her of alternative channels of communication."). In cases like *Dornfeld*, the First Amendment's applicability, or lack thereof, is clear. But after that, the circumstances in which the government may impose liability differ based on the defendant's relationship with the person or persons who directedly committed the unlawful act and the nature of the defendant's involvement in the protected activity.

In certain circumstances, an associate of a tortfeasor-protestor may be liable for the consequences of that tort. But to maintain fundamental associative rights, those circumstances are narrow. It is clear that "mere association" with a group whose member commits some unlawful act "is an insufficient predicate on which to impose liability." *Claiborne*, 458 U.S. at 924–25. "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

In other cases, a protest leader may be liable for the consequences of a demonstrator's unlawful act. But in keeping with the tailoring requirement, the First Amendment does not allow the government to hold a protest leader liable anytime a protestor does something unlawful. Rather, liability must be tailored such that there is a sufficiently close relationship between the leader's actions and the protestor's unlawful conduct. In *Claiborne*, the Supreme Court identified three "theories" that would support such liability:

> First, a finding that [the leader] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity. Second, a finding that [the leader's] public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period. Third, the speeches might be taken as evidence that [the leader] gave other specific instructions to carry out violent acts or threats.

*Id.* at 927. As discussed in some detail below, the "specific tortious activity" authorized or otherwise caused by the protest leader does not have to be violent to lawfully impose liability. It need only be "unlawful."

Nothing in *Claiborne* suggests that the three theories identified above are the only proper bases for imposing tort liability on a protest leader. Instead, they are three examples of liability that is sufficiently narrow such that it targets improper conduct without prohibiting legitimate expressive activity. In identifying the bounds of allowable liability, the temporal relationship between the leader's actions and unlawful acts committed by the protesters is particularly important.

To illustrate, liability was improper in *Claiborne* where the protest leader advocated for violence in general terms, but acts of violence did not follow until weeks or months after the speech at issue there. But, the Supreme Court stressed, the case might have been different if violence had occurred sooner after the leader's actions. *See id.* at 928 ("The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them. In the course of those pleas, strong language was used. If that language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that unlawful conduct.").

b

Applying those principles to the facts alleged, we hold that imposing negligence liability on Mckesson does not offend the First Amendment. *See Mckesson*, 945 F.3d at 828–32. At the outset, we highlight what we *do not* hold. First, it is clear that Mckesson did not throw the heavy object that injured Doe. That protestor could of course be held liable for his unlawful conduct notwithstanding his participation in the demonstration. *See Claiborne*, 458 U.S. at 918, 926; *accord Daly*, 756 F.2d at 1081–82. But Mckesson is not indirectly liable for that wrongful act because, as explained above, Doe fails to satisfy the conditions required for vicarious liability or civil conspiracy. *Supra* Sections III.A, III.B. Likewise, Mckesson is not liable for the unidentified protestor's tort merely because the two associated together for purposes of the Black Lives Matter protest. *Claiborne*, 458 U.S. at 925–26.

i

Setting those two forms of liability to the side, the negligence theory Doe pursues fits quite comfortably into two of the theories for protest-leader liability identified in *Claiborne*. First, Doe plausibly alleges that Mckesson "directed . . . specific tortious activity" insofar as Doe contends "that his injuries were the result of Mckesson's *own* tortious conduct in directing an illegal and foreseeably violent protest." *Mckesson*, 945 F.3d at 829. *Claiborne* reaffirmed that the First Amendment does not prohibit States from imposing tort liability even if the tort occurs in the context of expressive activity. The conduct the State deems unlawful here—creating unreasonably dangerous conditions—is a quintessential tort. Plainly that is within the scope of "tortious activity" contemplated by the *Claiborne* Court. 458 U.S. at 927.

The only other thing required for this cause of action to accord with the First Amendment is that it be sufficiently tailored to target the tortious activity without sweeping up legitimate expressive conduct. In this regard,

we do not disagree with the dissenting opinion[7] that the question of whether a particular form of liability is consistent with the First Amendment must be assessed "action-by-action" and "defendant-by-defendant." *Post* at 47. But we are confident that Doe's negligence theory satisfies that requirement.

Start with the "breach" element. The State of Louisiana does not put ordinary protest leaders at risk by recognizing that Mckesson's actions fell below a reasonable standard of care. On the contrary, Doe has alleged that Mckesson created unreasonably unsafe conditions in at least three significant respects. First, he organized the protest to begin in front of the police station, obstructing access to the building. Second, he personally assumed control of the protest's movements, but failed to take any action whatsoever to prevent or dissuade his fellow demonstrators once they began to loot a grocery store and throw items at the assembled police. And third, Mckesson deliberately led the assembled protest onto a public highway, in violation of Louisiana criminal law. Plainly the State has a strong interest in preventing unreasonably dangerous conduct such as this. But neither does that standard unnecessarily sweep in expressive conduct. Protest leaders who organize their demonstrations with at least a minimal level of care will not be responsible for any actions taken by rogue participants.

And then there is the cause-in-fact requirement. It is not enough that Doe show that Mckesson breached his duty of care—he must also prove that Mckesson's actions were a necessary antecedent to Doe's injuries. *See, e.g.*, *Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1089 (La. 2009). Restated, Doe must prove that he would not have been injured but for the manner in which

---

[7] The separate opinion concurs with the majority of our conclusions, but dissents from our holding that the proceeding of Doe's negligence claim against Mckesson does not violate the First Amendment. *Post* at 59 n.117. We therefore refer to that writing as "the dissenting opinion" only when addressing that specific subject.

Mckesson organized and led the protest. That is a tall task, and the standard will only be met in the exceptional cases where, as here, the well-pleaded allegations support the inference that the leader's specific actions caused the plaintiff's injuries.[8]

To recap, where a defendant creates unreasonably dangerous conditions, and where his creation of those conditions causes a plaintiff to sustain injuries, that defendant has "directed" his own "tortious activity" for purposes of *Claiborne*. 458 U.S. at 927. In these circumstances, imposing liability goes far more to preventing tortious conduct than it does to suppressing any legitimate expressive activity. The cause of action therefore satisfies *Claiborne*'s demand for "precision of regulation." *Id.* at 916.

The dissenting opinion reads *Claiborne* as limiting the authorize/direct/ratify theory of liability to torts committed by someone other than the defendant, *post* at 53, but that reading conflicts with settled First Amendment law. It is well-established that expressive activity is not a defense to an individual's own unlawful conduct. *Claiborne*, 458 U.S. at 918, 926; *Daly*, 756 F.2d at 1081–82; *Wilson*, 154 F.3d at 666; *Jews for Jesus, Inc.*, 968 F.2d at 295–98; *Dornfield*, 2023 WL 1956532 at *3. It follows that a protest leader who commits a tort cannot avoid liability for that tort merely by pointing to his participation in a protest. Doe may pursue claims against Mckesson even though the latter did not throw the projectile because, according to the complaint, Mckesson committed an intendent tort that caused Doe's injuries.

---

[8] The dissenting opinion worries that this cause of action will expose protest leaders to liability whenever a fight breaks out at a high-intensity event, like a protest or a sporting event between two rival teams. The opinion is certainly correct that altercations arise in many such occasions, but that fact actually cuts *against* the opinion's stated concern. In most cases, the altercation would have occurred regardless of how the protest leader or sports club owner acted. Only seldomly will a plaintiff be able to prove that the specific actions taken by the defendant caused the alleged injury.

In addition, the dissenting opinion contends that Mckesson cannot be held liable for his unviolent conduct because the Supreme Court declined to impose liability on Evers in *Claiborne*. *Post* at 42–43. But that fails to account for the significant differences between *Claiborne* and this case. First, according to the allegations, Mckesson had a closer connection to the unlawful components of the protest than Evers did. Mckesson personally led the protest in the field and directed its movements. To be sure, Evers was a protest leader and gave various speeches relating to the boycott. But it was never alleged that Evers actually participated in the particular activities that became unlawful. *See Claiborne*, 458 U.S. at 902 (describing Evers giving speeches); *id.* at 903–06 (making no mention of Evers in reciting the subsequent unlawful incidents). And so although Evers "led the protest," *post* at 42, he did so in a manner that is legally distinguishable from how Mckesson led the protest at issue here.

