UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHN FORD | * | CIVIL ACTION NO: 16-742 |
| | * | |
| v. | * | JUDGE BRIAN A. JACKSON |
| | * | |
| DeRAY McKESSON | * | MAGISTRATE JUDGE |
| | * | RICHARD L. BOURGEOIS, JR. |

*********************************************************************

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

As shown below, Officer Doe is able to show that DeRay McKesson incited violence through confrontation with police necessitating a use of force by ordering protesters into the street and leading them to I-12 on Airline Hwy in violation of state law. The pattern of violence at BLM protests across the country rendered the probability and foreseeability of injury to a police officer at the Baton Rouge protest both expected and intended. The Fifth Circuit, <u>Doe v. Mckesson</u>, 71 F.4th 278, 285 (5th Cir. 2023), found:

> Under the allegations of fact set forth in the plaintiff's federal district court petition, it could be found that Mr. Mckesson's actions, **in provoking a confrontation with Baton Rouge police officers through the commission of a crime (the blocking of a heavily traveled highway, thereby posing a hazard to public safety), directly in front of police headquarters, with full knowledge that the result of similar actions taken by BLM in other parts of the country resulted in violence and injury not only to citizens but to police, would render Mr. Mckesson liable for damages for injuries, resulting from these activities, to a police officer compelled to attempt to clear the highway of the obstruction.** [Emphasis added]

Here, DeRay McKesson claims that Officer John Doe, John Brad Ford, is unable to show that on July 9,2016, McKesson incited other protestors to violence against police during the Baton Rouge protest/riots. [R 109-2]. The Fifth Circuit, 71 F.4th at, 288,[1] found:

> The origin of Doe's negligence claim is Louisiana Civil Code article 2315. That article provides, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Within that body of tort liability, Louisiana has adopted a "duty-risk" approach to negligence.

---

[1] "In the prior panel opinion, we set forth our understanding of Louisiana state law as applied to this case. Mckesson, 945 F.3d at 826–28. The Supreme Court of Louisiana expressly incorporated that portion of our decision in its opinion on certification. *Mckesson*, 339 So. 3d at 530–33. We hereby reiterate our prior holding." <u>McKesson</u>, 71 F.4th at 288.

Under that approach, a plaintiff must prove five elements: "(1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached." *Mckesson*, 945 F.3d at 826 (collecting Louisiana authority).

## I. Plaintiff suffered an injury

Officer John Doe, John Bradley Ford, testified that he could not continue his employment as a police officer due to the head injuries he sustained which necessitated continual dental treatments and resulted in his seeing black spots and lines in his vision. His injuries are both serious and permanent. Among other injuries, he had a concussion. Ford at 6, lns. 9-20. John Brad Ford, Officer Doe, at pg 53, ln. 23 - pg. 54, ln. 4 as follows:

Q. Okay. So tell me about the injury. You were hit in the head. Do you know what you were hit with?

A. Well, it tasted like a piece of asphalt-type grainy, you know, substance. It was a hard either rock or some type of asphalt.

Ex 1: John Brad Ford, Officer Doe, at pg 55, ln. 5 - ln. 22, as follows:

A. I had several teeth in the front, some were broken completely out, some were broken in half, and I think some were pushed up, like, towards the roof of my mouth, so he just repaired what he could repair that night and then we ended up doing like a, I think it's called a bridge. I don't know all the technical terms of what he did, but he just fixed my teeth a little bit for me that night.

Q. Okay. All right. And I take it you probably -- did you have some other dental work you had to have done after that?

A. Yes, sir. I think I did total like 18 hours in a chair.

Q. Okay. Okay. And then you said you were also -- were you also diagnosed with a concussion?

A. Yes, sir.

Ex 1: John Brad Ford, Officer Doe, at pg 57, ln. 11 - ln. 24, testified as follows:

A. I remember my lip was cut. My tongue was cut. The inside of my cheek had a cut. Of course, the broken teeth and stuff and the concussion.

\* \* \* \*

A. Yes, sir. My vision is my biggest complaint. Well, my vision and my PTSD, I believe. But my vision is -- is -- I still see the dots and the black marks and those squiggly clear lines, like, look kind of like bubbles almost, but, I mean, that's the best way I can explain it.

Although Mr. Ford gave lengthy testimony on his injuries, Mr. McKesson is not disputing that Officer Doe was injured.

**II.     Defendants owed a duty of care**

The Fifth Circuit, <u>McKesson</u>, 71 F.4th at 288, found:

> The parties disputed whether Louisiana law recognizes a duty in these circumstances. In the course of that dispute, we understood the duty at issue as follows: "a duty not to negligently precipitate the crime of a third party." *Mckesson*, 945 F.3d at 827. The existence of a legal duty is a question of state law, and the Supreme Court of Louisiana expressly concluded that such a duty exists in the circumstances presented here. *Mckesson*, 339 So. 3d at 533. The threshold question having been answered, the only remaining issue is whether Doe has plausibly stated this form of a negligence claim. As before, we conclude that he has. Doe has plainly alleged that he suffered an injury.

Mr. McKesson is no longer disputing that he owed a duty.

**III.     The duty was breached**

McKesson disputes that he breached his legal duty.  Here, McKesson led the protestors to block the public highway, *Mckesson*, 71 F.4th at 289, which would be his *own* negligent, illegal *action* (not speech or advocacy),and the 'but for" cause of the police confrontation. Here, McKesson incited the confrontation with police and ensuing use of force by police in making arrests.  McKesson was aware of the property damaged during the protest.[2]  Here, the crowd was already throwing objects at police and had been doing so all day, when McKesson lead them onto the highway.  Moreover, the pattern of BLM protests throughout the country set the stage for police being injured during the confrontation.  McKesson well knew the history of police confrontations during BLM protests. The Fifth Circuit <u>McKesson</u>, 71 F.4th at 288, found:

> He has also plausibly alleged that Mckesson breached his duty in the course of the latter's organizing and leading the Black Lives Matter protest at issue here. **First and foremost, Doe alleged that Mckesson planned to lead the demonstrators onto Interstate 12, despite the fact that blocking a public highway is a crime under Louisiana law. La. Stat. Ann. § 14:97.** As we explained before, that act supports the contention that Mckesson breached his duty of care as to Doe:
>
> > **It was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by**

---

[2]  Ex 2: McKesson, at 97 ln. 19.

> **clearing the highway** and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that **leading the demonstrators onto a busy highway was likely to provoke a confrontation** between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. *Mckesson*, 945 F.3d at 827.

Relying upon the Louisiana Supreme Court decision, the Fifth Circuit found that Mckesson's participation in numerous other Black Lives Matter protests in which demonstrators blocked public highways, and in which police officers were injured was significant. Here, the evidence is overwhelming that McKesson was well aware that BLM protest after protest were held blocking access to public right of ways and officers were repeatedly injured.[3] The Fifth Circuit, relying on Louisiana law found, that -

> **Doe also alleges that Mckesson regularly gave orders to the protestors and directed their activity**. To be sure, Doe does not allege that Mckesson directed the unidentified assailant to throw the heavy object, or that he directed the protesters to loot the grocery store and throw water bottles at the assembled police officers. But the fact that those events occurred under Mckesson's leadership support the assertion that he organized and directed the protest in such a manner as to create an unreasonable risk that one protester would assault or batter Doe. [Emphasis added]

McKesson does not dispute that injuries to a police officer attending the Baton Rouge Protest were not foreseeable.