Second, and relatedly, Mckesson is alleged to have caused the protest to become unlawful more directly than did Evers. Perhaps, as the dissenting opinion says, the protest in *Claiborne* was "foreseeably violent," *post* at 42, but the evidence failed to attribute the foreseeability to Evers. Here, by contrast, Mckesson's organization and operation of the protest in an unsafe manner directly created foreseeable violent conduct. Contrary to the dissenting opinion, there is no tension between the result here and the one in *Claiborne*.

ii

The negligence cause of action at issue is also consistent with the second theory of protest-leader liability identified in *Claiborne*. The Court explained that a protest leader could be liable for his actions where it was shown that he or she "were likely to incite lawless action," and that "unlawful conduct . . . in fact followed within a reasonable period." 458 U.S. at 927. That is precisely what Doe alleges Mckesson did here. That is, Doe contends that

Mckesson organized and directed the protest in an unsafe manner such that it was likely that a violent confrontation with the police would result, and in fact did result. To be sure, this liability theory is seen more commonly in the context of allegedly inciteful speech. But it logically includes other actions tending to incite unlawful behavior.

A close example is *National Organization for Women v. Operation Rescue*, 37 F.3d 646 (D.C. Cir. 1994). That case involved a series of protests of clinics that perform abortions. Pro-life demonstrators obstructed access to and physically blockaded several clinics, sometimes involving trespass on and damage to private property. Based on a combination of Virginia state law and federal law, the district court enjoined the protesters from engaging in such behavior, as well as from taking any actions that would incite such behavior. *Id.* at 649–50. In an order clarifying its injunction, the district court explained that the protesters were prohibited from "specifically planning and organizing unlawful blockades." *National Organization for Women v. Operation Rescue*, No. 1:89-CV-2968, 1993 WL 836931, at *2 (D.D.C. July 29, 1993). The protesters initially declined to comply with the injunction, and so the district court held them in contempt and imposed monetary sanctions.

Pertinent here, the D.C. Circuit upheld the injunction and sanctions over the protesters' objection that the orders violated the First Amendment as understood in *Claiborne*. In doing so, the court carefully distinguished between actions that encourage legitimate expressive activity, which are protected by the First Amendment, and actions that provide for unlawful behavior, which are not. State law may not prohibit "the organizing of lawful demonstrations which may ultimately include unauthorized unlawful acts." *National Organization for Women*, 37 F.3d at 657. But "[i]t is well settled that incitement to specific unlawful acts may be prohibited without running afoul of First Amendment guarantees." *Id.*

This case would be different if all Mckesson had done was organize a lawful protest, and if an unidentified protester had nonetheless assaulted Doe. But that is not what Doe alleges happened. Rather, Doe alleges that Mckesson organized and led the protest in such a manner that his actions "were likely to incite lawless action." *Claiborne*, 458 U.S. at 927. As described above, these alleged actions include directing the protesters to obstruct a public highway, organizing the protest to begin in front of the Baton Rouge police station, and doing nothing to discourage the demonstrators from looting a grocery store and throwing water bottles at the police, despite Mckesson's allegedly exercising some degree of direction and control of the protest. And as is clear from Doe's injuries, "unlawful conduct . . . in fact followed within a reasonable period." *Id.* As explained above, Doe's allegations fit within the "directed, authorized, or ratified" theory set forth by the Supreme Court in *Claiborne*. In addition, for the reasons discussed here, the allegations also fit within the "likely to incite lawless action" theory.

The dissenting opinion disputes this conclusion, reasoning that the complaint does not plausibly allege that any statements Mckesson made were likely to incite violence. *Post* at 54–55. But the opinion focuses on the wrong facts—it is the manner in which Mckesson led the protest that made a violent encounter likely, not anything he said in an interview after the fact. Doe's allegations support the inference that Mckesson created unreasonably dangerous conditions—and it is undisputed that violence followed during his operation of the protest. That is all that *Claiborne* requires.

iii

Mckesson and the dissenting opinion raise a number of objections to this conclusion, but none demonstrate why the First Amendment prohibits the State from imposing liability for the injuries Doe contends are caused by Mckesson's negligence. Most prominently, the dissenting opinion contends

that "the First Amendment permits civil liability for the activity only if the activity itself involves violence." *Post* at 40 (emphasis omitted).

As an initial matter, we must note that, according to the complaint, Mckesson's actions caused violence—even if he did not personally attack Doe. As explained above, Doe alleges that the actions Mckesson took to organize and direct the protest in an unreasonably dangerous manner caused the violent encounter that led to his injuries. Even if Mckesson's underlying actions are not violent in nature, they still plainly involve violence as a matter of causation. We struggle to see how a non-violent action that unreasonably causes violence could be categorically disallowed for purposes of *Claiborne*. In short, assuming *arguendo* that violence is required to make liability accord with the First Amendment—which it is not—the facts alleged here sufficiently satisfy that condition.[9]

But contrary to Mckesson's argument, *Claiborne* required only that the tortfeasor's conduct be unlawful—that is, that is be conduct traditionally prohibited by tort law. That the unlawful conduct need not be violent is evident from the Supreme Court's repeated use of the latter term, when it might have otherwise said "violent." *See Claiborne*, 458 U.S. at 918 ("Only those losses proximately caused by unlawful conduct may be recovered."); *id.* at 920 (explaining that "it is necessary to establish that the group itself possessed unlawful goals"); *id.* at 925 (observing that "there is no evidence that

---

[9] In concluding that Mckesson's actions are purely non-violent, the dissenting opinion fails to accept Doe's theory of the case. That is, it does not recognize the allegation that Mckesson *caused* the confrontation that resulted in Doe's injury. *See post* at 37 ("It is not enough that [Mckesson] encouraged or committed unlawful-but-nonviolent actions that *preceded* violence.") (emphasis added). But Doe argues that a causal connection exists between Mckesson's actions and the violence that followed—and his allegations support that inference. Perhaps the First Amendment allows such a cause of action and perhaps it does not. (We think it does.) But we must confront the complete version of Doe's claim, and that version unquestionably involves violence.

the association possessed unlawful aims"); *id.* ("There is nothing unlawful in standing outside a store and recording names."); *id.* at 926 (holding that "a judgment tailored to the consequences of [defendants'] unlawful conduct may be sustained"); *id.* at 927 ("There are three separate theories that might justify holding [a leader] liable for the unlawful conduct of others."); *see also Mckesson*, 945 F.3d at 830. To be sure, the Court at times spoke in terms of "the consequences of violent conduct." *Claiborne*, 458 U.S. at 918. But that was so because the *only* tortious conduct at issue there was violent conduct.

The previous panel opinion explains this posture in some detail. *See Mckesson*, 945 F.3d at 829–30. The critical fact is that the Supreme Court of Mississippi, from which the *Claiborne* judgment was appealed, held that the defendants had committed the tort of malicious interference with business only if "force, violence, or threats" were present. *Claiborne*, 458 U.S. at 895 (citing *NAACP v. Claiborne Co.*, 393 So. 2d 1290, 1301 (Miss. 1980)). Indeed, the Supreme Court specified that "the Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a non-violent, politically motivated boycott." *Id.* at 915. As the prior opinion explained, if the force, violence, and threats "had been removed from the boycott, the remaining conduct would not have been tortious at all." *Mckesson*, 945 F.3d at 829. Thus, "violent conduct" in *Claiborne* is simply a shorthand for the unlawful conduct that is required to impose liability, not an independent condition for doing so.

The dissenting opinion would require violence as a condition of constitutionally permissible liability, but it misreads *Claiborne*. It quotes several passages of that case for the proposition that the First Amendment does not protect violent conduct. *Post* at 41 ("[V]iolent conduct is beyond the pale of constitutional protection.") (quoting *Claiborne*, 458 U.S. at 933); *id.* at 42 ("The First Amendment does not protect violence.") (quoting *Claiborne*,

458 U.S. at 916). But the fact that violent conduct *is not* protected does not mean that unlawful, non-violent conduct *is* protected.