## A. McKesson participated in hundreds of protests in City Streets

McKesson frankly admitted that he had participated in hundreds of protests, that he had been tear gased multiple times, almost daily.[4] As early as 2015, he knew that protestors blocking city streets and businesses was eliciting a police response.[5] He

---

[3] See e.g., Ex 2: McKesson at 10, ln. 7 - Page 11, ln. 15; at 12, ln. 25-Page 13, ln2 and lns. 21-22; at 14, ln. 19-Page 15, ln. 7; at 31 ln 17; at 37, lns. 15-16; at 41, ln. 10 - Page 43, ln. 12; 43, ln. 24, ln. 24-44, ln. 5; at 93, ln. 17-Page 94, ln. 23; at 95, ln. 9-17; at 96, lns. 11-14; at 99, ln. 14 and 22-25.

[4] Ex 2: McKesson at 45, ln. 4-8, 24-25.

[5] See Ex 2: McKesson, at 43, ln 24 - Page 44, ln. 5.

continually saw violence and protestors blocking streets, businesses and highways.[6]  He

was aware of the property damage in Baton Rouge during that protest.[7]

> Mr. Mckesson objects to Interrogatory No. 3 **because he has attended**
> **hundreds of protests**, and all of these protests are not relevant to the
> claims and defenses in this matter and are not proportional to the needs of
> the case, which involves a single protest in Baton Rouge on July 9, 2016.
> Subject to these objections, **Mr. Mckesson has attended hundreds of**
> **protests to bring awareness to unjust killings by police**.[8]

In one instance, Mr. McKesson protested in Ferguson for four hundred days.[9]  The

protesters were blocking streets and roads and businesses and McKesson frequently

witnessed police using force in response to the  protesters.[10]

### B.    McKesson aware that prior BLM protest were violent

Not was McKesson aware of the BLM violence, but he endorsed the need for

violence.  During the April 20, 2015, interview with Wolf Blitzer of CNN, McKesson refuses

to disclaim or renounce the ongoing violence at BLM protests.[11]

From 2014 - 2016, BLM protestors were collecting bond money in advance of

protests arrests.[12]  McKesson was well acquainted with BLM protests, violence, and

arrests.[13] As early as 2014 and 2015, McKesson knew that protestors blocking streets and

---

[6]  See Ex 2: McKesson, at 41, ln. 10 - Page 43, ln. 12.

[7]  See Ex 2: McKesson, at 97, ln. 19

[8]  See Ex 26, McKesson Responses to Interrogatories and Requsts for Production,
Interrogatory Response No. 3, at 4.

[9]  Ex 2: McKesson, at 37-38.

[10]  Ex 2: McKesson, at 41-42.

[11]  See Ex 7 "Transcript" and Ex 22, Wolfe Blitzer interview and article Ferguson activist
perfectly schools Wolf Blitzer: "You are suggesting broken windows are worse than broken
spines." Freddy Grey will never be back and those windows will be" Salon, 4/29/15.

[12]  Ex 2: McKesson, at 8, lns. 14 - page 10, ln. 4.

[13]  Ex 2: McKesson, 10, ln. 7 - page 11, ln. 15; Page 11, ln. 23 - Page 12, ln. 21; Page
12, ln. 23 - Page 13, ln. 2 and lns. 21-22; Page 14, lns. 19-25 ("Rocks being thrown". . . at
officers); Page 15, ln 1-7 ("there was an encounter of the police and protesters at the bus

businesses was eliciting a police response.[14]  Although he had a twitter following of over a quarter of a million at the time, McKesson claims he *may not have been aware* of the Police ambush in Dallas at a BLM protest the day before (Thursday) that McKesson (Friday) flew into Baton Rouge.[15]  The shooting that Thursday in Dallas was fueled by anger at white officers for shooting young black men.  Alton Sterling was a black man, who on July 5, 2016, was shot by a white officer in Baton Rouge.[16] McKesson flew to Baton Rouge as the face of Black Lives Matter to lead the protest over the death of Alton Sterling.  At the same time, Black Lives Matter was holding protests in cities across the country against police.[17] Of the Alton Sterling protest, McKesson testified:

A.    I would go to any place that people asked us to come and I could make it so his killing was as horrific as the many other killings that I either amplified the cases or supported the families or supported the local organizers, so this one was no different.[18]

### C.    McKesson was a well known distinguished leader of BLM

McKesson cannot deny that he established himself as a well known BLM leader and *the face of the movement.*[19]

McKesson, now 36, is probably the best known activist of the Black Lives Matter era.  From meetings at the White House to special-guest appearances at New York Fashion Week, Mckesson has been everywhere

---

station . . . protesters were throwing things at police."); .

[14]  Ex 2: McKesson, at 43, ln 24 - Page 44, ln. 5.

[15]  Ex 2: McKesson, at 52 ln. 14-29 (of Dallas, "I do remember this happening.")

[16]  Ex 23: Hundreds arrested as Black Lives Matter protests spread throughout America, Alexander, the Telegraph 7.10.16. See also, https://en.wikipedia.org/wiki/Killing_of_Alton_Sterling.

[17]  Ex 31: numerous protest across country.  See e.g., Ex 2: McKesson at 10, ln. 7 - Page 11, ln. 15; at 12, ln. 25-Page 13, ln2 and lns. 21-22; at 14, ln. 19-Page 15, ln. 7; at 31 ln. 17; at 37, lns. 15-16; at 41, ln. 10 - Page 43, ln. 12; 43, ln. 24, ln. 24-44, ln. 5; at 93, ln. 17-Page 94, ln. 23; at 95, ln. 9-17; at 96, lns. 11-14; at 99, ln. 14 and 22-25.

[18]  Ex 2: McKesson, at 115, lns. 1-6.

[19]  See Ex 35: DeRay McKesson Wikipedia - face of movement.

spreading the gospel of wokeness - and signing lucrative book and video deals along the way. . . . That Mckesson has become one of the most prominent faces of the movement today seems like history repeating itself.[20]

Q    What was your -- did you have anything to do with Black Lives Matter Movement at all in your life time?
A    Yes.
Q    Tell us about that.
A    I was one of the people -- the people identify as one of the many leaders in the Black Lives Matter Pride Movement.[21]

The other leaders he identified were Johnetta Elzie and Samuel Sinyangwe.[22]  As the face of the movement, McKesson met with President Obama and Attorney General Loretta Lynch.[23]  Besides his national reputation, by December 2015, McKesson was known in the Baton Rouge Community as a leader of BLM.[24] Thus, not only was McKesson recognized nationally as the leader, he was recognized locally as the BLM leader and the face of BLM.

### D.    McKesson organized and led the protest

McKesson was not invited by the Alton Sterling family or its representatives and no one from Baton Rouge asked McKesson to come to Baton Rouge.  McKesson did not meet with the Sterling family or any of its representatives, attend the funeral, and he was not invited to attend the funeral.[25] According to McKesson, local activist that he was unable to name or otherwise identify reached out to his team, which prompted McKesson to notify his followers to be in Baton Rouge at a certain date and place.

---

[20]  Ex 20: The Rise and Rupture of Campaign Zero How the founders of one of Black Lives Matter's most prominent organizations fell out, 1.31.22, at 620.

[21]  Ex 2: McKesson, at 33, ln. 24 - Page 34, ln. 2.

[22]  Ex 2: McKesson, at 34, ln. 23- Page 35, ln. 13; Page 34, lns. 23-24; Page 35, lns. 5-13.