Supreme Court and circuit caselaw offer examples of defendants being found liable for non-violent, unlawful acts—despite participating in otherwise legitimate expressive activity. Our prior opinion discussed two such examples at length:

> Take *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). That case held that a public officer cannot "recover[ ] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. But defamation is a non-violent tort, and statements made about public officers are often shouted during political protests. If [violence were required], then it would seem that even the narrow "actual malice" exception to immunity was eliminated by *Claiborne* . . . at least for statements made during a protest.
>
> Neither do recent cases vindicate this understanding. The Seventh Circuit examined a boycott similar to the one in *Claiborne Hardware*, this time a boycott by a union of a hotel and those doing business with the hotel. *See 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708 (7th Cir. 2014). The court found that it was "undisputed that the Union delegations all attempted to communicate a message on a topic of public concern." *Id* at 723. But the court nonetheless held that the boycotters could be found liable if they had crossed the line into illegal coercion, because "prohibiting some of the Union's conduct under the federal labor laws would pose no greater obstacle to free speech than that posed by ordinary trespass and harassment laws." *Id.* The court's benchmark for liability was illegality, not violence. The court concluded that if "the Union's conduct in this case is equivalent to secondary picketing, and inflicts the same type of economic harm, it too may be

prohibited without doing any harm to First Amendment liberties." *Id.*   The [purported violence requirement] cannot be squared with this outcome.

*Mckesson*, 945 F.3d at 831.

And there are others.  In *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002), the plaintiffs' son was murdered by Hamas terrorists. Unable to sue the men who carried out the attack, plaintiffs brought claims against two organizations that allegedly provided funds to Hamas.  The defendants protested, arguing that "all they intended was to supply money to fund the legitimate, humanitarian mission of Hamas," and citing *Claiborne* for the proposition that they could not be held liable for attacks carried out by someone else.  *Id.* at 1022.  The court rejected that argument, explaining that the plaintiffs were not seeking to hold the defendants "liable for their mere association with Hamas, nor are they seeking to hold the defendants liable for contributing money for humanitarian efforts. Rather, they are seeking to hold them liable for aiding and abetting murder by supplying the money to buy the weapons, train the shooters, and compensate the families of the murderers." *Id.* at 1024.  And so the finding of liability was upheld, despite the non-violent nature of financial contributions.

The upshot is that violence is not a necessary condition to impose liability that accords with the First Amendment.  Rather, all that is required is that the defendant violate independent state law, whose enforcement is itself consistent with *Claiborne* insofar as it targets wrongful conduct and not legitimate expressive conduct.  It would be consistent with those principles to hold Mckesson liable for his allegedly negligent actions.

iv

The dissenting opinion contends that "nonviolent torts" must be "intentional" to not offend the First Amendment, *post* at 45, but that distinction

appears nowhere in *Claiborne* or the dozens of circuit decisions applying it. On the contrary, the First Amendment framework set forth in *Claiborne* rejects the dissenting opinion's theory. Recall that the Supreme Court contrasted the nature of culpability required to hold an associate liable for unlawful conduct taken in the midst of legitimate expressive behavior with that required to hold a protest leader liable. For an associate, the plaintiff must show that the defendant "held a specific intent to further" the organization's "illegal aims." 458 U.S. at 920. But for a protest leader, the plaintiff need only show that the leader "authorized, directed, or ratified specific tortious activity [to] justify holding him responsible for the consequences of that activity" or that the leader's "public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period." *Id.* at 927. The Court certainly understood the First Amendment as placing a *mens rea* requirement on some forms of civil liability, but it did not mention the subject at all when discussing protest-leader liability. A proper reading of *Claiborne* shows that the Court's concept of liability for protest leaders did not include an intent condition.

That conclusion is also fully consistent with the Court's instruction that "precision of regulation" is required for State laws that impose liability in these circumstances. *Id.* at 916. As understood by the *Claiborne* court, the object of the First Amendment inquiry is to ensure that civil liability is "tailored" to reach only "losses proximately caused by unlawful conduct." *Id.* at 918, 926. This goal in mind, it makes sense to place a heightened culpability requirement on a mere associate because his relationship with the unlawful conduct is more attenuated than that of a protest leader. Restated, imposing liability on associates without an intent requirement would risk discouraging a whole range of legitimate expressive activities. But the same is not true for protest leaders—as the Supreme Court clarified in *Claiborne*. Leaders are far more responsible for the organization's operations and therefore

have a closer connection to unlawful activities committed by its members. To be sure, leaders are not liable on a *respondeat superior* basis. But holding a leader liable under one of the theories set forth in *Claiborne* is fully consistent with the First Amendment—*mens rea* aside.

The dissenting opinion also worries that the theory of liability recognized by the Supreme Court of Louisiana might encourage police violence against protestors or open the floodgates for rabble rousers to sue concert organizers or sports club owners. *Post* at 56–57. With great respect, those concerns are both speculative and inconsistent with the theory at issue here. As to the former, if a police officer responding to a protest initiates a violent confrontation, is injured during the conflict, and sues the protest leader to recover for his injuries, he will be unable to show causation. That is, it will be the police officer's actions, not the protest leader's negligence (if any) that caused the officer's injuries. And the use of excessive force against protestors would also expose the police officer to liability under § 1983.

As to the latter, there is no reason to suppose that the State would set the standard of care so low as to subject the owner of a football team to liability every time two disgruntled fans get into a fight—or so low as to offend the First Amendment. To be sure, an overly strict standard of care for protest leaders may well run afoul of *Claiborne*. But here, accepting Doe's allegations as true, Mckesson's actions fall well below any reasonable standard. The exact constitutional limits of this cause of action are better left for another day and a different case. But for this appeal, it suffices for us to conclude that it does not violate the First Amendment for Louisiana tort law to provide that Mckesson breached his duty of care in these circumstances.

v

Several other objections warrant brief attention. First, Mckesson contends that to impose liability on this basis is to hold him liable for the conduct

of others. But that confuses vicarious liability with negligently creating the conditions under which a plaintiff is likely to be injured. As we recognized before, the latter is "a standard aspect of state law." *Id.* (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 19 (2010)) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."). It is consistent with the First Amendment to impose tort liability where, as here, the defendant personally directs the activities of others such that he creates a foreseeable risk of injury to others.

Next, Mckesson protests that the "specific tortious activity" he directed is, at most, obstructing a public highway, that the unidentified demonstrator's assault on Doe is not a natural consequence of that tortious activity, and that the First Amendment therefore does not allow State law to hold him liable for that unrelated result. According to Mckesson, the prohibition on highway obstruction is principally concerned with traffic safety, not police safety. This objection misunderstands the precise tortious activity for which Doe seeks to hold Mckesson liable. Doe does not assert highway obstruction as a tort *per se*. Rather, he asserts that Mckesson's direction of the protesters to obstruct Interstate 12 is *evidence* that Mckesson breached his duty to refrain from creating the conditions in which it is likely that a third party will injure someone by an unlawful act.[10]

---

[10] Of course, this is not Doe's only evidence that Mckesson breached his duty of care. As explained above, Doe also alleges, among other things, that Mckesson organized the protest to begin in front of the Baton Rouge police station; that Doe did nothing to prevent the demonstrators from looting the grocery store and throwing water bottles at the police, despite Mckesson's exercising some amount of direction and control over the protest; and that Mckesson had participated in similar protests across the country, which had also resulted in violence to others and damage to property.