[23]  Ex 2: McKesson, at 122, lns. 22-25.

[24]  Ex 33: The rise of Black Lives Matter: Rising movement often polarizing, Sidney and Simon, brproud, 12/18/15.

[25]  Ex 2: McKesson, at 55, lns. 15-25. See also, 56, lns. 1-5.

Q      Now you said you met with some people in Baton Rouge.· Who were they?
A      I don't know them.· They were local activists.
Q      Were you called to come to Baton Rouge?· Did somebody from Baton Rouge call you and ask you to come to Baton Rouge?
A      Call me?· No.
Q      Did anybody from the Alton Sterling family or representing the family call you to come to Baton Rouge?
A      Call me?· No.

When McKesson was shown to have known so little about the Alton Sterling shooting, his death, his funeral or his family and where he had no contact with the family and showed no remorse for the death, his only objective for being in Baton Rouge with his followers was to protest and harass the local police.[26] McKesson used the death of Alton Sterling as a vehicle to harass police.[27] Ex 1: Ford, at 79, ln 15, Page 80, ln. 18:

A.      You know, like, we also had a black pastor that came out and talked to the protesters by loudspeaker, we gave him a loudspeaker, and he was telling them to go home, too, but some of the protesters that I spoke with that were friendly, they just kept apologizing for all the out-of-towners. They said, this is not Baton Rouge way, this is not our way, we didn't want them here and we wanted them to leave and we asked them to leave and they wouldn't leave, and they, you know, told us that they planned on being violent.
Q.      Now, who's the "theys?" Who's the "theys" there?
A.      Talking about the Black Lives Matter people that were coming from out of town.
Q.      Told who what?
A.      That when the black -- the black guys that I was talking to at the protest, they're citizens of Baton Rouge.
Q.      Okay.
A.      They live there. They're local. And they were mixed in with the Black Lives Matter that was the out-of-town group --
Q.      Okay.
A.      -- that came there to protest. Matter of fact, they told me they got paid to come there and protest.

Gary Chambers, the Sterling family representative, announced at the funeral, "If you want to protest, please leave now."[28]

According to McKesson, there was an activist from Baton Rouge who tweeted and

---

[26] At the same time, July 9, 2016, violent BLM protest was ongoing in St. Louis.  Ex 21: Officers injured as St. Paul Black Lives Matter Protest Turns Violent.

[27] Ex 2: McKesson, at 114, ln. 23 - Page 117, ln. 3.

[28] Ex 30: The St. Augustine Record, Killed by Police, Santana, 7.16.16. Gary Chambers Sterling Family Representative and local activist - if you are here to protest - go home.

by doing so reached out to his BLM team (McKesson, Elzie, Packnett and Sinyangwe) to help organize the protest.[29]   McKesson then retweeted ("amplified") the tweet of the location and time of the protest to his hundreds of thousands[30] of twitter followers:[31]

Q       Now you said somebody contacted your team. You recall that?
A       Yes.
Q       What did you do after your team was contacted?
A       Went to Baton Rouge.
Q       Okay, because in your answers to discovery[32] you said that you notified others of
         the protest.
A       Oh, Twitter.· I amplified a message on Twitter about it.
Q       What did you say?
A       I amplified a message, so I retweeted a message.
Q       What was that message?
A.      I cannot look, so I don't know.
                                              * * * *
Q       Okay and you provided the time and the place. Correct?
**A       I believe I re-tweeted something that had the time and the place.· Yes.**
Q       To your Twitter followers.· Correct?
A       Correct.[33]

Accordingly, there were multiple out-of-state protestors in attendance. Staging a protest on a public highway in front of a police station violated the reasonable time and place prongs of the First Amendment. Flaunting illegal activity in front of a police station was purposeful and intended to elicit a police response including arrests and other use of force confrontations just as it had in many other BLM protests.

    E.       McKesson ordered protestors on to the highway

    McKesson ordered protesters on to the highway.[34] An arrest, by its very nature, is

---

[29]  Ex 2: McKesson, at 57, lns. 13-23; Page 38, lns. 4-6.

[30]  Ex 2: McKesson, at 67, lns. 2-13.

[31]  Ex 2: McKesson, at 66, ln. 13 - Page 67, ln. 1.

[32]  Ex 26: McKesson Responses to Interrogatories, Interrogatory No. 5 at 5.

[33]  Ex 2: McKesson at 72, lns. 12-17.

[34]  "[W]e note that the criminal conduct allegedly ordered by Mckesson was not itself protected by the First Amendment, as **Mckesson ordered the demonstrators to violate a reasonable time, place, and manner restriction by blocking the public highway.** See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d

a use of force.  Mckesson led the protestors to block the public highway, *Mckesson*, 71 F.4th at 289, which would be his *own* negligent, illegal *action* (not speech or advocacy),and the 'but for' cause of the police confrontation.

The location of the protest was the busy Airline Hwy in front of the Baton Rouge Police Department on the corner of Goodwood Blvd and Airline. McKesson led protestors down Airline Hwy to I-12 where they were turned around by police. McKesson was arrested while provoking his own arrest[35] so that he could live stream his arrest to his followers.[36]

Despite holding a protest on a public highway and blocking the highway in front of the BRPD, McKesson would claim it was the police who provoked protesters.[37]  The live footage of DeRay McKesson[38] shows him walking on the highway and being warned by police to stay out of the lane of travel, but continuing to taunt police to trigger his own arrest,[39] which would be followed by an article in the New York Times fueling his own notoriety.  DeRay McKesson claimed, "What we saw in Baton Rouge was a police department that chose to provoke protesters to create, like, a context of conflict they could exploit."[40]  During the arrest, the arresting officer is heard warning McKesson, in his red shoes, to stay out of the lane of travel, making the arrest and then repeating, "City police.

---

221 (1984) (reasonable time, place, and manner restrictions do not violate the First Amendment). As such, no First Amendment protected activity is suppressed by allowing the consequences of Mckesson's conduct to be addressed by state tort law.  <u>Doe v. Mckesson</u>, 945 F.3d 818, 832 (5th Cir. 2019), <u>cert. granted, judgment vacated</u>, 141 S. Ct. 48, 208 L. Ed. 2d 158 (2020).

[35]  Ex 19 DeRay McKesson, Arrested in Baton Rouge, Is Released 7.10.16.

[36]  Ex 2: McKesson Livestream.

[37]  Ex 2: McKesson, at 64, lns. 9-11.

[38]  Ex 2: McKesson, at 59, lns. 16-25.

[39]  Ex X: Manual attachment of DeRay McKesson live streaming his own arrest.

[40]  Ex 14: DeRay Mckesson, Arrested While Protesting in Baton Rouge, Is Released. 7.10.16, New York Times.