No. 17-30864

Finally, Mckesson objects that our holding would remove all First Amendment protection whenever protest activity violates state civil or criminal law. The dissenting opinion adopts this objection, contending that imposing liability in these circumstances renders the First Amendment useless as it relates to *Claiborne*. *Post* at 46. That assertion lacks merit for the simple reason that it ignores the causal relationship between Mckesson's negligence and Doe's injuries. We *do not* hold that, where a protestor defendant directs some unlawful activity, he may be held liable for whatever consequences follow. We hold only that the First Amendment allows Mckesson to be held liable for negligence if Doe proves that Mckesson's breach of duty caused Doe's injury, insofar as the breach foreseeably precipitated the crime of a third party.[11]

In particular, liability cannot be imposed on protesters who organize and lead demonstrations with minimally acceptable standards of care. And even if a protest leader breaches that duty of care, the plaintiff must still prove that the breach caused his or her particular injuries. Those are demanding standards, and they will only be met in the most unusual of cases. The dissenting opinion is of course entitled to disagree that Doe's liability theory is

---

[11] As we did before, we reiterate that nothing in our holding should be understood to suggest that "the First Amendment allows a person to be punished, or held civilly liable, simply because of his associations with others, unless it is established that the group that the person associated with 'itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.'" *Mckesson*, 945 F.3d at 823 n.9 (quoting *Claiborne*, 458 U.S. at 920). With that being said, Doe's allegations sufficiently allege that Black Lives Matter possessed an unlawful goal (to block a public highway) and that Mckesson possessed a specific intent to further that goal. Doe alleges that Black Lives Matter "plann[ed] to block a public highway," and that Mckesson travelled to Baton Rouge "for the purpose of . . . rioting," including blocking the highway. This distinction does not affect the judgment here, given our conclusion that Doe's negligence action accords with the First Amendment for at least one of the two reasons we explain. But it underscores the causal relationship that Doe has alleged exists between Black Lives Matter, Mckesson, and the events giving rise to the assault on Doe.

sufficiently tailored for purposes of *Claiborne*. But its concerns regarding broader application of First Amendment protection are overstated.

\*　　　\*　　　\*

Our limited holding guarantees only that Doe may proceed to discovery on his negligence claim. It does not guarantee that he will *prevail* on that claim. Mckesson will have every opportunity to discover and offer evidence disproving Doe's allegations that Mckesson breached his duty of care, and that the breach was a but-for cause of Doe's injuries. Likewise, and in light of the fact that Doe seeks to avail himself of Louisiana tort law, Mckesson is entitled to seek to avail himself of traditional tort defenses. These defenses would of course be available to future defendants in future cases. For example, if a defendant could show that a police officer improperly provoked a confrontation with a protestor, the defendant might assert the defense of comparative negligence, which remains available to assign proportional fault, as the Supreme Court of Louisiana explained on certification. *See Mckesson*, 339 So. 3d at 535.

These legal defenses and procedural safeguards confirm that allowing Doe's claim to proceed will not create strict liability for protest leaders every time an errant protestor injures someone. Rather, Mckesson can be held liable only if Doe proves the specific elements of his negligence claim. Those elements are designed to target behavior that creates a foreseeable risk that others will be injured—and likewise designed to *allow* lawful expressive behavior. We conclude that imposing liability on the facts alleged here comports with *Claiborne*'s demand for "precision of regulation," 458 U.S. at 916, and therefore comports with the First Amendment.

## IV

Despite the dissenting opinion's insistence, this controversy is not

about the Boston Tea Party or Dr. Martin Luther King Jr. *Post* at 58. It is about whether sovereign States may impose tort liability for unreasonably dangerous conduct. They may. And where the unreasonably dangerous conduct occurs in proximity to behavior traditionally associated with the First Amendment, the State must tailor the cause of action to target the tortious activity, rather than to suppress the expressive conduct. The cause of action at issue here satisfies that requirement.

When we first considered this appeal, we affirmed the district court's dismissal of Doe's claims asserted against Black Lives Matter. We likewise affirmed the dismissal of Doe's vicarious-liability and civil-conspiracy claims asserted against DeRay Mckesson. But we reversed as to Doe's negligence claim, holding that it was sufficiently pleaded for purposes of Rule 12(b)(6), and that the First Amendment does not prohibit the imposition of liability on that basis. Each of those holdings was based on our best understanding of Louisiana state law. After guidance from both the Supreme Court and the Supreme Court of Louisiana, the appeal now returns to us. With the benefit of that guidance, and with the Supreme Court of Louisiana having largely confirmed our understanding of state law, we renew our prior holdings here.

Accordingly, the judgement of the district court is AFFIRMED in part and REVERSED in part. The dismissal of Doe's negligence claim against Mckesson and the denial of Doe's motion for leave to amend to re-plead that negligence claim (and only that claim) are REVERSED. In all other respects, the judgment of the district court is AFFIRMED. The case is REMANDED to the district court for further proceedings consistent with this opinion.[12]

---

[12] We hereby incorporate our prior holding that Doe failed to offer sufficient evidence to justify his proceeding anonymously. *Mckesson*, 945 F.3d at 835 n.12.

DON R. WILLETT, *Circuit Judge*, concurring in part, dissenting in part:

Officer John Doe was honoring his oath to serve and protect the people of Baton Rouge when an unidentified violent protestor hurled a rock or something like it, striking Doe in the face and inflicting devastating injuries. Officer Doe risked his life to keep his city safe that day—same as every other day he put on the uniform. He deserves justice. Unquestionably, Officer Doe can sue the rock-thrower. But I disagree that he can sue Mckesson as the protest leader. The Constitution that Officer Doe swore to protect itself protects Mckesson's rights to speak, assemble, associate, and petition. First Amendment freedoms are not absolute—but there's the rub: Did Mckesson stray from lawfully exercising his own rights to unlawfully exorcising Doe's? I don't believe he did.

I

The First Amendment "imposes restraints" on what (and whom) state tort law may punish. "No federal rule of law restricts a State from imposing tort liability for . . . violence [or] threats of violence."[1] But "[w]hen such conduct occurs in the context of constitutionally protected activity, however, 'precision of regulation' is demanded."[2] These guardrails prevent tort law from reaching "activity protected by the First Amendment."[3]

Start with "what." The First Amendment does not protect words "that provoke immediate violence"[4] or "that create an immediate panic."[5]

---

[1] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

[2] *Id.*

[3] *Id.* at 916.

[4] *Id.* at 927.

[5] *Id.*

That rule drives the analysis in the majority's leading case, *Claiborne*, which involved a years-long and sometimes violent boycott that tortiously interfered with white-owned businesses. Charles Evers "unquestionably played the primary leadership role in the organization of the boycott."[6] Yet the Supreme Court unanimously held that the Constitution protected his "highly charged political rhetoric," and it refused to hold him "liable for the unlawful conduct of others."[7] This even though Evers vilified and urged violence against boycott breakers, warning: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck."[8]

*Claiborne* shows that "mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment."[9] Because Evers only *advocated* for violence, but did not provoke or incite imminent acts of violence, the Court said his fiery words "did not exceed the bounds of protected speech."[10] And under a wealth of precedent before and since, raucous public protests—even "impassioned" and "emotionally charged" appeals for the use of force—are protected unless intended to, and likely to, spark immediate violence.[11] So, while "the State legitimately may

---

[6] *Id.* at 926.

[7] *Id.* at 926–27.

[8] *Id.* at 902.

[9] *Id.* at 927 (emphasis in original) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

[10] *Id.* at 929.

[11] *Id.* at 928 (citing *Brandenburg*, 395 U.S. at 447); *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 236 (2002) ("[T]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it absent some showing of a direct connection between the speech and imminent illegal conduct." (internal citation omitted)); *Shackelford v. Shirley*, 948 F.2d 935, 938 (5th Cir. 1991).

impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity."[12]

As for "whom," "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence."[13] Still, *Claiborne* gave three "theories that might justify holding [a leader] liable for the unlawful conduct of others."[14] First, "a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."[15] Second, "a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period."[16] Third, a leader's speeches might be "evidence that [he] gave other specific instructions to carry out violent acts or threats."[17]

The majority concludes that the first two theories allow Louisiana to punish Mckesson for "negligently organizing and directing a protest in an unsafe manner."[18] I disagree. Under *Claiborne*, Mckesson cannot be liable for violence unless he encouraged violence. It is not enough that he encouraged or committed unlawful-but-nonviolent actions that preceded violence. Next, even if *Claiborne* allows a state to pin liability for violence on a protest leader who committed only a nonviolent tort, that tort must at least be intentional. The majority argues that a "negligent protest" is unlawful, and thus

---

[12] *Claiborne*, 458 U.S. at 918.

[13] *Id.* at 920.