You're under arrest. Don't fight me. Don't fight me." [41]

McKesson was a well known BLM leader.[42]  His protest chants were inspired by Assata Shakur,[43] who was convicted of slaying a state trooper and who fled justice and is now a fugitive living in Cuba while remaining on the FBI's most wanted list.[44]  In August 2015, both Mr. McKesson and Ms. Elzie, another team organizer, were identified in Baltimore as "a threat of violence" as "Severity: HIGH" and "Threat Type: PHYSICAL."[45]

**INTERROGATORY NO. 5**:[46]
How did you learn of and notify others of the protest or demonstration?
**ANSWER TO INTERROGATORY NO. 5**:
Mr. Mckesson objects to Interrogatory No. 5 as vague. To the extent that Interrogatory No. 5 seeks information about every protest that Mr. Mckesson attended, Mr. Mckesson also objects to Interrogatory No. 5 as irrelevant to the claims and defenses in this matter and disproportional to the needs of the case, which involves a single protest in Baton Rouge on July 9, 2016. Subject to these objections, **Mr. Mckesson learned of the July 9, 2016 protest in Baton Rouge through social media and posted about the protest on Twitter.**

**ANSWER TO INTERROGATORY NO. 7**:[47]
Mr. Mckesson was in Baton Rouge, Louisiana on July 9, 2016 to protest the killing of Alton Sterling by police and to bring awareness to unjust killings by police. Mr. Mckesson learned about the protest on Twitter. **Mr. Mckesson posted on Twitter that he would be**

---

[41]  Ex 14: DeRay Mckesson, Arrested While Protesting in Baton Rouge, Is Released. 7.10.16, New York Times.

[42]  Ex 2: McKesson at 68, lns. 4-16 (t.v. documentary on 3.26.2016 "Stay Woke and the BLM Movement."  Others in documentary were Felicia Garza, Patrisse Cullors, Johnetta Elzie and Brittany Packnett.). Ex 14: DeRay Mckesson, Arrested While Protesting in Baton Rouge, Is Released. 7.10.16, New York Times ("one of the best known voices for the Black Lives Matter movement").

[43]
https://www.theguardian.com/books/2014/jul/13/assata-shakur-civil-rights-activist-fbi-most-wanted#:~:text=Assata%20Shakur%3A%20from%20civil%20rights%20activist%20to%20FBI%27s%20most%2Dwanted

[44]  Ex 2: McKesson, at 20, lns. 6-24.

[45]  Ex 2: McKesson, at 25, ln. 8 - Page 26, ln. 25. Ex 15: FBI Hired Social Media Surveillance Firm that Labeled Black Lives Matter Organizers "Threat Actors." Ex 27: ZeroFox, at page 7.   Ex 32: FBI Hired Firm that Labeled BLM Leaders "Threat Actors."

[46]  See Ex 26, Interrogatory Response No. 5, at 5.

[47]  See Ex 26, Interrogatory Response No. 7, at 6.

**attending the protest.** [Emphasis added]

Officer John Doe, John Brad Ford, testified that the police had multiple briefings prior to the BLM protestors descending upon Baton Rouge.  Paramount to their concerns was the recent ambush of officers in Dallas during a BLM protest on Thursday.  Two days before the Saturday protest in Baton Rouge, several officer were shot and killed during a BLM protest in Dallas where BLM protesters flooded the streets triggering police response.[48] Mr. Ford explained:[49]

Q.     Now, did the Dallas shooting of 12 officers just days before this, did that have any -- it was at a Black Lives Matter protest. Did that play any role in the actions of the Baton Rouge police or the -- the -- the actions that they felt they needed to take in the face of this particular protest?

A.     Yes, ma'am, I'm sure it did. I know that we -- we set up a lot of different types of barricades anticipating the violence, and we had a lot of medical personnel on staff, and we were anticipating that we could actually have some shootings during the protest. And then when we were told that the New Black Panther Party was armed and when we saw them armed, we kind of figured we was going to, you know, have some shootings because of it.

Q.     Were you in fear for your life?

A.     Yes, ma'am.

* * * *

A.     Basically we was informed that because of the shootings that we were going to have Black Lives Matters coming from several states. We were told that DeRay McKesson was a Black Lives Matter leader and that they were coming to Baton Rouge to try to get a response from the police department, and that it would probably be violent and, you know, that was his track record everywhere that he went, it was a violent protest, so it was preparing for the worst pretty much.[50]

The Declaration of Captain Wiedeman confirms the dangers faced by the Baton Rouge Police due to the out-of-state protestors descending upon the city.[51]

---

[48]  Ex 24: Video Dallas Protest July 7, 2016, posted on July 8, 2016 and Chaos in St. Paul =>Police Injured After #BlackLivesMatter Attacks Cops with Rocks, Rebar, Bottles, Fireworks, Molotov Cocktails, July 9, 2016; Ex 34: Dallas Police 'Ambush'=>12 Police officers Shot, 5 Killed During Protest. July 7, 2016.  Ex 31: Hundreds arrested in protests over shootings by police.

[49]  Ex 1: Ford, at 83, lns. 3 - 23

[50]  Ex 1: Ford, at 12, lns. 15-25.

[51]  Ex 16: Declaration of BRPD Capt. Judd Wiedeman.

A.      That, like I said, I'm not privy to all of that, but I know that when we had our briefing about getting ready for the protest, we were told during that briefing that DeRay McKesson, and I'd never heard his name really before that, so I didn't keep up with it, but that's the first I heard his name, but that he was leading the protest and was on his way to Baton Rouge to meet with New Black Panther Party and some activists from Baton Rouge.[52]

* * * *

Ex 1: Ford, at 33, lns. 6 - 19:

A.      From what they told us, the informant told them that they wanted to try to overwhelm the police department with numbers, that they had several coming from out of state or that was already there, I guess, but they were going to block that highway right in front of the police department, which is Airline Highway, and that they -- they wanted to cause a response from the police department, and told us, you know, be careful and make sure that laws were being broken if we were going to make contact with the protesters, you know, that kind of information, and that they were looking to get . . .

Ex 1: Ford, at 35, lns. 6 - 15:

A.      Yes, sir, I see what you're saying. The best I can remember, when the protest actually started and people were gathering up, we were called on the radio and told to report back to the police department. My team showed back up to the police department, and that's when we were told, hey, you know, they're gathering up, so we started getting ready for them blocking highways, because we was already told they was going to block highways.

There were multiple photographs taken as the crowd was building and into the night when the protesters began marching toward I-12.   There are photos of objects being thrown and in the street from having been thrown throughout the day and into the night.[53]

Besides Black Panthers bearing guns, there were people in the crowd with weapons.[54]  Ex 1: Ford, at 36, lns. 2 - Page 37, ln. 25:

Q.      Okay. During the protest, did you ever see Mr. McKesson?
A.      Yes, sir, several times.
Q.      All right. Tell me about that. Where did you see him?
A.      The first time I saw him was when they were out into the road blocking Airline Highway. **And throughout the protest, he was in the Circle K parking lot and**

---

[52]  Ex 1: Ford, at 18, lns. 4 - 13.

[53]  Exs 17 and 18: Photos of Circle K during the day, protesters in the street, blocking traffic, objects being thrown, water bottles littering the street, the Circle K crowd at night, protesters blocking traffic, arrests at the Circle K, arrests at the Nissan dealership, the preacher on the loud speaker asking BLM to leave. Ex 3-16.

[54]  Ex 25: Photo man with weapon in Baton Rouge Protest crowd.

Q.     **walking down Airline Highway**. I saw him downtown, also, at a different time.
Q.     Okay. So let's start with the first time. The first time you saw him was at – did you say that was on Airline Highway?
A.     Yes, sir. They was over there on the corner of Goodwood Boulevard, which runs beside the police department, and Airline Highway. There's a Circle K there, store.
Q.     Okay. And what was -- what was Mr. McKesson doing?
A.     He was just leading the crowd, just --I know that they were -- he was talking to a lot of people. He had New Black Panther Party that was all standing around him. We kept a good eye on them because they were all armed. **Every one of them had guns.** And, you know, while I was positioning with my team to move to the corner of our police lot, that's when they had all started walking out into the highway. The – McKesson, the New Black Panther Party, was all -- they were all in the front with the **guns,** and then, you know, a lot of the crowd followed them out into the highway.
Q.     Okay. So how did you -- how did you know that it was Mr. McKesson?
A.     Well, we were shown a picture of him, and plus I kind of did my own research once we found out he was coming, I started looking, and we were shown police, not police, but the police showed us pictures of him so we would know who he was.