[14] *Id.* at 927.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Ante*, at 6.

unprotected. But that theory defies *Claiborne*, which carefully explains that the First Amendment protects large swaths of protest-leader conduct from liability under state law. After all, Mckesson calls for the First Amendment's aid precisely *because* he has been sued for conduct that a state deems unlawful. And separately, even if *Claiborne* allows liability for nonviolent, non-intentional conduct in some instances, the "negligent protest" idea does not match either theory of liability that the majority cites. Passive negligence is the opposite of "authorization," under *Claiborne*'s first theory, just as "d[oing] nothing" is the opposite of "incite[ment]" under the second.[19]

All told, the majority's expansive approach does not "impose[] restraints" but rather disposes them.[20] And it replaces "precision of regulation" with a sweeping proscription-by-regulation that would swallow the very theories that the majority points to.[21] For all these reasons, the novel "negligent protest" theory of liability is incompatible with the First Amendment and is foreclosed—squarely—by Supreme Court precedent.

## A

The leader-liability framework that the majority relies on applies only when a protest organizer specifically directs *violence*. I disagree that *Claiborne* used the words "violent conduct" simply as a "shorthand for the unlawful conduct that is required to impose liability."[22] Just the opposite. Violence of some kind—whether direct or via incitement—*is* an independent condition of liability for violence under *Claiborne*. Like Evers, Mckesson did not commit or direct violence, so he cannot be liable for violence.

---

[19] *See Claiborne*, 458 U.S. at 927.

[20] *See id.* at 916.

[21] *See id.* (quoting *Button*, 371 U.S. at 438).

[22] *Ante*, at 26.

Evers threatened that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people."[23] And "several significant incidents of boycott-related violence" had already occurred.[24] As such, the economic harm at issue in *Claiborne* flowed from Evers's own (very likely) tortious conduct in organizing and leading a foreseeably and actually violent protest that "malicious[ly] interfere[d] with the plaintiffs' businesses."[25] Despite all that, the Supreme Court held that Evers's protest-leadership fell within the category of conduct that the First Amendment protects.[26] Because Evers did not specifically direct *violence*, the Supreme Court was unwilling to find him liable for *violence*.[27] Unlike preventing violence, preventing tortious interference is not a good reason to limit speech.[28] Thus the Court refused to hold Evers liable for the economic harms that the boycott caused—even though Evers *led* the sometimes-violent boycott.[29]

When the Supreme Court observed that Evers could be held liable if he "authorized, directed, or ratified specific tortious activity," it was clarifying that Evers could be held liable for *violence* he directly incited.[30] That's because violence is a tort that falls outside First Amendment protection.[31] I see further evidence for *violent conduct* as a key element of

---

[23] *Claiborne*, 458 U.S. at 900 n.28.

[24] *Id.* at 903.

[25] *Id.* at 891.

[26] *Id.* at 929.

[27] *Id.* at 927–28.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 927.

[31] *Brandenburg*, 395 U.S. at 447.

*violence liability* in the Court's reliance on that same three-verb standard to explain why Evers was not liable despite his intentionally tortious activity, including words that urged violence.[32] "[A]ny such theory fails for the simple reason that there is no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened *acts* of violence."[33]

The takeaway is clear: when violent conduct "occurs in the context of constitutionally protected activity," the First Amendment permits civil liability for *the activity* only if the activity itself involves *violence*.[34] On the other hand, liability cannot attach to "nonviolent, protected activity."[35]

The majority argues that *Claiborne* uses "violent" and its variants only to refer to the particular category of "unlawful conduct" at issue in that case. So, the majority says, "[t]hat the unlawful conduct need not be violent is evident from the Supreme Court's repeated use of the latter term, when it might have otherwise said 'violent.'"[36] But the opposite inference is equally valid. That the unlawful conduct *must* be violent is evident from the Supreme Court's repeated use of the former term when it might have otherwise said "unlawful." My inference has a firmer foundation.

The Supreme Court used "violent" in prominent parts of the opinion.

- <u>Concluding a section</u>: "We *hold* that the *nonviolent* elements of petitioners' activities are entitled to the protection of the First Amendment."[37]

---

[32] *Claiborne*, 458 U.S. at 929.

[33] *Id.* (emphasis added).

[34] *Id.* at 916.

[35] *Id.* at 918.

[36] *Ante*, at 25.

[37] *Claiborne*, 458 U.S. at 915 (emphases added).

- <u>Concluding a summary</u>: "*violent* conduct is beyond the pale of constitutional protection."[38]

- <u>Opening the opinion's final paragraph</u>: "[t]he taint of *violence* colored the conduct of some of the petitioners[, who] of course, may be held liable for the consequences of their *violent* deeds."[39]

But while the dueling usages may inspire good-faith debate about which term is a stand-in for the other, no amount of string-citing, word-counting, or prominence-hunting can provide a firm answer. As such, I would defer to the Court's exhortation toward "precision of regulation" and would hold that *Claiborne* authorizes leader-liability only for a leader who himself engages in violence. I would not extend *Claiborne* to those leaders who, like Evers and Mckesson, engaged only in the broader category of unlawful activity that the majority invokes.[40]

The majority opinion dismisses violence as a dividing line between liability and protection, pointing instead to proceedings that occurred in the state chancery and supreme courts to argue that the unlawful-but-nonviolent conduct that Evers led was actually not at issue in *Claiborne*. Under this view, *Claiborne* addressed leader-liability *only* for torts involving violent conduct. Thus, that case did not distinguish between unlawful-violent and unlawful-nonviolent conduct, and it therefore offers no constitutional protection to Mckesson's unlawful-nonviolent conduct. So the theory goes.

I am unpersuaded. For one thing, *Claiborne* held that "the nonviolent elements of petitioners' activities are entitled to the protection of the First

---

[38] *Id.* at 933 (emphasis added).

[39] *Id.* (emphases added).

[40] *Id.* at 916 (quoting *Button*, 371 U.S. at 438).

Amendment."[41] Evers was a petitioner. But even if that decision's procedural posture makes that holding dicta, as the majority opinion suggests, *Claiborne* does not thereby fail to distinguish between violence and nonviolence. On the contrary, *Claiborne*'s entire line of reasoning rests on the idea that "[t]he First Amendment does not protect violence."[42] Even if violence had been the "*only* tortious conduct at issue,"[43] then, violence *qua* violence was also the only possible path to liability for Evers.[44]

Also, and I hesitate to add complexity, but if violence really was the *only* tortious conduct at issue in *Claiborne* (a point I reject), wouldn't that, too, help Mckesson here? Consider this argument:

  (a) Evers led the protest.[45]

  (b) The protest was foreseeably violent.[46]

  (c) Yet because the plaintiffs sought to hold Evers liable only for tortious "violent conduct" that he did not himself commit,[47]

  (d) Evers was not liable.[48]

I understand the majority to agree with each of these points. But I also understand the majority to conclude that this argument fails when I swap

---

[41] *Claiborne*, 458 U.S. at 915.

[42] *Id.* at 916.

[43] *Ante*, at 26.

[44] *Claiborne*, 458 U.S. at 914–15.

[45] *Claiborne*, 458 U.S. at 926 ("Evers . . . unquestionably played the primary leadership role in the organization of the boycott.")

[46] *Id.* at 903 ("[S]everal significant incidents of boycott-related violence [had] occurred some years earlier.").

[47] *Ante*, at 26.

[48] *Claiborne*, 458 U.S. at 929.

"Evers" for "Mckesson." Why? I cannot tell. The majority says that "liability was improper" for Evers because he only "advocated for violence in general terms," and because "violence did not follow until weeks or months after the speech at issue there."[49] But I think those are distinctions without differences. Mckesson did not advocate for violence, so I fail to see why it would matter that the violent rock-thrower acted in close proximity to Mckesson's mere leadership of the protest. Indeed, it appears that Evers was still *leading* the protest when the "violent" torts happened in *Claiborne*. The issue here is not whether Mckesson urged violence, but whether he can be liable for failing to prevent foreseeable violence. *Claiborne* says no.