Ex 1: Ford, at 38, lns. 9 - 17:

A.     Well, the casual conversations, no. There was too much traffic and it was loud out there. But I could hear his chants and stuff like that.
Q.     Okay. What did you hear him say?
A.     The main thing they started off with was no justice, no peace, no racist police. That was the main chant that I actually heard him from his own voice say.

Ex 1: Ford, at 39, lns. 5 -9, lns. 14-20:

A.     No, I heard him when they were -- there were several things that were shouted. I did hear him say stuff about racist cops and stuff like, they murdered Alton Sterling, just little short quotes type stuff, you know.

A.     Mr. Gibbens, to be honest with you, they said so many things about white police, it was just a lot of -- a lot of hatred, you know, a lot of hate speech and stuff towards white police. This was hours and hours and hours of stuff, you know, they were -- they were yelling. I mean –

McKesson admitted to having an issue with whiteness, white supremacy and privilege.[55] McKesson testified:

Q     Have you given a talk or an interview on whiteness, white supremacy and privilege?
A     Have I ever?
Q     Yes, sir.
A     Yes.
Q     How many times?
A     I do not know the number.

---

[55]   Ex 2: McKesson, at 21, lns 3-6.

Officer John Doe, John Brad Ford, was concerned with the white police hate chants, taunts and threats, which he interpreted as hate speech.

A    . . . . unless I wrote it down, you know, but he chanted a lot of hate speech towards white police officers in particular, a lot of stuff about KKK, that we're just the new KKK, and stuff like that. There's a lot of hate speech that I heard.[56]

                                    * * * *

A.    Every minute they were out there. They threatened to rape our kids, kill us, come find us where we lived, stuff like that.

Q.    Was that the locals that were doing this or was it the group that came --

A.    No, that was the out-of-towners. That was the Black Lives Matters that was coming in from out of town.

Q.    The ones that DeRay McKesson was leading?

A.    Yes, ma'am.[57]

Ex 1: Ford, at 41, lns. 4 - :

Q.    Okay. What did you -- what did you hear him say about KKK?

A.    That, like, the police were the new KKK.

Ex 1: Ford at 89, lns. 21-Page 90, ln. 1.

A.    They -- they were -- they would chant a lot of different hate speech, but one of the things a lot of them were saying was, if you hurt one of us, and I'm assuming they're meaning, you know, African-Americans, you hurt one of us, we'll hurt three of you. They would say that a lot, stuff like that.

Ex 1: Ford at 90, lns. 22 - Page 91, ln. 3 and 11.

Q.    Was DeRay McKesson, was he able to see, did you see him in close enough proximity that he could see that these people had weapons?

A.    Yes, ma'am. He was standing right with them.

                                      * * * *

A.    It was very threatening.

Ex 1: Ford at 92, lns. 14-23:

Q.    Tell us about that. How did you go about approaching these people who were armed with weapons and trying to disarm them in this crowd?

A.    We were told that, you know, if they're committing a crime, that we were to disarm them and arrest them. So once they started blocking the highways, they were committing a crime, so we did make arrests and we disarmed these people and arrested them on the spot.[58]

---

[56] Ex 1: Ford, at 40, lns. 18-23.

[57] Ex 1: Ford, at 89, lns. 2 - 12.

[58] McKesson claims that 185 persons were arrested. See <u>McKesson v. City of Baton Rouge</u>, 16-520 RD 1, at 9, ¶30.

Ex 1: Ford at 41, Ins.19-23:

Q.     Was he doing anything else?
A.     No, sir. Just, you know, I think he was getting them ready to walk into the highway
       about the time that I was walking up to them, the corner of the police department.

Ex 1: Ford, at 42, Ins. 1-6 and 14 - Page 43, In. 5:

A.     Well, they were following him all over the area. I mean, anywhere he was going,
       they were following with him. And when he walked up to the New Black Panther
       Party, you know, a crowd walked with him to them, and they stopped and conversed
       for -- and, like I said
                                        * * * *
A.     He was directing them with his body language moving around. They were moving
       with him. They just followed him and New Black Panther Party when they walked
       out to the highway.
                                        * * * *
A.     Well, you know, just -- just by his body language, you know, of him moving people
       from one area to the next, and once they moved to where the Black Panthers were,
       like I said they stopped there, **but everybody was following him**, and the New
       Black Panther Party and him, when they started moving back out towards the road,
       they all -- **the whole crowd started following him**.

Ex 1: Ford, at 78, Ins. 20- Page 79, In. 5

A.     I've had several that -- a couple I knew personally from working at the Baton Rouge
       Police Department, but there were several out there just telling me that they were
       sorry about all this, that they wanted to protest the injustice, but they didn't want to
       commit crimes, and that **they asked DeRay to go home** personally and that he
       refused to go home, that they did not want them from -- all the people from out of
       town that was coming, they wanted them to leave.

       Mr. McKesson knew that communities feared him. In 2015, South Carolina locals

asked DeRay to **go home** due to their concern of the potential for looting and violence by

BLM protesters.[59] Ex 1: Ford, at 79, In. 15 - Page 80, In. 2:

A.     You know, like, we also had a black pastor that came out and talked to the
       protesters by loudspeaker, we gave him a loudspeaker, and he was telling them to
       **go home, too**, but some of the protesters that I spoke with that were friendly, they
       just kept apologizing for all the out-of-towners. They said, this is not Baton Rouge
       way, this is not our way, we didn't want them here and we wanted them to leave and
       we asked them to leave and they wouldn't leave, and they, you know, told us that
       they planned on being violent.

       Ex 1:Ford, at 80, In. 21-24:

---

[59]  Ex 26: DeRay McKesson Responses to Plaintiff's Second Set of Interrogatories,
Interrogatory No. 6, at 5.  Ex 28 and Ex 29 related articles.

A.   The Black Lives Matter protesters that were coming into Baton Rouge was telling the locals that they were being paid to come there.

Ex 1:Ford, at 43, 18-Page 44, ln. 3:

Q.   Okay. When you say "not personally," are you -- have you been told by anybody else that they saw -- they saw him throwing things or directing people to throw things?
A.   When I say "not personally," I mean I didn't see him do it, but, yes, I did hear them say that he was directing the crowd and that he was kind of agitating the crowd to do.

Ex 1:Ford, at 44, at 1-3 and 17-20:

A.   . . . . .certain things, to commit crimes and stuff, as far as walking out into the road, but I wasn't standing there like other cops were.

. . . they were talking about how DeRay was agitating the crowd to do certain chants, he was agitating the crowd to move out into the highway to block traffic, and so forth.

Ex 1:Ford, at 41, lns. 13-23:

Q.   Okay. All right. So you first saw him at the corner of Goodwood and Airline, and at that time he was with the members of the New Black Panther Party and talking to a lot of people. I think that's what you said at that point. Was he doing anything else?
A.   No, sir. Just, you know, I think he was getting them ready to walk into the highway about the time that I was walking up to them, the corner of the police department.

Ex 1: For at 49, lns. 22-24

A.   When I first saw him, he was in the parking lot.
Q.   The Circle K parking lot?
A.   Yes, sir.

Ex 1:Ford, at 42, lns. 1 -10 and 14-18.