I agree with the majority that protest leaders can sometimes be "found liable for nonviolent, unlawful acts—despite participating in otherwise legitimate expressive activity."[50] Certainly, a libeler can be held liable for the *reputational harms* caused by his libelous speech.[51] But a libeler cannot be liable for the violent acts of others that the libeler did not intend to incite with his libelous speech.[52] Evers used inflammatory language in *Claiborne*, denouncing his targets as "racists" and "bigots" and implying that they were murderers, rapists, and liars.[53] Yet the Court held that this language was "constitutionally inadequate to support the damages judgment against him."[54] Defamation is a nonviolent tort, so it cannot support liability for violent conduct. That remains true even if the defamation's author writes

---

[49] *Ante*, at 18.

[50] *Ante*, at 27.

[51] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50 (1974).

[52] *See Bradenburg*, 395 U.S. at 447–48.

[53] *Claiborne*, 458 U.S. at 936–37.

[54] *Id.* at 929.

words that, "as a matter of causation,"[55] inspire a third-party to commit violence. If the majority believes that this rule conflicts with *New York Times v. Sullivan*,[56] that belief misunderstands my position, *Sullivan*, or both.

I disagree with the majority because I read *Claiborne* to hold that a protest leader cannot be liable for *violent conduct* unless he himself committed or directed some form of violence.[57] The majority's Seventh Circuit citations show nothing to the contrary. The first case holds that a union can be liable for coercion if it engages in coercion.[58] That holding hews to the 1:1 correspondence I urge between activity and liability. The second case holds that "[t]here is no constitutional right to . . . provide the resources with which the terrorists can purchase weapons and explosives."[59] I do not agree with the majority's seeming view that donations to terrorists have a nonviolent nature. Rather, because "donations are not always equivalent to advocacy," the Constitution allows the government to prohibit "the provision of material support" for terrorism.[60] At the same time, though, individuals "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas."[61] Individuals can face liability for funding violence, just as leaders

---

[55] *Ante*, at 25.

[56] 376 U.S. 254 (1964).

[57] *Claiborne*, 458 U.S. at 927–28.

[58] *520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Loc. 1*, 760 F.3d 708, 733 (7th Cir. 2014).

[59] *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th Cir. 2002).

[60] *Boim*, 291 F.3d at 1026.

[61] *Id.*

can face liability for inciting violence. But those rules are inapt here, where Mckesson did not "material[ly] support" or incite violence.[62]

Finally, the majority argues that Mckesson's actions "plainly involve violence as a matter of causation."[63] I think the idea of violent negligence is something of an oxymoron in these circumstances, but I also disagree that Mckesson's actions were violent. To be sure, I accept the causal link between Mckesson's leadership and the rock-thrower's violence. If the protest hadn't happened, neither would Officer Doe's injuries. But just as in the context of defamation, I don't believe that a mere causal link is sufficient to establish liability. The majority also says that Mckesson participated in previous "similar protests," that he "organiz[ed]" the protest here, and that he "did nothing to prevent" violence.[64] But under this view, even Evers of *Claiborne* would be liable, for he too participated in and organized a boycott that was often violent.[65] Further, Evers did more than fail to discourage violence—he *encouraged* it.[66] Yet he wasn't liable.[67] Mckesson isn't either.

## B

Even if *Claiborne* allows assigning liability for violence to a protest leader who committed only a nonviolent tort, I believe that tort must at least be intentional. The First Amendment "imposes restraints on the grounds that may give rise to damages liability," and it demands both "extreme care"

---

[62] *Id.*

[63] *Ante*, at 25.

[64] *Ante*, at 31 n.10.

[65] *Claiborne*, 458 U.S. at 903.

[66] *Id.* at 902.

[67] *Id.* at 929.

and "precision of regulation."[68] As such, a protest leader's simple negligence is far too low a threshold for imposing liability for a third party's violence.[69]

To see why, step back to consider how this case arose. Officer Doe asserts a negligence claim. Mckesson asserts a First Amendment defense. The majority uses *Claiborne* to rebut Mckesson's defense. Importantly, then, *Claiborne* provides a basis of liability only in the sense that it gives "theories" that can rebut a First Amendment defense.[70] In turn, those theories unlock a possible path to tort liability under state law. But *Claiborne* does not create liability any more than it creates a cause of action.[71] Instead, for present purposes, *Claiborne* is relevant only when a protest leader uses the First Amendment to defend against a cause of action.

1

The majority's theory of negligence liability would reduce First Amendment protections for protest leaders to a phantasm, almost incapable of real-world effect. In my view, that state of affairs would run counter to *Claiborne*, which explained at length exactly the opposite idea—that the First Amendment *does* protect protest leaders from liability for other's actions.[72]

The question *Claiborne* asks is, "in what circumstances is a protest leader's First Amendment defense inadequate?"[73] The majority answers that such a defense fails—and thus that the leader can be liable for a third-party's

---

[68] *Id.* at 916–17, 927.

[69] *Id.*

[70] *Claiborne*, 458 U.S. at 927.

[71] *See, e.g.*, *id.* at 926 ("[L]iability may not be *imposed on* Evers for his presence at NAACP meetings or his active participation in the boycott itself."(emphasis added)).

[72] *Id.* at 925–29.

[73] *See id.* at 927.

violence—anytime the protest-leader's conduct is "unlawful" or "wrongful." In other words, the First Amendment protects you until you get sued. Hmmm. The majority opinion's answer is circular, because *Claiborne* is relevant only when there is *already* a protest leader who is *already* facing an allegation of unlawful or wrongful conduct. Such a view leaves no room for the First Amendment to work. And that may be fine in certain circumstances—the First Amendment is not relevant to the vast majority of unlawful conduct, whether civil or criminal. But here, such a lax approach defies the "extreme care" that the Court charged us with in *Claiborne*.[74]

Interrupting the circularity requires giving the First Amendment force, not mere fanfare. That means identifying some protest-leader conduct that the Constitution shields *even though* state law deems it an unlawful cause of third-party violence. If negligence is not constitutionally protected, then I don't know what conduct would be. Negligence sits at or near the far end of the "unlawfulness" spectrum that begins with violent crimes before running through property crimes, civil torts like battery, intentional-but-nonviolent civil torts such as trespass, and torts that require recklessness. A belt-and-suspenders view under which the First Amendment protects only that conduct which is already "lawful" under state law stands at odds with *Claiborne*'s painstaking action-by-action, defendant-by-defendant analysis.[75]

The majority opinion argues that its analysis *does* give the First Amendment force, because "liability must be tailored such that there is a sufficiently close relationship between the leader's actions and the protestor's unlawful conduct."[76] I agree that *Claiborne* requires a close

---

[74] *Claiborne*, 458 U.S. at 927.

[75] *See id.* at 906–34.

[76] *Ante*, at 17.

relationship. The majority says that *Claiborne*'s three separate theories of liability define this close relationship. I agree with that too. But the majority later tells us that, under *Claiborne*'s first theory, this close relationship is present anytime a protest-leader "negligently creat[es] the conditions under which a plaintiff is likely to be injured."[77] That relationship doesn't look very "close" to me. Instead, it just looks like a restatement of the idea that the First Amendment protections apply only to conduct that a state deems lawful. The majority opinion also argues that its analysis gives the First Amendment force in this context because the majority's test still prohibits liability for legitimate expressive conduct. But if conduct is "legitimate" only if it isn't "unlawful," then this response begs the question. I don't think *Claiborne* is that shallow (even if it *does* allow leader-liability for violence even when the leader did not commit violence).

Instead, *Claiborne* assumes that there are categories of conduct in which a protest leader can engage that are "unlawful" under state law but that are still protected under the First Amendment.[78] That decision then delineates those categories.[79] The majority opinion rejects the assumption—if not expressly, then by implication, and by a question-begging retreat to legitimate expressive conduct as the dividing line between categories. But that phrase is useful only as a tautology; it is like saying that the First Amendment protects protected conduct. The majority's actual analytical lever—"unlawful conduct"—sweeps far too broadly and would leave the First Amendment as a mere backstop that shields a protest leader from liability only for conduct that state law already deems lawful.

---

[77] *Ante*, at 31.

[78] *See Claiborne*, 458 U.S. at 926–27.

[79] *Id.* at 927.