A.   Well, **they were following him all over the area. I mean, anywhere he was going, they were following with him.** And when he walked up to the New Black Panther Party, you know, **a crowd walked with him to them**, and they stopped and conversed for -- and, like I said, I don't know what he said, it was too loud, you know, too much noise, but after a short little time that they stood there is when they all walked out into the highway.
* * * *
A.   He was directing them with his body language moving around. They were moving with him. They just followed him and New Black Panther Party when they walked out to the highway.

Ex 1:Ford, at 48, lns. 3 -8:

A.   I don't remember anybody telling me that they saw him throw anything. They -- I

**know I personally saw him with a water bottle in his hand**, but I never saw him throw a water bottle. But as far as anybody saying they saw him throw anything.

### F. McKesson threw a water bottle

As set forth above, Officer John Doe, John Brad Ford, saw DeRay McKesson walk over and retrieve a water bottle from the stack looted from the Circle K. DeRay McKesson testified that if he had a bottle of water, he would not have drank the water or carried it with him during the protest.[60] One may infer that McKesson likely threw his bottle of water at police along with the other protesters.

### G. McKesson leading protestor to and from I-12 when arrest occurred and Officer Doe injured

Mckesson led the protestors to block the public highway, *Mckesson*, 71 F.4th at 289, which would be his *own* negligent, illegal *action* (not speech or advocacy),and the 'but for" cause of the police confrontation. McKesson readily admits that he had been marching toward I-12 on Airline Hwy, with a large group behind him, when he was turned around on Airline by police.[61]  After being turned around attempting to reach I-12, McKesson was marching back to the BRPD when he staged his own arrest.  This took place during 10 and 11 p.m., which is the exact same time frame when Officer John Doe was arresting a protestor, who was attempting to march down Airline Hwy in the street toward I-12.

Ex 2: McKesson at 77, ln. 13 - 23:

A     That is not -- in the video I'm arrested – this is why I made the video, because **they told me to get out of the street and I was getting out of the street**, so I haven't seen that part of the video because I lived that part.

Q     We've seen the entire video, sir, so let's go back over it again.· You were marching towards I-12 correct?

A     I believe that is the name of the highway, but sure, yes.

Ex 2: McKesson, at 80, lns. 20-23:

---

[60]  Ex 2: McKesson, at 97, ln. 25 - Page 98, ln. 20.

[61]  The offense of "aggravated obstruction of a highway of commerce," a violation of La. R.S. 14:96. The statute defines this offense as "the intentional or criminally negligent placing of anything, or performance of any act, on any ... road, highway, [or] thoroughfare ... where it is foreseeable that human life might be endangered."

Q   Okay.· So if there's a large group behind you, your testimony is that you were not leading them, **but they were just following behind you**?

A   **Absolutely.· Correct**.· I was not leading them.

Ex 2: McKesson, at 90, ln 24 - 91, ln. 3:

Q   Did you go down Airline Highway and turn around and go back towards the police department before you were arrested?

A   I was turning around and walking back towards the police department when I was arrested.

Ex 1: For at 48, ln. 16 - Page 49, ln. 9.

Q.   Okay. Did anybody tell you that they heard him telling people to go out into the – into Airline Highway?

A.   Yes.

Q.   Okay. And who was that?

A.   About half the Shield Team, I guess. I don't know names specifically, but there were several people out there when he was telling them to block the roads that they heard DeRay say -- telling people to block the road?

A.   Yes, to go out into Airline Highway.

Q.   So let me just make sure we're clear on what it was that he said. Was he telling people to go out into Airline Highway or was he telling them to block the road?

A.   Go out and to block the traffic coming down Airline Highway.

The Baton Rouge Police **warned the protestors** before they started making

arrests.[62]

Q.   Okay. Okay. And what kind of things were said over these **loudspeakers** to notify the crowd and to give them a **warning**?

A.   **We just told them that if they walked out into the highway, that they would be arrested for blocking traffic** and that -- I remember them telling the actual law as far as the statute, Louisiana statute, they read the statute out loud and told them that we were going to be enforcing that and they were not going to be permitted to block traffic.

Ex 1:Ford, at 74, lns. 1-19.

A.   Well, they're going to deny it, Ms. Donna, but Black Lives Matter went and they looted the store, the Circle K. We watched them loot it, and I know it's on video, and I don't know why we can't get a copy of it, but it was on video, but --

Q.   Where was DeRay during this looting of the Circle K?

A.   I remember him walking back and forth. I don't know if he went inside the -- I lost him a few times, but I know he was in the parking lot while it was -- you know, the store was being looted. They brought several cases of water out back towards the corner closest to Airline Highway and Goodwood.

Q.   Is that where DeRay got his bottle of water, from the cases that they sat down by the corner?

---

[62]   Ex 1:Ford, at 82, lns. 17 - Page 83, ln. 2.

A.    Yes, ma'am.

Mr. DeRay McKesson placed himself at the corner of the Circle K at or about the same time the water bottles were looted.  When Officer Doe last saw McKesson, McKesson left the Circle K parking lot and was "walking down Airline Highway."[63]  Officer Doe was struck in his head with an object thrown by the protester while making an arrest of a protestor attempting to follow McKesson to I-12. Doe testified he was struck between 10 and 11 p.m..  McKesson was arrested around 11:00 p.m.[64] McKesson started at the corner of Goodwood at the Circle K and then moved from there leading a crowd down Airline toward I-12.  Once access to I-12 was blocked by Officer Jason Acree and other officers, McKesson was turned around and was walking back down Airline toward the BRPD when he too was arrested walking in the travel lane of Airline Hwy.[65]  McKesson live streamed his arrest.[66]

Of his arrest, McKesson blamed the police making arrests of protesters of provoking protestors.  He commented that "he and others jailed remained committed to the Black Lives Matter movement and would continue to use civil disobedience to make their points." Using "civil disobedience" was the pattern and practice of BLM and of McKesson to engage police.  During his arrest while walking in the highway McKesson told his viewers, "Watch

---

[63]  Ex 1:Ford, at 36, lns. 7-11; at 49, lns. 21-24.

[64]  Ex 2: McKesson, at 92, lns. 12 - Page 98, ln. 1.

[65]  Ex 2: McKesson, at 85, lns. 12-13 (began marching toward I-12 from BRPD); at 86, lns. 5-7 (police shut down area); at 90, lns. 7011, went from corner of Goodwood down Airline Shy towards interstate); at 91, lns. 2-4 (he had turned around and was walking back toward BRPD when he was arrested). Ex 1 from deposition. See also, Page 79, lns. 23-14 (started at BRPD on Airline); at 79, lns. 1-4 and 12-20 (walking away from BRPD on Airline Hwy); at 76, lns. 25 - Page 77, ln. 2 (he had been turned around and away from the I-12 interstate when he was arrested walking back down Airline).

[66]  Ex X: Video made by McKesson live streaming his arrest. (Manual attachment)

the police, they are just literally provoking people."[67]

Ex 1:Ford, at 47, lns. 21 -24.

A.     About half the Shield Team, I guess. I don't know names specifically, but there were several people out there when he was telling them to block the roads.

Ex 1:Ford, at 49, lns. 3-10.

A.     Yes, to go out into Airline Highway.
Q.     So let me just make sure we're clear on what it was that he said. Was he telling people to go out into Airline Highway or was he telling people to block the road?
A.     Go out and to block the traffic coming down Airline Highway. But as far as specifically how he worded it, I'm not sure.