I agree that there are some circumstances in which a protest leader might be liable for negligently causing a third-party's foreseeable negligence. Or for intentionally causing a third-party's intentional tort. Or for expressly calling for violence that leads to third-party violence. I also agree that Louisiana could, in theory, hold Mckesson liable for violating any state laws that protect highways and police-station entrances from obstruction. But none of that describes Officer Doe's theory. Instead, he seeks to hold Mckesson liable for an unknown third-party's violence. The third party's motivations and affiliations are also unknown. If a protest leader's *unintentional negligence* creates liability for a third-party's *intentional violence*, then the First Amendment is doing hardly any work in this area of the law, and the Supreme Court's opinion in *Claiborne* could have been much shorter.

2

Furthermore, and separately, I disagree that *Claiborne*'s actual language reaches a protest-leader's simple negligence. Consider it:

> There are three separate theories that might justify holding Evers liable for the unlawful conduct of others. First, a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity. Second, a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period. Third, the speeches might be taken as evidence that Evers gave other specific instructions to carry out violent acts or threats.[80]

None of these theories looks like open-ended negligence to me.

---

[80] *Claiborne*, 458 U.S. at 927.

The first theory's verbs are hardly passive, and anyway, I am unsure as to even the analytical possibility of holding a protest leader (or anyone else) liable for negligently "authoriz[ing], direct[ing], or ratif[ying]" a "specific" tort.[81] One can negligently *commit* a tort, of course—but only if the tort is one's own. By contrast, *Claiborne*'s three-verb formulation describes a leader's relationship not to his own conduct, but to the "unlawful conduct of others."[82] In my view, "authorize[]," "direct[]," and "ratif[y]" all connote intentionality. Thus, I see *Claiborne*'s first theory as encompassing only intentional conduct. So too for the third theory, which again applies to "specific" actions—this time instructions toward threats or violence. Both theories refer to intentional acts that are culpable far beyond mere negligence.

The second theory refers to speeches that are "likely to incite lawless action."[83] I think it is fair to say that this theory is a direct reference to that doctrine which appears most often in cases approving state-law criminal prohibitions against words or actions that are both "directed to . . . producing imminent lawless action" and "likely to . . . produce such action."[84] As such, incitement is among a relatively small number of familiar exceptions to the First Amendment, some others being libel, fighting words, true threats, and obscenity.[85] I can see how a bystander injured in the stampede from a lecture hall in which no "Fire!" was burning might have a cause of action for negligence against the yeller—but not against the lecture-planner. I would not use the incitement exception as a shovel to bury the rule. If the First

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Brandenburg*, 395 U.S. at 447.

[85] *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504–05 (1984).

Amendment allows *civil negligence* liability for words or actions whose unintentional-yet-foreseeable consequences include non-imminent injuries to third parties, then I do not understand why that Amendment would forbid criminal liability for those same deeds. Yet forbid it does.[86]

To sum up, state law already protects protest leaders from liability for *lawful* conduct. For protest leaders, *Claiborne* and the First Amendment are nugatory unless they protect something that state law doesn't—namely, conduct that is *unlawful* under state law. As to the specific question whether a protest leader can be liable for someone else's violence, I view the protest leader's own violence as the dividing line between what the First Amendment does and does not protect. But even if that line fails, I believe that the protest leader's unlawful actions must at least be intentional. The majority's dividing line—lawful versus unlawful—yields the same result whether a defendant looks to state law or to the Constitution. It says that the First Amendment protects protest leaders only until they need its help.

## C

Even if everything I have said so far is dead wrong, I still could not join the majority opinion. That's because Officer Doe's allegations fall outside both theories of liability that the majority draws from *Claiborne*.

### 1

The first theory says that Mckesson can face liability if "he authorized, directed, or ratified specific tortious activity."[87] The majority focuses on the second verb, arguing that Mckesson directed specific tortious activity. But then it gets muddy. What "specific tortious activity" does the majority opinion believe that Mckesson is liable for? Not throwing the rock,

---

[86] *Brandenburg*, 395 U.S. at 447.

[87] *Claiborne*, 458 U.S. at 927.

of course. And not obstructing a public highway. Rather, the majority opinion tells us that the "precise tortious activity" at issue is that "Mckesson breached his duty to refrain from creating the conditions in which it is likely that a third party will injure someone by an unlawful act."[88] In other words, Mckesson "directed" his own negligence.

I am not persuaded. *Claiborne* explains the contexts in which a protest leader can be liable for "the unlawful conduct of others."[89] To hold Mckesson liable under *Claiborne*'s first theory, I think that the majority must identify two things: a "specific" tort committed by someone other than Mckesson, and an action by Mckesson that "authorized, directed, or ratified" that tort.[90] If those two steps are satisfied, *then* the First Amendment allows Mckesson to face state-law liability for directing the third-party's tort. But here, the majority's analysis blends those two steps by arguing that Mckesson "directed" *his own* tort.[91]

The correct mode of analysis under the first theory would proceed (and fail) as follows. The rock-throwing and its "consequences" are the "tortious activity" for which Doe seeks to hold Mckesson liable.[92] Thus the second-step question is whether Mckesson "directed" that "specific" activity.[93] He didn't. At worst, Mckesson "did nothing to try to discourage" violent behavior.[94] Doing nothing is passive, while "direct[ing]" is active,

---

[88] *Ante*, at 31.

[89] *Claiborne*, 458 U.S. at 927.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Ante*, at 2.

and I think *Claiborne* demands that we observe that distinction.[95] And even if Mckesson directed protestors to block a highway, traffic obstruction is not the "specific" activity that Doe complains of. Therefore, *Claiborne*'s first theory of leader-liability does not apply here.

None of this means that Mckesson can "avoid liability for [a] tort merely by pointing to his participation in a protest."[96] And he isn't trying to do that. Instead, he's arguing that Doe's theory is constitutionally invalid. That argument strikes me as utterly sensible, because Doe's theory is that Mckesson *negligently organized a protest*—not that Mckesson committed some separate, non-protest tort while a protest was otherwise occurring.

2

The second theory says that a protest leader can be liable if his "speeches were likely to incite lawless action" and if "unlawful conduct . . . in fact followed within a reasonable period."[97] As discussed above, I view this as a straightforward reference to the incitement doctrine.[98] Under that doctrine, the Constitution does not protect speech that is intended to and likely to "produc[e] imminent lawless action."[99] The majority argues that incitement "is precisely what Doe alleges Mckesson did here."[100] I disagree.

For one thing—and here I agree with the majority—"this liability theory is seen more commonly in the context of allegedly inciteful speech."[101]

---

[95] *Claiborne*, 458 U.S. at 927.

[96] *Ante*, at 21.

[97] *Claiborne*, 458 U.S. at 927.

[98] *See supra* Part I.B.2.

[99] *Brandenburg*, 395 U.S. at 447.

[100] *Ante*, at 22.

[101] *Ante*, at 23.

The majority then says that the doctrine also extends to "*actions* tending to incite unlawful behavior."[102] Whether I agree with that or not, I do not see why it is relevant here, where the only "actions" that the majority identifies are: (1) "directing the protesters to obstruct a public highway," (2) "organizing the protest to begin in front of the Baton Rouge police station," and (3) "doing nothing to discourage the demonstrators from looting a grocery store and throwing water bottles at the police."[103] By my count, those "actions" are actually two instances of speech and one instance of *in*action.

But regardless, Mckesson's words (or actions) are not incitement—and thus do not fall within the second theory—unless they (1) were "directed to inciting or producing imminent lawless action" and (2) were "likely to incite or produce such action."[104] While I accept the Supreme Court of Louisiana's determination that Doe has stated a cause of action under that state's law, it remains for us to decide whether the allegations underpinning that cause of action, so stated, are consistent with the First Amendment.

To support his assertion of "incitement," Doe strings together various unadorned contentions—that Mckesson was "present during the protest," "did nothing to calm the crowd," "directed" protestors to gather on the public street in front of police headquarters, and "knew or should have known . . . that violence would result" from the protest that Mckesson "staged." But Officer Doe does not allege:

- What orders Mckesson allegedly gave, how he led the protest, or what he said or did to incite violence.