Ex 1:Ford, at 48, lns. 3-9.

A.     I don't remember anybody telling me that they saw him throw anything. They -- I **know I personally saw him with a water bottle in his hand**, but I never saw him throw a water bottle. But as far as anybody saying they saw him throw anything, I don't have anybody that told me that that I -- that I remember.

Ex 1:Ford, at 88, lns. 11-19

Q.     What about the criminal activity, did you ever see him encouraging people to violate the law by getting in the highway and blocking cars?
A.     **Yes, ma'am. He -- he led them a couple of times out into the road, which is a violation of the law, so that's -- that's encouraging them to follow him and breaking law**.

Ex 1:Ford, at 87, lns. 21 -24, Page 88 lns. 2-9.

Q.     Was it your opinion, with the command and control that you observed DeRay exercising over this crowd, that he could have stopped this?
A     Yes, ma'am, he could have -- he could have told them to stop.
BY MS. GRODNER:
Q.     Do you think -- do you think that his followers would have listened to him?
MR. GIBBENS:
     Objection.
A.     Yes, ma'am. He's the leader.

The live stream shows DeRay McKesson leading a group up Airline and after his

arrest, the BLM leaders that were with McKesson immediately began making calls to have

DeRay bailed out and they remained in contact with the BLM followers who were watching

the live stream.

---

[67] See Ex 14: DeRay McKesson, Arrested in Baton Rouge.  See manual attachment of arrest.

Ex 1:Ford, at 83, ln. 23 - Page 84, ln. 25:

Q.  Now, you talked about being on Goodwood and Airline at the corner of the Circle K when the looting took place and you saw DeRay McKesson two minutes before. Approximately how many feet away from him were you when you **saw him with the water bottle?**

A.  I was probably about 20 feet from him and he was probably about 10 or 15 feet from the cases of water.

Q.  Did you ever hear him order the crowd to stop throwing those water bottles?

A.  No, ma'am.

Q.  Did you ever hear him at any time or see him or get the idea that he was trying to damp things down, calm things down, encourage people to stop violating the law?

A.  No, ma'am.

Q.  Did you ever see him at any time try to encourage people to stop throwing objects at police?

A.  No, ma'am.

Q.  Now, were there -- this happened during the evening hours, you said, between -- after ten o'clock. Were there times during the day that things were being thrown --

A.  Yes, ma'am.

Ex 1: Ford, at 85, lns. 3 -19:

A.  Yes, ma'am. That's been several different, I guess you could call it almost in phases that they were enticing the police, you know, they would step out into the road, and then when we started to come around to push them back, they'd -- they'd jump back into the parking lot, but when we'd get back over in front of them, they'd start throwing bottles and -- not just bottles, just all kind of stuff, trash and, you know, some rocks were thrown, I believe, and -- but this happened several times.

Q.  Was DeRay -- was there some reason why he couldn't see what was going on or was he in a position where he could observe all this?

A.  Yeah, he was always on the front line, so he could see.

Ex 1: Ford, at 86, lns. 13-24:

Q.  You could see him, correct, with your own eyes?

A.  Yes, ma'am.

Q.  Okay. So you're not guessing about anything? This is something you witnessed, correct?

A.  Yes, ma'am.

Q.  **And so he was aware that the crowd had been throwing things at police all day, correct?**

**A.  Yes, ma'am**.

Ex 1:Ford, at 87, lns. 2-20:

Q.  And these guys that had shields, when you were behind them, could you hear things bouncing off their shields?

A.  Yes, ma'am.

Q.  What was that like? Tell us what that was like.

A.  Just sounded like objects, you know, hitting the -- hitting the plastic, and so that, you know, you could tell that it was stuff being thrown, and then some of the things were coming over the top of them, so they was coming back toward the back.

Q. And that was something that had been going on for several hours?
A. Yes, ma'am. Like I said, it was kind of in phases. It didn't happen the whole time of the protest, just different parts of the day and night they -- they started throwing things.

Ex 1:Ford, at 50, lns. 5 -Page 51, ln. 1.

Q. Okay. So that -- All right. When was it -- at some point I think you were -- you were hit with something, a rock or a piece of concrete or something?
A. Yes, sir.
Q. Okay. When did that happen?
A. That was late in the evening. I believe it's going to be between 10:00 and 11:00 p.m.
Q. Okay. Do you know where Mr. McKesson was at that time?
A. He was in the crowd. I had just seen him probably two minutes before that happened, but as far as exactly the exact time, I don't know where he was standing in the crowd.
Q. Okay. And this -- at this point, where were you?
A. We were behind the shield guys and, like I say, we was on the Arrest Team, so we were arresting agitators, and I had just went into the crowd to make an arrest when I got hit.

Ex 1:Ford, at 51, lns. 4-14, and 18- page 52, ln. 11.

A. Oh, I'm sorry. This was -- we were standing on Airline Highway pushing the crowd back into the Circle K parking lot.
Q. Okay. And you were -- and you said you were going to -- you were going in to make an arrest and that's when you got hit in the head?
A. Yes, sir.
Q. Okay. And did you actually -- did you arrest anybody at that time?
A. Yes, sir.

* * * *

A. Basically, we -- **there was a lot of stuff being thrown into the roadway** and in our direction, toward the police from that parking lot. We were identifying agitators, and so we had people, like my sergeant, telling us when to go in to make the arrest. We would -- we would actually point out who we was going to get based on who was agitating the crowd. -- the shields opened, I went into the crowd, and I had to chase my guy just a little ways. I caught him in kind of like a bear hug-type hold and was bringing him back towards the shields, back into the highway to get behind the shield guys, and I looked back for a second to make sure nobody was running at me. There was people running everywhere at this time. It was very chaotic. When I turned and looked backward, back behind me, that's when I got hit in the -- in the face.

The testimony from both Officer Doe and McKesson is clear that McKesson started at the Circle K and then marched down Airline Hwy towards I-12 until he was turned around. McKesson was arrested around 11 p.m., shortly after Officer Doe had been struck in the head, while making an arrest on Airline.

**It was patently foreseeable that the Baton Rouge police would be**

**required to respond to the demonstration by clearing the highway** and, when necessary, making arrests. Given the intentional lawlessness of this aspect of the demonstration, Mckesson should have known that **leading the demonstrators onto a busy highway was likely to provoke a confrontation** between police and the mass of demonstrators, yet he ignored the foreseeable danger to officers, bystanders, and demonstrators, and notwithstanding, did so anyway. *Mckesson*, 945 F.3d at 827.

## 4.   Conduct in question was cause in fact

Cause-in-fact is a jury question.[68] Mckesson led the protestors to block the public highway, *Mckesson*, 71 F.4th at 289, which would be his *own* negligent, illegal *action* (not speech or advocacy),and the 'but for' cause of the police confrontation for himself and those protestor he was leading.[69]  In Doe v. McKesson, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 532, the Louisiana Supreme Court found:

> Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. **It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries.** See *Roberts v. Benoit*, 605 So.2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, **a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."**). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was

---

[68]  "As correctly noted by Mr. Stelly, the jurisprudence has held that "cause-in-fact and legal cause are generally questions for the jury. The exception is when, under the uncontested facts, reasonable minds could not differ." Blanchard v. Mitchell, 17-444, p. 4 (La. App. 3 Cir. 6/12/17), 233 So.3d 719, 722 (quoting Nicholson v. Calcasieu Parish Police Jury, 96-314, p. 6 (La. App. 3 Cir. 12/11/96), 685 So.2d 507, 511), writ denied, 17-1372 (La. 11/6/17), 228 So.3d 738. Despite the trial court and Defendants' assertion that numerous facts are "undisputed" or "non-issue[s]," the record on appeal is rife with contested facts and inconsistent testimony, the resolution of which requires a reasonable trier of fact to weigh conflicting evidence, thus precluding the granting of summary judgment." Stelly v. Nat'l Union Fire Ins. Co., 2018-293 (La. App. 3 Cir. 2/6/19), 266 So. 3d 395, 404.