---

[102] *Ante*, at 23 (emphasis added).

[103] *Ante*, at 24.

[104] *Claiborne*, 458 U.S. at 927–28 (citing *Brandenburg*, 395 U.S. at 447).

- How Mckesson "controlled" or "directed" the unidentified assailant who injured Doe.

- How statements that Mckesson made to the media after the protest amount to a ratification of violence.

Without these and other fleshed-out facts, the complaint utterly fails to link Mckesson's role as leader of the protest demonstration to the mystery attacker's violent act. In short, Doe's skimpy complaint is heavy on well-worn conclusions but light on well-pleaded facts. Indeed, the lone "inciteful" speech quoted in Doe's complaint is something Mckesson said not to a fired-up protestor but to a mic'ed-up reporter—the day *after* the protest: "The police want protestors to be too afraid to protest." Tellingly, not a single word even obliquely references violence, much less advocates it. Temporally, words spoken after the protest cannot possibly have incited violence during the protest. Tacitly, the majority opinion seems to discard the suggestion that Mckesson uttered anything to incite violence against Officer Doe. Thus constitutionally, these allegations are inadequate.

### 3

The majority argues that these two theories may not be "the only proper bases for imposing tort liability on a protest leader" under *Claiborne*.[105] But that case suggests, if anything, just the reverse. Approaching the question with "extreme care," the Court said that there were "three" theories that "might" do the trick.[106] It also said that Evers "did not exceed the bounds of protected speech."[107] I do not read this langauge as an invitation for us to identify new proper bases of protest-leader liability.

---

[105] *Ante*, at 18.

[106] *Claiborne*, 458 U.S. at 927.

[107] *Id.* at 929.

And even if we had an invitation to invent new exceptions, there are good reasons to conclude that a protest-leader's liability for a third-party's actions cannot encompass mere negligence. For one thing, it is impossible to reconcile the majority opinion's view (negligently disregarding potential violence *is not* protected) with *Claiborne*'s holding (intentionally advocating violence *is* protected)—at least not without also accepting that one who expressly and purposely calls for violence is somehow not behaving negligently to the risk that violence may result. But "[m]ere negligence . . . cannot form the basis of liability under the incitement doctrine[.]"[108] To hold otherwise seems fanciful, as does allowing common-law tort principles to upstage constitutional free-speech principles.[109]

I also worry that the majority's approach will be a boon to anyone who might wish to quash protest using a heckler's (or rock-thrower's) veto. After all, the majority's "tortious conduct + foreseeable violence = liability for violence" formula leaves no accounting for *who* caused the violence. Here we don't know. Maybe the majority is correct in suggesting that the rock-thrower was a "member[]" of the group that Mckesson led, but maybe not.[110] Either way, under the majority's view, "protest organizers would be liable for all foreseeable damages that occurred during mass demonstrations—including those caused by the unlawful acts of counter-protesters and

---

[108] *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 798 (2011) (holding that even if violent video games cause aggression, a state could not prohibit their sale to children).

[109] *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").

[110] *See ante*, at 30.

agitators not associated with a group or movement."[111] Nor can we be blind to the fact that individual rogue officers have caused violence on occasion.[112] To spell it out, I am concerned that those who oppose a social or political movement might view instigating violence (or feigning injury) during that movement's protests as a path toward suppressing the protest leader's speech—and thus the movement itself. And even putting that risk aside, large protests—just like large concerts and large sporting events—tend to attract people looking for trouble. You might even say that violence is nearly *always* foreseeable when an organizer takes specific action by putting together a large-enough event. But if you do, it is hard to accept the majority's theory.

## II

The Supreme Court requires "extreme care" when attaching liability to protest-related activity.[113] The majority's theory—with no parsing between *intentional violent* tortious conduct (actionable) and *unintentional nonviolent* tortious conduct (nonactionable)—is at odds with the "precision of regulation" required to overcome the First Amendment.[114] Indeed, if it were that easy to plead around *Claiborne* and hold protest leaders personally liable for an individual protestor's violence, there would be cases galore holding as much. The majority opinion cites none. That's because the "negligent protest" theory of a leader's liability for the violent act of a rogue assailant dodges *Claiborne* and clashes head-on with constitutional

---

[111] Timothy Zick, *The Costs of Dissent: Protest and Civil Liabilities*, 89 Geo. Wash. L. Rev. 233, 238 (2021).

[112] *See, e.g.*, Shawn E. Fields, *Protest Policing and the Fourth Amendment*, 55 U.C. Davis L. Rev. 347, 349–50 (2021) (cataloguing several such instances). It would be perverse indeed if injured protestors—forbidden by qualified immunity from suing any rogue officers who committed violence—could sue the protest organizer.

[113] *Id.* at 927.

[114] *Id.* at 916, 921.

fundamentals. Such an exotic theory would have enfeebled America's street-blocking civil rights movement, imposing ruinous financial liability against citizens for exercising core First Amendment freedoms.

Holding Mckesson responsible for the violent acts of others because he "negligently" led a protest that carried the *risk* of *potential* violence is impossible to square with Supreme Court precedent holding that only tortious activity meant to incite imminent violence, and likely to do so, forfeits constitutional protection against liability for violent acts committed by others. With greatest respect, I disagree with the majority opinion's First Amendment analysis. Political uprisings, from peaceful picketing to lawless riots, have marked our history from the beginning—indeed, from *before* the beginning. The Sons of Liberty were dumping tea into Boston Harbor almost two centuries before Dr. King's Selma-to-Montgomery march occupied the full width of the bloodied Edmund Pettus Bridge.

Officer Doe put himself in harm's way to protect his community—including the violent protestor who injured him. And states have undeniable authority to punish protest leaders and participants who *themselves* commit violence. The rock-hurler's personal liability is obvious, but I do not believe that Mckesson's is. Our Constitution explicitly protects nonviolent political protest. *Claiborne* is among "our most significant First Amendment" cases.[115] It insulates nonviolent protestors from liability for others' conduct when engaging in political expression, even negligently planning a protest, that aims to spur anything less than immediate violence. The Constitution does not insulate violence, but it does insulate citizens—including protest leaders—from responsibility for *others'* violence.

---

[115] *Cloer v. Gynecology Clinic, Inc.*, 528 U.S. 1099 (2000) (Scalia, J., dissenting from denial of petition for a writ of certiorari).

No. 17-30864

\*     \*     \*

Dr. King's last protest march was in March 1968, in support of striking Memphis sanitation workers. It was a prelude to his assassination a week later, the day after his "I've Been to the Mountaintop" speech. Dr. King's hallmark was nonviolent protest, but as he led marchers down Beale Street, some young men began breaking storefront windows. The police moved in, and violence erupted, harming peaceful demonstrators and youthful looters alike. Had Dr. King been sued, either by injured police or injured protestors, I cannot fathom that the Constitution he praised as "magnificent"—"a promissory note to which every American was to fall heir"[116]—would countenance his personal liability.

Summing up: Mckesson is not liable for intentional violence, foremost because he did not commit any violence, but at minimum because he did not commit any intentional tort. Separately, *Claiborne*'s theories cannot support liability here, where Mckesson did not actively "direct" the tort that Officer Doe complains of, and where Doe's complaint is too flimsy to state an incitement rebuttal to Mckesson's First Amendment defense.

In all other respects, I concur.[117]

---

[116] Martin Luther King, Jr., I Have a Dream (Aug. 28, 1963), *in* I HAVE A DREAM: WRITINGS AND SPEECHES THAT CHANGED THE WORLD 102 (James M. Washington ed., 1992).

[117] I dissent on the First Amendment issue, but I agree with the majority opinion that: (1) we have jurisdiction over this appeal; (2) Mckesson cannot be held vicariously liable for the assailant's actions; (3) Officer Doe failed to state a civil conspiracy claim; (4) Officer Doe failed to adequately allege that Black Lives Matter is an unincorporated association capable of being sued under Louisiana law; (5) Officer Doe has no right to proceed anonymously; (6) Louisiana law recognizes the negligence claim that Doe asserts and; (7) under Louisiana law, Doe has plausibly alleged such a claim.