[69]  Ex 1:Ford, at 36, lns. 9-11 ("And throughout the protest, he was in the Circle K parking lot and walking down Airline Highway."); at 37, lns. 5-8 ("And, you know, while I was positioning with my team to move to the corner of our police lot, that's when they had all started walking out into the highway."); at 49, lns. 21-24 ("Q. Okay. And then you saw him walking down Airline? A. Yeah. That was much later in the -- in the evening.").

within the scope of the duty of care allegedly breached by Mckesson.

The amended complaint only bolsters these conclusions. It specifically alleges that Mckesson led protestors down a public highway in an attempt to block the interstate. The protestors followed. During this unlawful act, Mckesson knew he was in violation of law and livestreamed his arrest. Finally, the plaintiff's injury was suffered during this unlawful action. The amended complaint alleges that it was during this struggle of the protestors to reach the interstate that Officer Doe was struck by a piece of concrete or rock-like object. **It is an uncontroversial proposition of tort law that intentionally breaking, and encouraging others to break, the law is relevant to the reasonableness of one's actions**.

McKesson's only defense for leading protestors onto Airline Hwy was the lack of sidewalks along Airline Hwy, <u>McKesson v. City of Baton Rouge</u>, 16-520 8/4/16 RD 1, ¶ 25, writing:

> **Defendants ordered class members to walk on the sidewalks, and to not walk in the street.** This order was unreasonable and placed citizens walking along Airline Highway and other streets in danger, because those streets do not have sidewalks and the adjacent areas were uneven or not mowed and contained hazards that could not be seen. [Emphasis added]

Ex 2: McKesson, at 77, lns. 14-19:

A·     That is not -- in the video I'm arrested – · · · ·this is why I made the video, **because they told me to get out of the street and I was getting out of the street,** so I haven't seen that part of the video because I lived that part.

Ex X:  McKesson, at 78, lns. 21-25:

Q     **Did it matter to you whether or not there were sidewalks?**
A     **No.**
Q     So you started at the police headquarters. Correct?· On Airline Highway.
A     Yes.

Ex 2: McKesson, at 79, lns. 12-20

A     So remember that -- I thought you said you saw it, but remember that night we started at the police station.· Nobody was in the street and then **the protest marched to Airline Highway and so that's when people were in the street** and so I was there for both.· I was not in the street.· Nobody was in the street at the police department and then after people left the police department **we were in the street**. [Emphasis added]

But for the pattern of BLM organizing its protests on city streets without a permit in violation of local laws with the intention of engaging police, the injuries in this case would not have occurred. "Nonetheless, inasmuch as the sheriff's actions can be said to have

appreciably enhanced the chance of the accident occurring, they are a cause-in-fact of the accident. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821, 831 (1970), on rehearing; see also, Wex Malone, Ruminations on Cause–in–Fact, 9 Stan.L.Rev. 60, 74 (1956)." Roberts v. Benoit, 605 So. 2d 1032, 1052 (La. 1991), on reh'g (May 28, 1992).

Cause-in-fact, by definition, is a question of fact. As the Louisiana Supreme Court has explained,

> Defendant's conduct need not be the sole cause of the harm but it must be a **necessary antecedent**. Stated another way, **if plaintiff can show that more probably than not he would not have suffered damage, absent defendant's wrongful conduct, he has carried his burden of proving cause in fact**. Morris v. Orleans Par. Sch. Bd., 553 So.2d 427, 429 (La. 1989) (quoting Gibson v. Faubion Truck Lines, Inc., 427 So.2d 68, 71 (La. App. 4 Cir. 1983). "There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature." Vodanovich v. A.P. Green Indus., Inc., 03-1079, p. 3 (La. App. 4 Cir. 3/3/04), 869 So.2d 930, 932. Where multiple causes are present, "a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." Rando, 16 So.3d at 1065. The substantial factor test works well where there are multiple causes-in-fact, but the trier of fact may not be able to conclude that the accident would more probably than not have happened "but for" any one of the causes. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 (1996).[70]

> "There can be more than one cause-in-fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature. A plaintiff seeking to recover under either negligence or strict liability theories must prove that the negligent act or defect complained of was a cause-in-fact of the injury. Davis v. State Farm Ins. Co., 558 So.2d 636 (La. App. 1 Cir.1990)." **Elaborating on that pronouncement of law, we stated negligent conduct is a substantial factor if the harm would not have occurred without the conduct, i.e., but for defendant's conduct, plaintiff would not have sustained injury**. Thereby, we equated the two concepts of substantial factor and **necessary antecedent**. Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 373 (1970). [Emphasis added]

---

[70] Stelly v. Nat'l Union Fire Ins. Co., 2018-293 (La. App. 3 Cir. 2/6/19), 266 So. 3d 395, 404. See also, Rando v. Anco Insulations Inc., 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1088, abrogated by Pete v. Boland Marine & Mfg. Co., LLC, 2023-00170 (La. 10/20/23); Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962), ("conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm."); Davis v. State Farm Ins. Co., 558 So.2d 636 (La. App. 1 Cir.1990); Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 373 (1970).

McKesson led protestors onto the highway in violation of law, which is the reason that Officer Doe, John Brad Ford, was required to make arrests.

**5.      The risk of harm was within the scope of the duty**

In Doe v. McKesson, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 532, the Louisiana Supreme Court found:

> Officer Doe has also plausibly alleged that Mckesson's breach of duty was the cause-in-fact of Officer Doe's injury and that the injury was within the scope of the duty breached by Mckesson. It may have been an unknown demonstrator who threw the hard object at Officer Doe, but by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer Doe's injuries. See Roberts v. Benoit, 605 So.2d 1032, 1052 (La. 1992) ("To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred."). Furthermore, as the purpose of imposing a duty on Mckesson in this situation is to prevent foreseeable violence to the police and bystanders, Officer Doe's injury, as alleged in the pleadings, was within the scope of the duty of care allegedly breached by Mckesson.

McKesson is not claiming that the harm was not within the scope of the risk created by the breach of the duty.

**CONCLUSION**

McKesson is liable to Officer Doe, John Brad Ford, for McKesson's personal conduct and tortious actions: "negligently organizing and directing a protest in an unsafe manner, such that it was reasonably foreseeable for the police to respond, and violence to ensue. Nothing in the First Amendment prohibits such liability." *Mckesson*, 71 F.4th at 284.

Respectfully submitted:

s/ Donna U. Grodner
Donna U. Grodner (20840)
GRODNER & ASSOCIATES
2223 Quail Run, B-1
Baton Rouge, Louisiana 70808
(225) 769-1919 FAX (225) 769-1997
Dgrodner@grodnerlaw.com

Denise A. Vinet (17185)
VINET & DAY, LLC
11817 Bricksome Ave., Ste A
Baton Rouge, Louisiana 70816
(225) 292-7410 FAX (225) 292-4149

CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.

s/ Donna U. Grodner
Donna U. Grodner (20840)